Nicholas Espíritu (SBN 237665)
NATIONAL IMMIGRATION LAW CENTER
3450 Wilshire Boulevard, #108-62
Los Angeles, CA 90010
Telephone: (213) 639-3900
Fax: (213) 639-3911
espiritu@nilc.org

Antionette Dozier (SBN 244437)
WESTERN CENTER ON LAW & POVERTY
3701 Wilshire Boulevard, Suite 208
Los Angeles, CA 90010
Tel: (213) 487-7211
Fax: (213) 487-0242
adozier@wclp.org

Martha Jane Perkins (SBN 104784)
NATIONAL HEALTH LAW PROGRAM
200 N. Greensboro Street, Ste. D-13
Carrboro, NC 27510
Tel.: (919) 968-6308
Fax: (919) 968-8855
perkins@healthlaw.org

Laboni Hoq (SBN 224140)
ASIAN AMERICANS ADVANCING JUSTICE – LOS ANGELES
1145 Wilshire Blvd., 2nd Floor
Los Angeles, CA 90017
Telephone: (213) 977-7500
Fax: (213) 977-7500
lhoq@advancingjustice-la.org

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LA CLINICA DE LA RAZA; CALIFORNIA PRIMARY CARE ASSOCIATION; MATERNAL AND CHILD HEALTH ACCESS; FARMWORKER JUSTICE; COUNCIL ON AMERICAN ISLAMIC RELATIONS-CALIFORNIA; AFRICAN COMMUNITIES TOGETHER; LEGAL AID SOCIETY OF SAN MATEO COUNTY; CENTRAL AMERICAN RESOURCE CENTER, and KOREAN RESOURCE CENTER<br>　　　Plaintiffs,<br>　　　　　v. | Case No.  3:19-cv-4980<br><br>**COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF** |

DONALD J. TRUMP, in his Official Capacity as
President of the United States; UNITED STATES
DEPARTMENT OF HOMELAND SECURITY;
UNITED STATES CITIZENSHIP AND
IMMIGRATION SERVICES; KENNETH T.
CUCCINELLI, in his Official Capacity as Acting
Director of U.S. Citizenship and Immigration Services;
and KEVIN K. MCALEENAN, in his Official
Capacity as Acting Secretary of the Department of
Homeland Security,

    Defendants.

# INTRODUCTION

1.      President Donald J. Trump is determined to prevent immigrants of color from coming to and remaining in the United States.  As part of this broad effort, the administration has promulgated a "public charge" regulation, which erects hurdles to family-based immigration that Congress has not authorized.  This unlawful regulation harms and specifically targets immigrants of color.

2.      Defendants' "public charge" regulation ("Regulation") violates the Administrative Procedure Act ("APA") and the equal protection guarantee of the Fifth Amendment to the U.S. Constitution.  The Regulation is squarely at odds with the language of the statute, its century-long interpretation, and Congress's purpose in enacting the statute.  It is arbitrary and capricious and motivated by animus toward non-white immigrants.

3.      The Immigration and Nationality Act ("INA") bars an individual from obtaining a green card or from obtaining certain visas if the person is "likely at any time to become a public charge."  Since Congress first introduced the term in the immigration context in 1882, "public charge" has been understood to mean only someone who is *primarily dependent* on the government to avoid destitution (*i.e.*, someone who is effectively a "charge" or ward of the state). From its first use in the immigration laws, "public charge" was included alongside other grounds of inadmissibility that necessitate reliance on the government to avoid destitution, such as "paupers," "professional beggars," and "insane persons."  Congress has never altered the long-standing meaning of "public charge" as articulated by the courts and administrative agencies. "Public charge" has never been understood to reach immigrants who, like the majority of citizens in the United States, may at some point in their lives receive supplemental health care, nutrition, or housing assistance to improve their lives and those of their families.

4.      Acting unilaterally and without congressional approval, Defendants now deviate from the established meaning of the term public charge, dramatically expanding it to effect a sea-change in immigration law.  The Regulation treats as a public charge any immigrant found to be more likely than not, at any time over his or her lifetime, to receive any amount of benefits from a wide range of supplemental public benefits programs.

5.     The targeted benefits include health care coverage (non-emergency Medicaid for non-pregnant adults), housing assistance (Section 8 and public housing), and food assistance (Supplemental Nutrition Assistance Program or "SNAP").  Indeed, one in four U.S. citizens (over 70 million individuals) participate in one or more of these programs in any given year.  Moreover, about one half of U.S. citizens can be expected to use one of the programs at some point in their lifetime.  Those who rely on these programs include low- and moderate-income working families who depend primarily on income from employment, but who receive supplemental benefits that improve their quality of life and their communities.  These non-cash programs help millions of citizens and immigrants alike, enabling them to remain healthy and productive in communities where rents and other costs of living are high.

6.     In addition, the Regulation fundamentally distorts the totality-of-the-circumstances test that the public-charge statute prescribes.  The Regulation sets forth a series of arbitrary factors that are not reasonably related to whether a person is likely to become a public charge—including English proficiency and credit scores.  Most of the factors enumerated in the Regulation are negatively weighted, significantly and arbitrarily tipping the scale in favor of finding an applicant to be a public charge.

7.     The Regulation also introduces a public charge determination against an entirely new group—nonimmigrants seeking a change of status or an extension of their stay—making those nonimmigrants who have received certain designated benefits generally ineligible for a change of status or extension, despite the agency's acknowledgement that the public charge statute does not apply to this group.

8.     This Regulation fits squarely within a consistent pattern of racial discrimination in this Administration's immigration policies—including separating thousands of Central American children from their mothers and fathers; refusing refuge to non-white immigrants seeking asylum; attempting to end the Deferred Action for Childhood Arrivals program; terminating Temporary Protected Status and Deferred Enforced Departure for nationals of several predominantly non-white countries; excluding individuals from majority Muslim countries; proposing a rule that would bar families from housing programs if any family member is without eligible immigration

status; and proposing a Regulation that would apply the same overbroad definition to the "public-charge" deportability ground.

9.      Defendants fail to provide adequate reasons for their dramatic changes to the public-charge policy, and they fail to explain how those changes are consistent with the statutory language and the well-settled interpretation of that language.  Defendants have acted in total disregard of the Regulation's effects on families, communities, and the nation.  And the agency has failed to respond adequately to the myriad concerns expressed in the over 260,000 comments submitted.

10.      Plaintiffs bring this lawsuit to enjoin the implementation of Defendants' new public charge Regulation in order to prevent irreparable harm to themselves and their communities. Plaintiffs represent health care providers and other nonprofit organizations that seek to protect access to health care, nutrition, housing, and other public benefits for immigrants, including immigrants of color, regardless of their immigration status or financial means.  The Regulation has and will continue to divert Plaintiffs' resources, both to address the harmful effects of the Regulation and to educate immigrant families about those effects, preventing Plaintiffs from carrying out other aspects of their missions and ensuring that their patients, members, and clients do not forgo critical services to lead healthy, productive, and successful lives.

11.      The Regulation is also impermissibly vague and complex, inviting arbitrary and discriminatory enforcement by immigration officials.  As a result, the regulation will cause immigrant families, including those with U.S. citizen members, to disenroll from programs or to forgo benefits for which they are eligible.  Many of these immigrant families will not in fact be subject to the public charge inquiry but will nonetheless disenroll due to fear or lack of understanding as to how the Regulation operates.  The impacts of this chilling effect are far-reaching.  The Regulation not only will jeopardize the health of the affected immigrants, their children, and other family members, but will also endanger public health by, among other things, increasing the likelihood of untreated communicable disease, depriving essential community health providers of Medicaid revenue, and creating food and housing instability.  The Regulation will produce negative health and economic outcomes nationwide over generations.

12.     Plaintiffs request that this Court hold unlawful and set aside the Regulation under the Administrative Procedure Act and the Equal Protection guarantee of the Fifth Amendment to the U.S. Constitution and that it enter an injunction barring Defendants from implementing the Regulation.

**PARTIES**

**I.      Plaintiffs**

13.     Plaintiff LA CLÍNICA DE LA RAZA ("LA CLÍNICA") is a Federally Qualified Health Center whose mission is to improve the quality of life of the diverse communities it serves by providing culturally appropriate, high-quality, and accessible health care for all.  LA CLÍNICA serves more than 86,000 patients annually in the San Francisco Bay Area and is one of the largest community health centers in California, with a total of 35 clinical service and support/administrative sites across three Bay Area counties.

14.     LA CLÍNICA serves patients who may seek to extend or adjust their immigration status, and whose immigration applications will be subject to Defendants' Regulation.  Many LA CLÍNICA patients receive Medicaid and other public benefits.  A significant number of LA CLÍNICA's patients are low-income, have limited English proficiency, and/or have limited skills and education.  Many LA CLÍNICA patients also reside in large households.  LA CLÍNICA's patients are predominantly people of color.

15.     Defendants' new Regulation will frustrate LA CLÍNICA's ability to provide accessible health care to the thousands of patients it treats each year.  Because of the Regulation's chilling effect, many of LA CLÍNICA's patients—and their families—are likely to avoid using public benefits, including seeking health care services.  Many of LA CLÍNICA's patients will either disenroll themselves and/or their family members from Medicaid based on the fear that using these benefits will hinder their ability to adjust status in the future.  Other LA CLÍNICA patients will cancel or refrain from scheduling medical appointments for fear that using health care services could affect their ability to adjust status.  This will harm immigrant patients and their communities.  It will also severely harm LA CLÍNICA by significantly reducing LA CLÍNICA's funding stream while imposing substantial unbudgeted costs.

16.     Plaintiff CALIFORNIA PRIMARY CARE ASSOCIATION ("CPCA") brings this action on behalf of its members. Formed in 1994, CPCA has become the statewide leader and a recognized voice in representing the interests of California community health centers and their patients.  CPCA represents Regional Clinic Associations and 1,330 nonprofit community health centers ("CHCs") that provide comprehensive primary and preventive health services to low-income and uninsured patients in California.  CPCA's members include community and free health centers, some federally funded and federally designated health centers, rural and urban clinics, large and small clinic corporations, and clinics dedicated to special needs and special populations.

17.     CPCA's members serve diverse populations and ensure that everyone has access to health care regardless of their ability to pay, their immigration status, or their individual circumstances.  The CHCs serve 6.9 million California residents every year.  Approximately 72% of the CHCs' patients are Latino, Asian Pacific Islander, or Black.  CHCs serve patients of various immigrant statuses, including immigrants who will be subject to the public charge admission test when they seek to extend or change their nonimmigrant visas or apply for lawful permanent residence

18.     Sixty percent of the patients served by CPCA's members are enrolled in Medi-Cal, the Medicaid program in California.  This means that CHCs serve more than 4 million Medi-Cal enrollees.

