JOSEPH H. HUNT
Assistant Attorney General
DAVID L. ANDERSON
United States Attorney
ALEXANDER K. HAAS
Branch Director
ERIC J. SOSKIN
Senior Trial Counsel
KERI L. BERMAN
KUNTAL V. CHOLERA
JOSHUA M. KOLSKY, DC Bar No. 993430
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch

P.O. Box 883
Washington, D.C. 20044
Telephone: (202) 353-0533
Facsimile: (202) 616-8470
Email: eric.soskin@usdoj.gov

Attorneys for Defendants

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| LA CLINICA DE LA RAZA, *et al.* | Case No. 4:19-cv-04980-PJH |
| Plaintiffs, |  |
| v. | **DEFENDANTS' OPPOSITION PRELIMINARY INJUNCTION** |
| DONALD J. TRUMP, *et al.*, |  |
| Defendants. |  |
|  | Date: October 2, 2019 |
|  | Time: 9:00 a.m. |
|  | Dept: Courtroom 3, 3rd Floor |
|  | Judge: Hon. Phyllis Hamilton |

### TABLE OF CONTENTS

INTRODUCTION ................................................................................................................... 1

BACKGROUND ..................................................................................................................... 2

ARGUMENT .......................................................................................................................... 5

I.        Plaintiffs Are Unlikely to Succeed on the Merits ....................................................... 5

    A.        Plaintiffs Lack Article III Standing And Their Claims Are Unripe ........................ 5

    B.        Plaintiffs Are Outside the Zone of Interests Regulated by the Rule ..................... 10

    C.        Plaintiffs' Substantive Claims Lack Merit ........................................................... 11

        1.        The Rule Is Consistent With the Plain Meaning Of "Public Charge" ............ 11

        2.        The Plain Meaning Of Public Charge Does Not Require
                  Long-Term Receipt Of Government Benefits Or That Such
                  Benefits Be Paid in Cash ............................................................................... 15

        3.        The Rule Properly Exercises Interpretive Authority That Congress
                  Delegated, Implicitly and Explicitly, To The Executive Branch ..................... 18

        4.        The Rule is Not Arbitrary and Capricious ..................................................... 19

            a.        DHS Adequately Responded to Comments ........................................ 20

            b.        The Rule's Treatment of Children and Pregnant Women is
                     Reasonable ........................................................................................ 25

            c.        The Rule's 12/36 Standard is Reasonable ........................................... 26

        5.        Acting Director Cuccinelli's Appointment Has No Bearing On
                  The Validity Of The Rule ............................................................................. 28

II.       Plaintiffs Fail to Establish Irreparable Harm ............................................................ 29

III.      The Remaining Equitable Factors Require Denial of Plaintiffs' Motion ................... 31

IV.       The Court Should Not Grant a Nationwide Injunction ............................................... 32

CONCLUSION ..................................................................................................................... 33

i

## TABLE OF AUTHORITIES

**Cases**

*Aguayo v. Jewell*,
  827 F.3d 1213 (9th Cir. 2016) ................................................................. 19

*All. for the Wild Rockies* ["AFWR"] *v. Cottrell*,
  632 F.3d 1127 (9th Cir. 2011) ........................................................... 29, 31

*Am. Sec. & Tr. Co. v. Utley*,
  382 F.2d 451 (D.C. Cir. 1967) ................................................................. 17

*Am. Textile Mfrs. Inst., Inc. v. Donovan*,
  452 U.S. 490 (1981) ................................................................................. 21

*Am. Trucking Ass'ns, Inc. v. Fed. Motor Carrier Safety Admin.*,
  724 F.3d 243 (D.C. Cir. 2013) ................................................................. 22

*Ass'n of Private Sector Colls. & Univs. v. Duncan*,
  681 F.3d 427 (D.C. Cir. 2012) ................................................................. 20

*Baker v. Johnston*,
  21 Mich. 319 (Mich. 1870) ..................................................................... 11

*Bishop Paiute Tribe v. Inyo Cty.*,
  863 F.3d 1144 (9th Cir. 2017) ................................................................... 9

*Boardman v. Pac. Seafood Grp.*,
  822 F.3d 1011 (9th Cir. 2016) ................................................................. 30

*Boston v. F.W. Capen*,
  61 Mass. 116 (Mass. 1851) ..................................................................... 13

*Cal. by & through Becerra v. Azar*,
  927 F.3d 1068 (9th Cir. 2019), *reh'g en banc granted*, 927 F.3d 1045 (9th Cir. 2019)........... 19

*California v. Azar*,
  911 F.3d 558 (9th Cir. 2018) ............................................................. 30, 33

*Caribbean Marine Servs. Co. v. Baldrige*,
  844 F.2d 668 (9th Cir. 1988) ............................................................. 30, 32

*Center for Biological Diversity v. Zinke*,
  900 F.3d 1053 (9th Cir. 2018) ................................................................. 25

*Chevron, U.S.A., Inc. v. NRDC*,
  467 U.S. 837 (1984)................................................................................. 18

*La Clinica de la Raza, et al. v. Trump, et al.*, Case No. 19-cv-4980-PJH
Opp'n to Mot. for Prelim. Inj.

*Clapper v. Amnesty Int'l USA*,
    568 U.S. 398 (2013) ................................................................................ 7, 8

*Clark v. City of Seattle*,
    899 F.3d 802 (9th Cir. 2018) ................................................................... 9

*Clarke v. Sec. Indus. Ass'n*,
    479 U.S. 388 (1987) ................................................................................ 10

*Colwell v. HHS*,
    558 F.3d 1112 (9th Cir. 2009) ................................................................. 9

*Competitive Enter. Inst. v. U.S. Dep't of Transp.*,
    863 F.3d 911 (D.C. Cir. 2017) ............................................................... 19

*Consumer Elecs. Ass'n v. FCC ("CEA")*,
    347 F.3d 291 (D.C. Cir. 2003) .......................................................... 21, 22

*Ctr. for Auto Safety v. Peck*,
    751 F.2d 1336 (D.C. Cir. 1985) ........................................................ 22, 23

*Daniels Sharpsmart, Inc. v. Smith*,
    889 F.3d 608 (9th Cir. 2018) ................................................................. 29

*Davis v. PBGC*,
    571 F.3d 1288 (D.C. Cir. 2009) ............................................................. 29

*Defs. of Wildlife v. Zinke*,
    856 F.3d 1248 (9th Cir. 2017) ............................................................... 23

*Drakes Bay Oyster Co. v. Jewell*,
    747 F.3d 1073 (9th Cir. 2014) ............................................................... 31

*East Bay Sanctuary Covenant v. Barr*,
    No. 19-16487, 2019 WL 3850928 (9th Cir. Aug. 16, 2019) .................... 33

*East Bay Sanctuary Covenant v. Trump*,
    354 F. Supp. 3d 1094 (N.D. Cal. 2018) ................................................. 30

*Entergy Corp. v. Riverkeeper, Inc.*,
    556 U.S. 208 (2009) ................................................................................ 21

*Envtl. Def. Fund v. EPA*,
    922 F.3d 446 (D.C. Cir. 2019) ............................................................... 25

*Ex Parte Horn*,
    292 F. 455 (W.D. Wash. 1923) .............................................................. 15

iii

*La Clinica de la Raza, et al. v. Trump, et al.*, Case No. 19-cv-4980-PJH
Opp'n to Mot. for Prelim. Inj.

*Ex Parte Pugliese*,
209 F. 720 (W.D.N.Y. 1913) ........................................................ 18

*Fed'n for Am. Immigration Reform, Inc. v. Reno*,
93 F.3d 897 (D.C. Cir. 1996) ........................................................ 11

*Fla. Bankers Ass'n v. U.S. Dep't of Treas.*,
19 F. Supp. 3d 111 (D.D.C. 2014),
*vacated on other grounds*, 799 F.3d 1065 (D.C. Cir. 2015) ...................... 21

*Fleck & Assocs. v. City of Phoenix*,
471 F.3d 1100 (9th Cir. 2006) ........................................................ 6

*Food & Water Watch, Inc. v. Vilsack*,
808 F.3d 905 (D.C. Cir. 2015) .................................................... 6, 8

*Gegiow v. Uhl*,
239 U.S. 3 (1915) ........................................................ 14

*Gill v. Whitford*,
138 S. Ct. 1916 (2018) ........................................................ 33

*Greater Yellowstone Coal, Inc. v. Servheen*,
665 F.3d 1015 (9th Cir. 2011) .................................................... 23, 24

*Habeas Corpus Res. Ctr. v. U.S. DOJ*,
816 F.3d 1241 (9th Cir. 2016) ........................................................ 9

*Havens Realty Corp. v. Coleman*,
455 U.S. 363 (1982) ........................................................ 6

*Hodgers-Durgin v. de la Vina*,
199 F.3d 1037 (9th Cir. 1999) ........................................................ 31

*In re Feinknopf*,
47 F. 447 (E.D. N.Y. 1891) ........................................................ 13

*Inhabitants of Fitchburg v. Cheshire R.R. Co.*,
110 Mass. 210 (Mass. 1872) ........................................................ 14

*Inhabitants of Guilford v. Inhabitants of Abbott*,
17 Me. 335 (Me. 1840) ........................................................ 14

*Inhabitants of Windham v. Inhabitants of Portland*,
4 Mass. 384 (Mass. 1808) ........................................................ 14

*INS v. Jong Ha Wang*,
450 U.S. 139 (1981) ........................................................ 18

iv

*INS v. Legalization Assistance Proj.*,
   510 U.S. 1301 (1993) ................................................................................... 10

*Inv. Co. Inst. v. CFTC*,
   720 F.3d 370 (D.C. Cir. 2013) ................................................................... 23

*Karnoski v. Trump*,
   926 F.3d 1180 (9th Cir. 2019) ...................................................................... 5

*Kenneson v. Kenneson*,
   36 N.Y.S. 2d 676 (N.Y. Dom. Rel. Ct. 1942) ........................................... 15

*L.A. Mem'l Coliseum Comm'r v. NFL*,
   634 F.2d 1197 (9th Cir. 1980) .................................................................... 32

*La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest*,
   624 F.3d 1083 (9th Cir. 2010) ............................................................... 6, 31

*La Asociacion De Trabajadores De Lake Forest v. City of Lake Forest*,
   No. SA CV 07-250, 2008 WL 11411732 (C.D. Cal. Aug. 18, 2008) ............ 8

*Lam Fung Yen v. Frick*,
   233 F. 393 (6th Cir. 1916) ..................................................................... 12, 13

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
   572 U.S. 118 (2014) ................................................................................... 10

*Lopez v. Brewer*,
   680 F.3d 1068 (9th Cir. 2012) ...................................................................... 5

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992) ...................................................................................... 5

*Madsen v. Women's Health Ctr., Inc.*,
   512 U.S. 753 (1994) ................................................................................... 33

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*,
   567 U.S. 209 (2012) ................................................................................... 10

*Matter of Harutunian*,
   14 I. & N. Dec. 583 (BIA 1974) ................................................................ 18

*Matter of Perez*,
   15 I. & N. Dec. 136 (BIA 1974) ................................................................ 19

*Meyer v. Bush*,
   981 F.2d 1288 (D.C. Cir. 1993) ................................................................ 21

v

*La Clinica de la Raza, et al. v. Trump, et al.*, Case No. 19-cv-4980-PJH
Opp'n to Mot. for Prelim. Inj.

*Michigan v. EPA*,
  135 S. Ct. 2699 (2015)................................................................................. 21

*Munaf v. Geren*,
  553 U.S. 674 (2008)..................................................................................... 5

*NLRB v. SW Gen., Inc.*,
  137 S. Ct. 929 (2017).................................................................................. 28

*NRDC v. EPA*,
  822 F.2d 104 (D.C. Cir. 1987)................................................................... 20

*Ohio Forestry Ass'n v. Sierra Club*,
  523 U.S. 726 (1998)..................................................................................... 9

*Overseers of Princeton Twp. v. Overseers of S. Brunswick Twp.*,
  23 N.J.L. 169 (N.J. 1851).......................................................................... 12

*Park Vill. Apt. Tenants Ass'n v. Mortimer Howard Tr.*,
  636 F.3d 1150 (9th Cir. 2011) ................................................................... 31

*People ex rel. Durfee v. Comm'rs of Emigration*,
  27 Barb. 562 (N.Y. Gen. Term 1858) ....................................................... 16

*Poor Dist. of Edenburg v. Poor Dist. of Strattanville*,
  5 Pa. Super. 516 (Pa. Super. Ct. 1897) .................................................... 16

*ProtectMarriage.com – Yes on 8 v. Bowen*,
  752 F.3d 827 (9th Cir. 2014) ....................................................................... 9

*Pub. Citizen, Inc. v. FAA*,
  988 F.2d 186 (D.C. Cir. 1993).................................................................. 20

*SIFMA v. CFTC*,
  67 F. Supp. 3d 373 (D.D.C. 2014)............................................................ 23

*State ex rel. Currie v. Currie*,
  No. 01-A-01-9303-JV00084, 1993 WL 339304 (Tenn. Ct. App. 1993) .................................. 15

*Stormans, Inc. v. Selecky*,
  586 F.3d 1109 (9th Cir. 2009) ................................................................... 32

*Summers v. Earth Island Inst.*,
  555 U.S. 488 (2009)..................................................................................... 6

*Thomas v. Anchorage Equal Rights Comm'n*,
  220 F.3d 1134 (9th Cir. 2000) ..................................................................... 9

*La Clinica de la Raza, et al. v. Trump, et al.*, Case No. 19-cv-4980-PJH
Opp'n to Mot. for Prelim. Inj.

