Nicholas Espíritu (SBN 237665)
NATIONAL IMMIGRATION LAW CENTER
3450 Wilshire Boulevard, #108-62
Los Angeles, CA 90010
Telephone: (213) 639-3900
Fax: (213) 639-3911
espiritu@nilc.org

Antionette Dozier (SBN 244437)
WESTERN CENTER ON LAW & POVERTY
3701 Wilshire Boulevard, Suite 208
Los Angeles, CA 90010
Tel: (213) 487-7211
Fax: (213) 487-0242
adozier@wclp.org

Martha Jane Perkins (SBN 104784)
NATIONAL HEALTH LAW PROGRAM
200 N. Greensboro Street, Ste. D-13
Carrboro, NC 27510
Tel.: (919) 968-6308
Fax: (919) 968-8855
perkins@healthlaw.org

Laboni Hoq (SBN 224140)
ASIAN AMERICANS ADVANCING JUSTICE – LOS ANGELES
1145 Wilshire Blvd., 2nd Floor
Los Angeles, CA 90017
Telephone: (213) 977-7500
Fax: (213) 977-7500
lhoq@advancingjustice-la.org

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LA CLÍNICA DE LA RAZA, ET AL., | Case No.  4:19-cv-4980-PJH |
| Plaintiffs, | **PLAINTIFFS' REPLY BRIEF IN SUPPORT OF MOTION FOR A PRELIMINARY INJUNCTION** |
| v. | |
| DONALD J. TRUMP, ET AL. | Judge: Hon. Phyllis J. Hamilton |
| Defendants. | Date: October 2, 2019<br>Time: 9:00 AM<br>Courtroom: 3<br>Trial Date: Not set<br>Action Filed: August 16, 2019 |

# **TABLE OF CONTENTS**

**Page**

I.     INTRODUCTION ................................................................................................1

II.    PLAINTIFFS SATISFY JURISDICTIONAL AND PRUDENTIAL STANDING .............1

       A.    Plaintiffs have Article III Standing ...........................................................1

       B.    Plaintiffs' Claims Are Ripe ......................................................................3

       C.    Plaintiffs Are in the Zone of Interests ......................................................4

III.   PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS ......................................4

       A.    The Regulation Is Inconsistent with the Meaning of "Public Charge" ....................4

       B.    The Regulation Is Arbitrary and Capricious ..............................................9

IV.    PLAINTIFFS WILL SUFFER IRREPARABLE HARM ABSENT AN
       INJUNCTION ................................................................................................14

V.     PUBLIC INTEREST AND BALANCE OF EQUITIES FAVOR AN
       INJUNCTION ................................................................................................14

VI.    THE COURT SHOULD GRANT A NATIONWIDE INJUNCTION AND
       POSTPONE THE EFFECTIVE DATE OF THE REGULATION ...................................15

VII.   CONCLUSION ................................................................................................15

PLAINTIFFS' REPLY BRIEF IN SUPPORT OF MOTION FOR A PRELIMINARY INJUNCTION

# TABLE OF AUTHORITIES

**Page**

**FEDERAL CASES**

*Bennett v. Spear*,
520 U.S. 154 (1997) ...........................................................................................3

*Boardman v. Pac. Seafood Grp.*,
822 F.3d 1011 (9th Cir. 2016)...........................................................................14

*California v. Azar*,
911 F.3d 558 (9th Cir. 2018).......................................................................14, 15

*Chevron, U.S.A., Inc. v. NRDC*,
467 U.S. 837 (1984) ...........................................................................................9

*Clark v. City of Seattle*,
899 F.3d 802 (9th Cir. 2018)...............................................................................3

*Clarke v. Secs. Indus. Ass'n*,
479 U.S. 388 (1987) ...........................................................................................4

*Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*,
657 F.3d 936 (9th Cir. 2011) (en banc) ..............................................................2

*Consumer Electronics Association v. FCC*,
347 F.3d 291 (D.C. Cir. 2003) .........................................................................10

*Cottonwood Environmental Law Center v. U.S. Forest Service*,
789 F.3d 1075 (9th Cir. 2015)..............................................................................3

*Ctr. for Biological Diversity v. Zinke*,
900 F.3d 1053 (9th Cir. 2018)....................................................................11, 13

*East Bay Sanctuary Covenant v. Barr*,
934 F.3d 1026 (9th Cir. 2019)...........................................................................15

*East Bay Sanctuary Covenant v. Trump*,
354 F. Supp. 3d 1094 (N.D. Cal. 2018) ............................................................15

*East Bay Sanctuary v. Trump*,
932 F.3d 742 (9th Cir. 2018)...............................................................2, 3, 4, 15

*Fair Housing Council of San Fernando Valley v. Roommate.com, LLC*,
666 F.3d 1216 (9th Cir. 2012)............................................................................1

*In re Feinknopf*,
47 F. 447 (E.D.N.Y. 1891)..................................................................................8

PLAINTIFFS' REPLY BRIEF IN SUPPORT OF MOTION FOR A PRELIMINARY INJUNCTION

## TABLE OF AUTHORITIES

**(Continued)**

**Page**

*Fleck & Assocs., Inc. v. City of Phoenix,*
    471 F.3d 1100 (9th Cir. 2006) ................................................................................1

*Fred Meyer Stores, Inc. v. NLRB,*
    865 F.3d 630 (D.C. Cir. 2017) .............................................................................10

*Gegiow v. Uhl,*
    239 U.S. 3 (1915) ...................................................................................................6

*Genuine Parts Co. v. EPA,*
    890 F.3d 304 (D.C. Cir. 2018) .............................................................................10

*Havens Realty Corp. v. Coleman,*
    455 U.S. 363 (1982) ...............................................................................................1

*Head Money Cases,* 112 U.S. 580 (1884) .................................................................9

*Ex parte Hosaye Sakaguchi,*
    277 F. 913 (9th Cir. 1922) .................................................................................6, 8

*Int'l Ladies' Garment Workers' Union v. Donovan,*
    722 F.2d 795 (D.C. Cir. 1983) .............................................................................10

*Jarecki v. G. D. Searle & Co.,*
    367 U.S. 303 (1961) ...............................................................................................6

*Lam Fung Yen v. Frick,*
    233 F. 393 (6th Cir. 1916) .....................................................................................7

*Lexmark Int'l, Inc. v. Static Control Components, Inc.,*
    572 U.S. 118 (2014) ...............................................................................................4

*Lujan v. Nat'l Wildlife Fed.,*
    497 U.S. 871 (1990) ...............................................................................................3