19.     CPCA's members will face significant financial harm as a result of the Rule. CPCA expects CHCs' patients will disenroll from public benefits, including Medi-Cal, because of the changes to the public charge test.  Specifically, CPCA predicts that hundreds of thousands of its members' patients will disenroll from Medi-Cal as a result of the Rule, causing the CHCs to lose millions of dollars annually in Medi-Cal reimbursements.  This will lead to an increase in uninsured patients. CPCA anticipates that a number of these patients will continue seeking services at CHCs, forcing the CHCs to incur increased costs serving uninsured patients while experiencing a dramatic drop in revenue.

20.      One of CPCA's members, Asian Health Services ("AHS"), is a nonprofit community health center headquartered in Oakland, California.  AHS provides health services at more than a dozen locations in Oakland and San Leandro, California and has 28,000 active patients of all ages.  AHS is a member in good standing of CPCA and has been a member since 1994, when CPCA was formed.

21.      Founded in 1974, AHS's mission is to serve and advocate for the medically underserved, including the immigrant and refugee Asian community, and to ensure equal access to health care for all, regardless of income, insurance status, immigration status, language, or culture. As a federally qualified health center, AHS offers services to uninsured patients on a sliding fee scale. Individuals with incomes below 100% of the federal poverty level receive most services at no cost.  Approximately 93% of AHS patients are Asian; 2% are Latino; and 2% are Black. In addition, approximately 58 % of AHS patients are not yet United States citizens. For 73% of patients, English is not their primary language.  Roughly two-thirds of AHS patients are enrolled in Medi-Cal, which is the Medicaid program in California.

22.      The Regulation will cause irreparable harm to many AHS patients and to AHS. The Regulation will have a substantial chilling effect on AHS patients' access to health care and/or use of their health coverage.  Some patients will stop receiving services altogether based on fears about the effect on their or their children's immigration status.  Other AHS patients will continue to receive services from AHS, but will decline to enroll in or will disenroll from Medi-Cal due to the Rule.

23.      As a result of the Regulation, AHS will incur significant financial loss. Medi-Cal reimbursements account for 52% of AHS's annual budget.  AHS estimates that as its patients disenroll from or decline to enroll in Medi-Cal, it will lose as much as $5.2 million in Medi-Cal reimbursements every year.  AHS will have no way to recoup the cost of the services provided to those patients who disenroll but continue to receive services.  In addition to losing Medi-Cal funding, AHS will have to divert considerable resources to responding to the Regulation.  For example, AHS expects staff to spend time responding to individual patients' questions and concerns about enrolling in or remaining enrolled in Medi-Cal and/or CalFresh given the

1   Regulation.  These efforts will leave staff members with less time to help patients enroll in health

2   coverage and SNAP, schedule appointments, and provide case management, referrals and care

3   coordination.

4           24.     Plaintiff Maternal and Child Health Access ("MCHA") works to ensure access to

5   quality and comprehensive health care for all, with a focus on perinatal care and child health.

6   MCHA works with low-income immigrant families who access services through California's

7   SNAP program, California's Medicaid program, and Section 8 housing.  Since the 1990s,

8   MCHA's purpose has been to support women and their families so they can be healthy and

9   financially independent.  MCHA offers enrollment assistance programs to help people of all

10  genders and ages secure and navigate SNAP and health-care coverage, training and education for

11  organizations and individuals about eligibility for benefit programs for low-income and immigrant

12  families, plus home visits, weekly classes, and mental health supports to help families succeed.

13          25.     The Regulation will frustrate MCHA's mission by reducing access to nutrition,

14  medical care, and adequate housing.  Immigrant families who MCHA serves are already

15  disenrolling from public benefit programs, such as SNAP and Medicaid, based on fears that using

16  those programs will affect their future immigration relief options.  Women have refrained and will

17  continue to refrain from seeking health services, food, and other programs for themselves and their

18  children, based on fears that using those benefits will prevent them from adjusting status.  If the

19  Regulation is implemented, MCHA expects even more women to refrain from seeking Medicaid

20  and other necessary health services, food, and other programs for themselves and their children,

21  based on fears that using those benefits will prevent them from adjusting status.  To support their

22  babies, pregnant women need, on average, an additional 300 calories per day.  Yet MCHA already

23  sees women pulling themselves out of nutrition support programs based on fear of public charge,

24  and anticipates even more SNAP disenrollments if the rule is implemented.  Losing access to

25  critical health and nutrition services during pregnancy and early childhood could negatively affect

26  MCHA's clients for years.

27          26.     Their clients' disenrollment from health, housing, and nutrition programs will make

28  it difficult for MCHA to continue its operations.  MCHA will be forced to shift its capacity and

1   divert its resources to respond to the Regulation, whose complexity makes simple reassuring

2   messages impossible.  MCHA will need to identify alternative forms of assistance for those who

3   disenroll from benefit programs, develop and implement additional measures so that mothers and

4   families feel comfortable continuing to use MCHA's home-visitation program, and engage in

5   substantial community education to try to combat the Regulation's chilling effect.  If the

6   Regulation goes into effect, MCHA will be forced to address client situations that have worsened

7   over time, such as prolonged malnutrition and delayed access to medical care.  These heightened

8   client problems will require additional staff time.  To respond to the Regulation, MCHA will also

9   need to allocate staff members who can follow up with individuals who raise concerns about the

10  Regulation.

11          27.     Plaintiff Farmworker Justice ("FJ") is a national non-profit organization

12  representing farmworkers who perform agricultural work in the United States and their families.

13  FJ's mission is to empower migrant and seasonal farmworkers to improve their living and working

14  conditions, health, occupational safety, and access to justice.  It also provides policy analysis and

15  advocacy, legal advocacy, training, and technical assistance to farmworkers, attorneys, migrant

16  health centers, and immigrant advocacy groups.  FJ represents approximately 2 million

17  farmworkers who work in the United States, as well as their spouses and children who, combined,

18  represent approximately 4.5 million individuals in the United States.  A large and growing number

19  of farmworkers have H-2A non-immigrant visas, which are for temporary agricultural workers.

20          28.     The Regulation will disadvantage many farmworkers who seek to adjust to lawful

21  permanent resident (LPR) status or to obtain or extend their non-immigrant H-2A status.  For

22  example, the Regulation penalizes individuals with low incomes, and farm laborers' wages are

23  among the lowest in the nation.  FJ also represents immigrant farmworker families who receive

24  Medicaid and SNAP, and who will feel compelled by the Regulation to forgo those benefits in

25  order to remain eligible to adjust their status.  Farmworkers are disenrolling eligible U.S. citizen

26  children from Medicaid due to fears that their children's health care coverage will affect their

27  ability to seek immigration relief. They also fear that this may lead eventually to the forced

28

separation of their family and are not seeking health coverage or services at health centers for the same reasons.

29.     The Regulation has forced FJ to divert substantial resources in order to develop and disseminate information about the Regulation that addresses the farmworker communities' needs, thus reducing the organization's ability to engage extensively in other issues that affect farmworker families and advance FJ's mission.

30.     Plaintiff COUNCIL ON AMERICAN-ISLAMIC RELATIONS–CALIFORNIA ("CAIR-CA") is dedicated to enhancing the understanding of Islam, protecting civil rights, promoting justice, and empowering American Muslims.  CAIR-CA was established in 1994 and has four offices throughout the state.  CAIR-CA serves Arab, Middle Eastern, Muslim, and South Asian ("AMEMSA") communities.  Among other activities, CAIR-CA provides direct immigration assistance, including by helping AMEMSA communities with adjustment of status applications.

31.     CAIR-CA has clients who are seeking or will seek to adjust their status in the future.  CAIR-CA also has clients who use public benefits, including Medicaid, public housing, and SNAP.  CAIR-CA's clients have incomes at or below 250% of the Federal Poverty Level ("FPL").  The Regulation will frustrate CAIR-CA's mission to protect civil rights, promote justice, and empower American Muslims.  CAIR-CA will need to divert its resources in an attempt to reduce the harm stemming from Defendants' Regulation, forcing CAIR-CA staff members to reduce their capacity in other areas that further CAIR-CA's mission.  Moreover, the Regulation is causing many of the immigrant families that CAIR-CA serves to refrain from seeking supplemental benefits or to disenroll from those programs, cutting off important services and destabilizing their families and their communities.

32.     Plaintiff AFRICAN COMMUNITIES TOGETHER ("ACT") is a membership organization of African immigrant members fighting for civil rights, opportunity, and a better life for African immigrant families residing in the United States.  ACT serves African immigrants seeking legal assistance with immigration relief, including by providing assistance with adjustment of status applications.  ACT has approximately 3,000 members, offices in New York

and the District of Columbia, and organizes a national network of African immigrant- serving organizations.  ACT serves immigrant families who are originally from Nigeria, Ghana, Liberia, Ethiopia, and other African nations.

33.    Defendants' Regulation will frustrate ACT's mission by directly restricting the number of African immigrants who will be able to adjust to LPR status or maintain or change their non-immigrant immigration status due to the public charge test, thus eliminating essential pathways for this population to obtain LPR status.  This is because ACT's clients who will seek to adjust status include individuals who are low-income and who possess other characteristics considered to be negative factors under the Regulation.  ACT also has clients who receive Medicaid, SNAP, and other public benefits.  Moreover, ACT will be forced to divert its resources to combat the chilling effects and discriminatory message of the Regulation, forcing the organization to spend less time on its other areas of work and to reduce the overall number of cases the organization can take on.  The Regulation is discouraging ACT's clients from accessing social services for fear that receipt of any public benefit will affect any future attempt to adjust, maintain or change their immigration status, causing harm to individuals and families who are eligible for those benefits.

34.    Plaintiff LEGAL AID SOCIETY OF SAN MATEO COUNTY ("LEGAL AID") has been the primary legal service provider for low-income and vulnerable residents in San Mateo County for over sixty years.  LEGAL AID engages in community education, legal representation, systemic advocacy, and collaboration with community partners to help vulnerable community members secure safe, affordable housing, access health care, achieve economic security, and obtain immigration benefits for which they are eligible.  Legal Aid has devoted significant resources to educating San Mateo County's immigrant residents about the various public programs for which they are eligible, including Medicaid and SNAP, as well as about the public charge inadmissibility test.