*Town of Chester v. Laroe Estates, Inc.*,
  137 S. Ct. 1645 (2017) ........................................................................... 33

*Town of Hartford v. Town of Hartland*,
  19 Vt. 392 (Vt. 1847) ............................................................................ 14

*Trump v. Hawaii*,
  138 S. Ct. 2392 (2018) ........................................................................... 20

*U.S. Telecom Ass'n v. FCC*,
  825 F.3d 674 (D.C. Cir. 2016) ................................................................ 24

*United States v. Carona*,
  660 F.3d 360 (9th Cir. 2011) .................................................... 11, 12, 15

*United States v. Lipkis*,
  56 F. 427 (S.D.N.Y. 1893) ..................................................................... 13

*Valle del Sol Inc. v. Whiting*,
  732 F.3d 1006 (9th Cir. 2013) ............................................................ 7, 31

*Vill. of Barrington v. Surface Transp. Bd.*,
  636 F.3d 650 (D.C. Cir. 2011) ................................................................ 21

*Wallis v. U.S. ex rel. Mannara*,
  273 F. 509 (2d Cir. 1921) ....................................................................... 18

*Whitmore v. Arkansas*,
  495 U.S. 149 (1990) .............................................................................. 7, 8

*Winter v. NRDC*,
  555 U.S. 7 (2008) ......................................................................... 5, 31, 32

**Statutes**

5 U.S.C. § 551(13) ..................................................................................... 28

5 U.S.C. § 706(2)(A) .................................................................................. 19

5 U.S.C. § 3348(a)(1) ................................................................................. 28

5 U.S.C. § 3348(a)(2) ................................................................................. 29

5 U.S.C. § 3348(d)(1) ........................................................................... 28, 29

6 U.S.C. § 542 ............................................................................................. 3

6 U.S.C. § 557 (2003) .................................................................................. 3

vii

8 U.S.C. § 1103(a) .................................................................................................. 29

8 U.S.C. § 1182(a)(4) ............................................................................................ 1, 16

8 U.S.C. § 1182(a)(4)(A) ........................................................................................ 18

8 U.S.C. § 1182(a)(4)(B) .......................................................................................... 3

8 U.S.C. § 1182(s) .................................................................................................. 28

8 U.S.C. § 1252 ..................................................................................................... 10

8 U.S.C. § 1551 ...................................................................................................... 3

8 U.S.C. § 1601 .................................................................................................. 2, 24

8 U.S.C. § 1601(1) ................................................................................................... 2

8 U.S.C. § 1601(2)(A) ............................................................................................ 13

8 U.S.C. § 1613(a) ................................................................................................. 26

Pub. L. No. 104-193, 110 Stat. 2105 (1996) ............................................................ 4

Pub. L. No. 104-208, 110 Stat. 3009 (1996) ............................................................ 1

Pub. L. No. 107-296, 116 Stat. 2135 (2002) ............................................................ 3

Immigration Act of 1882,
   22 Stat. 214 (1882) ........................................................................................... 3

Immigration Act of 1891,
   26 Stat. 1084 (1891) .................................................................................... 3, 12

Immigration Act of 1903,
   32 Stat. 1213 (1903) ......................................................................................... 3

Immigration Act of 1917,
   39 Stat. 874 (1917) .................................................................................... *passim*

Immigration and Nationality Act of 1952,
   66 Stat. 163 (1952) ........................................................................................... 3

## Regulations

8 C.F.R. § 212.22 ............................................................................................. 25, 26

8 C.F.R. § 221.21(b) ............................................................................................. 26

*La Clinica de la Raza, et al. v. Trump, et al.*, Case No. 19-cv-4980-PJH
Opp'n to Mot. for Prelim. Inj.

*Inadmissibility and Deportability on Public Charge Grounds* ("1999 NPRM"),
   64 Fed. Reg. 28676 (May 26, 1999) .......................................................... 4, 12, 17, 19

*Field Guidance on Deportability and Inadmissibility on Public Charge Grounds* ("Field Guidance"),
   64 Fed. Reg. 28689 (May 26, 1999) ..................................................... *passim*

*Inadmissibility on Public Charge Grounds* ("NPRM"),
   83 Fed. Reg. 51114 (Oct. 10, 2018) ..................................................... *passim*

*Inadmissibility on Public Charge Grounds* ("Rule"),
   84 Fed. Reg. 41292 (Aug. 14, 2019) ..................................................... *passim*

**Executive Materials**

Exec. Order No. 12866, 58 Fed. Reg. 51725 (Sept. 30, 1993) .................................... 21

Exec. Order No. 13563, 76 Fed. Reg. 3821 (Jan. 18, 2011) ...................................... 21

Exec. Order No. 13771, 82 Fed. Reg. 9339 (Jan. 30, 2017) ...................................... 21

**Legislative Materials**

26 Cong. Rec. 657 (1894) ....................................................................... 13

H.R. Doc. No. 64-886 (1916) .................................................................... 15

H.R. Rep. No. 104-829 (1996) (Conf. Rep.) ....................................................... 1

S. Rep. No. 81-1515 (1950) ..................................................................... 18

**Other Authorities**

Arthur Cook, *et al.*, Immigration Laws of the U.S. (1929) ................................... 11, 13

Century Dictionary & Cyclopedia (1911) .......................................................... 12

E. P. Hutchinson, Legislative History of American Immigration Policy, 1798-1965 (1981) ........... 3

Frederic Jesup Stimson, Glossary of the Common Law (1881) ....................................... 11

Stewart Rapalje *et al.*, Dict. of Am. and English Law (1888) ................................... 11

Webster's Third New Int'l Dict. (1996) .......................................................... 12

C.H. Winfield, Words and Phrases, A Collection of Adjudicated Definitions of Terms Used in the Law, with References to Authorities (1882) ...................................................... 11

*La Clinica de la Raza, et al. v. Trump, et al.*, Case No. 19-cv-4980-PJH
Opp'n to Mot. for Prelim. Inj.

# INTRODUCTION

For over 135 years, Congress has restricted the admissibility of aliens who are likely, in the judgment of the Executive Branch, to become "public charges." Congress has never defined the term "public charge," but it has long been understood to mean a person who cannot provide himself with the basic needs of subsistence, and therefore imposes a burden on the public fisc to provide him with aid in obtaining the necessities of daily life. A major purpose of the public charge ground of inadmissibility is to set the expectation for immigrants that they be self-sufficient and refrain from entering the United States with the expectation of receiving public benefits, thereby ensuring that persons unable or unwilling to provide for themselves do not impose an ongoing burden on the American public.  For the past two decades, the public charge ground of inadmissibility, which applies in various ways to both applications for admission to the United States and for adjustments of status to that of a lawful permanent resident, has been governed by interim field guidance adopted without the benefit of notice-and-comment procedures.

On August 14, 2019, the Department of Homeland Security ("DHS") published *Inadmissibility on Public Charge Grounds* ("Rule") in the Federal Register. 84 Fed. Reg. 41292. This final rule is the culmination of an extensive, multi-year process to adopt regulations that prescribe how DHS will determine whether an alien applying for admission or adjustment of status is inadmissible under section 212(a)(4) of the Immigration and Nationality Act ("INA") because he is "likely at any time to become a public charge." 8 U.S.C. § 1182(a)(4). This Rule is long overdue: in 1996, Congress passed the Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA"), Pub. L. No. 104-208, 110 Stat. 3009 (1996), "to expand the public charge ground of inadmissibility" after concluding that "only a negligible number of aliens who become public charges have been deported in the last decade." H.R. Rep. 104-829, at 240-241 (1996); *see also* IIRIRA § 531 (enumerating "minimum" factors to be considered in every public charge determination). Congress therefore provided the INS with a list of factors to consider "at a minimum" in forming an "opinion" about whether an alien is "likely at any time to become a public charge." Yet for two decades, DHS has provided its officers, current and prospective immigrants, and the public with nothing more than an interim guidance document to specify how the factors are being implemented.

*La Clinica de la Raza, et al. v. Trump, et al.*, Case No. 19-cv-4980-PJH
Opp'n to Mot. for Prelim. Inj.

The Rule revises an anomalous definition of "public charge" set forth in interim guidance from 1999 to better reflect Congress's legislated policy making aliens who are likely to require public support to obtain their basic needs inadmissible. The Rule also reflects Congress's delegation of broad authority to the Executive Branch concerning the meaning of "public charge" and the establishment of procedures for forming an "opinion" about whether individual aliens are "likely at any time to become a public charge." The Rule is the product of a well-reasoned process that considered the plain text of the statute, legislative intent, statistical evidence, and the substance of hundreds of thousands of comments submitted by the public. Finally, the Rule has a limited scope: it does not apply to naturalization applications for lawful permanent residents ("LPRs"), or lead to public charge inadmissibility determinations based on the receipt of Emergency Medicaid, disaster assistance, school lunches, or benefits received by U.S.-born children. Nor does it apply to refugees or asylum recipients.

Plaintiffs—a group of organizations providing services to certain immigrant communities—nevertheless seek a nationwide preliminary injunction against the Rule. This Court should deny the motion. Plaintiffs, who are organizations rather than aliens actually governed by the Rule, cannot meet basic jurisdictional requirements, and their claims in any event are meritless. The Rule accords with the longstanding meaning of "public charge" and complies with the APA and other relevant statutes. In short, Plaintiffs provide no basis for turning their abstract policy disagreement with the Executive Branch into a nationwide injunction.

## BACKGROUND

"Self-sufficiency has been a basic principle of United States immigration law since this country's earliest immigration statutes." 8 U.S.C. § 1601(1). "[T]he immigration policy of the United States [is] that aliens within the Nation's borders not depend on public resources to meet their needs." *Id.* § 1601(2)(A). Rather, aliens must "rely on their own capabilities and the resources of their families, their sponsors, and private organizations." *Id.* Relatedly, "the availability of public benefits [is] not [to] constitute an incentive for immigration to the United States." *Id.* 1601(2)(B).

These statutorily enumerated policies are effectuated in part through the public charge ground of inadmissibility in the INA. With certain exceptions, the INA provides that "[a]ny alien who, in the opinion of the consular officer at the time of application for a visa, or in the opinion of the Attorney

2

General at the time of application for admission or adjustment of status, is likely at any time to become a public charge is inadmissible." *Id.* § 1182(a)(4)(A).[1] An unbroken line of predecessor statutes going back to at least 1882 have contained a similar inadmissibility ground for public charges, and those statutes have, without exception, delegated to the Executive Branch the authority to determine who constitutes a public charge for purposes of that provision. *See* Immigration Act of 1882, 47th Cong. ch. 376, §§ 1-2, 22 Stat. 214 ("1882 Act"); 1891 Immigration Act, 51st Cong. ch. 551, 26 Stat. 1084 ("1891 Act"); Immigration Act of 1903, 57 Cong. ch. 1012, 32 Stat. 1213, 1214; Immigration Act of 1917, 64 Cong. ch. 29 § 3, 39 Stat. 874, 876 ("1917 Act"); INA of 1952, 82nd Cong. ch. 477, section 212(a)(15), 66 Stat. 163, 183. In IIRIRA, Congress added to these predecessor statutes by instructing that, in making public charge determinations, "the consular officer or the Attorney General shall at a minimum consider the alien's: (1) age; (2) health; (3) family status; (4) assets, resources, and financial status; and (5) education and skills," 8 U.S.C. § 1182(a)(4)(B) (Arabic numerals substituted), but otherwise left in place the broad delegation of authority to the Executive Branch to determine who constitutes a public charge.

The longstanding denial of admission of aliens believed likely to become public charges dates from the colonial era, when a principal "concern [in] provincial and state regulation of immigration was with the coming of persons who might become a burden to the community," and "colonies and states sought to protect themselves by [the] exclusion of potential public charges." E. P. Hutchinson, Legislative History of American Immigration Policy, 1798-1965 at 410 (1981). Provisions requiring the exclusion and deportation of public charges emerged in federal law in the late 19th century. *See, e.g.*, 1882 Act at 214 (excluding any immigrant "unable to take care of himself or herself without becoming a public charge"); 1891 Act § 11 (providing for deportation of "any alien who becomes a public charge within one year after his arrival in the United States from causes existing prior to his landing").

In 1996, Congress enacted immigration and welfare reform statutes that bear on the public charge determination. IIRIRA strengthened the enforcement of the public charge inadmissibility

---

[1] As of March 1, 2003, references to the Attorney General in the INA "shall be deemed to refer to the Secretary" of DHS where they describe functions transferred to DHS by the Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135 (2002).  *See* 6 U.S.C. § 557 (2003); 6 U.S.C. § 542 note; 8 U.S.C. § 1551 note.

3

ground in several ways. Besides codifying mandatory factors for immigration officers to consider, *see supra*, it raised the standards and responsibilities for persons who must "sponsor" an alien by pledging to bear financial responsibility for that immigrant and requiring that sponsors demonstrate sufficient means to support the alien. Contemporaneously, the Personal Responsibility and Work Opportunity Reconciliation Act ("PRWORA"), Pub. L. No. 104-193, 110 Stat. 2105 (1996), restricted most aliens from accessing many public support programs, including Supplemental Security Income ("SSI") and nutrition programs. PRWORA also made the sponsorship requirements in IIRIRA legally enforceable against sponsors.