*Madsen v. Women's Health Ctr., Inc.,*
    512 U.S. 753 (1994) .............................................................................................15

*McDonnell Douglas Corp. v. U.S. Dep't of the Air Force,*
    375 F.3d 1182 (D.C. Cir. 2004) ...........................................................................11

*Ex parte Mitchell,*
    256 F. 229 (N.D.N.Y. 1919) ...............................................................................7, 8

# **TABLE OF AUTHORITIES**

### **(Continued)**

**Page**

*Motor Vehicle Manufacturers Ass'n of U.S. v. State Farm,*
   463 U.S. 29 (1983) ................................................................................................12

*Pub. Citizen v. Fed. Motor Carrier Safety Admin.,*
   374 F.3d 1209 (D.C. Cir. 2004) ...........................................................................10

*Regents of the Univ. of Cal. v. Dep't of Homeland Sec.,*
   279 F. Supp. 3d 1011 (N.D. Cal. 2018) ................................................................15

*SEC v. Chenery Corp.,*
   318 U.S. 80 (1943) ................................................................................................12

*SIFMA v. CFTC,*
   67 F. Supp. 3d 373 (D.D.C. 2014) ........................................................................10

*Southwest General, Inc. v. NLRB,*
   796 F.3d 67 (D.C. Cir. 2015), *aff'd,* 137 S. Ct. 929 (2017) ................................13, 14

*Susan B. Anthony List v. Driehaus,*
   573 U.S. 149 (2014) ................................................................................................3

*United States v. Lipkis,*
   56 F. 427 (S.D.N.Y. 1893) ......................................................................................8

*United States v. Williams,*
   553 U.S. 285 (2008) ................................................................................................6

*Util. Air Regulatory Grp. v. EPA,*
   573 U.S. 302 (2014) ................................................................................................9

*Valle del Sol Inc. v. Whiting,*
   732 F.3d 1006 (9th Cir. 2013) ....................................................................1, 2, 14, 15

STATE CASES

*Inhabitants of Guilford v. Inhabitants of Abbott,*
   17 Me. 335 (1840) ..................................................................................................7

*Town of Hartford v. Town of Hartland,*
   19 Vt. 392 (1847) ....................................................................................................7

PLAINTIFFS' REPLY BRIEF IN SUPPORT OF MOTION FOR A PRELIMINARY INJUNCTION

# **TABLE OF AUTHORITIES**

### **(Continued)**

**Page**

**REGULATORY CASES**

*Matter of Harutunian,*
  14 I. & N. Dec. 583 (BIA 1974)...................................................................................8

*Matter of Perez,*
  15 I. & N. Dec. 136 (BIA 1974)...................................................................................8

**FEDERAL STATUTES**

5 U.S.C. § 705 ...............................................................................................................15

5 U.S.C. § 706 ...............................................................................................................14

5 U.S.C. § 3345 .......................................................................................................13, 14

5 U.S.C. § 3348 .......................................................................................................13, 14

6 U.S.C. § 271 ...............................................................................................................13

8 U.S.C. § 1182 ...............................................................................................................4

1917 Act, Chapter 29, § 3, 39 Stat. 874 .........................................................................6

Act to Regulate Immigration, ch. 376, § 1, 22 Stat. 214 (1882) ....................................9

**FEDERAL REGULATIONS AND REGULATORY MATERIALS**

8 C.F.R. § 212.21 ............................................................................................................4

Notice of Proposed Rulemaking, Inadmissibility and Deportability on Public
  Charge Grounds, 64 Fed. Reg. 28,676 (May 26, 1999) ...........................................5, 8

Final Rule, Inadmissibility on Public Charge Grounds
  84 Fed. Reg. 41,292 (Aug. 14, 2019)............................................................. 3, passim

**SECONDARY AUTHORITIES**

Shambie Singer, *Sutherland Statutory Construction* § 47:16 (7th ed. 2018)....................................6

Stewart Rapalje *et al.*, Dict. of Am. and English Law (1888) ........................................5

Robe Carl White, *Immigration Laws and Rules of January 1, 1930* 25 n.5 (1935)...........................6

I.     **INTRODUCTION**

After failing to persuade the American people and their representatives to pass radical immigration legislation, Defendants now attempt to implement that same policy by executive fiat. Defendants' Regulation substantially redefines the term "public charge," which has been construed consistently by courts and administrative agencies since 1882.  Defendants deny the enormity of this change, but their cited authorities fail to refute the Regulation's clear departure from over a century of consistent interpretation.  Indeed, Defendants fail entirely to engage with the anomalous result of their construction: fully one half of U.S.-born citizens would qualify as likely public charges under the Regulation, a clear indication that the Regulation is not reasonable. In addition, the Regulation is independently arbitrary and capricious because Defendants have failed to adequately respond to comments or justify their chosen methodology, and the head of the implementing agency was not validly appointed.  Defendants' contrary arguments are unavailing. Because Plaintiffs have shown a likelihood of success on the merits, and because the other preliminary injunction factors also weigh in their favor, the Court should enjoin the Regulation.

II.    **PLAINTIFFS SATISFY JURISDICTIONAL AND PRUDENTIAL STANDING**

A.     **Plaintiffs have Article III Standing**

Plaintiffs have organizational standing because the Regulation frustrates their missions, diverts their resources, and reduces their funding.[1]  *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378–79 & n.19 (1982) (organizational standing where defendant's racial steering frustrated plaintiffs' equal housing mission and caused it "to devote significant resources to identify and counteract" those practices).  The Ninth Circuit has consistently held such allegations establish standing under *Havens*.  *E.g.*, *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1018 (9th Cir. 2013) (organizational standing based on frustration of mission and diversion of resources "to educating their members about the law"); *Fair Housing Council of San Fernando Valley v. Roommate.com,*

---

[1] Plaintiff California Primary Care Association ("CPCA") has brought suit in its representational capacity, as alleged in the Complaint, ¶ 16, and supported in its declaration, ECF No. 35-3, Castellano-García Decl., and meets the standard for associational standing under *Fleck & Assocs., Inc. v. City of Phoenix*, 471 F.3d 1100, 1105–06 (9th Cir. 2006).

1    *LLC*, 666 F.3d 1216, 1219 (9th Cir. 2012) (organizational standing where defendant's conduct

2    "frustrated their central mission" so they "divert[ed] resources independent of litigation costs"

3    through "education and outreach campaigns").  Indeed, in *East Bay Sanctuary v. Trump*, 932 F.3d

4    742, 765–66 (9th Cir. 2018), the Court held legal services organizations (specifically including

5    Plaintiff Central American Resource Center ("CARECEN")), had standing to challenge an

6    immigration rule that frustrated their missions to provide legal services, caused them to divert

7    resources to training and educating, and reduced their funding.