35.    Some of LEGAL AID's clients will be subject to the Regulation when they seek to adjust their status or extend or change their non-immigrant visas.  Many of Legal Aid's clients are likely to disenroll from, or fear enrolling in, these important programs.   Some clients may be

1  deemed public charges under the Regulation because they either use or will become eligible for

2  public benefits, including Medicaid, SNAP, and housing benefits and have other characteristics

3  that will weigh against them, including low household incomes, limited-English proficiency, and

4  large household sizes.  Access to these programs enables LEGAL AID clients to thrive.

5      36.    The Regulation frustrates LEGAL AID's mission to fight social injustice by

6  helping San Mateo County residents obtain services through legal advocacy, and to help low-

7  income individuals achieve self-sufficiency.  LEGAL AID will need to divert its resources to help

8  San Mateo County's immigrant residents and their families who are either directly subject to the

9  Regulation or harmed because of the Regulation's chilling effect.  These diversions will reduce

10  Legal Aid's capacity to take additional cases.

11      37.    Plaintiff CENTRAL AMERICAN RESOURCE CENTER of Los Angeles

12  ("CARECEN") is a civil rights, social services and community empowerment organization.

13  Founded by Salvadoran refugees in 1983, it is now the largest Central American immigrant-rights

14  organization in the country.  CARECEN's mission is to empower Central Americans and all

15  immigrants by defending human and civil rights, working for social and economic justice, and

16  promoting cultural diversity, including by providing pro bono and low-cost immigration legal

17  services to low-income immigrants.  Most of CARECEN's legal work consists of legal counseling

18  and representation to low-income individuals seeking admission and LPR status.  CARECEN also

19  engages in community outreach and education, including about the process for obtaining lawful

20  permanent residence.

21      38.    The Regulation will frustrate the core component of CARECEN's mission to

22  provide legal representation to individuals seeking admission and adjustment to lawful permanent

23  residence.  More than half of CARECEN's clients receive, have received, or have household

24  members who receive or have received one or more forms of public assistance, including

25  Medicaid and SNAP.  About half of CARECEN's clients' household incomes fall below the

26  federal poverty line, and nearly all of its clients' household incomes fall below 250% of the FPL.

27  CARECEN's legal staff will have to expend significant additional time interviewing clients about

28  their public-benefits history and assessing whether they are harmed by the Regulation, as well as

advising clients about the potential impact of the Regulation if they receive certain benefits in the future.  CARECEN will also expend considerable time educating the community about the Regulation as well as training its own staff so they can properly counsel clients who may be adversely affected by the Regulation.  This will divert significant resources away from other aspects of CARECEN's mission.

39.     Plaintiff KOREAN RESOURCE CENTER ("KRC") is a non-profit community and membership organization empowering low-income, immigrants, Asian American and Pacific Islander, and people of color communities in Southern California. KRC's mission is to empower members and clients, using a holistic approach, by integrating services, education, culture, organizing, and coalition building, all of which seek to help individuals thrive.  KRC has offices in Los Angeles and Orange County.

40.     KRC engages in community education and organizing, systemic advocacy, and legal representation.  KRC's legal representation in immigration matters includes family-based adjustment of status applications, naturalization, Deferred Action for Childhood Arrival (DACA) renewals, and deportation defense.  KRC also assists members, particularly seniors, with public benefits, such as Medicaid, SNAP and subsidized housing.  The Regulation will cause KRC members and their families to disenroll from, or to fear enrolling in these important programs.

41.     The Regulation will frustrate KRC's mission by directly reducing the number of clients and members who will be able to adjust to LPR status or maintain or change their non-immigrant immigration status due to the public charge test.  KRC's members and clients include individuals who are low-income and receive Medicaid, SNAP, subsidized housing and other public benefits, and who possess other characteristics considered to be negative factors under the Regulation, including being elderly, having low incomes, and having limited-English proficiency.  KRC believes its individual members will be unable to adjust status as a result of the Regulation.

42.     In addition, the Regulation will force KRC to spend more resources on immigration consultations and public benefits assistance.

43.     KRC will be forced to divert its resources to combat the chilling effects of the Regulation, forcing the organization to spend less time on its other areas of work, such as services

for survivors of domestic violence.  KRC has already had to expend considerable resources on community education on public charge, including training Korean ethnic media to correct misinformation about the public charge rule.  KRC expects to conduct additional trainings to the media and members on public charge because of the Regulation's upcoming implementation.

**II.**   **Defendants**

44.    Defendant Donald J. Trump is the President of the United States.  He is sued in his official capacity.

45.    Defendant United States Department of Homeland Security ("DHS") is a federal agency headquartered in Washington, D.C.

46.    Defendant United States Citizenship and Immigration Services ("USCIS") is a component agency of DHS, which is responsible for the adjudication of applications for adjustment of status and for extensions or modifications of stay by non-immigrant visa holders. USCIS is the component of DHS that promulgated the public charge Regulation.

47.    Defendant Kenneth T. Cuccinelli is the Acting Director of USCIS.  He is sued in his official capacity.

48.    Defendant Kevin K. McAleenan is Acting Secretary of DHS.  He is sued in his official capacity.

**JURISDICTION AND VENUE**

49.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, as this case arises under the U.S. Constitution and the Administrative Procedure Act, 5 U.S.C. §§ 701 et seq.

50.    Venue properly lies in this district because Plaintiffs LA CLÍNICA, CPCA, LEGAL AID, CAIR-CA, and FJ work and provide services in this district.  28 U.S.C. § 1391(e)(1).  Venue also properly lies in this district because a substantial part of the events or omissions giving rise to this action occurred in the district.  28 U.S.C. § 1391(b).

**BACKGROUND**

**I.**   **Current Statutory Framework**

51.    The INA is the primary statute governing immigration to the United States.  Under the INA, if a current resident of the United States seeks LPR status through a family-based or

employment-based petition, the first step is to file the petition and, if it is approved, wait until a visa becomes available.  If the resident has been admitted or paroled into the United States and meets certain other conditions, the individual may file an application for adjustment of status with USCIS, in most cases only once a visa becomes available.  In determining whether a noncitizen is eligible for adjustment of status, or whether an LPR who has been outside the United States for more than 180 days can reenter the country, DHS officers assess whether the applicant is inadmissible under section 212 of the INA (8 U.S.C. § 1182).

52.     Individuals seeking admission as nonimmigrants, such as temporary agricultural or health care workers, foreign students, and cultural exchange visitors, are also assessed for inadmissibility before receiving a visa.  Most nonimmigrant visa holders may apply to extend or change their visa provided certain conditions are satisfied, such as compliance with the terms of their current visa.

53.     Section 212(a)(4) of the INA provides that "[a]ny alien who, in the opinion of the consular officer at the time of application for a visa, or in the opinion of the Attorney General at the time of application for admission or adjustment of status, is likely at any time to become a public charge is inadmissible."  8 U.S.C. § 1182(a)(4)(A).  This is commonly known as the "public charge" ground of inadmissibility.

54.     The statute further directs that an adjudicator making a determination on the public charge ground "shall at a minimum consider the alien's (I) age; (II) health; (III) family status; (IV) assets, resources, and financial status; and (V) education and skills."  8 U.S.C. § 1182(a)(4)(B)(i).  Together these five factors are referred to as the "totality of circumstances" test.

55.     The adjudicator "may also consider any affidavit of support."  8 U.S.C. § 1182(a)(4)(B)(ii).  The U.S. citizen or LPR sponsor who signs the affidavit of support pledges to accept financial responsibility for the immigrant who is seeking admission or adjustment of status and specifically pledges to maintain the sponsored immigrant "at an annual income that is not less than 125 percent of the Federal poverty line during the period in which the affidavit is enforceable."  8 U.S.C. § 1183a(a)(1)(A).  The affidavit is a legally enforceable contract between the sponsor and the U.S. government.

## II.    The Public Charge Statute and its Long-Standing Meaning.

56.    For over a century, the term "public charge" has referred to persons who cannot care for themselves and are thus *primarily dependent* on the government to avoid destitution.

57.    The term first appeared in an 1882 act barring the admission of "any convict, lunatic, idiot, or any person unable to take care of himself or herself without becoming a public charge."  An Act to Regulate Immigration, ch. 376, § 2, 22 Stat. 214 (1882).

58.    The Immigration Act of 1907 included those "likely to become a public charge" among the categories of individuals barred entry, which also included "idiots," "imbeciles," "insane persons," "paupers," "professional beggars," and "persons . . . with a loathsome or dangerous contagious disease."  An Act to regulate the immigration of aliens into the United States, Pub. L. No. 96, § 2, 34 Stat. 898, 898–99 (1907).

59.    As the Second Circuit recognized, "The excluded classes with which this provision is associated are significant.  It appears between 'paupers' and 'professional beggars.'"  *Howe v. United States*, 247 F. 292, 294 (2d Cir. 1917).  The court concluded, "We are convinced that Congress meant the act to exclude persons who were likely to become occupants of almshouses for want of means with which to support themselves in the future."  *Id.*; *see also Gegiow v. Uhl*, 239 U.S. 3, 10 (1915) (reasoning that "public charge" had "to be read as generically similar to the others mentioned before and after" and rejecting an attempt to exclude individuals on public charge grounds).

60.     In 1952 Congress enacted § 212 of the INA, which excluded from admissibility individuals "who, in the opinion of the consular officer at the time of application for a visa, or in the opinion of the Attorney General at the time of application for admission, are likely at any time to become public charges."  Pub. L. 414, ch. 2, § 212(a)(15), 66 Stat. 163, 183 (1952).

61.    The Department of Justice has recognized courts' longstanding interpretation of the term "public charge" to mean a person who is "destitute." For instance, the Department has explained that "[t]he words 'public charge' had their ordinary meaning: that is to say, a money charge upon or an expense to the public for support and care, the alien being destitute."  *Matter of*

1   *Harutunian*, 14 I. & N. Dec. 583, 586 (BIA 1974).  Congress has not altered this meaning of

2   "public charge," though it has revisited the topic on many occasions.

3       62.     In the INA of 1965, for instance, Congress deliberately overturned decades-old

4   laws that restricted immigration from certain global regions and opened the U.S. to immigrants

5   from all over the world.  But Congress made no change to the public charge test.

6       63.     In 1986, Congress enacted the Immigration Reform and Control Act ("IRCA").

7   Congress again did not modify the "public charge" test.  But Congress did provide additional

8   grounds for waivers allowing individuals deemed a public charge to overcome that determination.