In light of the 1996 legislative developments, the INS attempted in 1999 to engage in rulemaking to guide immigration officers, aliens, and the public in understanding public charge determinations. *See Inadmissibility and Deportability on Public Charge Grounds*, 64 Fed. Reg. 28676 (May 26, 1999) ("1999 NPRM"). No final rule was ever issued, however. Instead, the agency adopted the 1999 NPRM interpretation on an interim basis by publishing *Field Guidance on Deportability and Inadmissibility on Public Charge Grounds*, 64 Fed. Reg. 28689 (May 26, 1999) ("Field Guidance"). The Field Guidance dramatically narrowed the public charge inadmissibility ground by defining "public charge" as a person "primarily dependent on the government for subsistence," *id.*, and by barring immigration officers from considering any non-cash public benefits, regardless of the value or length of receipt, as part of the public charge determination. *See* 1999 NPRM at 28678. Under that standard, an alien receiving Medicaid, food stamps, and public housing, but no cash assistance, would have been treated as no more likely to become a public charge than an alien who was entirely self-sufficient.

The Rule revises this approach and adopts, through notice-and-comment rulemaking, a well-reasoned definition of public charge providing practical guidance to Executive Branch officials making public charge inadmissibility determinations. DHS began by publishing a Notice of Proposed Rulemaking, comprising 182 pages of description, evidence, and analysis. *See Inadmissibility on Public Charge Grounds*, 83 Fed. Reg. 51114 (Oct. 10, 2018) ("NPRM"). The NPRM provided a 60-day public comment period, during which 266,077 comments were collected. *See* Rule at 41297. After considering these comments, DHS published the Rule, addressing comments, making several revisions to the proposed rule, and providing over 200 pages of analysis in support of its decision. Among the Rule's

major components are provisions defining "public charge" and "public benefit" (which are not defined in the statute), an enumeration of factors to be considered in the totality of the circumstances when making a public charge determination, and a requirement that aliens seeking an extension of stay or a change of status show that they have not received public support in excess of the Rule's threshold since obtaining nonimmigrant status. The Rule supersedes the Interim Field Guidance definition of "public charge," establishing a new definition based on a minimum time threshold for the receipt of public benefits. Under this "12/36 standard," a public charge is an alien who receives designated public benefits for more than 12 months in the aggregate within a 36-month period. *Id.* at 41297. The "public benefits" included are extended by the Rule to include many non-cash benefits: with some exceptions, an alien's participation in the Supplemental Nutrition Assistance Program ("SNAP"), Section 8 Housing Programs, Medicaid, and Public Housing may now be considered as part of the public charge inadmissibility determination. *Id.* at 41501-02. The Rule also enumerates a non-exclusive list of factors for assessing whether an alien is likely at any time to become a public charge and explains how DHS officers should apply these factors as part of a totality-of-the-circumstances determination of whether an alien is likely at any time to become a public charge.

## ARGUMENT

A preliminary injunction is "an extraordinary and drastic remedy" that should not be granted "unless the movant, *by a clear showing*, carries the burden of persuasion." *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Karnoski v. Trump*, 926 F.3d 1180, 1198 (9th Cir. 2019) (quoting *Winter v. NRDC*, 555 U.S. 7, 20 (2008)); *see Munaf v. Geren*, 553 U.S. 674, 690 (2008) (likelihood of success requires far more than identifying "serious, substantial, difficult, and doubtful" questions, including as to jurisdiction). Plaintiffs fail to meet any of these requirements.

### I.      Plaintiffs Are Unlikely to Succeed on the Merits.

#### A.  Plaintiffs Lack Article III Standing And Their Claims Are Unripe.

As the party invoking federal jurisdiction, Plaintiff bears the burden of establishing standing,

*La Clinica de la Raza, et al. v. Trump, et al.*, Case No. 19-cv-4980-PJH
Opp'n to Mot. for Prelim. Inj.

"an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).  "To seek injunctive relief, a plaintiff must show that [it] is under threat of suffering 'injury in fact' that is concrete and particularized; the threat must be actual and imminent, not conjectural or hypothetical; it must be fairly traceable to the challenged action of the defendant; and it must be likely that a favorable judicial decision will prevent or redress the injury." *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009).

Plaintiffs rely on an "organizational" standing theory. Mot for Prelim. Inj. at 28-32, ECF No. 35 ("Mot.").[2] Generally, "[a]n organization suing on its own behalf can establish an injury when it suffered both a diversion of its resources and a frustration of its mission." *La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest*, 624 F.3d 1083, 1088 (9th Cir. 2010). However, the organization "must . . . show that it would have suffered some other injury if it had not diverted resources to counteracting the problem." *Id.*; *see also id.* at 1088 n.4 ("An organization may sue only if it was forced to choose between suffering an injury and diverting resources to counteract" it). The alleged injury it seeks to counteract must be "more than simply a setback to the organization's abstract social interests." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982). The plaintiffs must show that the challenged "conduct perceptibly impaired the organization's ability to provide services," not just that its "mission has been compromised" in the abstract. *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 919 (D.C. Cir. 2015). The organization "cannot manufacture the injury by . . . simply *choosing* to spend money." *La Asociacion*, 624 F.3d at 1088 (emphasis added). Neither the health care plaintiffs, nor the social interest group plaintiffs, meet this standard.[3]

The health care plaintiffs claim they share a mission of "provid[ing] high quality health care to low income communities" and that they will have to "divert[] resources . . . to address community and

---

[2] Plaintiffs' complaint states that California Primary Care Association ("CPCA") brings suit in a representational capacity, but CPCA has neither alleged nor provided evidence in support of the requirements for associational standing. *See, e.g., Fleck & Assocs. v. City of Phoenix*, 471 F.3d 1100, 1105-06 (9th Cir. 2006).

[3] The health care plaintiffs include La Clinica de la Raza, CPCA, and Maternal and Child Health Access. The social interest group plaintiffs include Farmworker Justice, Council on American Islamic Relations-California, African Communities Together, Legal Aid Society of San Mateo County, Central American Resource Center, and Korean Resource Center.

*La Clinica de la Raza, et al. v. Trump, et al.*, Case No. 19-cv-4980-PJH
Opp'n to Mot. for Prelim. Inj.

individual patient concerns about the" Rule. Mot. at 28. But these plaintiffs identify no injury they will suffer if they do not divert resources towards addressing these concerns, apart from a purported harm to their "abstract social interest" in better health care for low income communities. There is no allegation, for example, that a failure to divert resources will result in staff shortages, or otherwise compromise their ability to administer health services to those requesting them. This case is thus distinguishable from *Valle del Sol Inc. v. Whiting*, on which Plaintiffs rely. 732 F.3d 1006 (9th Cir. 2013). There, certain organizations challenged an Arizona law criminalizing, under certain circumstances, the transportation or harboring of unauthorized aliens. *See id.* at 1012-13. The plaintiff organizations— whose volunteers helped transport and shelter aliens—submitted declarations stating that they had to divert resources into educating their volunteers over the law, lest they "be deterred from conducting these functions." *Id.* at 1018. They were thus forced to choose between an extraneous resource investment and staffing shortages. *See id.* Plaintiffs here, by contrast, do not allege that their employees will be unable or unwilling to perform the requisite health service functions, or that plaintiffs will otherwise be incapable of providing health services.[4]

The social interest group plaintiffs likewise fail to establish organizational standing. Their stated mission is to "provide advocacy and/or legal services to their clients and members, including obtaining immigration relief and helping to secure public benefits." Mot. at 30. To establish injury, they argue that the Rule will impact their clients, and that they thus will have to divert resources into "address[ing] the impact of the" Rule on their services. *See id.* at 30-31. But for organizational standing,

---

[4] The health service plaintiffs also claim that they "obtain a substantial portion of their funding through [Medicaid] reimbursements," and that certain of their patients, or of their members' patients, have disenrolled, or will disenroll from Medicaid due to the Rule. Mot. at 28-29. To establish standing for injunctive relief, however, the "threatened injury must be *certainly impending*." *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990) (emphasis added). Plaintiffs' speculation that *their* patients will imminently forgo Medicaid benefits is insufficient to meet this standard. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 (2013) (courts are "usual[ly] reluctan[t] to endorse standing theories that rest on speculation about the decisions of independent actors"). The declarations plaintiffs cite do little to cure this defect. All contain only conclusory assertions, with no support. *See* García Decl. ¶¶ 11-12 (asserting that "La Clinica believes that many of its patients will" forgo public benefits, and projecting, with no support, a "20% Medi-Cal disenrollment rate"); Quach Decl. ¶¶ 20-22 (asserting, again with no support, that "[s]ome" of a CPCA member's patients will forgo "Medi-Cal" benefits); Castellano-García ¶ 20 (projecting, with no explanation or supporting data, that "82,000 to 247,000 of CPCA members' patients will disenroll from Medi-Cal").

*La Clinica de la Raza, et al. v. Trump, et al.*, Case No. 19-cv-4980-PJH
Opp'n to Mot. for Prelim. Inj.

a plaintiff must have been "injured by a necessity to divert resources from its normal activities to activities outside of its normal realm." *La Asociacion De Trabajadores De Lake Forest v. City of Lake Forest*, No. SA CV 07-250, 2008 WL 11411732, at *6 (C.D. Cal. Aug. 18, 2008), *aff'd*, 624 F.3d 1083; *see also Vilsack*, 808 F.3d at 920 ("an organization does not suffer an injury in fact where it expend[s] resources to educate its members and others unless doing so subjects the organization to operational costs beyond those normally expended"). Here, the social interest group plaintiffs are in the business of assessing applicable immigration laws and providing appropriate education and legal counseling. *See, e.g.*, Mot. at 30; Nakamura Decl. ¶ 3; Goldstein Decl. ¶ 5. The practice of reviewing and assessing the Rule falls perfectly within their "normal activities" and thus requires no resource diversion.[5] *Cf. La Asociacion*, 2008 WL 11411732, at *6 (immigrant worker interest group plaintiffs lacked organizational standing to challenge Sheriff's office targeting of day laborers since plaintiffs "actions in support of the day laborers . . . are directly in line with the organizations' missions").[6] If this expenditure were sufficient, then Plaintiffs would have standing to challenge *any* change to the immigration laws—even one more lenient towards noncitizens—since Plaintiffs would have to commit resources into reviewing and assessing the new law to provide effective legal counsel.

---

[5] Plaintiffs cite to a number of declarations for the claim that they "divert[ed] resources from other core services" to "address[] the Regulation." Although the declarations repeatedly use the rhetoric of "diversion"—likely in order to manufacture standing—none states that resources have been, or will be, channeled into a use that falls outside of the organizations' standard activities. Quite the opposite. For example, one declarant states that his organization holds monthly meetings with community members and provides regular "consultations" for immigration proceedings, both of which may now include some content concerning the Rule. Kassa Decl. ¶¶ 15-16. Another declarant states that his organization is already in the business of "educational outreach" relating to "legal issues impacting [its] community" and that in 2018—before the Rule was proposed—its staff had "held hundreds of . . . events, including Know Your Rights presentations." Ayloush Decl. ¶ 7.

[6] The social interest group plaintiffs also speculate that they may lose funding. They claim that "[m]any of their clients will no longer be eligible for immigration relief or will choose to not enroll or to disenroll from benefits," which "means Plaintiffs will be able to file fewer cases," and their funding is "proportional to the number of cases filed or clients served." Mot. at 30. These alleged harms are speculative (relying on the independent decisions of third parties) and are thus not "*certainly* impending." *Whitmore*, 495 U.S. at 158 (1990); *see also Clapper*, 568 U.S. at 414. For plaintiffs to suffer an injury, a material number of clients must not only be affected by the Rule, but must then choose to forgo plaintiffs' counseling services altogether. This is inconsistent with plaintiffs' claim that they will have to spend resources on "education" and "public outreach" due to the Rule, Mot. 31—presumably to serve *more* clients, not fewer.

*La Clinica de la Raza, et al. v. Trump, et al.*, Case No. 19-cv-4980-PJH
Opp'n to Mot. for Prelim. Inj.

"Constitutional ripeness," another prerequisite of justiciability, "is often treated under the rubric of standing because 'ripeness coincides squarely with standing's injury in fact prong.'" *Bishop Paiute Tribe v. Inyo Cty.*, 863 F.3d 1144, 1153 (9th Cir. 2017) (quoting *Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1138 (9th Cir. 2000) (en banc)). "Ripeness can be characterized as standing on a timeline," *Thomas*, 220 F.3d at 1138, and ripeness precludes "premature" review where "the injury at issue is speculative, or may never occur." *ProtectMarriage.com – Yes on 8 v. Bowen*, 752 F.3d 827, 838 (9th Cir. 2014). For the same reasons stated above regarding Plaintiffs' lack of standing, Plaintiffs' claims fail to satisfy the requirements of constitutional ripeness. *See, e.g., Clark v. City of Seattle*, 899 F.3d 802, 809 (9th Cir. 2018).