8         The Regulation frustrates the legal and civic organizational Plaintiffs'[2] missions to provide

9    immigration relief and access to public benefits because the Regulation hinders their clients'

10   ability to obtain immigration relief and/or public benefits.  Kassa Decl. ¶¶ 10–13, 16; Ayloush

11   Decl. ¶¶ 11–14; Sharp Decl. ¶¶ 12–15, 18; Goldstein Decl. ¶ 8; Seon Decl. ¶¶ 10–14; Nakamura

12   Decl. ¶¶ 12, 14–15; Kersey Decl. ¶¶ 29–30.[3]  This decreases funding tied to the number of cases

13   or benefit applications Plaintiffs file, and makes existing funding less effective due to increased

14   operating costs.  Kassa Decl. ¶¶ 10–17; Ayloush Decl. ¶¶ 11–16, 18–19; Sharp Decl. ¶¶ 12–16,

15   20–21; Goldstein Decl. ¶¶ 7–12; Seon Decl. ¶¶ 10–14, 16–21, 23; Nakamura Decl. ¶¶ 13–17;

16   Kersey Decl. ¶¶ 26–30, 34–36.  Plaintiffs have shifted resources from other services to address

17   harms and community demand regarding the Regulation.  *E.g.*, Seon Decl. ¶ 16 (shift from

18   domestic violence services); Kersey Decl. ¶ 26 (shift from benefit enrollment); Goldstein Decl.

19   ¶¶ 8–11 (shift from previously spending "virtually no time" on public charge to diverting

20   resources from work on agricultural trends and H2A program); Nakamura Decl. ¶¶ 13–14 (shift

21   from public benefits assistance); Kassa Decl. ¶¶ 15, 17–18 (shift from census participation and

22   other initiatives).

23

24   _____

25   [2] African Communities Together ("ACT"), Council on American Islamic Relations-California
     ("CAIR-CA"), CARECEN, Farmworker Justice ("FJ"), Korean Resource Center ("KRC"), Legal
26   Aid Society of San Mateo County ("Legal Aid"), and Maternal and Child Health Access
     ("MCHA").

27   [3] Contrary to Defendants' arguments, the Ninth Circuit has repeatedly recognized the sufficiency
     of sworn declarations.  *E.g.*, *Valle del Sol*, 732 F.3d at 1018; *Comite de Jornaleros de Redondo
28   Beach v. City of Redondo Beach*, 657 F.3d 936, 943 (9th Cir. 2011) (en banc).

1      The Regulation also has harmed Plaintiff CPCA's members, including Plaintiff La Clínica

2 and AHS, by frustrating their missions to provide quality health care to low-income, immigrant

3 communities because the number of patients seeking medical services and enrolling in Medi-Cal

4 (California's Medicaid), from which they obtain the majority of their funding, have decreased.

5 Castellano-García Decl. ¶¶ 5, 7, 16–22 (estimating members' annual Medi-Cal reimbursement loss

6 of $46 to $138 million ); García Decl. ¶¶ 3, 8–9, 11–13, 14–16, 18 (noting reduced funding may

7 lead to layoffs); Quach Decl. ¶¶ 4, 16–19, 20–24 (estimating annual Medi-Cal reimbursement loss

8 of $5.2 million).  "For standing purposes, a loss of even a small amount of money is ordinarily an

9 injury."  *East Bay*, 932 F.3d at 767 (internal quotation marks and citation omitted).  Defendants

10 argue these injuries are "speculative," but their *own* regulatory analysis acknowledges expected

11 Medicaid disenrollment.  *E.g.*, Kolsky Decl. Ex. A (hereafter "RIA") at 90–101, Tables 16, 19; 84

12 Fed. Reg. 41,292, 41,300.  Funding shortages, fewer patients, and diversion of resources will

13 impair Plaintiffs' ability to provide quality health care to their communities.  García Decl. ¶¶ 13,

14 16, 18, 21; Quach Decl. ¶¶ 26–29.  As a result, Plaintiffs have standing.

15     **B.**       **Plaintiffs' Claims Are Ripe**

16      Plaintiffs' claims are ripe under Article III for the same reasons that they have standing.

17 *See Clark v. City of Seattle*, 899 F.3d 802, 809 (9th Cir. 2018); *Susan B. Anthony List v. Driehaus*,

18 573 U.S. 149, 167–68 (2014).  They also are prudentially ripe under *Cottonwood Environmental*

19 *Law Center v. U.S. Forest Service*, 789 F.3d 1075, 1083 (9th Cir. 2015).  First, delayed review

20 would cause hardship to Plaintiffs because they *already* face frustrations of their missions,

21 diversions of resources, and reductions in funding.  Second, the Regulation is the agency's final

22 action, so judicial intervention does not inappropriately interfere with further administrative

23 action.  Third, Defendants do not identify any factual development necessary for the Court to

24 review the legal issues.  *Lujan v. Nat'l Wildlife Fed.*, 497 U.S. 871, 891 (1990) ("[A] substantive

25 rule which as a practical matter requires the plaintiff to adjust his conduct immediately . . . is 'ripe'

26 for review at once . . . ."); *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (final agency action

27 "mark[s] the 'consummation' of the agency's decisionmaking process").

28

1

### C.   Plaintiffs Are in the Zone of Interests

2   To bring a statutory claim, a plaintiff must be "within the zone of interests protected by the

3   law invoked," *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 127–29

4   (2014) (citation omitted), which means the plaintiff's interests cannot be "so marginally related to

5   or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that

6   Congress intended to permit the suit."  *Clarke v. Secs. Indus. Ass'n*, 479 U.S. 388, 399 (1987).

7   Here, Plaintiffs' interests in serving low-income, immigrant communities by providing

8   medical or legal services and advice as well as access to public benefits are both related to and

9   consistent with the purposes of the Regulation's underlying statute to provide procedures and

10   policies for immigration relief.  *See East Bay*, 932 F.3d at 768–69; 8 U.S.C. § 1182(a)(4)(B); 8

11   C.F.R. § 212.21(a)–(b).  Indeed, the Regulation and RIA count health care providers and non-

12   profit organizations among those who will be affected by the Regulation.  *E.g.*, 84 Fed. Reg. at

13   41,301; RIA at 3–7, Table 11 at 36-37, 101–10 (describing costs to "immigration lawyers,

14   immigration advocacy groups, health care providers of all types, non-profit organizations," and

15   "reduced revenues for healthcare providers participating in Medicaid").  Defendants' argument

16   that only "aliens improperly determined inadmissible" are in the zone of interests, Opp. 10, is

17   contrary to *East Bay*'s holding that plaintiffs like those here are within the statute's zone of

18   interests.  932 F.3d at 768–69 & n.10.  Plaintiffs have shown that they "are, at the least, arguably

19   within the zone of interests" here.  *Id.* at 769 (citation omitted); *see also Lexmark*, 572 U.S. at 130

20   (noting test "is not 'especially demanding'" and "the benefit of any doubt goes to the plaintiff").