9       64.     Consistent with prior agency interpretations, the Immigration and Naturalization

10  Service ("INS")—the previous federal agency tasked with administering immigration

11  applications—explained in 1987 that applicants would not be subject to exclusion on public-

12  charge grounds if "the applicant demonstrates a history of employment in the United States

13  evidencing self-support without the receipt of *public cash assistance*."  Adjustment of Status for

14  Certain Aliens, 52 Fed. Reg. 16,205, 16,211 (May 1, 1987) (emphasis added).  The agency defined

15  "public cash assistance" as "income or needs-based monetary assistance . . . designed to meet

16  *subsistence levels*."  *Id.* at 16,209 (emphasis added).  The agency specifically excluded "assistance

17  in kind, such as food stamps, public housing, or other non-cash benefits" from those benefits that

18  would render an individual a public charge.  *Id.*

19      65.     Congress again declined to alter the "public charge" test in the Immigration Act of

20  1990, despite making a number of other changes to immigration-related statutes.

21      66.     In 1991, the State Department—an agency that also has primary responsibility for

22  implementing the INA's public charge provisions—recognized in its Foreign Affairs Manual that

23  the essential issue in determining if an individual is a public charge within the meaning of INA

24  212(a)(4) is "whether the purpose of the public program in which the individual is participating is

25  specifically designed to support individuals unable to provide for themselves."  It recognized that

26  the purpose of the food stamp program is "to strengthen the agricultural economy and help achieve

27  a fuller use of food abundances through improving levels of nutrition among low-income

28  households.  It has thus a number of objectives of a general nature and is not simply a matter of

welfare or relief as such . . . [A] program that is essentially *supplementary* in nature, in the sense of providing training, services, food, etc. to augment the standard of living, rather than to undertake directly the support of the recipients does not fall within the scope of INA 212(a)(4)." (emphasis added).

67.     In 1996, Congress enacted the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 ("PRWORA"), which imposed restrictions on immigrant eligibility for certain public benefits.  But Congress did not alter the "public charge" test.

68.     Congress again declined to change the meaning of "public charge" one month later when it enacted the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA").  Congress considered but rejected, an expanded definition of "public charge" that would have included food, health care, and housing assistance.

69.     Instead, IIRIRA codified the totality–of–the–circumstances test, which had been developed in case law and administrative policies.  8 U.S.C. § 1182(a)(4)(B)(i).

70.     IIRIRA also introduced the affidavit of support that could be used to help an immigrant overcome the public-charge barrier, so long as the sponsor pledged to maintain the sponsored immigrant's at or above 125% of the FPL. 8 U.S.C. §§ 1182(a)(4)(B)(ii); 1183a(a)(1)(A).

71.     Following IIRIRA, the INS issued guidance explaining that the statute "has not altered the standards used to determine the likelihood of an alien to become a public charge nor has it significantly changed the criteria to be considered in determining such a likelihood." Immigration and Naturalization Serv., Dep't of Justice, Public Charge:  INA Sections 212(A)(4) and 237(A)(5)—Duration of Departure for LPRs and Repayment of Public Benefits (Dec. 16, 1997).

72.     Similarly, in 1998, the State Department stated that IIRIRA did "not change[] the long-standing legal presumption that an able-bodied, employable individual will be able to work upon arrival in the United States" and thus not become a public charge.  Dep't of State, I-864 Affidavit of Support:  Update No. 14—Commitment to Provide Assistance, Unclas State 102426 (Cable dated June 8, 1998).  The INS further stated "[t]he presumption that the applicant will find

work coupled with the fact that the [affidavit of support] is a legally enforceable contract will provide in most cases a sufficient basis to accept a sponsor's . . . technically sufficient [affidavit] as overcoming the public charge ground." *Id*.

73.     Although the INS and State Department recognized that IIRIRA made no changes to the longstanding meaning or interpretation of the term "public charge," the INS was concerned that, because Congress passed both IIRIRA and PRWORA close in time, "confusion about the relationship between the receipt of public benefits and the concept of 'public charge' ha[d] deterred eligible [non-citizens] and their families, including U.S. citizen children, from seeking important health and nutrition benefits that they are legally entitled to receive."  Field Guidance on Deportability and Inadmissibility on Public Charge Grounds, 64 Fed. Reg. 28,689, 28,692 (May 26, 1999) ("1999 Field Guidance").

74.     The INS recognized that "[t]his reluctance to access benefits has an adverse impact not just on the potential recipients, but on public health and the general welfare."  *Id.*, 64 Fed. Reg. at 28,692.  The uncertainty following IIRIRA and PRWORA was "undermining the Government policies of increasing access to health care and helping people to become self-sufficient." Inadmissibility and Deportability on Public Charge Grounds, 64 Fed. Reg. 28,676, 28,677 (proposed May 26, 1999) ("Public Charge Grounds").

75.      To alleviate that confusion and its deleterious effects, the INS published two documents in the 1999 Federal Register to confirm that the longstanding historic understanding of the term "public charge" remained operative.

76.     The first was a Notice of Proposed Rulemaking ("NPRM") in which the INS confirmed that the term "public charge" meant an individual "who is likely to become . . . primarily dependent on the Government for subsistence, as demonstrated by either the receipt of public cash assistance for income maintenance or institutionalization for long-term care at Government expense."  Public Charge Grounds, 64 Fed. Reg. at 28,677.  The agency never issued a final rule.

77.     The second was the INS Field Guide that aimed to "help alleviate public confusion over the meaning of the term 'public charge' in immigration law and its relationship to the receipt

of Federal, State, and local public benefits" and to "provide aliens with better guidance as to the types of public benefits that will and will not be considered in public charge determinations." 1999 Field Guidance, 64 Fed. Reg. 28,689.

78.     These documents dictated that agencies consider only receipt of cash assistance for income maintenance (such as Temporary Assistance for Needy Families, Supplemental Security Income, and state equivalents) and publicly funded long-term institutionalization in making the public-charge determination.

79.     In explaining its interpretation of "public charge," the INS recognized that "federal, state, and local benefits are increasingly being made available to families with incomes far above the poverty level, reflecting broad public policy decisions about improving general public health and nutrition, promoting education, and assisting working-poor families in the process of becoming self-sufficient." *Id.*, 64 Fed. Reg. at 28,692.  This meant that "participation in such non-cash programs is not evidence of poverty or dependence." *Id.*

80.     The INS further observed that non-cash benefits "are by their nature supplemental and do not, alone or in combination, provide sufficient resources to support an individual or family." *Id.*  By focusing only on cash assistance for income maintenance and long-term institutionalization, the INS could thus "identify those who are primarily dependent on the government for subsistence without inhibiting access to non-cash benefits that serve important public interests." *Id.*

81.     The INS also explained that the focus on cash benefits for making the public-charge determination was consistent with the advice provided by federal benefits agencies, including the Department of Health and Human Services, the Department of Agriculture, and the Social Security Administration.  Each department had concurred that "receipt of cash assistance for income maintenance is the best evidence of primary dependence on the Government" because "non-cash benefits generally provide supplementary support . . . to low-income working families to sustain and improve their ability to remain self-sufficient."  Public Charge Grounds, 64 Fed. Reg. at 28,677–78.

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

82.     The INS reasoned further, based on input from the Department of Health and Human Services, that while as a general matter, it could not "conceive of a situation where an individual … could support himself or his family solely on non-cash benefits so as to be primarily dependent on the [G]overnment," it made one exception for long-term institutionalization at government expense, which should be considered in the public charge determination. *Id.*, 64 Fed. Reg. at 28,678.

83.     In addition, under the 1999 Field Guidance, forms of cash not intended for income maintenance and cash benefits that have been earned, such as government pension benefits or veteran's benefits, were not considered cash benefits for purposes of the public-charge determination and should not be taken into account. Further, "[p]ast receipt of non-cash benefits [such as Medicaid, CHIP, nutrition programs, housing benefits, child care services, energy assistance, emergency disaster relief, foster care and adoption assistance, educational assistance, job training programs, and in-kind, community-based programs, as well as similar state and local programs] should be excluded from consideration for public charge purposes." 64 Fed. Reg. at 28,693.

84.     The INS noted that the "*primary dependence* model of public assistance was the backdrop against which the 'public charge' concept in immigration law developed in the 1800s." Since then, legislators, judges, and executive officials have consistently understood the term to refer to those who are *primarily* dependent on the government to avoid destitution. This is of particular importance given the many times that Congress has sought to re-employ the term over the years including in 1891, 1903, 1907, 1917, 1952, 1990, and 1996. At no time has Congress widened the concept of "public charge" to include nutrition, health care (other than institutionalization), housing, or other non-cash programs, even as public assistance programs expanded and changed over the years.

85.     Although the 1999 NPRM never became a final rule, these regulations and the Field Guidance governed Defendants' public charge policy until the new Regulation, at issue in this litigation, was finalized.

86.     Indeed, the Congressional Research Service explained that, until the new Regulation, Defendants' position had been consistent and clear: "USCIS, in making public charge determination for aliens applying for adjustment to LPR status, only considers cash income-maintenance benefits and government-funded institutionalization for long-term care.  Cash assistance for income maintenance . . . 'includes Supplemental Security Income (SSI), cash assistance from the Temporary Assistance for Needy Families (TANF) program and state or local cash assistance programs for income maintenance, often called "general assistance" programs' . . . . [A]n alien's past or current receipt of these benefits or of government funded long-term care does not automatically lead to a determination of inadmissibility, but instead only factors into the prospective analysis under the totality of the circumstances test."  Congressional Research Service, Immigration: Frequently Asked Questions about "Public Charge" at 7 (Sept. 19, 2018), https://fas.org/sgp/crs/homesec/R45313.pdf.

87.     In fact, Congress has expanded immigrants' access to some of the benefits that had been explicitly excluded from the public charge determination. In the 2002 Farm Bill, for example, Congress restored eligibility for food stamps (now known as "SNAP") to immigrant children, immigrants receiving disability benefits, and adults who had lived in the United States in a "qualified" immigrant status for five years.  Farm Security and Rural Investment Act of 2002: Pub L. No. 107-171 (May 13, 2002).

88.     Although Congress and administrative agencies have interpreted "public charge" consistently over time, altering the definition of "public charge" has been a clear priority from the early days of the Trump administration.  During the President's first month in office, members of the administration drafted an executive order to reinterpret the term.  That executive order was leaked to the public.  The administration never issued the executive order.