Prudential ripeness also counsels against consideration of Plaintiffs' claims. This doctrine "protect[s] agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Habeas Corpus Res. Ctr. v. U.S. DOJ*, 816 F.3d 1241, 1252 (9th Cir. 2016). "In resolving ripeness questions, courts examine the 'fitness of the issues for judicial decision' and the 'hardship to the parties of withholding court consideration.'" *Id.* Fitness is generally lacking where the reviewing court "would benefit from further factual development of the issues presented." *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 733 (1998). Here, Plaintiffs' claims are all premised on speculation about the potential future effects of the Rule and disagreement with DHS's predictions based on the available evidence. *See, e.g.*, Mot. at 17, 20-21, 22. "Judicial appraisal of these [questions]" should await the "surer footing [of] the context of a specific application of this regulation," such as an actual application of the public charge ground of inadmissibility to an alien under the Rule as well as experience and statistical evidence regarding the actual implementation and its statistical effects on individuals' decision-making. *Colwell v. HHS*, 558 F.3d 1112, 1127 (9th Cir. 2009).

Additionally, withholding judicial consideration of Plaintiffs' claims will not cause them any significant hardship. With respect to the organizations bringing this case, the Rule "do[es] not create adverse consequences of a strictly legal kind, that is, effects of a sort that traditionally would have qualified as harm," and therefore cannot serve as the basis for a ripe claim. *Ohio Forestry Ass'n*, 523 U.S. at 733. Instead, the harms alleged are possible cumulative side effects of third party individuals'

*La Clinica de la Raza, et al. v. Trump, et al.*, Case No. 19-cv-4980-PJH
Opp'n to Mot. for Prelim. Inj.

decisions to take action not required by the Rule, so they do not create a ripe facial challenge.

**B. Plaintiffs Are Outside the Zone of Interests Regulated by the Rule.**

Even if Plaintiffs could meet their standing and ripeness burdens, Plaintiffs' claims would still fail because they are outside the zone of interests served by the limits of the "public charge" inadmissibility provision in § 1182(a)(4)(A) and related sections. The "zone-of-interests" requirement constrains the plaintiffs who "may invoke [a] cause of action" to enforce a particular statutory provision or its limits. *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 129-30 (2014). Under the APA, a plaintiff falls outside this zone when its "interests are … marginally related to or inconsistent with the purposes implicit in the statute." *Clarke v. Sec. Indus. Ass'n,* 479 U.S. 388, 399 (1987). This standard applies with equal force where, as here, Plaintiffs seek to challenge the government's adherence to statutory provisions in the guise of an APA claim. *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 224 (2012).

Plaintiffs plainly fall outside the zone of interests served by the limits of the meaning of public charge in the inadmissibility statute. At issue in this litigation is whether DHS will deny admission or adjustment of status to certain aliens deemed inadmissible on public charge grounds. By using the term "public charge" rather than a broader term like "non-affluent," Congress ensured that only certain aliens could be determined inadmissible on the public charge ground. It is aliens improperly determined inadmissible, not organizations that provide health, welfare, and advocacy services on their behalf, who "fall within the zone of interests protected" by any limitations implicit in §§ 1182(a)(4)(A) and 1183, because they are the "reasonable—indeed, predictable—challengers" to DHS's inadmissibility decisions. *Patchak*, 567 U.S. at 227; *see* 8 U.S.C. § 1252 (providing individuals who have a final order of removal from the United States based on a public charge determination an opportunity to file a petition for review before a federal court of appeals to contest the definition of public charge as applied to them). The purported educational and economic interests asserted by the plaintiffs are not even "marginally related" to those of an alien seeking to demonstrate that the "public charge" inadmissibility ground has been improperly applied to his detriment. *Cf. INS v. Legalization Assistance Proj.*, 510 U.S. 1301, 1302, 1304-05 (1993) (O'Connor, J., in chambers) (concluding that relevant INA provisions were "clearly meant to protect the interests of undocumented aliens, not the interests of

*La Clinica de la Raza, et al. v. Trump, et al.*, Case No. 19-cv-4980-PJH
Opp'n to Mot. for Prelim. Inj.

organizations [that provide legal help to immigrants]," and that the fact that a "regulation may affect the way an organization allocates its resources . . . does not give standing to an entity which is not within the zone of interests the statute meant to protect"); *Fed'n for Am. Immigration Reform, Inc. v. Reno*, 93 F.3d 897, 899 (D.C. Cir. 1996) (dismissing under zone-of-interests test a suit challenging parole of aliens into this country, where plaintiffs relied on incidental effects of that policy on workers).

### C.  Plaintiffs' Substantive Claims Lack Merit.

#### 1.  The Rule Is Consistent With the Plain Meaning Of "Public Charge."

The definition of "public charge" in the Rule is consistent with the plain meaning of the statutory text, which is to be "be determined with reference to its dictionary definition at the time the statute was enacted." *United States v. Carona*, 660 F.3d 360, 367 (9th Cir. 2011). Here, it is undisputed that since 1882, Congress has consistently provided for the exclusion of indigent aliens determined by the Executive Branch as likely to become "public charges." *Compare* Compl. ¶ 33, ECF No. 1, *with* NPRM at 51125.

Contemporary dictionaries from the 1880s define "charge" as "an obligation or liability," such as "a pauper being chargeable to the parish or town." Stewart Rapalje *et al.*, Dict. of Am. and English Law (1888) ("Rapalje 1888"); *accord* Frederic Jesup Stimson, Glossary of the Common Law (1881) (defining "charge" as "[a] burden, incumbrance, or lien; as when land is charged with a debt") ("Stimson 1881"). As to the term "public," such dictionaries explain the term "public" as meaning "[t]he whole body of citizens of a nation, or of a particular district or city, [or] [a]ffecting the entire community." Rapalje 1888.[7] Together, these early definitions make clear that an alien becomes a "public charge" when his inability to achieve self-sufficiency imposes an "obligation" or "liability" on "the body of the citizens" to provide for his basic necessities, as reflected in early legal sources addressing the term "public charge." *See* Arthur Cook *et al.*, Immigration Laws of the U.S., § 285 (1929) ("Public charge means any maintenance, or financial assistance, rendered from public funds").[8]

---

[7] *See also* C.H. Winfield, Words and Phrases, A Collection of Adjudicated Definitions of Terms Used in the Law, with References . . ., 501 (1882) ("Public" means "not any corporation like a city, town, or county but the body of the people at large." (quoting *Baker v. Johnston*, 21 Mich. 319 (Mich. 1870)).

[8] The original public meaning of "public charge," as derived from the definitions of "public" and "charge," is consistent with modern dictionary definitions of the term "public charge." For example, the online version "of the Merriam-Webster Dictionary defines public charge simply as 'one that is

11

Nothing about the plain meaning of this term suggests that a person must be in "destitution," "extreme poverty," or "depende[nt] primarily, if not entirely, upon the government," as Plaintiffs contend. Mot. at 8-9. When Congress originally enacted the public charge inadmissibility ground, the term "pauper" was in common use for a person in extreme poverty. *See, e.g.*, Century Dictionary & Cyclopedia (1911) (defining "pauper" as "[a] very poor person; a person entirely destitute"); *see also Overseers of Princeton Twp. v. Overseers of S. Brunswick Twp.*, 23 N.J.L. 169, 172 (N.J. 1851) (treating "a pauper" and "a person likely to become chargeable" as two separate classes). And in early versions of the statute, Congress provided a *separate* inadmissibility ground for paupers. *See, e.g.*, 1891 Act; 1917 Act.[9] Congress thereby made "clear that the term 'persons likely to become a public charge' is *not* limited to paupers or those liable to become such; 'paupers' are mentioned as in a separate class." *Lam Fung Yen v. Frick*, 233 F. 393, 396 (6th Cir. 1916) (emphasis added).[10]

---

supported at public expense.'" NPRM at 51158 (quoting "Public Charge", http://www.merriamwebster.com/ dictionary/public%20charge (last visited Sept. 9, 2019)). Similarly, "Black's Law Dictionary (6th ed.). . . defines public charge as 'an indigent; a person whom it is necessary to support at public expense by reason of poverty alone or illness and poverty.'" *Id.* Apparently misreading the 1999 NPRM, Plaintiffs contend that a 1986 dictionary definition supports their interpretation. Mot. at 14-15. But as the 1999 NPRM makes clear, the definition that Plaintiffs quote is one of the "many meanings" of "[t]he word 'charge,'" set forth in that dictionary, not the definition of "public charge." 1999 NPRM at 28677; *see generally Webster's Third New Int'l Dict.* (1986). In any event, the definitions provided by Defendants from "the time the statute was enacted" are much more probative of the meaning of the term. *Carona*, 660 F.3d at 367.

[9] The 1891 Act provided "[t]hat the following classes of aliens shall be excluded from admission . . . : "All idiots, insane persons, paupers or persons likely to become a public charge, persons suffering from a loathsome . . . disease, [those] convicted of a felony or other infamous crime or misdemeanor involving moral turpitude, polygamists, and also any person whose ticket or passage is paid for with the money of another . . . unless it is affirmatively . . . shown . . . that such person does not belong to one of the forgoing excluded classes." 1891 Act at 1094. The 1917 Act listed, *inter alia*, "idiots, imbeciles, feeble-minded persons, epileptics, insane persons; . . . persons with chronic alcoholism; paupers; professional beggars; vagrants; persons afflicted with tuberculosis in any form or with a . . . disease; persons . . . certified by the examining surgeon as being mentally or physically defective . . . of a nature which may affect the ability . . . to earn a living; [felons]; polygamists . . . ; anarchists, or persons . . . who advocate . . . the unlawful destruction of property; prostitutes . . .; persons . . . induced, assisted, encouraged, or solicited to migrate . . . by offers . . . of employment [or] . . . advertisements for laborers . . . in a foreign country; persons likely to become a public charge; persons deported [within the previous year]; stowaways," and others. 1917 Act at 875-76.

[10] Plaintiffs note that Congress removed the separate inadmissibility ground of "pauper" in 1990, *see* Mot. at 11 n.3, and argue that this is because the "outdated term[] . . . pauper" is now "generally encompass[ed]" by "public charge." Mot. at 14. This provides no indication, however, that "public

*La Clinica de la Raza, et al. v. Trump, et al.*, Case No. 19-cv-4980-PJH
Opp'n to Mot. for Prelim. Inj.

Remarkably, although Plaintiffs urge that "150 years" of construction supports the definition of "public charge" as one "primarily dependent" on the government, Mot. at 1, 14, they identify no source—and Defendants are aware of none—that defines "public charge" using these words (or using the similar phrase "primary dependence") prior to 1999, when INS issued the nonbinding, interim field guidance. In contrast, there is longstanding evidence that the term "[p]ublic charge means any maintenance, or financial assistance, rendered from public funds." Cook, Immigration Laws, § 285; *see also* 26 Cong. Rec. 657 (1894) (statement of Rep. Warner) (explaining that under the public charge inadmissibility ground, "[i]t will not do for [an alien] [to] earn half his living or three-quarters of it, but that he shall presumably earn all his living . . . [to] not start out with the prospect of being a public charge"). Courts have also suggested that the exclusion of public charges extended to those who, although earning a modest living, might need assistance with "the ordinary liabilities to sickness, or . . . any other additional charges . . . beyond the barest needs of existence." *U.S. v. Lipkis*, 56 F. 427, 428 (S.D.N.Y. 1893) (holding that immigration officers properly required a bond from a poor family on account of poverty, even though the ultimate reliance on public aid occurred through commitment to an insane asylum); *see also In re Feinknopf*, 47 F. 447, 447 (E.D. N.Y. 1891) (determining that an alien was not likely to become a public charge after considering, as distinct evidence, whether the alien "received public aid or support" or had been an "inmate of an almshouse"). Such individuals impose a "liability" on "the body of the people at large," even if they are not fully destitute. This interpretation of "public charge" conforms with Congress's explicit instruction that "the immigration policy of the United States [is] that . . . [a]liens within the Nation's borders [should] not depend on public resources to meet their needs." 8 U.S.C. § 1601(2)(A).

Plaintiffs' reliance on *Boston v. F.W. Capen*, 61 Mass. 116 (Mass. 1851), for the suggestion that 19th century state law supports their view is misplaced. *See* Mot. at 9. As an initial matter, the court's analysis in *Capen* equated "paupers" with "public charges" under state law: "Secondly, for those who have been paupers in a foreign land; that is, for those who have been a public charge in another

---

charge" and "pauper" are identical in meaning. Rather, it is indicative of the fact that, by abolishing poorhouses and almshouses, society has revised public services in a way that negates the former distinctions among types of public support provided to individuals needing different amounts of aid.

*La Clinica de la Raza, et al. v. Trump, et al.*, Case No. 19-cv-4980-PJH
Opp'n to Mot. for Prelim. Inj.

country; and not merely destitute persons, who, on their arrival here, have no visible means of support; the word 'paupers' being used . . . in its legal, technical sense." 61 Mass. at 121. Congress's separate exclusions for "paupers" and "public charges," *Frick*, 233 F. at 396, by contrast, demonstrates that Congress did not adopt a definition equating "pauper" and "public charge."[11] Further, other contemporaneous state law cases demonstrate that "public charges" had a far broader definition than Plaintiffs' constricted view limiting it to "people incompetent to act for themselves." Mot. at 10 (internal quotations omitted). The Maine Supreme Court, for example, identified as "likely to become chargeable" to a town to which he had travelled a person who required only "a small amount" of assistance, based on his "age and infirmity." *Inhabitants of Guilford v. Inhabitants of Abbott*, 17 Me. 335, 335-36 (Me. 1840) (reaching conclusion despite recognizing that, at "the time of filing the complaint he . . . had strength to perform some labor, [] was abundantly able to travel from town to town," and had a "house provided for him" in another town"). And the Vermont Supreme Court recognized that receipt of public aid, not complete destitution, was the standard for chargeability. *See Town of Hartford v. Town of Hartland*, 19 Vt. 392, 398 (Vt. 1847) (widow and children with a house, furniture, and a likely future income of $12/year from the lease of a cow were nonetheless public charges after receiving relief in "the amount of some five dollars").