21   ### III.   PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS

22   ### A.   The Regulation Is Inconsistent with the Meaning of "Public Charge"

23   Defendants contend that the Regulation's definition of "public charge," one which

24   radically departs from any prior administrative or judicial interpretation, is supported by its plain

25   meaning and by case law.  Defendants fail entirely, however, to contend with the breadth of their

26   Regulation, which on its face adopts a definition of public charge so broad—and so

27   unreasonable—that, if applied to U.S.-born citizens, would cover roughly half of them.  And,

28   Defendants' own chosen dictionary definitions, cases, and prior agency interpretations provide no

1  support for their sweeping change.  Defendants ultimately fall back on their purported rulemaking

2  authority, but that authority, even assuming it exists, is beside the point; the question is whether

3  Defendants' interpretation of Section 1182 is consistent with the statute.  Because it is not, the

4  Regulation is invalid.

5          Defendants' opposition sidesteps the absurd results to which their radical new

6  interpretation inexorably leads.  Although Defendants claim the proposed change "better reflect[s]

7  Congress's legislated policy," Opp. 2, the Regulation will label as "likely to become a public

8  charge" vast numbers of individuals who do not meet the common understanding of that term.

9  Mot. 8, 16–17.  Defendants all but ignore this, neither disputing Plaintiffs' expert's numbers nor

10 attempting to defend their own approach.[4]  Indeed, nowhere do Defendants explain how such a

11 definition could possibly be consistent with the statute's text, purpose, and history.

12         Defendants' cited dictionary definitions in fact confirm that their interpretation of "public

13 charge" is unreasonable.  As noted in the Motion, contemporary definitions of "charge" referred to

14 a person "committed or intrusted [sic] … to the care, custody, or management of another."  Mot. 9

15 (quoting nineteenth century dictionary definitions of charge).  Defendants do not address those

16 definitions, but quote different dictionaries of the same era.  Their only definition of "charge" that

17 actually refers to a person—"a pauper being chargeable to the parish or town"—is entirely

18 consistent with the definitions offered by Plaintiffs.  *See* Opp. 11 (quoting Stewart Rapalje *et al.*,

19 Dict. of Am. and English Law (1888)).  Thus, Defendants' own source material confirms that

20 "public charge" referred in 1882 to a person primarily dependent on the public—in this case a

21 parish or town—to avoid destitution or extreme poverty.[5]

22

23 _____

24 [4] Defendants contend that Plaintiffs' data does not account for the 12/36 standard, Opp. 28 n.23,
   but Defendants do not dispute that an official has no practical means of predicting whether a
   noncitizen will use more or less than 12 months of benefits.  *See* Trisi Decl. ¶ 31.

25

26 [5] Definitions of public charge at the time Congress passed IIRIRA in 1996 likewise point to
   individuals unable to care for themselves and therefore primarily dependent on the public.  *See*
   Opp. 11 n.8 (citing Black's Law Dictionary definition of "a person whom it is necessary to
27 support at public expense by reason of poverty alone or illness and poverty," and *Webster's Third
   New Int'l Dict.* (1986), definition of "a person or thing committed or entrusted to the care,
28 custody, management, or support of another"); *see* Mot. 14–15; 1999 NPRM, 64 Fed. Reg. 28,676

1    Defendants argue that "public charge" is not synonymous with "pauper," Opp. 12, but that

2  is not Plaintiffs' contention.[6]  Instead, Plaintiffs' point is that the term "public charge" "gathers

3  meaning from the words around it" and should be given "a precise and narrow application"

4  because "a word is known by the company it keeps," and such an approach "avoid[s] the giving of

5  unintended breadth to Acts of Congress." *Jarecki v. G. D. Searle & Co.*, 367 U.S. 303, 307

6  (1961); *see* 2A Shambie Singer, *Sutherland Statutory Construction* § 47:16 (7th ed. 2018) (noting

7  that "the coupling of words denotes an intention that they should be understood in the same

8  general sense").  Thus, the term "public charge" gained its more "precise content," *United States*

9  *v. Williams*, 553 U.S. 285, 294 (2008), by its grouping in the early immigration statutes with terms

10  that refer to individuals who, due to mental, physical, or other incapacity, are incapable of

11  supporting themselves absent primary support from the public.

12    In an effort to combat this straightforward statutory construction, Defendants claim that

13  Congress in 1917 moved the public charge provision to disassociate "public charge" from the

14  statutory terms discussed above.  This argument is wrong twice over.  First, Defendants claim that

15  the 1917 statute itself contains a note that it meant to override the Supreme Court's decision in

16  *Gegiow v. Uhl*, 239 U.S. 3 (1915), which held that "public charge" should be construed as similar

17  to the terms around it.  Opp. 14–15.  But in fact that footnote is from a compilation by the

18  Department of Labor *commenting* on the statute.  *Compare* 1917 Act, ch. 29, § 3, 39 Stat. 874 (no

19  footnote) *with* Robe Carl White, *Immigration Laws and Rules of January 1, 1930* 25 n.5 (1935).

20  The statute thus did not indicate any intention to override *Gegiow*.

21    Second, multiple courts rejected *this very argument* shortly after the 1917 Act was passed

22  and instead followed the same canon that Plaintiffs advance.  *See Ex parte Hosaye Sakaguchi*, 277

23  F. 913, 916 (9th Cir. 1922) ("Although in the act of February 5, 1917, under which the present

24  case is to be determined, the location of the words persons likely to become a public charge is

25

26  (providing additional definitions that "unambiguously" apply to a person that likewise require
   dependence on the public for "care [or] custody").