89.     Instead, in 2017, the Trump Administration endorsed the Reforming American Immigration for Strong Employment ("RAISE") Act.  That bill that would have eliminated some of the family-based admission preferences created by the 1965 Act and established a point-based system for evaluating potential immigrants.  The system would have awarded points based on factors including age, formal education, English language proficiency, and highly-compensated

employment.  The RAISE Act would have disadvantaged many groups of potential immigrants, including applicants who had family ties to U.S. citizens but who had limited formal education or employment history and middle-aged and older adults.

90.     In 2017, Congress once again rejected changes to the existing immigration system and declined to pass the RAISE Act.

91.     Subsequently, on October 10, 2018, the Department of Homeland Security published its Notice of Proposed Rulemaking for the Regulation.

### III.     Defendants' New Public Charge Regulation

92.     On August 13, 2019, the Department of Homeland Security published the Regulation.

93.     The Regulation drastically redefines the term "public charge."  Under the Regulation, "public charge" means a noncitizen "who receives one or more public benefits, as defined in paragraph (b) of this section, for more than 12 months in the aggregate within any 36-month period."  Inadmissibility of Public Charge Grounds, 84 Fed. Reg. 41,292, 41,501 (Aug. 14, 2019) (to be codified as 8 CFR § 212.21(a)).  Paragraph (b) defines "public benefit" to mean *any* receipt of federal, state, local, or tribal cash assistance for income maintenance and includes receipt of health assistance through  Medicaid (with some exceptions); SNAP benefits; and housing assistance through Section 8 housing choice vouchers, project-based Section 8 rental assistance, or public housing.  Several of these non-cash benefits were not included in prior agency definitions of "public charge," and were, in fact, specifically excluded under agency guidance.  The Regulation counts all benefits equally, regardless of the value of the benefit received.

94.     The Regulation next defines the term "likely at any time to become a public charge."  *Id.* (to be codified as 8 CFR § 212.21(c)); *see* 8 U.S.C. § 1182(a)(4)(A).  Under the Regulation, "[l]ikely at any time to become a public charge means more likely than not at any time in the future to become a public charge, as defined [above], based on the totality of the alien's circumstances."

95.     Under the Regulation, the totality of the circumstances determination is prospective and looks to "all factors that are relevant to whether the alien is more likely than not at any time in the future [to receive one or more public benefit for 12 months over a 36-month period]." 84 Fed. Reg. at 41,502 (to be codified as 8 CFR § 212.22(a)). As prescribed by Section 1182(a)(4)(B), the determination must consider, at minimum, the individual's "age; health, family status, education and skills, and assets, resources, and financial status." 84 Fed. Reg. at 41,502 (to be codified as 8 CFR § 212.22(b)).

96.     As to age, the agency must consider whether the noncitizen is between 18 and the minimum retirement age for Social Security. *Id.* (to be codified as 8 CFR § 212.22(b)(1)).

97.     With regard to health, the agency must consider whether the individual's health, including any diagnosed medical conditions, makes the individual more or less likely to be a public charge. *Id.* (to be codified as 8 CFR § 212.22(b)(2)).

98.     The Regulation next requires that the agency consider whether the individual's household size makes the individual more or less likely to become a public charge. *Id.* (to be codified as 8 CFR § 212.22(b)(3)).

99.     As to assets, resources, and financial status, the Regulation requires the agency to consider, *inter alia*, whether the individual's household's annual gross income is at least 125% of the FPL (100% for active duty military personnel). If it is under that amount, the agency must consider whether the individual has "significant assets." *Id.* (to be codified as 8 CFR § 212.22(b)(4)(i)). The Regulation also requires the agency to examine whether the individual has sufficient assets and resources to cover "any reasonably foreseeable medical costs;" has any financial liabilities; and has applied for, been certified to receive, or received public benefits. *Id.*

100.    As evidence, the agency must look to the noncitizen's sources of income, other assets and resources, credit score, whether the noncitizen has private health insurance, and whether the noncitizen has applied for, been certified or approved for, disenrolled or requested to be disenrolled from, or received public benefits. *Id.* at 41,503 (to be codified as 8 CFR § 212.22(b)(4)(ii)).

101.    Finally, as to education and skills, the agency is to look to whether the noncitizen "has adequate education and skills to either obtain or maintain lawful employment with an income sufficient to avoid being more likely than not to become a public charge," including evidence of past work history, education level, and English language proficiency.  *Id.* (to be codified as 8 CFR § 212.22(b)(5)).

102.    The Regulation selects a subset of factors to be "heavily weighted" in the determination.  *Id.* at 41,504 (to be codified as 8 CFR § 212.22(c)(1)).  The Regulation adopts the following "heavily weighted negative factors," under 8 CFR § 212.22(c)(1):

(A)    The noncitizen is not a full-time student and is authorized to work, but is unable to demonstrate current employment, recent employment history, or a reasonable prospect of future employment;

(B)    The noncitizen has received, or been certified or approved to receive, public benefits for more than 12 months within any 36-month period;

(C)    The noncitizen has been diagnosed with a medical condition that will interfere with the alien's ability to support him or herself;

(D)    The noncitizen is uninsured and has neither the prospect of receiving private insurance nor the financial resources to pay for reasonably foreseeable expenses due to a medical condition; and

(E)    The noncitizen has previously been found inadmissible or deportable on public charge grounds.

103.    The Regulation includes as "heavily weighted positive factors":

(A)    The noncitizen's "household has financial assets, resources, and support," excluding illegal activities or public-benefit income, of at least 250% of FPL.  *Id.* (to be codified as 8 CFR § 212.22(c)(2)(i)). That income threshold equates to over $64,000 a year for a family of four, more than the median household income for households of any size in the United States.

(B)    The noncitizen is authorized to work and has a legal annual income of at least 250 percent of the FPL for her household size; and

(C)   The noncitizen has private health insurance, excluding health insurance subsidized by premium tax credits established by the Patient Protection and Affordable Care Act.

104.   The Regulation adds new, nonstatuory factors for USCIS to consider in evaluating the affidavit of support.  USCIS must now also evaluate the sponsor's annual income, the sponsor's relationship to the applicant, the likelihood that the sponsor will actually provide the required financial support, "and any other related considerations." *Id.* (to be codified as 8 CFR § 212.22(b)(7)).

105.   The Regulation also requires applicants to compile extensive documentation of their finances and to fill out a newly developed 15-page form that the agency estimates will require 4.5 hours to complete.

106.   The Regulation also applies a public charge test to an entirely new group of people: nonimmigrant visa holders seeking to extend or change their visas.  USCIS must evaluate whether the person has received the designated benefits for more than 12 months in the aggregate within a 36-month period since obtaining their status.

107.   During the notice and comment period, hundreds of thousands of comments were submitted, "the vast majority" opposing the proposed rule, as acknowledged by the agency. 84 Fed. Reg. 41304.  Commenters explained that the factors were not rationally related to predicting the likelihood of a noncitizen becoming a public charge, were arbitrary and vague, and would cause substantial negative effects.

108.   For example, commenters criticized the proposed Regulation's threshold of 15% of the Federal Poverty Guidelines as the value of monetizable benefits a noncitizen could receive over a 12-month period without being a public charge.  According to several sets of commenters, the threshold was far too low to show dependency on benefits and did not account for the taxes that immigrants pay and the fact that they pay more into the healthcare system than they take out. Rather than engage with these criticisms, the Regulation instead moved the threshold from 15% to 0%, such that receipt of benefits of any value over the applicable time period qualifies a noncitizen as a public charge. *See* 84 Fed. Reg. 41,357–358.

109.    In addition, Defendants failed to adequately respond to comments related to the potential retroactive application of the Regulation.  Although Defendants repeatedly assert that the Regulation will have no retroactive effect and implicates no reliance interests, Defendants failed to adequately respond to concerns that the new Form I-944 asks applicants to list all benefits that the applicant ever used and to list the dates of the use of those benefits even if they were used before the effective date of the Regulation.  If DHS does not intend to take past use of benefits into account, there is no reason to ask for this information, yet DHS also claims that Form I-944 requests information "about all the relevant factors" for the public charge determination. Inadmissibility of Public Charge Grounds, 84 Fed. Reg. at 41,483.  Questions on the Form I-944 about past use of public benefits, which DHS simultaneously claims are relevant and not relevant to the public charge determination, creates internal inconsistency and ambiguity about the retroactive effect of the Regulation.

A.    **Impact of the New Regulation on Immigrants and Non-White Communities**

110.    Defendants' Regulation will label as a "public charge" a very large percentage of immigrants, including low-and moderate-income working families.  In fiscal year 2017, 83% of all immigrants who received green cards were subject to the public-charge test.[1]  The remainder were exempt under the statute.

111.    While only roughly 2–4% of the noncitizen population would have qualified as a public charge under the prior definition, the Regulation will result in the exclusion of vast numbers of individuals who, like millions upon millions of working Americans, will receive one or more of the supplemental benefits listed in the Regulation over the course of a lifetime.  Under a similar definition of public charge, which applies to individuals seeking to enter the United States from abroad, exclusions on the basis of public charge increased from 1,076 in 2016 to 13,450 in 2018, a 1,250% increase.  The increases have disproportionately impacted immigrants from predominantly non-white countries.  For instance, denials on public charge grounds of

---

[1] *See* Randy Capps, et al., *Gauging the Impact of DHS's Proposed Public –Charge Rule on U.S. Immigration* (Nov. 2018), https://www.migrationpolicy.org/research/impact-dhs-public-charge-rule-immigration.

immigrants from Mexico increased from 7 to 5,343 in just a few years.  Similarly, the State Department denied 1,254 immigrant visas for Indian nationals in 2018, after denying none at all in 2016.  And the State Department denied 1,109 immigrant visas to Haitian nationals in 2018, after denying none in 2016.  Meanwhile, only three Canadian nationals had immigrant visas denied in 2018.[2]

112.    In fact, the Regulation's definition is so expansive that, if applied to U.S. citizens, roughly half of the population would be characterized as "public charges," simply because they will receive one of the newly listed supplemental benefits at some point in their lifetimes.

113.    The Regulation will also affect an estimated 2.3 million nonimmigrants with temporary visas, including students and agricultural workers, who attempt to extend their visas or change their non-immigrant status over a five-year period.  The Regulation introduces an unprecedented public charge inquiry and potential barrier for these groups.  *See* DHS, RIN: 1615-AA22, Inadmissibility on Public Charge Grounds 28–32 (Aug. 2019).

114.    The increase in denials for green cards will not be based solely on current or recent benefit use but will also be based on immigration officers' determinations that individuals are likely to use benefits in the future considering the factors listed in the Regulation's totality-of-the-circumstances test.