Nor are Plaintiffs correct in their contention that "adjoining statutory terms" require imposing Plaintiffs' cramped meaning of the term "public charge." *See* Mot. at 9-10. When an early Supreme Court case (cited by Plaintiffs as authority for their argument, *see* Mot. at 10) employed a similar interpretive approach to overrule the exclusion of aliens based on the (un)availability of jobs in their

---

[11] Other authorities suggest that, by the time Congress first created the "public charge" inadmissibility ground in 1882, Massachusetts interpreted "public charge" far more broadly than the view urged by Plaintiffs. For example, the Massachusetts legislature required that a common carrier bringing in a "foreigner" who "falls sick, or from any cause becomes a public charge" would be responsible for any "expenses for his support, sickness, or burial." Mass. Gen. Sts. C. 71 § 25 (as amended by the St. of 1866, c. 272). In 1872, the Massachusetts Supreme Judicial Court ("SJC") interpreted this provision as covering any "expense for [the] support" of a woman and five children brought into the state. *Inhabitants of Fitchburg v. Cheshire R.R. Co.*, 110 Mass. 210, 211 (Mass. 1872). And even in an early 1808 case, the SJC examined the application of a statutory "public charge" provision to a "pauper" who required support, notwithstanding a yearly income derived from land and a history of paying taxes, because he now had incurred a debt for his support. *Inhabitants of Windham v. Inhabitants of Portland*, 4 Mass. 384 (Mass. 1808).

*La Clinica de la Raza, et al. v. Trump, et al.*, Case No. 19-cv-4980-PJH
Opp'n to Mot. for Prelim. Inj.

intended destination city, Congress acted decisively to overrule this interpretation. *See Gegiow v. Uhl*, 239 U.S. 3 (1915). In the 1917 Act, Congress relocated the term "public charge" in the statute and explained why: "This clause . . . has been shifted . . . to indicate the intention of Congress that aliens shall be excluded upon said ground for economic as well as other reasons" and "overcoming the decision of the Supreme Court in *Gegiow*."[12]  *See* 1917 Act § 3 n.5; *reprinted in* Immigration Laws and Rules of January 1, 1930 with Amendments from January 1, 1930 to May 24, 1934 (1935). Subsequent cases recognized that this alteration negated the Court's interpretation in *Gegiow* by underscoring that the term "public charge" is "not associated with paupers or professional beggars." *Ex Parte Horn*, 292 F. 455, 457 (W.D. Wash. 1923) (explaining that "public charge" in the 1917 Act "is differentiated from the application in *Gegiow*"). Neither the structure of the statute nor any other factor provides any evidence that Congress intended to cabin "public charge" more narrowly than the plain meaning of the term.[13]

### 2.   The Plain Meaning Of Public Charge Does Not Require Long-Term Receipt Of Government Benefits Or That Such Benefits Be Paid in Cash.

An alien's temporary receipt of public benefits, as reflected in the Rule's 12/36 standard, also constitutes an obligation on the public to support the basic necessities of life, and is therefore

---

[12] During the drafting of the 1917 Act, in a letter to the House Committee on Immigration and Naturalization, the Secretary of Labor defined "public charge" as "the fact that such applicant may be a charge (an economic burden) upon the community to which he is going." Letter from the Sec. of Labor, H.R. Doc. No. 64-886, at 3-4 (1916). He then requested that Congress amend the statute to address the "defect in . . . the arrangement of the wording" identified in *Gegiow*, which, if maintained, would "materially reduce[] the effect of the clause" as the "chief measure of protection in the law . . . intended to reach economic . . . objections to the admission" of aliens. *Id.*

[13] Cases cited by Plaintiffs from other contexts, such as state family law and *in forma pauperis* cases, where the term "public charge" has been employed, *see* Mot. at 12-13, n.5, & n.6,  have no bearing on the interpretation of the public charge ground of inadmissibility. These sources do not analyze the meaning of "public charge "at the time the [inadmissibility] statute was enacted." *Carona*, 660 F.3d at 367. Nor do they reflect the particular interests at issue in the immigration context. And in any event, other cases from these same contexts recognize that partial or temporary dependence on public services satisfies the definition of public charge. *See, e.g.*, *Kenneson v. Kenneson*, 36 N.Y.S. 2d 676, 686 (N.Y. Dom. Rel. Ct. 1942) (awarding $6 per week in domestic support to substitute teacher during school summer vacation to ensure that she did not become a "public charge" due to lack of "liquid assets for food and other essential needs," notwithstanding teacher's ownership of home and rental income from portion thereof); *State ex rel. Currie v. Currie*, No. 01-A-01-9303-JV00084, 1993 WL 339304 at *5 (Tenn. Ct. App. 1993) (rejecting argument that "receipt of [public welfare] payments on only an intermittent basis . . . shows a lack of need to be a public charge").

*La Clinica de la Raza, et al. v. Trump, et al.*, Case No. 19-cv-4980-PJH
Opp'n to Mot. for Prelim. Inj.

encompassed by the plain meaning of public charge. Both the analysis in early cases and more recent administrative practice confirm that the meaning of the term "public charge" extends to those who need only temporary government assistance, not just those who receive support on a "long [and] continued" or "life-long" basis. Mot. at 9, 11.

For example, a lower court in New York in *People ex rel. Durfee v. Comm'rs of Emigration* recognized that "the modes in which the poor become chargeable upon the public" extend to "all expenses lawfully incurred," including "temporary relief." 27 Barb. 562, 569-70 (N.Y. Gen. Term 1858). Similarly, in *Poor Dist. of Edenburg v. Poor Dist. of Strattanville*, a Pennsylvania appellate court recognized that even a landowner with a long track record of supporting herself as a teacher, artist, and writer, could become "chargeable to" the public by temporarily receiving "some assistance" while ill, despite having "plenty of necessaries to meet her immediate wants." 5 Pa. Super. 516, 520-24 (Pa. Super. Ct. 1897). Although the court ultimately rejected the landowner's classification as a pauper, it did so not because her later earnings or payment of taxes barred this conclusion, but because, under the specific facts of the case, she was "without notice or knowledge" that receipt even of limited assistance would "place[] [her] on the poor book." *Id* at 527-28. As the NPRM in this case explained, moreover, short-term receipt has been "a relevant factor under the [previous] guidance with respect to covered benefits." NPRM at 51165 & n. 304 ("In assessing the probative value of past receipt of public benefits, 'the length of time . . . is a significant factor'") (quoting 1999 Interim Field Guidance at 28690). In fact, the 1999 Field Guidance made no suggestion that an alien needed to receive cash benefits for an extended period for the totality of the circumstances to trigger a public charge determination and set no minimum period below which the receipt of such benefits would be less meaningful. Field Guidance at 28690.

Plaintiffs' interpretation of "public charge" as excluding short-term reliance on public benefits is also undercut by Congress's instruction in the text of the INA that Executive Branch officers are to determine whether an individual is "likely *at any time* to become a public charge," 8 U.S.C. § 1182(a)(4) (emphasis added), and by Congress's further decision to leave undefined the minimum period that would qualify an individual as a public charge. As the Rule explains, "public benefit receipt for more than 12 cumulative months over a 36-month period is indicative of a lack of self-sufficiency." Rule at

41359.[14] Such a person has demonstrated a sustained "inability to rely on his or her own capabilities," or even "the resources of family, sponsors, and private organizations" for some of the most "basic living needs," such as food and shelter. *Id.* There is no conflict between this 12/36 standard and the meaning of the term "public charge."

Nor does anything in the plain meaning of "public charge" suggest a distinction between benefits provided in cash and benefits provided as services. Both types of assistance create an obligation on the part of the public and both equally relieve recipients from the conditions of poverty. For this reason, consideration of an alien's receipt of public benefits for "housing, food and medical care," as "examples of the obvious basic necessities of life," falls within the reasonable parameters of determining whether that person creates a liability on the body of the public. *Am. Sec. & Tr. Co. v. Utley*, 382 F.2d 451, 453 (D.C. Cir. 1967). Plaintiffs acknowledge that receipt of in-kind services such as health care, food, and housing were among the types of public support that rendered a person a public charge in the past, by acknowledging that such persons included those who were "occupants of almshouses." Mot. at 11-12. The fact that the modern mores governing public assistance have appropriately deinstitutionalized the poor by providing assistance through subsidies for private housing, private food purchases, and the like does not in any way change the fact that the receipt of such subsidies imposes an "obligation" or "burden" on the body of the public.

The public benefits enumerated in the Rule as components of the public charge definition all fall well within this plain meaning of the statutory text by providing that both cash and in-kind support for "the obvious basic necessities of life"—food, shelter, medical treatment, and the like, *Utley*, 382 F.2d at 453—qualify as predicates for a public charge determination. Medicaid, SSI, public housing, SNAP, and other enumerated programs all obligate the public to assist with the basic necessities of life, such that recipients fall within the category of those historically identified as public charges.[15]

---

[14] The Rule provides data from the Census Bureau that further confirms the contrast between the "significant portion of the benefits-receiving population [who] ended their participation within a year [31.2 percent]," and the much larger share who could not achieve self-sufficiency in the long run, remaining as public charges for three years or longer. Rule at 41360.

[15] Although the 1999 Interim Field Guidance and the 1999 NPRM adopted a different interpretation, those documents provide further support for DHS's determination that the Rule is consistent with the plain meaning of "public charge." Both documents describe the exclusion of "non-cash public

17

*La Clinica de la Raza, et al. v. Trump, et al.*, Case No. 19-cv-4980-PJH
Opp'n to Mot. for Prelim. Inj.

### 3.   The Rule Properly Exercises Interpretive Authority That Congress Delegated, Implicitly and Explicitly, To The Executive Branch.

The statutory term "public charge" has "never been [explicitly] defined by Congress in the over 100 years since the public charge inadmissibility ground first appeared in the immigration laws." Rule at 41308. Congress implicitly delegates interpretive authority to the Executive Branch when it omits definitions of key statutory terms, thereby "commit[ting] their definition in the first instance to" the agency, *INS v. Jong Ha Wang*, 450 U.S. 139, 144 (1981), to be exercised within the reasonable limits of the plain meaning of the statutory term. *See Chevron, U.S.A., Inc. v. NRDC*, 467 U.S. 837, 844 (1984). Congress has long recognized this implicit delegation for the definition of "public charge." *See, e.g.*, S. Rep. No. 81-1515 at 349 (1950) (recognizing that because "there is no definition of the term [public charge] in the statutes, its meaning has been left to the interpretation of the administrative officials and the courts"). This delegation is reinforced by Congress's explicit directive that the determination be made "in the opinion of the Attorney General" or a "consular officer." 8 U.S.C. § 1182(a)(4)(A). This expansive delegation of authority grants DHS wide latitude to interpret "public charge" within the reasonable limits set by the broad, plain meaning of the term itself.

Congress's comprehensive delegation of interpretive authority is well-established in precedent dating back to the early public charge statutes. *See, e.g.*, *Ex Parte Pugliese*, 209 F. 720, 720 (W.D.N.Y. 1913) (affirming the Secretary of Labor's authority "to determine [the] validity, weight, and sufficiency" of evidence going to whether an individual was "likely to become a public charge"); *Wallis v. U.S. ex rel. Mannara*, 273 F. 509, 510 (2d Cir. 1921) (deference required even if "evidence to the contrary [is] very strong"). It is also recognized in Executive Branch practice. For example, in 1974, the Board of Immigration Appeals explained that Congress's broad delegation of authority in this area was necessary because "the elements constituting likelihood of becoming a public charge are varied."

---

benefits" at that time as "reasonable," confirming that although they did not conclude that the meaning of "public charge" *required* consideration of such benefits, they also did not conclude that the meaning of public charge *foreclosed* their consideration. 1999 NPRM at 28677; *see id.* at 28678 ("It has never been [the] policy that the receipt of any public service or benefit *must* be considered") (emphasis added). Indeed, the only examples of prior exclusion of non-cash benefits from consideration that the drafters of the interim guidance could identify were: 1) broadly-available public benefits such as "public schools"; and 2) the exclusion of food stamps (i.e., "SNAP") under State Department guidance that apparently did not exclude other forms of non-cash benefits. *See, e.g.*, 1999 Interim Field Guidance at 28692.

18

*Matter of Harutunian*, 14 I. & N. Dec. 583, 588-90 (BIA 1974) (quoting S. Rep. No.81-1515 at 349 (1950) (holding that alien's receipt of "old age assistance benefits" in California was sufficient to render the alien a "public charge")). Indeed, Plaintiffs themselves seek to preserve a *prior* exercise of this delegated interpretive authority by requiring DHS to revert to the "primarily dependent" standard for public charge determinations that appeared for the first time in the 1999 Interim Field Guidance and simultaneous 1999 NPRM. Compl. ¶ 85; *see* Mot. at 3-4 (citing Interim Field Guidance); *see also* Mot. at 14 (relying on 1987 regulations exercising delegated authority regarding adjustment of status).