27  [6] As noted above, however, Defendants themselves rely on a definition of public charge that
28  equates the term with pauper, *see* p. 5, *supra*; Opp. 11.

changed . . . this change of location of the words does not change the meaning that should be given them, and that it is still to be held that a person likely to become a public charge is one who, by reason of poverty, insanity, or disease or disability, will probably become a charge on the public." (citation omitted)); *Ex parte Mitchell*, 256 F. 229, 230 (N.D.N.Y. 1919) ("I am unable to see that this change of location of these words in the act changes the meaning that is to be given them. A person likely to become a public charge is one who for some cause or reason appears to be about to become a charge on the public, one who is to be supported at public expense, by reason of poverty, insanity and poverty, disease and poverty, idiocy and poverty, or, it might be, by reason of having committed a crime which, on conviction, would be followed by imprisonment." (citation omitted)). Defendants do not acknowledge these precedents.[7]

As the Motion noted, immigration cases consistently construed the term "public charge" as requiring primary dependence on the public to avoid destitution, and cases outside the immigration context had drawn the same line. Mot. 10–12. Defendants misconstrue these and other cases to claim that they stand for the proposition that any assistance rendered an immigrant a public charge.[8] Opp. 13. Not so. In *Lam Fung Yen v. Frick*, 233 F. 393, 396–97 (6th Cir. 1916), the court found that the immigrant was *not* a public charge on the grounds of never having had a job, but instead was likely to become a public charge because he was a habitual gambler likely to

---

[7] At a minimum, the history of the later-enacted 1990 Act makes clear that the non-public-charge exclusions, such as "pauper" and "professional beggar," were ultimately removed because of their similarity to "public charge." Mot. 11 n.3. This later congressional action makes clear that Congress believed those terms should be construed together.

[8] Defendants claim that state cases cited by Plaintiffs interpret only "state law" and "have no bearing on the interpretation of the public charge ground of inadmissibility," Opp. 13, 15 n.13. The government thus largely fails to engage with the cases Plaintiffs cited in their opening brief that equate public charge with destitution. *See* Mot. 12–13 & nn.4–7. Defendants nonetheless rely on state law themselves, but that authority is inapposite. In *Inhabitants of Guilford v. Inhabitants of Abbott*, 17 Me. 335, 335 (1840), Defendants omit that the person at issue was a "pauper" who had previously been confined due to insanity and was "roving in great destitution in several neighboring towns." In *Town of Hartford v. Town of Hartland*, 19 Vt. 392, 397 (1847), the woman and children found to be public charges were "paupers," and, contrary to Defendants' characterization, they were found not entitled to the $12 per year in rental income. After evaluating "the degree of her destitution and poverty," the court determined that the woman's complete lack of income made her a public charge. *Id.* These cases thus support Plaintiffs' interpretation of public charge.

---

1   be incarcerated. *In re Feinknopf*, 47 F. 447, 447–48 (E.D.N.Y. 1891), dealt with the level of

2   evidence on which an immigration officer must rely to make a public charge determination, but

3   provided no standard. Defendants rely on *United States v. Lipkis*, 56 F. 427, 427–28 (S.D.N.Y.

4   1893), which found that long-term institutionalization renders an immigrant a public charge—a

5   position on which both parties agree. Defendants cannot cite a single federal case to support their

6   chosen interpretation of "public charge." Meanwhile, *Hosaye Sakaguchi* and *Mitchell*, along with

7   the cases cited in Plaintiffs' opening brief, support the longstanding definition.

8        Defendants also downplay and ignore longstanding administrative interpretations of the

9   public charge statute. Defendants do not dispute, nor could they, that the BIA acknowledged in

10  *Matter of Harutunian*, 14 I. & N. Dec. 583, 586 (BIA 1974), the distinction between those benefits

11  on which an individual was primarily dependent and "supplementary benefits" provided by the

12  government. *Harutunian* specifically noted that the term public charge entailed the individual

13  being "destitute." *Id.*; *see also Matter of Perez*, 15 I. & N. Dec. 136, 137 (BIA 1974) (rejecting

14  receipt of benefits as establishing the immigrant was a public charge).

15       And Defendants entirely disregard the 1999 NPRM's determination that benefits like

16  SNAP, Medicaid, and Section 8 vouchers should not be included in the public charge analysis

17  because they are among "[c]ertain Federal, State, and local benefits [that] are increasingly being

18  made available to families with incomes far above the poverty level, reflecting broad public policy

19  decisions about improving general health and nutrition, promoting education, and assisting

20  working-poor families." 64 Fed. Reg. at 28,678. The INS previously recognized that mere receipt

21  of these benefits is not an indication of destitution, but was instead a consequence of decisions by

22  legislatures across the country—including Congress—to provide certain benefits to those who are

23  not in fact destitute. By contrast, Defendants deny that such a public policy choice was made.

24       They instead claim, entirely without support, that those who receive supplemental benefits

25  are equivalent to previous "occupants of almshouses," the only difference being that the

26  government has "deinstitutionalized the poor" and "revised public services in a way that negates

27  the former distinctions among types of public support provided to individuals needing different

28  amounts of aid." Opp. 12 n.10, 17. This contention is belied by the facts that gave rise to the

1   1882 Act.  There, the Act excluded individuals who were public charges, but also imposed on each

2   noncitizen who entered the United States a 50-cent head tax for the purpose of creating an

3   "immigrant fund," An Act to Regulate Immigration, ch. 376, § 1, 22 Stat. 214 (1882), in part to

4   provide "relief of such [immigrants] as are in distress."  *Id.*; *see also Head Money Cases*, 112 U.S.

5   580, 590–91 (1884) (describing the purposes of the fund).  As such, small amounts of aid, under

6   the 1882 statute, did *not* render immigrants "public charges."  And, "the specific context in which

7   . . . language is used" demonstrates that "public charge" cannot encompass benefits that provide

8   relief, but—unlike providing support to occupants of almshouses, asylums, or prisons in 1882—

9   are not indicative of destitution.  *Util. Air Regulatory Grp. v. EPA*, 573 U.S. 302, 321 (2014)

10   (noting that "reasonable statutory interpretation" must include such context).

11   Against this backdrop of consistent judicial and administrative interpretation, Congress

12   repeatedly reenacted the public charge provision and rejected changes to the statute that would

13   have adopted a definition similar to the one advanced in the Regulation.  *See* Mot. 14–16.