115.    Overall, the Regulation's modification of the totality-of-the-circumstances test will disproportionately exclude women, children, and older adults and will serve to facilitate or prolong the separation of immigrant families, striking at the heart of the pro-family immigration policy conceived in 1965.  Under the Regulation, many citizens, both U.S. and foreign born, will encounter new barriers to uniting with their families.

116.    The majority of green card applications, especially in communities of color, are family-based petitions that allow U.S. citizens and LPRs to reunite with their immediate family

---

[2] *See* Ted Hesson, *Visa denials to poor Mexicans skyrocket under Trump's State Department* (Aug. 6, 2019), https://www.politico.com/story/2019/08/06/visa-denials-poor-mexicans-trump-1637094.

1   members in the United States.  The Regulation's negatively weighted factors disproportionately

2   and detrimentally affect communities of color.

3       117.    According to a recent study of recently admitted lawful permanent residents that

4   was submitted in comments, 60% of those from Mexico and Central America had at least two

5   negative factors, compared with only 27% of those from Europe, Canada, and Oceania.  Forty-

6   eight percent of recent LPRs from the Caribbean, 41% from Asia, 40% from South America, and

7   34% from Africa had at least two negative factors and thus would be excluded at a

8   disproportionately higher rate than those from Europe, Canada, and Oceania.

9       118.    Defendants do not dispute the disparate impact.  In fact, acting director of USCIS

10  Kenneth Cuccinelli has tacitly admitted its presence, stating during a press briefing on the

11  Regulation that "if we had been having this conversation 100 years ago, [the Regulation] would

12  have applied more to Italians" than to other groups.[3] And a day later in an interview about the

13  Regulation, Mr. Cuccinelli argued that "The New Colossus," the 136-year-old sonnet inscribed at

14  the base of the Statue of Liberty that welcomes "poor" immigrants, referred to "people coming

15  from Europe."[4]

16      **B.    <u>The Discriminatory Impact is the Intended Purpose of the New Regulation.</u>**

17      119.    The Trump Administration has made numerous efforts to suppress immigration

18  from non-white countries, including advocating to end family-based immigration.  Curtailing

19  immigration by people of color has been a thread uniting each of the Trump Administration's

20  numerous attempts to change existing immigration law and regulations.

21      120.    The Administration has promulgated numerous immigration-related executive

22  actions since January 2017, most either exclusively or disproportionately harming immigrants

23  from non-white-majority nations, including:

24

25

26  _____
[3] Chris Rodrigo, *White House: New immigration policy meant to promote 'self-sufficiency and*
27  *personal responsibility'* (Aug. 12 2019), https://thehill.com/homenews/administration/457093-
    white-house-defends-new-immigration-policy.
28  [4]  Jacey Fortin, *'Huddled Masses' in Statue of Liberty Poem Are European, Trump Official Says*
    (Aug. 14, 2019), https://www.nytimes.com/2019/08/14/us/cuccinelli-statue-liberty-poem.html.

(A)     Separating thousands of young children from their parents as a proclaimed deterrent to immigration at the southern border;

(B)     Refusing refuge to immigrants seeking asylum, and criminally prosecuting asylum seekers for crossing the border between checkpoints;

(C)     Initially suspending the refugee admission program and then slashing the number of refugees who may be admitted from 110,000 to 30,000 in 2019, and proposing cutting the number to 0 in 2020;

(D)     Ending the Deferred Action for Childhood Arrivals program;

(E)     Terminating Temporary Protected Status for nationals of El Salvador, Honduras, Haiti, Nepal, Sudan, and Nicaragua;

(F)     Winding down Deferred Enforced Departure for Liberian nationals; and

(G)     Excluding nationals from several majority-Muslim countries.

121.    These attempted changes have occurred alongside a string of racist statements by the President predating his seeking office and continuing through to the final days before the Regulation's promulgation, including:

(A)     Rising to political prominence based upon the racist false claim that President Obama was not born in the United States and/or had allegiance to Kenya;[5]

(B)     Running a campaign replete with racist aspersions about people of Mexican descent and of the Muslim faith;[6] and

(C)     Wrongly slurring countries of the African diaspora by declaring while in office that Haitians "all have AIDS"; that once Nigerians had seen the

---

[5] Alexander Burns, *Trump: Obama born in Kenya* (May 25, 2012), https://www.politico.com/blogs/burns-haberman/2012/05/trump-obama-born-in-kenya-124569.

[6] Matt Ford, *Trump Attacks a 'Mexican' U.S. Federal Judge* (May 28, 2016), https://www.theatlantic.com/politics/archive/2016/05/trump-judge-gonzalo-curiel/484790/; Maggie Haberman and Richard Oppel Jr., *Donald Trump Criticizes Muslim Family of Slain U.S. Soldier, Drawing Ire* (June 30, 2016), https://www.nytimes.com/2016/07/31/us/politics/donald-trump-khizr-khan-wife-ghazala.html.

United States, they would never go "back to their huts;" and that America should not be a haven for "people from shithole countries."[7]

122.  Courts considering challenges to the Administration's immigration policies have routinely considered the President's statements as evidence of discriminatory animus toward immigrants of color.[8]

123.  More recently, while the Regulation was in final review at the Office of Management and Budget, President Trump made statements linking his view of immigration and racial exclusion.

124.  Specifically, on July 14, 2019, the President claimed that four women of color serving in the United States Congress "originally came from countries whose governments are a

---

[7] Michael Shear and Julie Hirschfeld Davis, *Stoking Fears, Trump Defied Bureaucracy to Advance Immigration Agenda* (Dec. 23, 2017), https://www.nytimes.com/2017/12/23/us/politics/trump-immigration.html?smid=tw-share&mtrref=thehill.com&gwh=786472CC33DA9619FF8E4ABABEBAAA04&gwt=pay; https://www.nbcnews.com/politics/white-house/trump-referred-haiti-african-countries-shithole-nations-n836946.

[8] *See, e.g., CASA de Md. v. Trump*, 355 F. Supp. 3d 307, 325–26 (D. Md. 2018) ("Defendants do not suggest that President Trump's alleged statements are not evidence of discriminatory motive on his part, nor could they.  One could hardly find more direct evidence of discriminatory intent towards Latino immigrants."); *see also Arab Am. Civil Rights League v. Trump*, No. 17-10310, 2019 WL 3003455, at *10 (E.D. Mich. July 10, 2019) (denying post-*Trump v. Hawaii* motion to dismiss challenge to Muslim ban based, in part, on President Trumps anti-Muslim rhetoric ); *Int'l Refugee Assistance Project v. Trump*, 373 F. Supp. 3d 650, 678 (D. Md. 2019) (same); *NAACP v. DHS*, 364 F. Supp. 3d 568, 578 (D. Md. 2019) (denying motion to dismiss Equal Protection Clause challenge to ending Temporary Protected Status ("TPS") for Haitian nationals); *Saget v. Trump*, 375 F. Supp. 3d 280, 371–74 (E.D.N.Y. 2019) (same); *La Union del Pueblo Entero v. Ross*, 353 F. Supp. 3d 381, 295 (D. Md. 2018) (denying motion to dismiss, *inter alia*, Equal Protection claims regarding immigrants of color in challenge to adding citizenship question to 2020 Census); *Ramos v. Nielsen*, 336 F. Supp. 3d 1075, 1108 (N.D. Cal. 2018), *appeal filed*, No. 18-16981 (9th Cir. 2018) (granting preliminary injunction in challenge to decision to end TPS for El Salvador, Haiti, Honduras, and Nicaragua); *Centro Presente v. DHS*, 332 F. Supp. 3d 393, 415 (D. Mass. 2018) (denying motion to dismiss as to Equal Protection claim in challenge to ending TPS for El Salvador, Haiti, and Honduras); *State of New York v. U.S. Dep't of Commerce*, 315 F. Supp. 3d 766, 810–11 (S.D.N.Y. 2018) (denying motion to dismiss in challenge to adding Census citizenship question); *Regents of the Univ. of Cal. v. DHS*, 298 F. Supp. 3d 1304, 1314–15 (N.D. Cal. 2018), *aff'd* 908 F.3d 476, 519–20 (9th Cir. 2019) (denying motion to dismiss as pertained to Equal Protection challenge to ending Deferred Action for Childhood Arrivals); *Batalla Vidal v. Nielsen*, 291 F. Supp. 3d 260, 277 (E.D.N.Y. 2018) (same); *Hawaii v. Trump*, 241 F. Supp. 3d 1119, 1140 (D. Hawaii 2017) (granting temporary restraining order, in part on Equal Protection grounds, for second iteration of travel ban targeting Muslim-majority nations).

complete and total catastrophe, the worst, most corrupt and inept anywhere in the world (if they even have a functioning government at all)" and asking "Why don't they go back and help fix the totally broken and crime infested places from which they came . . . ."

125.   The President and the White House have been actively involved in pressing for the Regulation.  In March 2019 Senior Adviser to the President Stephen Miller told staff that "You ought to be working on this regulation all day every day," and that "[i]t should be the first thought you have when you wake up. And it should be the last thought you have before you go to bed. And sometimes you shouldn't go to bed."[9]   In mid-2019, President Trump removed the leadership of several immigration-related agencies based, in part, on a desire to speed up the Regulation's release.

126.   L. Francis Cissna was directed to step down as director of USCIS, in part because Stephen Miller had been "agitating for Mr. Cissna's removal for months" due to Mr. Miller's stance that Mr. Cissna was "moving too slowly in implementing" the Regulation.[10]   Prior to Mr. Cissna's removal from office, Mr. Miller told Mr. Cissna in a June 8, 2018 email exchange that "the timing on public charge is unacceptable … I don't care what you need to do to finish it on time."[11]

127.   After Mr. Cissna resigned at the President's request effective June 1, 2019, President Trump nominated Kenneth Cuccinelli to be the new Secretary of Homeland Security. Mr. Cuccinelli has a long history of advocating for anti-immigrant policies. While he was a Virginia State Senator, he proposed bills to end birthright citizenship and to allow firing of

---

[9] Eileen Sullivan & Michael D. Shear, *Trump Sees an Obstacle to Getting His Way on Immigration: His Own Officials* (Apr. 14, 2019), https://www.nytimes.com/2019/04/14/us/politics/trump-immigration-stephen-miller.html.

[10] Nick Miroff, et al., *Trump to place Ken Cuccinelli at the head of the country's legal immigration system* (May 24, 2019), https://www.washingtonpost.com/immigration/trump-to-place-ken-cuccinelli-at-the-head-of-the-countrys-legal-immigration-system/2019/05/24/143fdec8-7e64-11e9-a5b3-34f3edf1351e_story.html?utm_term=.5ddcfc7451bc.