The long history of congressional delegation of definitional authority over the meaning of "public charge" refutes Plaintiffs' claim that Congress has, by choosing not to impose a definition of "public charge" when revising the statute, implicitly adopted into the statute the definitions used by the Executive Branch (such as the standards described in the 1999 Interim Field Guidance or other immigration regulations). *See* Mot. at 14-16 (contending that Congress has "acquiesce[d]" to DHS's prior interpretation). Plaintiffs themselves acknowledge that Congress "has left the public charge provision unchanged." Mot. at 15. This "Congressional inaction lacks persuasive significance" where competing "inferences may be drawn from such inaction." *Competitive Enter. Inst. v. U.S. Dep't of Transp.*, 863 F.3d 911, 917 (D.C. Cir. 2017).[16] Here, the competing—and more plausible—inference is that Congress has intended for DHS to retain the authority delegated to it to analyze the "totality of the alien's circumstances" to make "a prediction" about the likelihood that an alien will become a public charge. *Matter of Perez*, 15 I. & N. Dec. 136, 137 (BIA 1974). With that delegation comes the concomitant authority for DHS to adopt further procedures to guide its officers, aliens, and the public at large in understanding the application of the public charge ground of inadmissibility.

### 4.  The Rule is Not Arbitrary and Capricious.

Many of Plaintiffs' arguments are raised as claims that the Rule is "arbitrary and capricious" under the APA, but Plaintiffs fail to meet this demanding standard. *See* 5 U.S.C. § 706(2)(A). Arbitrary and capricious review "is highly deferential; the agency's decision is entitled to a presumption of regularity, and [the court] may not substitute [its] judgment for that of the agency." *Aguayo v. Jewell*,

---

[16] For the same reason, Congress's allegedly "purposeful[] rejection," Mot. at 15, n.9, of proposed public charge definitions leads to no persuasive inference about congressional intent.

*La Clinica de la Raza, et al. v. Trump, et al.*, Case No. 19-cv-4980-PJH
Opp'n to Mot. for Prelim. Inj.

827 F.3d 1213, 1226 (9th Cir. 2016) (cleaned up). Plaintiffs' arguments repeatedly suffer from the same flaw: a disregard for the explanations presented in the NPRM and Rule. But the Court may not disregard DHS's "explanations, reasoning, and predictions" simply because Plaintiffs "disagree[] with the policy conclusions that flowed therefrom." *Calif. by & through Becerra v. Azar*, 927 F.3d 1068, 1079 (9th Cir. 2019), *reh'g en banc granted*, 927 F.3d 1045 (9th Cir. 2019). And if review here is warranted at all, *see* Part I.A., B., *supra*, a particularly high degree of deference is required given that admission and exclusion of aliens is historically committed to the political branches. *See Trump v. Hawaii*, 138 S. Ct. 2392, 2418 (2018).

### a. DHS Adequately Responded to Comments.

Plaintiffs insist that DHS did not adequately respond to certain comments, but fail to show any deficiency in DHS's responses. An agency's obligation to respond to comments on a proposed rulemaking is "not 'particularly demanding.'" *Ass'n of Private Sector Colls. & Univs. v. Duncan*, 681 F.3d 427, 441–42 (D.C. Cir. 2012). "[T]he agency's response to public comments need only 'enable [courts] to see what major issues of policy were ventilated . . . and why the agency reacted to them as it did.'" *Pub. Citizen, Inc. v. FAA*, 988 F.2d 186, 197 (D.C. Cir. 1993).

Plaintiffs first attack the Rule on that ground that the majority of the comments opposed it. Mot. at 17. Plaintiffs cite no precedent supporting this novel head-counting approach to rulemaking, and the D.C. Circuit rejected an analogous argument decades ago: "The substantial-evidence standard has never been taken to mean that an agency rulemaking is a democratic process by which the majority of commenters prevail by sheer weight of numbers." *NRDC v. EPA*, 822 F.2d 104, 122 n.17 (D.C. Cir. 1987). Plaintiffs' argument deserves a similar fate.

Next, it is untrue that Defendants "summarily dismissed" comments concerning disenrollment by individuals not subject to the Rule, as Plaintiffs claim. Mot. at 18-19. DHS did consider that potential impact of the Rule and reasonably decided that it did not support abandoning the Rule. DHS correctly noted that it is "difficult to predict the rule's disenrollment impacts with respect to people who are not regulated by this rule" and explained that it would not amend the Rule because of the potential that these people might choose to disenroll. Rule at 41313. It is not "sound policy to ignore the longstanding self-sufficiency goals set forth by Congress" because of the potential for

disenrollment. *Id.* at 41314. Thus, DHS did not ignore potential harms; rather, it found those harms insufficient to override the legitimate policy goals of the Rule. *Id.* at 41312 (the "rule's overriding consideration, *i.e.*, the Government's interest [as set forth in 8 U.S.C. § 1601] . . . is a sufficient basis to move forward"). DHS's decision to move forward notwithstanding potential, unquantifiable harms is a quintessential exercise of the agency's policymaking function and is neither arbitrary nor capricious. *See Consumer Elecs. Ass'n v. FCC*, 347 F.3d 291, 303 (D.C. Cir. 2003) ("When . . . an agency is obliged to make policy judgments where no factual certainties exist . . . we require only that the agency so state and go on to identify the considerations it found persuasive."). Plaintiffs may not agree with DHS's weighing of the costs and benefits, but that does not mean that DHS ignored costs or that the Rule is arbitrary and capricious.

Plaintiffs also take issue with DHS's estimate that the number of individuals who are likely to disenroll from or forgo enrollment in a public benefits program is equal to 2.5% of the number of members of households that include aliens. *See* Mot. at 19. DHS calculated that number to estimate the total transfer payments from the federal government to individuals who may choose to disenroll from or forgo enrollment in a public benefits program, as part of DHS's regulatory impact analysis required by Executive Orders 12866, 13563, and 13771. NPRM at 51227, 51266 (implementing Exec. Order No. 12866, 58 Fed. Reg. 51735 (Sept. 30, 1993); Exec. Order No. 13563, 76 Fed. Reg. 3821 (Jan. 18, 2011); Exec. Order No. 13771, 82 Fed. Reg. 9339 (Jan. 30, 2017)). Any claim alleging a failure to adequately perform that analysis is precluded because "Executive Orders cannot give rise to a cause of action" under the APA. *Fla. Bankers Ass'n v. U.S. Dep't of Treas.*, 19 F. Supp. 3d 111, 118 n.1 (D.D.C. 2014), *vacated on other grounds*, 799 F.3d 1065 (D.C. Cir. 2015); *Meyer v. Bush*, 981 F.2d 1288, 1296 n.8 (D.C. Cir. 1993) ("An Executive Order devoted solely to the internal management of the executive branch—and one which does not create any private rights—is not subject to judicial review.").[17]

---

[17] The APA, standing alone, does not require a detailed cost-benefit analysis. *See Entergy Corp. v. Riverkeeper, Inc.*, 556 U.S. 208, 224 (2009) (upholding agency choice to seek "only to avoid extreme disparities between costs and benefits"); *Am. Textile Mfrs. Inst., Inc. v. Donovan*, 452 U.S. 490, 510-12 & n.30 (1981) ("Congress uses specific language when intending that an agency engage in cost-benefit analysis."); *Vill. of Barrington v. Surface Transp. Bd.*, 636 F.3d 650, 670-71 (D.C. Cir. 2011) (rejecting argument that "the APA's arbitrary and capricious standard alone requires an agency to engage in cost-benefit analysis"). While the Supreme Court noted in *Michigan v. EPA* that "reasonable regulation

21

But even if DHS's cost-benefit analysis were subject to review, it would withstand scrutiny. The principle "that a court is not to substitute its judgment for that of the agency" is "especially true when the agency is called upon to weigh the costs and benefits of alternative policies." *Consumer Elecs. Ass'n,* 347 F.3d at 303 (cleaned up). Courts must be deferential when reviewing "an agency's cost/benefit analysis," *Am. Trucking Ass'ns, Inc. v. Fed. Motor Carrier Safety Admin.,* 724 F.3d 243, 254 (D.C. Cir. 2013), and review is limited to deciding whether DHS's "decision was based on a consideration of the relevant factors and whether there has been a clear error in judgment," *Ctr. for Auto Safety v. Peck,* 751 F.2d 1336, 1342 (D.C. Cir. 1985). Plaintiffs fail to identify a sufficient basis to overcome the deference due to DHS's cost-benefit analysis. Plaintiffs claim that DHS's estimate is "flawed" in focusing on the wrong individuals. Mot. at 19 (citing Ku Decl. ¶ 34). But DHS made the reasonable and logical choice to base its estimates on "individuals intending to apply for adjustment of status" because they are "most likely to disenroll from or forgo enrollment in public benefits programs in order to preserve their chances of adjusting status."  Regulatory Impact Analysis at 92-93, Ex. A to Decl. of Joshua Kolsky ("RIA"). And although DHS acknowledged that the disenrollment rate could be higher because "covered aliens may choose to disenroll from or forgo enrollment in public benefits programs sooner than in the same year that the alien applies for adjustment of status," *id.* at 97, DHS also noted that some "prospective adjustment applicants and associated household members" may recognize that they have other factors that "counterbalance acceptance of public benefits" in the totality of the circumstances analysis and thereby choose not to disenroll. *Id.* at 97-98. DHS's conclusion that the best way to reconcile these competing elements was to rely on data concerning the year in which aliens intended to adjust status is precisely the type of expertise-driven decision for which Plaintiffs may not insist the Court "substitute its judgment." *CEA,* 347 F.3d 303.

Plaintiffs also observe that disenrollment rates above 2.5% occurred two decades ago when Congress, through PRWORA, dramatically limited the eligibility of many aliens for public benefits. Mot. at 19. DHS acknowledged that higher disenrollment rates were measured following PRWORA

---

ordinarily requires paying attention to the advantages and the disadvantages of agency decisions," 135 S. Ct. 2699, 2707 (2015), it did not require the agency "to conduct a formal cost-benefit analysis," leaving it up to the agency "to decide (as always, within the limits of reasonable interpretation) how to account for cost." *Id.* at 2711.

22

*La Clinica de la Raza, et al. v. Trump, et al.*, Case No. 19-cv-4980-PJH
Opp'n to Mot. for Prelim. Inj.

and explained why disenrollment rates should be expected to differ here: instead of the direct change in eligibility requirements made by PRWORA, the Rule does not affect eligibility and merely serves as a disincentive for public benefits usage that affects those intending to apply for adjustment of status. *See* RIA at 91-93.[18] DHS also considered several factors that could cause disenrollment rates to be below 2.5%, such as the fact that some "categories of aliens (such as [asylum recipients] and refugees) are exempt from the public charge ground of inadmissibility." There is no "clear error in judgment" in DHS's decision to balance these countervailing factors in the face of uncertainty and thereby rely on the 2.5% estimate for the disenrollment rate. *Peck*, 751 F.2d at 1342. Beyond its judgments about how to assess competing statistical evidence, DHS also reasonably exercised its discretion to conclude that the interests in promoting the self-sufficiency of aliens and minimizing the incentives for immigration or adjustment of status due to the availability of public benefits outweigh the possibility of negative effects in the event that disenrollment rates exceed DHS's estimate. Rule at 41312. Particularly given the broad delegation of discretionary authority to DHS and the agency's expertise in immigration policy, its projections were not arbitrary or capricious.[19]

Plaintiffs fault DHS for not "quantify[ing]" costs such as "[p]otential lost productivity, [a]dverse health effects, [and a]dditional medical expenses due to delayed health care treatment," Mot. at 20, but Plaintiffs cite no cases holding that, to comply with the APA, an agency must "quantify" all potential effects of a rule. Nor could they. *See Inv. Co. Inst. v. CFTC*, 720 F.3d 370, 379 (D.C. Cir. 2013) (the "law does not require agencies to measure the immeasurable"); *Defs. of Wildlife v. Zinke*, 856 F.3d 1248, 1263 (9th Cir. 2017) (finding agency action was not arbitrary and capricious notwithstanding agency's "failure to quantify" effects). Plaintiffs fail to identify any methodology DHS could have

---

[18] As part of its analysis of different disenrollment scenarios, DHS used the PRWORA data identified by Plaintiffs to conduct some of its analyses in the RIA, before using its judgment to conclude that the 2.5% number best reflected the likely disenrollment rate in light of the disparate factors and predictive uncertainties involved.

[19] Plaintiffs discuss a report on the alleged "current effects" of the Rule, Mot. at 19-20, but that report was published in May 2019, *after* the comment period for the Rule had closed, *id.* at 19 n.10, and therefore, has no relevance to whether DHS adequately responded to comments. In any event, that report acknowledges that it describes the purported "effects" of "rumors about" the NPRM that "were circulating in early 2018," long before the actual NPRM was published. *Id.* DHS did not act unreasonably by failing to base its decision on the alleged effects of unspecified "rumors."