14   Defendants contend that this lack of action evidences a desire by Congress to delegate to DHS the

15   definition of public charge.  Opp. 19.  To the contrary, repeated congressional reenactment of the

16   public charge provision and rejection of changes reflects congressional approval of judicial and

17   administrative interpretation.  *See* Mot. 14–16.  In any event, even if Defendants were correct,

18   Congress could delegate to DHS the power only to adopt *reasonable* interpretations of the statute,

19   *Chevron, U.S.A., Inc. v. NRDC*, 467 U.S. 837, 844 (1984), and the text, structure, and history of

20   Section 1182 all make clear that Defendants' interpretation is not reasonable.

21   **B.   The Regulation Is Arbitrary and Capricious**

22   Defendant's Opposition fails to justify the arbitrary and capricious Regulation.

23   **Chilling Effect and Costs:** Defendants' opposition, like the Regulation itself, fails to

24   grapple with the extensive evidence provided in comments addressing the harms and costs.

25   Defendants misconstrue Plaintiffs' argument as focusing on the quantity of comments opposing

26   the rule, Opp. 20; instead, Plaintiffs' argument is that Defendants have not addressed or responded

27   to substantial *evidence* in the comments regarding the Regulation's chilling effect.  That failure

28

1   renders the Regulation arbitrary and capricious.  *See Fred Meyer Stores, Inc. v. NLRB*, 865 F.3d

2   630, 638 (D.C. Cir. 2017); *Genuine Parts Co. v. EPA*, 890 F.3d 304, 311–12 (D.C. Cir. 2018).

3           Defendants first contend that they did in fact adequately consider the chilling effect.  Opp.

4   20–21.  Although Defendants acknowledged its existence, 84 Fed. Reg. at 41,312, they simply

5   dismissed it because "it is difficult to predict the rule's disenrollment impacts with respect to the

6   regulated population," and "with respect to people who are not regulated by this rule." *Id*.

7   Defendants contend, based on *Consumer Electronics Association v. FCC*, 347 F.3d 291, 303 (D.C.

8   Cir. 2003)), that merely noting that forecasting is difficult is sufficient.  Opp. 21.  But in

9   *Consumer Electronics*, the agency did not refuse to take into account projections based on

10  uncertainty; instead, the FCC picked among three general categories of commenters' forecasts.

11  347 F.3d at 303.  Here, Defendants dismissed all the studies wholesale.[9]  Such lack of

12  consideration was not sufficient.  *See Int'l Ladies' Garment Workers' Union v. Donovan*, 722 F.2d

13  795, 821–22 (D.C. Cir. 1983) (vacating agency action that did not "give sufficient consideration to

14  factors that may be highly relevant" and rejecting agency's reliance on "predictive nature of the

15  judgment"); *Fred Meyer Stores, Inc.*, 865 F.3d at 638 (agency must "reflect upon the information

16  contained in the record and grapple with contrary evidence").  Indeed, DHS provided its own

17  estimates for chilling effect in its Final Regulatory Impact Analysis.  RIA at 89–101 & Table 20

18  (calculating potential benefit disenrollment at three different levels).[10]  DHS cannot reasonably

19  claim both that it is too difficult to estimate a chilling effect and simultaneously conduct a cost-

20  benefit analysis that estimates a chilling effect.

---

[9] Defendants' citation (at 24) to *SIFMA v. CFTC*, 67 F. Supp. 3d 373, 432 (D.D.C. 2014), is no more persuasive.  *SIFMA* did not involve a defendant agency disregarding empirical studies in comments, but rather involved a claim that the agency reached a determination for an issue on a record *devoid* of data.  *Id*.  That same case makes clear exactly what an agency should do where, as here, data is available: "The agency's job is to exercise its expertise to make tough choices about which of the competing estimates is most plausible, and to hazard a guess as to which is correct, even if the lack of [data] means that estimate will be imprecise."  *Id.* (quoting *Pub. Citizen v. Fed. Motor Carrier Safety Admin.*, 374 F.3d 1209, 1221 (D.C. Cir. 2004)).

[10] The Regulation violates the APA not because the RIA was flawed, *see* Opp. 21, but because it shows that Defendants did conduct the chilling effect analysis they claim they could not.

Crucially, Plaintiffs do not merely disagree with Defendants' "weighing of the costs and benefits," Opp. 21; Plaintiffs instead claim that Defendants impermissibly dismissed evidence submitted by multiple commenters as to the chilling effects of the Regulation by deeming the "rule's overriding consideration" to be self-sufficiency, and finding that consideration alone to be "a sufficient basis to move [the Regulation] forward." 84 Fed. Reg. at 41,312.  This one concern trumped all others and prevented Defendants from engaging in reasoned decisionmaking.

Defendants similarly claim they grappled with other costs and public health effects, Opp. 23–24, but the same myopic focus on self-sufficiency stopped Defendants from grappling with, for example, "worse health outcomes," "increased prevalence of communicable diseases,' "increased rates of poverty and housing instability," and "reduced productivity and educational attainment." RIA at 109. The Regulation similarly gave inadequate consideration to the costs to hospitals and other medical providers, dismissing them as "administrative" and "familiarization costs," 84 Fed. Reg. at 41,475, while once again justifying them due to self-sufficiency.  Defendants suggest that they were unable to quantify these costs because they were "immeasurable," Opp. 23–24, but fail to explain why the estimates from studies provided in the comments were insufficient to do so. *See Ctr. for Biological Diversity v. Zinke*, 900 F.3d 1053, 1068–70 (9th Cir. 2018).[11]

Finally, Defendants claim that they sufficiently engaged with the myriad comments detailing the negative effects and their costs to the health and well-being of individuals, families, and the nation.  Opp. 23–24.  In the Regulation, Defendants make the conclusory assertion that they "believe[] that it will ultimately strengthen public safety, health, and nutrition through this rule by denying admission or adjustment of status to [individuals] who are not likely to be self-sufficient." 84 Fed. Reg. at 41,314.  But Defendants provide no evidence for how or why this belief is justified.  Defendants were required to explain why their purported benefits outweigh the harms and justify the policy choice made.  *McDonnell Douglas Corp. v. U.S. Dep't of the Air Force*, 375 F.3d 1182, 1187 (D.C. Cir. 2004) (courts "do not defer to the agency's conclusory or

---

[11] While Defendants are correct that the statute in *Zinke* created additional data requirements, Opp. 25 n.22, the Court applied the APA's standard for adequate explanation—a standard Defendants cannot here meet.

1    unsupported suppositions") (citing *Motor Vehicle Manufacturers Ass'n of U.S. v. State Farm*, 463

2    U.S. 29, 44 (1983)).  They failed to do so.

3        **Inconsistency:** In response to Plaintiffs' contention that Defendants can evaluate as a

4    heavily weighted negative factor Medicaid use by pregnant women or children against them in the

5    public charge determination, Defendants assert for the first time in their opposition that Medicaid

6    benefits can constitute "financial resources" to be considered in the public charge determination.