[11] *Id.*, https://www.politico.com/f/?id=0000016c-5349-de87-affd-7bc9eff20001.

1  employees and denying unemployment benefits to anyone speaking a language other than English

2  at work.

3  **C.   Defendants' Unlawful Appointment of Acting Head of USCIS**

4  128.   Under the Federal Vacancies Reform Act ("FVRA"), vacancies in an office

5  requiring Presidential nomination and Senate confirmation can only be filled on an acting basis by

6  certain individuals. Specifically, such a vacancy can be filled by "the first assistant to the office of

7  such officer," by a person who has already been confirmed by the Senate for a different office, or

8  by a person who, during the year prior to the vacancy, served as an officer or employee in the

9  same agency for at least 90 days.  5 U.S.C. § 3345(a).

10  129.   On the date of Mr. Cissna's resignation, Mr. Cuccinelli did not meet any of these

11  criteria.  The position of first assistant was then, and is now, held by Mark Koumans.  On or about

12  June 10, 2019, after Mr. Cissna resigned effective June 1, 2019, USCIS created the entirely new

13  office of Principal Deputy Director, vaulting that office above the Deputy Director and

14  purportedly creating a new First Assistant.  DHS Acting Secretary McAleenan named Mr.

15  Cuccinelli Principal Deputy Director and Acting Director of USCIS.

16  130.   While in the position of Acting Director of USCIS, Mr. Cuccinelli issued the

17  Regulation challenged in this litigation.  He described the Regulation as the President "delivering

18  on his promise to the American people."[12]

19  **D.   Additional Harms Resulting from the Regulation**

20  131.   While the Regulation targets immigrants of color, it will have significantly broader

21  consequences for the country's public health and the economy as a whole.

22  132.   Defendants admit that the proposed Regulation will create the following harms

23  because individuals will be deterred from using important supplemental benefits:

24

25

26

27  _____

[12] Ken Cuccinelli (@USCISCuccinelli), Twitter (Jul. 15, 2019, 9:21 AM)

28  https://twitter.com/usciscuccinelli/status/1150802490843176960?lang=en.

(A)     Worse health outcomes, including increased prevalence of obesity and malnutrition, especially for pregnant or breastfeeding women, infants, or children, and reduced prescription adherence;

(B)     Increased use of emergency rooms and emergent care as a method of primary health care due to delayed treatment;

(C)     Increased prevalence of communicable diseases, including among members of the U.S. citizen population who are not vaccinated;

(D)     Increases in uncompensated care in which a treatment or service is not paid for by an insurer or patient;

(E)     Increased rates of poverty and housing instability; and

(F)     Reduced productivity and educational attainment.  Inadmissibility of Public Charge Grounds, 83 Fed. Reg. 51,114, 51,270 (Oct. 10, 2018) (NPRM); Inadmissibility of Public Charge Grounds, 84 Fed. Reg. at 41,364–66 (responding to comments regarding detriments of disenrollment by noting, *inter alia*, "rigorous application of the public charge ground of inadmissibility will inevitably have negative consequences for some individuals.").

133.    The proposed Regulation recognized that "reductions in federal and state transfers under federal benefit programs may have downstream and upstream impacts on state and local economies, large and small businesses, and individuals."  Inadmissibility of Public Charge Grounds (NPRM), 83 Fed. Reg. at 51,118.  The final Regulation acknowledged that reduced program participation could result in higher poverty levels, reduced access to health care, and an increase in severe and chronic health issues.  *See generally* Inadmissibility of Public Charge Grounds, 84 Fed. Reg. at 41,310–12 (detailing comments on effects of Regulation).  In other words, families will increasingly be poorer and less healthy.

134.    Rather than contest commenters' assertions, Defendants simply stated that it would be "difficult to predict how this rule will affect aliens subject to the public charge ground of admissibility."  *Id.*, 84 Fed. Reg. at 41,313.  DHS did not directly refute the numerous comments

1  estimating such impacts, did not address the chilling effect which necessarily does not require

2  estimating eligibility numbers, and conceded that it is not sure of the breadth of impact of the

3  Regulation.

4       135.    The Regulation will create confusion and fear in immigrant communities and will

5  have a dramatic effect, potentially causing an estimated tens of millions of people to avoid seeking

6  services or to disenroll from core public-health and general-welfare programs.  This includes both

7  individuals subject to the public charge inquiry and individuals who are not subject to the

8  Regulation but who will nonetheless be dissuaded from applying for benefits for themselves and

9  their families.  These harms defeat Defendants' stated purpose of the Regulation because they

10  make it harder to achieve self-sufficiency for immigrants and their families, including their U.S.

11  citizen children.  As immigration policy experts note, "public assistance can make someone less

12  likely to rely on government in the future" because "temporary use of public benefits can stabilize

13  immigrants and families, putting them on a track to long-term financial stability and health."[13]

14  While Defendants assert that altering the longstanding definition of "public charge" will save

15  costs, the long-term effect will be the exact opposite.

16       136.    Deterring people from enrolling or remaining in vital programs that support their

17  health, food security, and ability to maintain housing will cause severe harm to the health and

18  welfare of communities across the country.

19       137.    Reducing access to preventive care and vital health services will lead to a range of

20  negative health outcomes, including increased costs and rates of preventable disease, late

21  diagnoses, unmanaged chronic conditions, premature births, and early deaths.  These effects will

22  reach far beyond the individuals who are subject to public charge determinations and will harm

23  significant numbers of U.S. residents regardless of their national origin or immigration status.

24

25

26

27  [13] Matthew La Corte, *The New 'Public Charge' Rule Will Harm the Rule of Law, Economic Growth, and Public Health* (Aug. 28, 2018), https://niskanencenter.org/blog/the-new-public-

28  charge-rule-will-harm-the-rule-of-law-economic-growth-and-public-health/.

138.    Deterring families from remaining in affordable housing will increase homelessness and housing instability, leading to negative health outcomes and higher health care costs.  Lack of access to affordable housing will also lead to job instability and loss.

139.    Reduction in use of SNAP benefits will increase food insecurity, which will lead to negative health outcomes and correspondingly higher health-care costs.

140.    U.S. citizen children living in mixed-status families are at particular risk. Evidence shows that when parents lose access to health coverage, children are more likely to be uninsured. The Regulation, therefore, is likely to increase the rates of uninsured children throughout the country.

141.    Reducing access to housing benefits will also result in severe and irreparable harm to children, including impairment of cognitive development.  SNAP benefits are particularly important to mitigate the effects of poverty on children, and reducing access to these benefits will have a negative impact on school attendance and performance, emotional and physical development, and long-term health and achievement.

142.    In addition to the direct impact on immigrants, their families, and their communities, the new Regulation will have severely negative impacts on several sectors of the economy.

143.    For example, SNAP benefits have a high multiplier effect as they circulate through the economy.  Every dollar of SNAP translates to $1.79 in local economic activity.

144.    Businesses that accept SNAP will be disproportionately harmed and may need to close or cut back on carrying healthy, perishable foods that can be purchased with SNAP, which will reduce the healthy food options available in these communities.

145.    The direct health impacts of the new rule will create additional negative economic consequences because people who are uninsured miss more work, tend to be less productive when they are working, and are more likely to retire at younger ages because of health issues and disability.  Among working-age adults, there is a significant correlation between food insecurity and chronic disease, including conditions that can limit an individual's ability to work.

146.     Moreover, Medicaid supports hospitals, health centers, and other community providers that are critical sources of care for low-income people and the broader community.  By reducing Medicaid enrollment, these providers will lose a primary source of funding, significantly increasing the risk that hospitals and other providers will close or offer fewer services.  When health centers and other community providers close or reduce services, individuals have to rely on more costly emergency care to address acute medical conditions.

147.     The impacts of hospital closures and reductions are far-reaching.  They push providers to leave in their wake, and will affect access to care for all residents of their service areas, particularly for rural communities, which generally have difficulty attracting health care providers.

148.     Hospital closures and cutbacks also harm local economies, as hospitals are major employers and purchasers of goods and services. Moreover, communities without hospitals find it more difficult to attract new industries, companies, and job seekers and thus grow their economies.

149.     The Regulation will also have destabilizing effects on several other critical sectors of the economy.  For example, the public charge rule will disadvantage farmworkers who are either adjusting to lawful permanent residence or who seek to apply for or extend their non-immigrant H-2A visas, as these low-wage workers will find it difficult to satisfy the new public charge test.  Farmworker families will disproportionately have a number of factors negatively weighed against them, including their income, lack of credit history and health insurance, household-size, lack of education and skills, and lack of English proficiency.

150.     The public charge rule will also destabilize the health care workforce—a sector with a sizable immigrant population that relies on access to public programs.  For example, approximately 24% of direct care workers—comprising home health aides, personal care aides, and nursing assistants—are foreign-born, and approximately 40% of foreign-born direct care workers receive public benefits.[14]  The Regulation will force some workers to choose between

---

[14] Robert Espinoza, *Immigrants and the Direct Care Force*, Paraprofessional Healthcare Institute at 4–5 (June 2017), https://phinational.org/wp-content/uploads/2017/06/immigrants_and_the_direct_care_workforce_-_phi_-_june_2017.pdf.

1   securing benefits and potentially undermining their opportunity to extend or change their

2   nonimmigrant visas or adjust their status.  Others who would not be subject to the Regulation will

3   nonetheless refrain from seeking benefits to which they are entitled for fear of potential

4   consequences.  If these individuals forgo access to benefits, and in particular health care benefits,

5   they will miss more work days and burden the vulnerable population whom they serve—a

6   population that consists overwhelmingly of older adults and U.S. citizens.

7       151.    The administrative and adjudicative burdens imposed by the new Regulation and

8   the accompanying paperwork will cause significant delays in access to immigration benefits and

9   work authorization for all applicants.  These delays will prevent affected individuals from being

10  able to support themselves and their families.

11                      **FIRST CLAIM FOR RELIEF**

12                    **ADMINISTRATIVE PROCEDURE ACT**

13  **THE CHALLENGED REGULATION IS CONTRARY TO THE STATUTORY SCHEME**

14                   **ESTABLISHED BY CONGRESS**

15                          **5 U.S.C. § 706**

16      152.    Plaintiffs repeat and incorporate by reference each allegation contained in the

17  preceding paragraphs as if fully set forth herein.

18      153.    The Regulation is a final agency action and subject to judicial review.

19      154.    The APA prohibits agency action that is "not in accordance with law" or is "in

20  excess of statutory jurisdiction, authority, or limitations, or short of statutory right."