23

followed to reliably measure these costs. "As predicting costs and benefits without reliable data is a primarily predictive exercise, the [agency] need[s] only to acknowledge [the] factual uncertainties and identify the considerations it found persuasive in reaching its conclusions." *SIFMA v. CFTC*, 67 F. Supp. 3d 373, 432 (D.D.C. 2014).[20]

Plaintiffs also contend that DHS did not adequately consider comments about potential negative health consequences from disenrollment. Mot. at 20-21. The record, however, reveals not only that DHS considered such comments, but that it modified the Rule in response. Rule at 41310-14, 41471. DHS explained why the Rule was justified despite these potential harms. The "rule's overriding consideration, *i.e.*, the Government's interest . . . is a sufficient basis to move forward." *Id.* at 41312 (explaining that the relevant Government interests are those set forth in PRWORA and codified in 8 U.S.C. § 1601). DHS has the "authority to take past, current, and likely future receipt of public benefits into account, even where it may ultimately result in discouraging aliens from receiving public benefits." *Id.* Moreover, DHS made a number of changes to the Rule to mitigate some of the concerns raised regarding disenrollment impacts, such as excluding certain benefits from the scope of the Rule. *Id.* at 41313-14, 41471. This process—full consideration of the issues and the evidence on both sides, the adoption of changes in response, and an articulated statement of the reasons for the agency's ultimate decision—was neither arbitrary nor capricious.[21]

For similar reasons, DHS adequately considered comments about costs to hospitals and other medical providers. Mot. at 21-22; *see also* Rule at 41310-14, 41471. Again, DHS determined that such

---

[20] *Greater Yellowstone Coal, Inc. v. Servheen*, 665 F.3d 1015 (9th Cir. 2011), is inapposite. *See* Mot. at 16 (citing *Servheen*). DHS did not "merely recite the terms 'substantial uncertainty' as a justification for its actions." *Servheen* at 1028. Rather, DHS explained why the Rule was justified, notwithstanding the potential disenrollment impact. Rule at 41312-14.

[21] DHS's consideration of potential health consequences is not inconsistent with the 1999 Field Guidance. Mot. at 21. That Guidance noted the "confusion about the relationship between the receipt of public benefits and the concept of 'public charge,'" which "deterred eligible aliens and their families, including U.S. citizen children, from seeking important health and nutrition benefits that they are legally entitled to receive." 64 Fed. Reg. at 28692. The Rule, similarly, seeks to avoid confusion by providing a definition of "public charge," Rule at 41346, and in particular by listing each of the public benefits subject to the Rule to promote "clarity and consistency," *id.* at 41387. Also, Plaintiffs' suggestion that public health impacts are no longer significant to DHS is incorrect. As discussed, the Rule acknowledges that such impacts are a significant potential cost but concludes that such costs do not justify abandoning the Rule.

*La Clinica de la Raza, et al. v. Trump, et al.*, Case No. 19-cv-4980-PJH
Opp'n to Mot. for Prelim. Inj.

costs did not overcome the legitimate policy goals that will be advanced by the Rule.  *Id.* at 41312-14.  Mere disagreement with DHS's decision does not render that decision arbitrary or capricious.  *See U.S. Telecom Ass'n v. FCC*, 825 F.3d 674, 697 (D.C. Cir. 2016).  Plaintiffs again fault Defendants for not quantifying those costs, Mot. at 22, but as noted, DHS was not required to quantify every potential cost.  Plaintiffs try to impose a higher standard in other ways as well, as they suggest that DHS was required to respond individually to every cost estimate mentioned in any of the more than 250,000 comments received. Mot. at 22. It is well-established, however, that "an agency need not discuss every item of fact or opinion included in comments," and "[n]othing in the APA saddles agencies with the crushing task of responding to every single example cited in every single comment." *Envtl. Def. Fund v. EPA,* 922 F.3d 446, 458 (D.C. Cir. 2019).[22] In the end, DHS made a reasoned policy choice that the benefits of the Rule provided a sufficient basis to move forward despite the potential costs, including costs to hospitals and other health care providers.  Rule at 41312-14.  Plaintiffs may not agree with DHS's policy decision, but that does not mean that DHS ignored costs or that the Rule is arbitrary and capricious.

### b.  The Rule's Treatment of Children and Pregnant Women is Reasonable.

DHS exempted Medicaid benefits received by individuals under the age of 21 and pregnant women from the operation of the Rule. Rule at 41379-80. Plaintiffs argue that the Rule's treatment of aliens with serious medical conditions is inconsistent with that exemption. Mot. at 23. The Rule identifies the following as a heavily weighted factor: "The alien has been diagnosed with a medical condition that is likely to require extensive medical treatment or institutionalization or that will interfere with the alien's ability to provide for himself or herself, attend school, or work; and (B) The alien is uninsured and has neither the prospect of obtaining private health insurance, nor the financial resources to pay for reasonably foreseeable medical costs related to such medical condition."  Rule at 41504 (8 C.F.R. § 212.22(c)(1)(iii)).  Plaintiffs argue that this provision would treat a serious medical condition by an alien under the age of 21 or a pregnant woman as a heavily weighted negative factor

---

[22] Plaintiffs rely on *Center for Biological Diversity v. Zinke*, 900 F.3d 1053 (9th Cir. 2018), Mot. at 22, but that case involved a statute, not applicable here, imposing heightened data requirements on the Secretary of the Interior.  *Id.* at 1068-69 (applying standard under 16 U.S.C. § 1533(b)(1)(A)).

*La Clinica de la Raza, et al. v. Trump, et al.*, Case No. 19-cv-4980-PJH
Opp'n to Mot. for Prelim. Inj.

even if that individual uses Medicaid to treat the illness.

At the outset, Plaintiffs' claim should be rejected because it was not raised in their Complaint. Plaintiffs' argument also fails on the merits because Plaintiffs have misread the Rule. As noted, the Rule does not count a severe medical condition as a heavily weighed negative factor if the alien has "the financial resources to pay for reasonably foreseeable medical costs related to such medical condition." Rule at 41504. Such "financial resources" can include Medicaid benefits. *See id.* (8 C.F.R. § 212.22(b)(4)(ii)(H) provides that "resources . . . to pay for reasonably foreseeable medical costs" includes "health insurance not designated as a public benefit under 8 C.F.R. § 221.21(b)"). Thus, Medicaid benefits for an alien under the age of 21 or a pregnant woman would be considered in determining whether that individual has the financial resources to pay for reasonably foreseeable medical costs related to a serious medical condition.

Plaintiffs also question DHS's decision not to exempt SNAP benefits received by individuals under the age of 21 and pregnant women, asserting inconsistency with the treatment of Medicaid benefits. Mot. at 23-24. DHS, however, explained its exemption decision for Medicaid in light of "strong legal and policy reasons" specific to Medicaid. Rule at 41380 (providing separate explanations for pregnant women and for those under 21). For example, Congress generally authorized states to expand Medicaid eligibility to aliens under the age of 21 and pregnant women without a waiting period, *id.* at 41380, whereas the comparable waiver of the waiting period for SNAP applies only to "qualified aliens," 8 U.S.C. § 1613(a), (c)(2)(L), who are generally not subject to the public charge test, *see id.* § 1641(b). Congress also expressly provided that receipt of Medicaid by aliens under the age of 21 and pregnant women would not trigger a reimbursement requirement for the alien's sponsor under an Affidavit of Support, but made no such provision for receipt of SNAP benefits. *Id.*; *see also* Rule at 41375 n.431 (contrasting SNAP); *id.* at 41374 (describing reasons for the Rule's inclusion of SNAP benefits). Plaintiffs dismiss this justification, asserting that it should be irrelevant to DHS because the "sponsor, and not the public, would be responsible" for the costs of SNAP benefits, Mot. at 24, but that does not change the fact that Congress has treated Medicaid differently from SNAP and that DHS has reasonably relied on these differences in crafting the Rule. *See* Rule at 41380.

### c. The Rule's 12/36 Standard is Reasonable.

*La Clinica de la Raza, et al. v. Trump, et al.*, Case No. 19-cv-4980-PJH
Opp'n to Mot. for Prelim. Inj.

Plaintiffs next challenge the Rule's adoption of the 12/36 standard.  They argue that the standard is inconsistent with comments objecting to the 15% federal poverty guidelines threshold proposed in the NPRM. Mot. at 24-25.  But DHS considered those comments and explained in great detail why it was adopting the 12/36 standard. Rule at 41357-63.  "After considering all of the public comments on the proposed thresholds for the receipt of public benefits, DHS decided against finalizing separate thresholds for monetizable and non-monetizable benefits," as had been proposed in the NPRM.  *Id.* at 41358.  Instead, DHS "determined that a better approach from a policy and operational perspective, and one indicative of a lack of self-sufficiency is a single duration-based threshold."  *Id.*  That approach would "alleviate confusion about the threshold for being a public charge" that would have resulted from using different thresholds for monetizable benefits, non-monetizable benefits, and for a combination of both, as proposed in the NPRM.  *Id.*  DHS's simplified standard "is particularly responsive to public comments that communicated concerns about the complexity of the bifurcated standard and lack of certainty."  *Id.*  Moreover, it "eliminates the need for complicated calculations and projections related to the 15 percent of [federal poverty guidelines] threshold."  *Id.* at 41359.  Thus, DHS provided a reasonable explanation for its decision to eliminate the threshold based on the value of public benefits.

Plaintiffs also complain that the Rule's adopted standard could be met through an alien's use of a small dollar amount of benefits, particularly objecting that this amount could be "even lower" than that proposed in the NPRM. Mot. at 25. DHS reasonably explained its decision to jettison a specific dollar threshold for the receipt of benefits as a response to comments it described "about the complexity of the [NPRM dollar-amount] standard and lack of certainty" for aliens at the time of application for a public benefit about whether the amount of the benefit would meet the threshold. Rule at 41358. DHS concluded that the 12/36 durational requirement would be "indicative of a lack of self-sufficiency," and this is correct because receipt of twelve months of benefits demonstrates sustained reliance on those benefits as a public charge. *See* Rule at 41359 ("Receipt of public benefits for such a duration exceeds what DHS believes is a level of support that temporarily or nominally supplements an alien's independent ability to meet his or basic living needs."). Further, DHS discussed multiple studies supporting the 12-month duration. *See, id.* at 41360; n.14, *supra*. In short, as DHS

27

explained in the Rule, the scenario to which Plaintiffs object is a necessary outcome of balancing the relevant considerations of: "(1) provid[ing] meaningful guidance to aliens and adjudicators, (2) accommodat[ing] meaningful short-term and intermittent access to public benefits, and (3) [] not excus[ing] continuous or consistent public benefit receipt that denotes a lack of self-sufficiency." *Id.* at 41361.

Nor was it arbitrary or capricious for DHS to consider benefits received *in the aggregate* over a 12-month period.  Mot. at 25  "[R]eceipt of multiple public benefits in a single month is more indicative of a lack of self-sufficiency than receipt of a single public benefit in a single month because receipt of multiple public benefits indicates the alien is unable to meet two or more basic necessities of life."  *Id.* Aggregation also avoids differential treatment between an alien who receives one benefit in one month and another in the next month, and a different alien who receives each of those benefits in the same month. *Id.* at 41362.

Last, the Rule appropriately considers an alien's receipt of any designated public benefit, irrespective of duration, as part of the totality of the circumstances.  Congress implicitly recognized that past receipt of public benefits can be considered in determining the likelihood of someone becoming a public charge when it prohibited consideration of past benefits for "certain battered aliens."  8 U.S.C. § 1182(s).  Congress, therefore, understood and accepted DHS's consideration of past receipt of benefits in other circumstances.  Moreover, DHS explained why receipt of past benefits, irrespective of duration, is relevant to public charge inadmissibility.  "[S]uch receipt will in some cases suggest that the alien is not self-sufficient, or may soon lack self-sufficiency."  Rule at 41422.  Receipt of benefits for less than 12 months in a 36-month period, however, is not dispositive on its own and would only be considered a negative factor, though not a heavily weighted negative factor.  *Id.*; *see also id.* at 41421 (providing for consideration of duration, amount, and recentness of the alien's receipt of benefits as part of the totality of the circumstances).[23]

---

[23] Plaintiffs' statement that this standard "would deem roughly half" of all U.S.-born citizens to be public charges, Mot. at 16-17 (citing Trisi Decl.), lacks any reasoned basis. The cited declarant estimated only the approximate number of U.S.-born citizens who received a public benefit who received the benefit *at least once*. Trisi Decl. ¶¶ 18, 25-26. The declarant made no estimate of whether any of these individuals met the 12/36 standard, *id.* ¶ 31, let alone whether any would, under the totality of the circumstances, be "deem[ed]" inadmissible on public charge grounds. Mot. at 16-17.

*La Clinica de la Raza, et al. v. Trump, et al.*, Case No. 19-cv-4980-PJH
Opp'n to Mot. for Prelim. Inj.

### 5. Acting Director Cuccinelli's Appointment Has No Bearing On The Validity Of The Rule.

Plaintiffs claim that USCIS Acting Director Cuccinelli holds his position in violation of the Federal Vacancies Reform Act of 1998 (FVRA), rendering the Rule void. The FVRA permits certain "Government officials to perform acting service in a vacant" office requiring Senate confirmation. *NLRB v. SW Gen., Inc.*, 137 S. Ct. 929, 936 (2017). The FVRA provides that, in general, "[a]n action taken by any person who is not" properly serving in an acting capacity under the statute "in the performance of any function or duty of a vacant office . . . shall have no force or effect." 5 U.S.C. § 3348(d)(1). The FVRA defines "action" to include "the whole or a part of an agency rule." 5 U.S.C. § 3348(a)(1) (defining "action" to include "any agency action as defined under section 551(13)"); 5 U.S.C. § 551(13).

Here, these principles have no application because the Rule's passage was not an "action taken by" USCIS Acting Director Cuccinelli. The Rule was formally promulgated by Acting Secretary of Homeland Security Kevin McAleenan pursuant to 8 U.S.C. § 1103(a), which gives the "Secretary of Homeland Security" the authority to "establish such regulations" that "he deems necessary for carrying out his authority under the provisions" of the INA. *See* 84 Fed. Reg. at 41,295; *id.* at 41,508. Thus, the validity of Cuccinelli's role as USCIS Acting Director has no bearing on whether the Rule has "force or effect" under the FVRA.