7    Opp. 26.  This is inconsistent with the Regulation, which does not identify Medicaid as an asset,

8    resource, or financial status factor that can be considered when determining whether an individual

9    has sufficient household assets or resources to cover foreseeable medical costs, despite explicitly

10   including private health insurance as an independent means of overcoming the heavily weighted

11   negative factor. 84 Fed. Reg. at 41,412.  In fact, Defendants responded to a commenter asking

12   them to eliminate this heavily weighted factor by stating that "DHS will retain the heavily

13   weighted negative factor [for an individual diagnosed with a serious medical condition] based on

14   *the applicant's lack of financial means* to pay for reasonably foreseeable medical costs *if the*

15   [individual] *does not have private health insurance*."  *Id.* at 41,445 (emphasis added).  The

16   Regulation's treatment of financial resources simply cannot be reconciled with Defendants'

17   litigating position.  *See SEC v. Chenery Corp.*, 318 U.S. 80 (1943).

18       Defendants' attempt to justify their arbitrary distinction between the use of Medicaid (not

19   considered) and SNAP (considered) by children and pregnant women fares no better.  Although

20   Defendants point to differences between the Medicaid and SNAP statutes, they do not dispute that

21   the sponsor, and not the public, would be responsible for the costs of SNAP benefits used by

22   children and pregnant women.  Opp. 26.  This concession exposes the bankruptcy of Defendants'

23   position.  Throughout the Regulation, Defendants sidestep the substantial harms identified by

24   commenters and resort to the principal that individuals should rely on themselves or the "financial

25   resources of the family, [and their] sponsors."  84 Fed. Reg. at 41,486.  They nonetheless did not

26   exempt use of SNAP by children and pregnant women even though SNAP *sponsors* are

27   responsible for the financial costs associated with those benefits.  Defendants have no answer for

28

1    this inconsistent treatment of SNAP, which they concede does not serve the goals of the

2    Regulation.

3        **Calculation of Benefits Usage:** The conclusions of the "multiple studies" Defendants rely

4    on do not support the Defendants' "12/36 Standard."  Under this standard, if an individual is

5    receiving more than one benefit in a given month, that individual could easily run afoul of that

6    factor in as few as four months.  Mot. 25.  To justify their assertion that the 12/36 standard had

7    predictive value Defendants relied heavily on two studies: the "Census Bureau's Dynamics of

8    Economic Well-being study" and the "welfare leaver study."  84 Fed. Reg. at 41,360.  But neither

9    study examines whether concurrent use of benefits over a short duration has any correlation to the

10   length of time a person uses benefits.[12]  As such, Defendants have failed to provide "adequate

11   explanation and support for its determinations." *Zinke*, 900 F.3d at 1068–69 (failure to explain its

12   reliance on a specific studies given other relevant evidence was arbitrary and capricious) (citation

13   omitted).

14       **Defendant Cuccinelli's unlawful appointment:** Defendants do not dispute that

15   Defendant Cuccinelli's appointment was based in part on the Administration's desire to

16   promulgate the Regulation, and that he was significantly involved in the Regulation's

17   promulgation, publicity, and implementation.  Mot. 25–26 & n.13.[13]  Nor do they dispute that the

18   appointment was unprecedented.  Defendants' only substantive response is that Cuccinelli's

19   appointment does not violate the FVRA's remedial provision, 5 U.S.C. § 3348(d).  Opp. 29.  The

20   APA, however, provides a remedy *independent* from Section § 3348(d).  *Southwest General, Inc.*

21   *v. NLRB*, 796 F.3d 67 (D.C. Cir. 2015), *aff'd*, 137 S. Ct. 929 (2017).  In *Southwest General*, the

22

23   [12] The census study examined the behaviors of people enrolled in "one or more major assistance
     programs" without disaggregating participants in one benefit from those enrolled in multiple
24   benefits, while the "welfare leaver" study was limited to recipients of cash assistance, which were
     already considered in the public charge analysis prior to the Regulation. 84 Fed. Reg. at 41,360.

25
     [13] Defendants do not provide substantive responses to Plaintiffs' claims as to the illegality and
26   procedural irregularity of Defendant Cuccinelli's appointment, simply noting instead that they
     "disagree" with Plaintiffs' arguments.  *See* Opp. 29 n.4.  Defendants' response likewise ignores
27   Defendant Cuccinelli's statutory duties to both "establish national immigration services policies
     and priorities," 6 U.S.C. § 271(a)(3)(D), and to "establish the policies for performing" immigrant
28   visa petitions, *id.* § 271(a)(3)(A), (b).

D.C. Circuit found that because an officer who was invalidly appointed under 5 U.S.C. § 3345 was involved in an agency adjudication, that adjudication was invalid under the APA.  796 F.3d at 78–81.  That was true notwithstanding the fact that Section 3348—the remedial provision on which the government relies here—did not apply to the officer under the statute.  *Id.* at 78.  That is, the D.C. Circuit concluded that so long as an officer who was invalidly appointed subject to Section 3345 was involved in an agency action, that action violates the APA, independent of whether or not it separately violates the remedial provision of the FVRA.  The government's reliance on Section 3348 is thus inapposite.  As in *Southwest General*, Plaintiffs assert that Defendant Cuccinelli was unlawfully appointed under Section 3345 and was involved in issuing the regulation.  The Regulation was issued "not in accordance with law" under 5 U.S.C. § 706(2)(A).  Mot. 26 (citing *both* APA and FVRA for vacatur of Regulation).  Vacatur is warranted.  *Id.*

**IV.   PLAINTIFFS WILL SUFFER IRREPARABLE HARM ABSENT AN INJUNCTION**

Plaintiffs will be irreparably harmed.  *See, e.g.*, *California v. Azar*, 911 F.3d 558, 581 (9th Cir. 2018); *Valle del Sol*, 732 F.3d at 1029; *see also* Mot. 28–32.  Defendants' argument that Plaintiffs fail to show magnitude, certainty, and immediacy, Opp. at 30–32, is inconsistent with Circuit precedent.  *California*, 911 F.3d at 581 (only "irreparability, 'irrespective of the magnitude of the injury,'" is required (citation omitted)); *Boardman v. Pac. Seafood Grp.*, 822 F.3d 1011, 1023 (9th Cir. 2016) ("A threat of irreparable harm is sufficiently immediate to warrant preliminary injunctive relief if the plaintiff 'is likely to suffer irreparable harm before a decision on the merits can be rendered.'" (citation omitted)).  Defendants claim that "record-review briefing could occur in a matter of months."  Opp. 31.  But Plaintiffs' declarations demonstrate not only the likelihood that they will suffer irreparable harm during those months absent an injunction, but also that they *already* are suffering those harms and require injunctive relief now.  *See* Mot. 28–32.  Defendants' regulatory analysis also demonstrates the magnitude, certainty, and immediacy of Plaintiffs' harms.  *See, e.g.*, RIA at Tables 1, 16, 19.