21      155.    The Regulation's definition of "public charge" is contrary to the plain and well-

22  established meaning of that phrase, and to how it has been interpreted and applied since 1882.

23  With knowledge of those interpretations and applications, Congress has repeatedly declined to

24  change the longstanding definition of "public charge."

25      156.    The new public charge definition is an unreasonable interpretation of and contrary

26  to the meaning of "public charge" in Section 1182.  The Regulation uses the public charge ground

27  of inadmissibility to penalize the receipt of or likely use of certain public benefits even though

28  Congress has repeatedly rejected efforts to do precisely that.

**SECOND CLAIM FOR RELIEF**

**ADMINISTRATIVE PROCEDURE ACT**

**THE CHALLENGED REGULATION IS ARBITRARY AND CAPRICIOUS OR**

**OTHERWISE NOT IN ACCORDANCE WITH LAW**

**5 U.S.C. § 706**

157.    Plaintiffs repeat and incorporate by reference each allegation contained in the preceding paragraphs as if fully set forth herein.

158.    The APA prohibits agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."

159.    The Regulation is arbitrary and capricious because it departs from decades of prior law and practice without adequate explanation.

160.    The changes in policy are substantive and highly consequential, and they require a showing that there are good reasons for the new policy, which Defendants have failed to provide.

161.    Defendants failed to consider all relevant factors and articulate a rational connection between the facts found and the decisions made.  In fact, Defendants have offered explanations for their decisions that run counter to the evidence before the agency.

162.    The Regulation sets forth a number of different factors, some weighted more than others, to determine whether an applicant is likely to become a public charge.  These weighted factors are not reasonably related to determining whether an individual is likely to become a public charge.  Indeed, even under Defendants' expanded definition of "public charge," these various considerations do not predict a likelihood that an individual will receive benefits.

163.    Defendants failed to consider that the factors are so vague they invite arbitrary or discriminatory enforcement.

164.    The Agency ignored or failed to adequately consider important aspects of the problem, including evidence that the Regulation would cause harm by penalizing the use of housing, health care, and nutritional assistance benefits.

165.    The Agency failed to adequately consider the harms caused by the chilling effect of the Regulation.

166.    The Agency failed to adequately consider the racially disparate impact of the policy.

167.    In addition, although the Regulation provides several purported rationales for the changes it makes to the public charge inquiry, those purported rationales are arbitrary, irrational, not supported by the evidence in the record, and a pretext that conceal the true motivation, which is to dismantle the family-based immigration system and make it more difficult for non-white immigrants to remain in the United States.  Even on their own terms, the explanations for the Regulation are arbitrary and capricious.

168.    Defendants have also failed to adequately address the public comments that were submitted in response to the proposed Regulation.

169.    USCIS and DHS were improperly influenced in their rulemaking process by the political motivations of individuals within the Trump Administration.

170.    USCIS issued the Regulation under the signature of and with the approval of Mr. Cuccinelli, who is not lawfully in charge of the promulgating agency.  As a result, the Regulation is contrary to law and without observance of procedure required by law under 5 U.S.C. § 706.

### THIRD CLAIM FOR RELIEF

### FIFTH AMENDMENT (EQUAL PROTECTION)

### THE REGULATION DISCRIMINATES AGAINST NON-WHITE IMMIGRANTS

171.    Plaintiffs repeat and incorporate by reference each allegation contained in the preceding paragraphs as if fully set forth herein.

172.    The Fifth Amendment contains an implicit guarantee of equal protection that invalidates any official action that reflects a racially discriminatory intent or purpose. Classifications based on race, ethnicity, or national origin are subject to strict scrutiny, and even facially neutral policies and practices will be held unconstitutional when they reflect a pattern unexplainable on grounds other than racial discrimination.  *Bolling v. Sharpe*, 347 U.S. 497, 499 (1954); *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265–66 (1977).

173.    Defendants acted with improper discriminatory intent and bias against non-white immigrants in promulgating the Regulation.

174.    Multiple tweets, statements, speeches and other actions by President Trump and his administration demonstrate racial animus toward non-white immigrants that underlie the Regulation.

175.    The Regulation is unconstitutional because its promulgation was motivated, at least in part, because of, and not merely in spite of, its adverse effects on non-white immigrants. *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979).

176.    Defendants promulgated the Regulation with full knowledge that it would have a disproportionate impact on non-white immigrants' ability to obtain green cards and extend non-immigrant visas.

177.    The history and sequence of events leading up to the promulgation of the Regulation were irregular, indicate a predetermined outcome not based on an objective assessment, and reveal that the Trump Administration's animus for non-white immigrants drove the decision to adopt the Regulation.

178.    Plaintiffs will suffer irreparable injury resulting from the implementation of the unconstitutional Regulation.

## FOURTH CLAIM FOR RELIEF

## DECLARATORY JUDGMENT ACT

## THE REGULATION IS INVALID BECAUSE IT WAS ISSUED BY AN UNLAWFULLY APPOINTED AGENCY DIRECTOR

179.    Plaintiffs will suffer irreparable injury resulting from the implementation of the unconstitutional Regulation.

180.    Plaintiffs repeat and incorporate by reference each allegation contained in the preceding paragraphs as if fully set forth herein.

181.    The Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq*. provides that "in a case of actual controversy within its jurisdiction . . . , any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not such further relief is or could be sought." *Id*. § 2201(a). The Court has equitable jurisdiction to enjoin "violations of federal law by federal officials,"

*Armstrong v. Exceptional Child Ctr., Inc.*, 135 S. Ct. 1378, 1384 (2015); *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010) (there is an "implied private right of action directly under the Constitution to challenge governmental action under the Appointments Clause").

182.   Defendant Cuccinelli was appointed in violation of the Appointments Clause and the Federal Vacancies Reform Act.  Plaintiffs are entitled to a declaration that the Regulation is invalid as signed by Defendant Cuccinelli and that Defendant Cuccinelli's designation as acting head of USCIS violated the Constitution and federal law.

183.   The Regulation, which could not have been promulgated without the approval of Cuccinelli as head of the issuing agency, harms Plaintiffs for the reasons stated above.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court:

1.   Declare the Regulation arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law, and without observance of procedure as required by law, in violation of the Administrative Procedure Act and the United States Constitution;

2.   Declare the Regulation unconstitutional as violating the equal protection guarantee of the Fifth Amendment of the U.S. Constitution;

3.   Declare that the Regulation has no force or effect under the Federal Vacancies Reform Act.

4.   Vacate the Regulation;

5.   Enjoin the Department and all its officers, employees and agents from implementing, applying, or enforcing the Regulation;

6.   Declare the appointment of Kenneth Cuccinelli as Acting Director of USCIS invalid under the Appointments Clause and the Federal Vacancies Reform Act.

7.   Award Plaintiffs their costs and reasonable attorney's fees as appropriate; and

8.   Grant such further and other relief as this Court deems just and proper.

1    Respectfully submitted,

2    Dated: August 16, 2019     By:    */s/ Nicholas Espíritu*
                                       NICHOLAS ESPÍRITU (SBN 237665)
3                                      espiritu@nilc.org
                                       LINTON JOAQUIN (SBN 73547)
4                                      joaquin@nilc.org
                                       ALVARO M. HUERTA (SBN 274787)
5                                      huerta@nilc.org
                                       MAYRA B. JOACHIN (SBN 306065)
6                                      joachin@nilc.org
                                       NATIONAL IMMIGRATION LAW CENTER
7                                      3450 Wilshire Boulevard, #108-62
                                       Los Angeles, CA 90010
8                                      Telephone: (213) 639-3900
                                       Fax: (213) 639-3911
9

10                                     ANTIONETTE DOZIER (SBN: 244437)
                                       adozier@wclp.org
11                                     ROBERT D. NEWMAN (SBN) 86534)
                                       rnewman@wclp.org
12                                     DAVID KANE (SBN: 292186)
                                       dkane@wclp.org
13                                     WESTERN CENTER ON LAW & POVERTY
                                       3701 Wilshire Boulevard, Suite 208
14                                     Los Angeles, CA 90010
                                       Tel: (213) 487-7211
15                                     Fax: (213) 487-0242

16                                     MARTHA JANE PERKINS (SBN 104784)
                                       perkins@healthlaw.org
17                                     NATIONAL HEALTH LAW PROGRAM
                                       200 N. Greensboro Street, Ste. D-13
18                                     Carrboro, NC 27510
                                       Tel: (919) 968-6308
19                                     Fax: (919) 968-8855

20                                     LABONI HOQ (SBN 224140)
                                       lhoq@advancingjustice-la.org
21                                     YANIN SENACHAI (SBN 288336)
                                       ysenachai@advancingjustice-la.org
22                                     MICHELLE (MINJU) CHO (SBN 321939)
                                       mcho@advancingjustice-la.org
23                                     ASIAN AMERICANS ADVANCING JUSTICE –
                                       LOS ANGELES
24                                     1145 Wilshire Blvd., 2nd Floor
                                       Los Angeles, CA 90017
25                                     Telephone: (213) 977-7500
                                       Fax: (213) 977-7500
26
                                       Tanya Broder (SBN 136141)
27                                     broder@nilc.org
                                       NATIONAL IMMIGRATION LAW
28                                     CENTER

2030 Addison Street, Suite 420
Berkeley, CA 94704
Telephone: (510) 663-8282
Fax: (213) 639-3911

JOANNA ELISE CUEVAS INGRAM** (SBN 290011)
cuevasingram@nilc.org
NATIONAL IMMIGRATION LAW
CENTER
P.O. Box 170392
Brooklyn, NY 11217
Telephone: (213) 377-5258
Fax: (213) 377-5258

MAX S. WOLSON*
wolson@nilc.org
NATIONAL IMMIGRATION LAW
CENTER
P.O. Box 34573
Washington, D.C. 20043
Telephone: (202) 216-0261
Fax: (202) 216-0266

*Pro hac vice application forthcoming
**Admitted to Practice in New York and California

Attorneys for Plaintiffs LA CLINICA DE LA RAZA;
CALIFORNIA PRIMARY CARE ASSOCIATION;
MATERNAL AND CHILD HEALTH ACCESS;
FARMWORKER JUSTICE; COUNCIL ON
AMERICAN ISLAMIC RELATIONS-CALIFORNIA;
AFRICAN COMMUNITIES TOGETHER; LEGAL
AID SOCIETY OF SAN MATEO COUNTY;
CENTRAL AMERICAN RESOURCE CENTER, and
KOREAN RESOURCE CENTER