Plaintiffs do not claim that Cuccinelli executed or authorized the Rule, but instead note that he "assist[ed] in [its] promulgation," and thus conclude "the [Rule] cannot stand." Mot. at 26-27. To be rendered void under the FVRA, however, the "action" must be taken "in the performance of any function or duty" of the relevant office. 5 U.S.C. § 3348(d)(1). The FVRA defines "function or duty" to be one that is "*required*" by statute or regulation "to be performed by the applicable officer (*and only that officer*)." 5 U.S.C. § 3348(a)(2) (emphasis added). Generally "assisting" in the promulgation of a DHS regulation is certainly not a duty reserved exclusively for the USCIS Director, and Plaintiffs do not suggest otherwise. And even if it were, that would not invalidate the Rule as a whole, as Plaintiffs suggest.[24]

---

[24] Defendants disagree that Cuccinelli is serving as Acting Director of the USCIS in violation of the

*La Clinica de la Raza, et al. v. Trump, et al.*, Case No. 19-cv-4980-PJH
Opp'n to Mot. for Prelim. Inj.

## II.    Plaintiffs Fail to Establish Irreparable Harm.

"[P]laintiffs may not obtain a preliminary injunction unless they can show that irreparable harm is likely to result in the absence of the injunction." *All. for The Wild Rockies* ["*AFWR*"] *v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011).[25]   To establish a likelihood of irreparable harm, plaintiffs "must do more than merely allege imminent harm sufficient to establish standing; [they] must *demonstrate* immediate threatened injury." *Boardman v. Pac. Seafood Grp.*, 822 F.3d 1011, 1022 (9th Cir. 2016) (citation omitted). As explained above, Plaintiffs have not alleged sufficient injuries to establish standing, and therefore they cannot satisfy the more demanding standard of establishing irreparable harm. *See supra* Part I.A.

Plaintiffs allege both future injuries and injuries they claim to have already suffered. Plaintiffs' alleged future injuries, including increased healthcare costs and loss of funding, are speculative, and "[s]peculative injury does not constitute irreparable injury sufficient to warrant granting a preliminary injunction." *Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988). As discussed *supra*, these alleged harms are founded on an attenuated chain of inferences and contingent on the aggregate decisions of independent third parties to take action not required by the Rule. Even assuming Plaintiffs are correct that some individuals will forgo enrollment or disenroll from federal benefits as a result of the Rule, Plaintiffs must still demonstrate a likelihood that such disenrollment will occur at a sufficiently high rate and magnitude to cause perceptible harm to Plaintiffs' interests. However, Plaintiffs' allegations on this point are conclusory and unsupported. *See supra* n.3; n.5.[26]

---

FVRA. But since this issue does not implicate the Rule's validity, the Court need not address it.

[25] Contrary to Plaintiffs' implication, Mot. at 7, the Ninth Circuit's "sliding-scale" approach to the preliminary injunction factors permits a reduced showing of likelihood of success on the merits only, and only when the balance of hardships tips sharply in Plaintiffs' favor. *See AFWR*, 632 F.3d at 1135. Plaintiffs must make full showings of a likelihood of irreparable injury and that the injunction is in the public interest in order to prevail. *Id.; see also Daniels Sharpsmart, Inc. v. Smith*, 889 F.3d 608, 615 (9th Cir. 2018). The Ninth Circuit's sliding-scale approach is also erroneous, and the government preserves that issue for further review. *See Davis v. PBGC*, 571 F.3d 1288, 1296 (D.C. Cir. 2009) (Kavanaugh, J., concurring).

[26] Plaintiffs assert that possible future financial loss alone is sufficient to demonstrate an irreparable injury, Mot. at 29-30, but this misstates the relevant precedent. Under *California v. Azar*, 911 F.3d 558 (9th Cir. 2018), economic harm must still be "substantial" and "non-speculative." *East Bay Sanctuary Covenant v. Trump*, 354 F. Supp. 3d 1094, 1116 (N.D. Cal. 2018) (citing, *e.g.*, *Azar*, 911 F.3d at 581).

Plaintiffs have also failed to demonstrate that the alleged future harms are "sufficiently immediate to warrant" preliminary relief because they will occur before "a decision on the merits can be rendered." *Boardman*, 822 F.3d at 1023. Plaintiffs have alleged no facts in support of their conclusory statements that the financial harms they allege would likely develop so quickly. Any such harms, if they ever emerged, would be the cumulative effect of independent decisions of an unknown number of third-party aliens over an unknown period of time. Plaintiffs offer no prediction about when these harms might arise and why the Rule's effective date must be enjoined when record-review briefing could occur in a matter of months. Indeed, Plaintiffs' own motion and declarations acknowledge the logical conclusion that the speculative and attenuated alleged impacts of the Rule would develop over time. *See, e.g.,* Quach Decl. ¶ 21 ("Ultimately, when their conditions worsen, many of these patients will be forced to seek care in emergency rooms."); Sharp Decl. ¶ 20-21. This falls far short of the showing necessary to obtain a preliminary injunction. *See Park Vill. Apt. Tenants Ass'n v. Mortimer Howard Tr.*, 636 F.3d 1150, 1160 (9th Cir. 2011) ("An injunction will not issue if the person or entity seeking injunctive relief shows a mere 'possibility of some remote future injury.'" (quoting *Winter*, 555 U.S. at 22)). Indeed, Plaintiffs' own supporting declarations belie their assertion that they have alleged sufficient harms, as these filings explicitly use the language of possibility rather than probability. *See, e.g.*, Garcia Decl. ¶ 14; Ayloush Decl. ¶¶ 11-12; Sharp Decl. ¶¶ 13, 21; Seon Decl. ¶ 21; Kersey ¶ 29.

As for the harms Plaintiffs allege are already occurring, they did not satisfy the standing requirements and cannot satisfy the more rigorous irreparable injury requirements. A Plaintiff organization must demonstrate both a diversion of resources and a frustration of its mission to establish a cognizable injury. *La Asociacion*, 624 F.3d at 1088.[27] Moreover, the diversion of resources must have been necessary to avoid another injury. *Id.* As described *supra* Part I.A, the health care

---

[27] Plaintiffs' assertion that frustration of mission, diversion of resources or reduction in funding alone is sufficient to establish irreparable organizational harm, *see* Mot. at 28, is contrary to law and unsupported by their cited precedent. Plaintiffs attempt to rely on *Whiting*, 732 F.3d 1006, but *Whiting* explained that an organization "must . . . show that it would have suffered some other injury if it had not diverted resources to counteracting the problem," *id.* at 1018,  and also incorrectly equated the standards for an injury sufficient to establish standing and for irreparable injury. *Compare id.* at 1029 *with Hodgers-Durgin v. de la Vina*, 199 F.3d 1037, 1041-44 (9th Cir. 1999) (assuming likelihood of future injury for standing purposes but finding insufficient likelihood to establish irreparable injury).

*La Clinica de la Raza, et al. v. Trump, et al.*, Case No. 19-cv-4980-PJH
Opp'n to Mot. for Prelim. Inj.

plaintiffs have not demonstrated that they were forced to divert their resources to avoid suffering a different injury. The social interest group plaintiffs have demonstrated neither a diversion of resources away from their core purpose nor a frustration of their mission. *See supra* Part I.A.

### III.   The Remaining Equitable Factors Require Denial of Plaintiffs' Motion.

Even if Plaintiffs had made a sufficient showing on either likelihood of success on the merits or likelihood of irreparable injury, and they have not, they would still be obligated to make a satisfactory showing both that the balance of equities tips in their favor and that the public interest favors injunction. *AFWR*, 632 F.3d at 1135. These two factors merge when the government is a party, *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014), but Plaintiffs have not made a sufficient showing to meet the standard for either factor—particularly under Plaintiffs' formulation of the test, under which they must show that the balance of equities tips *sharply* in their favor. *AFWR*, 632 F.3d at 1132. "In assessing whether the plaintiffs have met this burden, the district court has a 'duty . . . to balance the interests of all parties and weigh the damage to each.'" *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1138 (9th Cir. 2009) (quoting *L.A. Mem'l Coliseum Comm'r v. NFL*, 634 F.2d 1197, 1203 (9th Cir. 1980)). Plaintiffs assert that the equities clearly favor an injunction because they have alleged harms to public health and because an injunction will allegedly preserve the status quo. Mot. at 32.[28]

This analysis is facially incorrect and self-serving. As explained in detail *supra*, Plaintiffs' purported public health harms are wholly speculative, and there is no support for their assertions that these harms will be either immediate or irreparable. Conversely, there can be no doubt that the Defendants have a substantial interest in administering the national immigration system, a *solely federal* prerogative, according to the expert guidance of the responsible agencies as contained in their regulations, and that the Defendants will be harmed by an impediment to doing so. Quite obviously, Defendants have made the assessment in their expertise that the "status quo" referred to by Plaintiffs

---

[28] Plaintiffs allege that the balance of equities favors them because their interests are "served by compliance with the APA." Mot. at 32. However, the interests of the Defendants, as federal regulators, are also served by proper APA compliance, which was undertaken in this case. *See supra*. Thus this factor is at best neutral in the balance. Plaintiffs also state that they "highlighted" in comments on the NPRM that the Rule would have disparate impacts on immigrants based on protected characteristics, but fail to explain the relevance of such statements to the balance of equities or to preliminary relief generally.

*La Clinica de la Raza, et al. v. Trump, et al.*, Case No. 19-cv-4980-PJH
Opp'n to Mot. for Prelim. Inj.

1   is insufficient or inappropriate to serve the purposes of proper immigration enforcement. Therefore,

2   imposing the extraordinary remedy of a preliminary injunction and requiring the prior practice to

3   continue before a determination on the merits would significantly harm Defendants.

4   Plaintiffs' speculative harms have no weight in the balance of hardships compared to the

5   Defendants' interest in avoiding roadblocks to administering the national immigration system. *See*

6   *Baldrige,* 844 F.2d at 674. Consequently, Plaintiffs have failed to demonstrate that the balance of

7   hardships tips in their favor or that the public interest favors injunction. On this ground alone, their

8   motion for a preliminary injunction must fail. *See Winter*, 555 U.S. at 26.

9   **IV.   The Court Should Not Grant a Nationwide Injunction.**

10   Were the Court to order a preliminary injunction here, it should be limited to redressing only

11   any established injuries to Plaintiffs.  Under Article III, a plaintiff must "demonstrate standing . . . for

12   each form of relief that is sought."  *Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017);

13   *see also Gill v. Whitford*, 138 S. Ct. 1916, 1930, 1933 (2018) ("The Court's constitutionally prescribed

14   role is to vindicate the individual rights of the people appearing before it."). Equitable principles

15   likewise require that an injunction "be no more burdensome to the defendant than necessary to

16   provide complete relief to the plaintiffs." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994).

17   Accordingly, the Ninth Circuit has repeatedly vacated or stayed the nationwide scope of injunctions,

18   including in a challenge to a federal immigration rule. *See, e.g.*, *East Bay Sanctuary Covenant v. Barr*, No.

19   19-16487, 2019 WL 3850928, at *2 (9th Cir. Aug. 16, 2019) ("Under our case law . . . all injunctions—

20   even ones involving national policies—must be 'narrowly tailored to remedy the specific harm

21   shown.'"); *see also Azar*, 911 F.3d at 584 (collecting cases).

22   Here, Plaintiffs have not established that nationwide relief is necessary to remedy their alleged

23   harms.  Although they refer to "clients and patients" who allegedly "would still be effected by the

24   Regulation with anything less than nationwide relief," Mot. at 34, that does not justify extending an

25   injunction broadly to every alien in the nation.  Any injunction should be limited to clients and patients

26   and only those clients and patients who have demonstrated injury.  Also, Plaintiffs are overwhelmingly

27   California organizations and the fact that two of them allegedly "serve populations across the United

28   States," *id.*, is insufficient to warrant a nationwide injunction because the Court still must balance any

33

*La Clinica de la Raza, et al. v. Trump, et al.*, Case No. 19-cv-4980-PJH
Opp'n to Mot. for Prelim. Inj.

demonstrated harm against the other equitable considerations. *Winter*, 555 U.S. at 26. A nationwide injunction that applies to countless individuals lacking any non-speculative, irreparable harm tied to their specific relationships with these plaintiff organizations is not "narrowly tailored to remedy the specific harm shown." *East Bay*, 2019 WL 3850928, at *2.

## CONCLUSION

For the reasons stated herein, the Court should deny preliminary relief.


Dated: September 16, 2019                    Respectfully submitted,


                                             JOSEPH H. HUNT
                                             Assistant Attorney General

                                             ALEXANDER K. HAAS
                                             Branch Director

                                             */s/ Eric J. Soskin*
                                             KERI L. BERMAN
                                             KUNTAL V. CHOLERA
                                             JOSHUA M. KOLSKY
                                             ERIC J. SOSKIN, PA Bar # 200663
                                             Trial Attorneys
                                             U.S. Department of Justice
                                             Civil Division, Federal Programs Branch
                                             P.O. Box 883
                                             Washington, D.C. 20044
                                             eric.soskin@usdoj.gov

                                             *Attorneys for Defendants*

*La Clinica de la Raza, et al. v. Trump, et al.*, Case No. 19-cv-4980-PJH
Opp'n to Mot. for Prelim. Inj.