**V.   PUBLIC INTEREST AND BALANCE OF EQUITIES FAVOR AN INJUNCTION**

The public interest and balance of equities sharply favors maintaining the status quo because there is substantial public interest in public health, equal application of U.S. immigration

law, and government compliance with the law.  *See California*, 911 F.3d at 582–83; *Valle del Sol Inc.*, 732 F.3d at 1029.  Defendants point only to their authority to administer immigration policy as a public interest, Opp. 32–33, but that neither allows the government to violate the law nor outweighs the significant public interests and equities that favor maintaining the status quo while the Court reviews the legality of Defendants' action.  *E.g.*, *East Bay*, 932 F.3d at 778–79.

## VI.     THE COURT SHOULD GRANT A NATIONWIDE INJUNCTION AND POSTPONE THE EFFECTIVE DATE OF THE REGULATION

The Court should grant a nationwide injunction and postpone the effective date of the Regulation.  5 U.S.C. § 705; *East Bay Sanctuary Covenant v. Trump*, 354 F. Supp. 3d 1094, 1119 n.20 (N.D. Cal. 2018).[14]  An injunction's scope is shaped by what is "necessary to provide complete relief to the plaintiffs."  *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994).  A geographically-limited injunction would not provide complete relief here: Plaintiffs' patients and clients could still be affected by the Regulation based on their present and potential future locations, and the Regulation's chilling effects could increase with ensuing confusion over its patchwork application.  That in turn would still harm Plaintiffs by frustrating their missions, forcing them to divert their resources, and reducing their funding.  Moreover, Plaintiff ACT and FJ are located in New York and Washington, D.C., and directly serve communities and members across the nation.  Kassa Decl. ¶ 3; Goldstein Decl. ¶¶ 3, 5.  Thus, the "breadth" of a nationwide injunction is "necessary to remedy" all Plaintiffs' harms in this case.  *East Bay Sanctuary Covenant v. Barr*, 934 F.3d 1026, 1029 (9th Cir. 2019); *see also Regents of the Univ. of Cal. v. Dep't of Homeland Sec.*, 279 F. Supp. 3d 1011, 1048 (N.D. Cal. 2018).

## VII.     CONCLUSION

For all of the reasons stated above and in Plaintiffs' motion, the Court should issue a nationwide preliminary injunction and postpone the effective date of the regulation.

---

[14] Defendants do not challenge postponing the effective date as a remedy.  Opp. 33–34.

1

2   Dated: September 20, 2019

                                    Respectfully submitted,
3

4                                   */s/ Nicholas Espíritu*
                                    NICHOLAS ESPÍRITU (SBN 237665)
5                                   espiritu@nilc.org
                                    LINTON JOAQUIN (SBN 73547)
6                                   joaquin@nilc.org
                                    ALVARO M. HUERTA (SBN 274787)
7                                   huerta@nilc.org
                                    MAYRA B. JOACHIN (SBN 306065)
8                                   joachin@nilc.org
                                    NATIONAL IMMIGRATION LAW CENTER
9                                   3450 Wilshire Boulevard, #108-62
                                    Los Angeles, CA 90010
10                                  Telephone: (213) 639-3900
                                    Fax: (213) 639-3911
11
                                    ANTIONETTE DOZIER (SBN: 244437)
12                                  adozier@wclp.org
                                    ROBERT D. NEWMAN (SBN) 86534)
13                                  rnewman@wclp.org
                                    DAVID KANE (SBN: 292186)
14                                  dkane@wclp.org
                                    WESTERN CENTER ON LAW & POVERTY
15                                  3701 Wilshire Boulevard, Suite 208
                                    Los Angeles, CA 90010
16                                  Tel: (213) 487-7211
                                    Fax: (213) 487-0242
17
                                    MARTHA JANE PERKINS (SBN 104784)
18                                  perkins@healthlaw.org
                                    NATIONAL HEALTH LAW PROGRAM
19                                  200 N. Greensboro Street, Ste. D-13
                                    Carrboro, NC 27510
20                                  Tel.: (919) 968-6308
                                    Fax: (919) 968-8855
21
                                    LABONI HOQ (SBN 224140)
22                                  lhoq@advancingjustice-la.org
                                    YANIN SENACHAI (SBN 288336)
23                                  ysenachai@advancingjustice-la.org
                                    MICHELLE (MINJU) CHO (SBN 321939)
24                                  mcho@advancingjustice-la.org
                                    ASIAN AMERICANS ADVANCING JUSTICE –
25                                  LOS ANGELES
                                    1145 Wilshire Blvd., 2nd Floor
26                                  Los Angeles, CA 90017
                                    Telephone: (213) 977-7500
27                                  Fax: (213) 977-7500

28                                  TANYA BRODER (SBN 136141)

broder@nilc.org
NATIONAL IMMIGRATION LAW
CENTER
2030 Addison Street, Suite 420
Berkeley, CA 94704
Telephone: (510) 663-8282
Fax: (213) 639-3911

JOANNA ELISE CUEVAS INGRAM** (SBN 290011)
cuevasingram@nilc.org
NATIONAL IMMIGRATION LAW
CENTER
P.O. Box 170392
Brooklyn, NY 11217
Telephone: (213) 377-5258
Fax: (213) 377-5258

MAX S. WOLSON*
wolson@nilc.org
NATIONAL IMMIGRATION LAW
CENTER
P.O. Box 34573
Washington, D.C. 20043
Telephone: (202) 216-0261
Fax: (202) 216-0266

KEVIN HERRERA*
herrera@nilc.org
NATIONAL IMMIGRATION
LAW CENTER
P.O. Box 32358
Chicago, IL 60632-0358
Telephone: (213) 770-1325
Fax: (213) 770-1325

*  Admitted *Pro hac vice*
**Admitted to Practice in New York and California

*Attorneys for Plaintiffs*