UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

LA CLINICA DE LA RAZA, et al.,

    Plaintiffs,

  v.

DONALD J. TRUMP, et al.,

    Defendants.

Case No.  19-cv-04980-PJH

**ORDER GRANTING IN PART, DENYING IN PART, AND DEFERRING RULING IN PART ON MOTION TO DISMISS**

Re: Dkt. No. 166

  Before the court is defendants Donald J. Trump, the Department of Homeland Security ("DHS"), the U.S. Citizenship and Immigration Service ("USCIS"), Chad Wolf,[1] and Kenneth Cuccinelli's (collectively "defendants") motion to dismiss.  The matter is fully briefed and suitable for decision without oral argument.  Having read the parties' papers and carefully considered their arguments and the relevant legal authority, and good cause appearing, the court hereby rules as follows.

## BACKGROUND

  This case involves a challenge to the implementation of the final rule entitled "Inadmissibility on Public Charge Grounds," published by DHS on August 14, 2019.  See Inadmissibility on Public Charge Grounds, 84 Fed. Reg. 41,292 (Aug. 14, 2019) ("the Rule").  On October 10, 2018, DHS began the rulemaking process to create a new framework for the public charge assessment by publishing a Notice of Proposed

---

[1] Kevin McAleenen was originally named in the complaint, (Dkt. 1, ¶ 48); however, the FAC reflects the fact that Chad Wolf has replaced McAleenan as acting Secretary of Homeland Security.

Rulemaking ("NPRM").  See Inadmissibility on Public Charge Grounds, 83 Fed. Reg. 51,114 (Oct. 10, 2018).  The Rule was originally set to become effective on October 15, 2019.

Publication of the Rule resulted in several complaints filed in federal district courts across the nation.  Three such complaints were filed in the Northern District of California and related before this court.  Dkt. 24.  The present motion involves one of the three cases: La Clínica de la Raza, et al. v. Donald J. Trump, et al., Case No. 19-cv-04980-PJH, wherein the La Clínica De La Raza and California Primary Care Association (the two together are the "healthcare organizations"), Maternal and Child Health Access, Farmworker Justice, Council on American Islamic Relations–California, African Communities Together, Legal Aid Society of San Mateo County, Central American Resource Center, and Korean Resource Center (the "legal organizations" and, together with the healthcare organizations, the "organizational plaintiffs" or "plaintiffs") filed a first amended complaint ("FAC") asserting eight causes of action: (1) Violation of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706—Contrary to Law; (2) Violation of APA, 5 U.S.C. § 706—Arbitrary and Capricious; (3) Violation of APA, 5 U.S.C. § 706—Arbitrary and Capricious; (4) Violation of APA, 5 U.S.C. § 706—Arbitrary and Capricious; (5) Violation of the Federal Vacancies Reform Act ("FVRA"), 5 U.S.C. § 3345 et seq., and DHS Organic Statute, 6 U.S.C. § 113; (6) Violation of the Federal Vacancies Reform Act, 5 U.S.C. § 3345 et seq.; (7)  Violation of the Fifth Amendment; and (8) Declaratory Judgment Act—Unlawfully Appointed Agency Director.  Dkt. 161.

On October 11, 2019, this court issued a preliminary injunction enjoining defendants from applying the Rule to any person residing in the City and County of San Francisco, Santa Clara County, the States of California, Oregon, or Maine, the Commonwealth of Pennsylvania, or the District of Columbia.  Dkt. 131 at 92.  Defendants appealed the preliminary injunction on October 30, 2019.  Dkt. 129.  A three-judge panel

United States District Court
Northern District of California

1    of the Ninth Circuit stayed the preliminary injunction on December 5, 2019.[2]  Dkt. 141;

2    see City & Cty. of San Francisco v. U.S. Citizenship & Immigration Servs., 944 F.3d 773

3    (9th Cir. 2019).  On February 18, 2020, the Ninth Circuit panel voted to deny plaintiffs-

4    appellees' motions for reconsideration and for rehearing en banc.  Dkt. 153.  Other

5    district courts also issued preliminary injunctions prohibiting enforcement of the Rule, but

6    these were ultimately stayed by the Supreme Court.  See Dep't of Homeland Security v.

7    New York, 140 S. Ct. 599 (2020); Wolf v. Cook Cty., Illinois, 140 S. Ct. 681 (2020).

8    Accordingly, the Rule went into effect on February 24, 2020.  Most recently, the district

9    court for the Southern District of New York enjoined the Rule as long as the government

10   has declared a public health emergency related to COVID-19.  See New York v. Dep't of

11   Homeland Sec., — F. Supp. 3d —, Nos. 19 Civ. 7777 (GBD), 19 Civ. 7993 (GBD), 2020

12   WL 4347264, at *14 (S.D.N.Y. July 29, 2020).

13        A broader summary of the relevant statutory framework and the changes

14   implemented by the Rule may be found in the court's preliminary injunction order.  Dkt.

15   131 at 6–10.  To briefly summarize here, DHS promulgated the Rule pursuant to its

16   authority under the INA, 8 U.S.C. § 1101, et seq., which requires that all noncitizens

17   seeking to be lawfully admitted into the United States or to become lawful permanent

18   residents prove they are not inadmissible.  8 U.S.C. §§ 1361, 1225(a).  A noncitizen may

19   be deemed inadmissible on any number of grounds, including that they are "likely at any

20   time to become a public charge."  8 U.S.C. § 1182(a)(4)(A).  The statute directs

21   immigration officials to form an opinion as to whether the applicant "is likely at any time to

22   become a public charge."  Id.  In forming that opinion, immigration officers must consider

23   "at a minimum" five statutorily-defined factors: (1) age; (2) health; (3) family status; (4)

24   assets, resources, and financial status; (5) education and skills.  8 U.S.C.

25

26   _____

27   [2] The panel consolidated the three related cases before this court with a similar case
     from the Eastern District of Washington.  That court issued a nationwide injunction of the
     Rule on the same day as this court's geographically limited preliminary injunction order.

28   Washington v. U.S. Dep't of Homeland Security, 408 F. Supp. 3d 1191, 1224 (E.D.
     Wash. 2019).

1 § 1182(a)(4)(B)(i).  The Rule would define the term "public charge" and set out various

2 criteria for government officials as part of their totality of the circumstances determination.

3 **DISCUSSION**

4 **A.    Legal Standard**

5     **1.    Rule 12(b)(1)**

6     A federal court may dismiss an action under Federal Rule of Civil Procedure

7 12(b)(1) for lack of federal subject matter jurisdiction.  Fed. R. Civ. P. 12(b)(1).  Rule

8 12(h)(3) similarly provides that a court "must dismiss the action" if it "determines at any

9 time that it lacks subject-matter jurisdiction."  Fed. R. Civ. P. 12(h)(3).  "Federal courts are

10 courts of limited jurisdiction" and the burden of establishing subject matter jurisdiction

11 "rests upon the party asserting jurisdiction."  Kokkonen v. Guardian Life Ins. Co. of Am.,

12 511 U.S. 375, 377 (1994) (citations omitted).

13     A jurisdictional challenge may be facial or factual.  Safe Air for Everyone v. Meyer,

14 373 F.3d 1035, 1039 (9th Cir. 2004).  When the attack is facial, the court determines

15 whether the allegations contained in the complaint are sufficient on their face to invoke

16 federal jurisdiction.  Id.  Where the attack is factual, however, "the court need not

17 presume the truthfulness of the plaintiff's allegations."  Id.

18     When resolving a factual dispute about its federal subject matter jurisdiction, a

19 court may review extrinsic evidence beyond the complaint without converting a motion to

20 dismiss into one for summary judgment.  McCarthy v. United States, 850 F.2d 558, 560

21 (9th Cir. 1988) (holding that a court "may review any evidence, such as affidavits and

22 testimony, to resolve factual disputes concerning the existence of jurisdiction"); see also

23 Land v. Dollar, 330 U.S. 731, 735 n.4 (1947) ("[W]hen a question of the District Court's

24 jurisdiction is raised . . . the court may inquire by affidavits or otherwise, into the facts as

25 they exist.").  "Once the moving party has converted the motion to dismiss into a factual

26 motion by presenting affidavits or other evidence properly brought before the court, the

27 party opposing the motion must furnish affidavits or other evidence necessary to satisfy

28 its burden of establishing subject matter jurisdiction."  Safe Air for Everyone, 373 F.3d at

United States District Court<br>Northern District of California

4

1039.

The Ninth Circuit has noted that "jurisdictional dismissals in cases premised on federal-question jurisdiction are exceptional, and must satisfy the requirements specified in Bell v. Hood, 327 U.S. 678 (1946)." Safe Air for Everyone, 373 F.3d at 1039 (quoting Sun Valley Gas., Inc. v. Ernst Enters., 711 F.2d 138, 140 (9th Cir. 1983)). "In Bell, the Supreme Court determined that jurisdictional dismissals are warranted 'where the alleged claim under the constitution or federal statutes clearly appears to be immaterial and made solely for the purpose of obtaining federal jurisdiction or where such claim is wholly insubstantial and frivolous.'" Id. (quoting Bell, 327 U.S. at 682–83).

### 2.    Rule 12(b)(6)

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests for the legal sufficiency of the claims alleged in the complaint.  Ileto v. Glock Inc., 349 F.3d 1191, 1199–1200 (9th Cir. 2003).  Under Federal Rule of Civil Procedure 8, which requires that a complaint include a "short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), a complaint may be dismissed under Rule 12(b)(6) if the plaintiff fails to state a cognizable legal theory, or has not alleged sufficient facts to support a cognizable legal theory.  Somers v. Apple, Inc., 729 F.3d 953, 959 (9th Cir. 2013).

While the court is to accept as true all the factual allegations in the complaint, legally conclusory statements, not supported by actual factual allegations, need not be accepted.  Ashcroft v. Iqbal, 556 U.S. 662, 678–79 (2009).  The complaint must proffer sufficient facts to state a claim for relief that is plausible on its face.  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 558–59 (2007).

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Iqbal, 556 U.S. at 678.  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'"  Id. at 679 (quoting Fed. R. Civ.

United States District Court
Northern District of California

P. 8(a)(2)).  Where dismissal is warranted, it is generally without prejudice, unless it is clear the complaint cannot be saved by any amendment.  In re Daou Sys., Inc., 411 F.3d 1006, 1013 (9th Cir. 2005).

Review is generally limited to the contents of the complaint, although the court can also consider documents "whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the plaintiff's pleading."  Knievel v. ESPN, 393 F.3d 1068, 1076 (9th Cir. 2005) (quoting In re Silicon Graphics Inc. Sec. Litig., 183 F.3d 970, 986 (9th Cir. 1999), superseded by statute on other grounds as stated in In re Quality Sys., Inc. Sec. Litig., 865 F.3d 1130 (9th Cir. 2017)); see also Sanders v. Brown, 504 F.3d 903, 910 (9th Cir. 2007) ("[A] court can consider a document on which the complaint relies if the document is central to the plaintiff's claim, and no party questions the authenticity of the document." (citation omitted)).  The court may also consider matters that are properly the subject of judicial notice (Lee v. City of Los Angeles, 250 F.3d 668, 688–89 (9th Cir. 2001)), and exhibits attached to the complaint (Hal Roach Studios, Inc. v. Richard Feiner & Co., Inc., 896 F.2d 1542, 1555 n.19 (9th Cir. 1989)).

**B.     Analysis**

    **1.     Standing**

Federal courts may adjudicate only actual cases or controversies, U.S. Const. art. III, § 2, and may not render advisory opinions as to what the law ought to be or affecting a dispute that has not yet arisen.  Aetna Life Ins. Co. of Hartford, Conn. v. Haworth, 300 U.S. 227, 240 (1937).  Article III's "standing" requirements limit the court's subject matter jurisdiction.  Cetacean Cmty. v. Bush, 386 F.3d 1169, 1174 (9th Cir. 2004) (citing Steel Co. v. Citizens for a Better Environment, 523 U.S. 83, 101 (1998)).  The burden of establishing standing rests on the party asserting the claim.  Renne v. Geary, 501 U.S. 312, 316 (1991) (citing Bender v. Williamsport Area Sch. Dist., 475 U.S. 534, 546 n.8 (1986)).  "In order to establish Article III standing, a plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the

United States District Court
Northern District of California

defendant, and (3) that is likely to be redressed by a favorable judicial decision." California v. Trump, 963 F.3d 926, 935 (9th Cir. 2020) (citing Lujan v. Defs. of Wildlife, 504 U.S. 555, 560–61 (1992)). "[A]t the pleading stage, the plaintiff must 'clearly . . . allege facts demonstrating' each element." Spokeo Inc. v. Robins, 136 S. Ct. 1540, 1547 (2016) (second alteration in original) (quoting Warth v. Seldin, 422 U.S. 490, 518 (1975)).

"At least one plaintiff must have standing to seek each form of relief requested, and that party bears the burden of establishing the elements of standing with the manner and degree of evidence required at the successive stages of the litigation." E. Bay Sanctuary Covenant v. Trump ("E. Bay Sanctuary I"), 932 F.3d 742, 763–64 (9th Cir. 2018) (internal quotation marks and citations omitted). They "need only establish a risk or threat of injury to satisfy the actual injury requirement." Id.; see also Dep't of Commerce v. New York, 139 S. Ct. 2551, 2565 (2019) (noting that future injuries to states "may suffice if the threatened injury is certainly impending, or there is a substantial risk that the harm will occur" (quoting Susan B. Anthony List v. Driehaus, 573 U.S. 149, 158 (2014))).

Organizations can demonstrate standing in two ways. First, they can show "that the challenged 'practices have perceptibly impaired [their] ability to provide the services [they were] formed to provide.'" E. Bay Sanctuary I, 932 F.3d at 765 (alterations in original) (quoting El Rescate Legal Servs., Inc. v. Exec. Office of Immigration Review, 959 F.2d 742, 748 (9th Cir. 1991)). "[A] diversion-of-resources injury is sufficient to establish organizational standing for purposes of Article III if the organization shows that, independent of the litigation, the challenged policy frustrates the organization's goals and requires the organization to expend resources in representing clients they otherwise would spend in other ways." Id. (internal quotation marks and citations omitted). Second, organizations can also demonstrate that a government policy "will cause them to lose a substantial amount of funding. 'For standing purposes, a loss of even a small amount of money is ordinarily an injury.'" Id. at 766–67 (internal quotation marks omitted) (quoting Czyzewski v. Jevic Holding Corp., 137 U.S. 973, 983 (2017)).

In the preliminary injunction order, the court found that the harm alleged by plaintiffs was sufficient to create standing. Dkt. 131 at 85. The court noted evidence from both the healthcare organizations and the legal organizations that the Rule would cause them to either divert resources from their core missions or would frustrate the purpose of the organization. Id. at 84–85. The court also found persuasive evidence that plaintiffs would have to divert funding because clients who may still be eligible for relief would require additional time and resources from plaintiffs thereby depleting funds that would be used elsewhere. Id. at 85. Some plaintiffs would have increased operational costs in order to address the impact of the Rule on their services. Id.

In their present motion, defendants assert that plaintiffs have not demonstrated that they would have suffered some other injury if they had not diverted resources to counteracting the problem caused by the government action. Mtn. at 6. More specifically, while plaintiffs allege that they have expended or will expend additional resources, defendants contend that plaintiffs have not identified some other injury they will suffer if they do not divert resources towards addressing their concerns. Id. Plaintiffs argue that they have sufficiently alleged that they have diverted and will divert resources to counteract the effects of the Rule. Opp. at 4. They also contend that they will face direct financial consequences from the Rule because a decrease in the use of benefits and plaintiffs' services will reduce funding streams connected to provision of services. Id.

Defendants' renewed standing argument does not alter this court's prior findings. Defendants cite La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest, 624 F.3d 1083, 1088 (9th Cir. 2010), for the proposition that an organization "must . . . show that it would have suffered some other injury if it had not diverted resources to counteracting the problem." Organizations "cannot manufacture the injury by incurring litigation costs or simply choosing to spending money fixing a problem that otherwise would not affect the organization at all." Id. (citation omitted). Plaintiffs have adequately alleged that the Rule will cause them to divert resources that would otherwise be spent helping some clients and providing other core services and redirecting those resources to

8

1    help clients who choose to apply for benefits and may be subject to the Rule.  First,

2    plaintiffs demonstrate that they will be injured by the Rule if they do nothing.  For

3    example, La Clínica produced evidence that the Rule would increase the organization's

4    no-show rate due to a decrease in patients seeking care.  Dkt. 35-5, ¶ 16.  La Clínica

5    went on to explain that it receives a large portion of its revenue from Medi-Cal such that

6    disenrollment or non-enrollment in Medi-Cal would negatively affect La Clínica's revenue.

7    This harm is and will continue to occur regardless of whether plaintiffs divert resources to

8    respond to the Rule.

9           Next, in response to the pending loss of resources, plaintiffs demonstrate that they

10   diverted and will continue to divert resources.  For example, La Clínica presented

11   evidence that it would have to retrain staff on a new enrollment process in response to

12   the Rule, staff that would otherwise be treating patients.  Id. ¶ 21.  One of plaintiff

13   California Primary Care Association's ("CPCA")[3] members, Asian Health Services,

14   presented evidence that at the time of the Rule's promulgation, it had spent $500,000

15   developing a national education campaign and expected to spend an additional $500,000

16   once the Rule was released.  Dkt. 35-11, ¶¶ 26–29.  This money would have been used

17   to advance other community organizing priorities.  Accordingly, plaintiffs have sufficiently

18   demonstrated standing under a diversion of resources theory.

19          Separately, plaintiffs have also alleged that they will suffer direct financial

20   consequences as a result of the Rule because the Rule will cause a decrease in the use

21   of plaintiffs' services and a corresponding reduction in funding streams connected to

22   provision of those services.  See FAC ¶¶ 17, 21, 25, 33, 38, 40; Dkt. 35-5, ¶ 18 (La

23   Clínica's CEO stating "La Clínica expects to lose a significant amount of funding and

24

25   [3] Defendants challenge CPCA's associational standing on the grounds that CPCA has
     neither alleged nor provided evidence of associational standing.  Mtn. at 5 n.2.  CPCA is
26   an association of various organizations and is bringing suit on behalf of its members.
     FAC ¶ 18.  In its prior order, the court determined that La Clínica and CPCA's member,
27   Asian Health Services, had diverted resources such that they had standing.  Dkt. 131 at
     84.  Other than citing a case for the requirements for associational standing, defendants
28   put forward no further argument explaining why the court's prior finding should not apply
     here.

United States District Court
Northern District of California

revenue if the Rule is implemented").  As cited above, organizations "can demonstrate organizational standing by showing that the Rule will cause them to lose a substantial amount of funding."  E. Bay Sanctuary I, 932 F.3d at 766–67.  Defendants make no effort to challenge plaintiffs' allegations or evidence that plaintiffs will suffer a loss in funding.

Instead, defendants only argue that any loss in funding would be commensurate with a decrease in the quantity of services provided such that plaintiffs have not suffered any net financial harm.  Reply at 1–2.  Defendants' argument contorts the injury-in-fact requirement beyond what is required by plaintiffs and cite no authority that a plaintiff not only has to show injury but also a "net" injury.  The Ninth Circuit rejected a similar argument that a hospice provider could only have standing to challenge a regulation if the provider suffered a net increase in its overpayment liability.  See L.A. Haven Hospice, Inc. v. Sebelius, 638 F.3d 644, 657 (9th Cir. 2011); see also Aluminum Co. of Am. v. Bonneville Power Admin., 903 F.2d 585, 590 (9th Cir. 1989) ("There is harm in paying rates that may be excessive, no what the California utilities may have saved.").  Simply put, defendants' argument is not the test for standing.  "[A]n organization that suffers a decreased 'amount of business' and 'lost revenue' due to a government policy 'easily satisf[ies] the injury in fact standing requirement.'"  E. Bay Sanctuary I, 932 F.3d at 767 (second alteration in original) (internal quotation marks omitted) (quoting Constr. Indus. Ass'n Sonoma Cty. v. City of Petaluma, 522 F.2d 897, 903 (9th Cir. 1975)).  By demonstrating a reduction in funding, plaintiffs have sufficiently alleged the Rule has and will continue to harm them.

For the foregoing reasons, the court DENIES defendants' motion with respect to standing.

### 2.    Ripeness

"Ripeness is an Article III doctrine designed to ensure that courts adjudicate live cases or controversies and do not 'issue advisory opinions [or] declare rights in hypothetical cases.'  A proper ripeness inquiry contains a constitutional and a prudential component."  Bishop Paiute Tribe v. Inyo Cty., 863 F.3d 1144, 1153 (9th Cir. 2017)

(alteration in original) (quoting Thomas v. Anchorage Equal Rights Comm'n, 220 F.3d 1134, 1138 (9th Cir. 2000) (en banc)).

"For a case to be ripe, it must present issues that are definite and concrete, not hypothetical or abstract.  Constitutional ripeness is often treated under the rubric of standing because ripeness coincides squarely with standing's injury in fact prong."  Id. (internal quotation marks and citation omitted); see Thomas, 220 F.3d at 1138–39 ("Sorting out where standing ends and ripeness begins is not an easy task. . . . [I]n 'measuring whether the litigant has asserted an injury that is real and concrete rather than speculative and hypothetical, the ripeness inquiry merges almost completely with standing.'" (citation omitted)).  Allegations that a "threat" to a "concrete interest is actual and imminent" are sufficient to allege "an injury in fact that meets the requirements of constitutional ripeness."  Bishop Paiute Tribe, 863 F.3d at 1154.  Therefore, if plaintiffs satisfy the Article III standing requirements under Lujan v. Defenders of Wildlife, addressed above, the action here is ripe.  See, e.g., Thomas, 220 F.3d at 1139 ("Whether the question is viewed as one of standing or ripeness, the Constitution mandates that prior to our exercise of jurisdiction there exist a constitutional 'case or controversy,' that the issues presented are 'definite and concrete, not hypothetical or abstract.' . . . We need not delve into the nuances of the distinction between the injury in fact prong of standing and the constitutional component of ripeness: in this case, the analysis is the same." (citations omitted)).

"In evaluating the prudential aspects of ripeness, our analysis is guided by two overarching considerations: 'the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration.'"  Id. at 1141 (quoting Abbott Labs. v. Gardner, 387 U.S. 136, 149 (1967), abrogated on other grounds by Califano v. Sanders, 430 U.S. 99 (1977)).  When the question presented "is 'a purely legal one'" that "constitutes 'final agency action' within the meaning of § 10 of the APA," that suggests the issue is fit for judicial decision.  Nat'l Park Hosp. Ass'n v. Dep't of Interior, 538 U.S. 803, 812 (2003).  However, an issue may not be ripe for review if "further factual

United States District Court
Northern District of California

1   development would 'significantly advance our ability to deal with the legal issues

2   presented.'" Id. (quoting Duke Power Co. v. Carolina Envtl. Study Grp., Inc., 438 U.S. 59,

3   82 (1978)).

4        In this case, the court has determined that plaintiffs have standing, therefore, it

5   follows that the case is constitutionally ripe for adjudication. See Thomas, 220 F.3d at

6   1139. The court has not previously addressed prudential ripeness. Defendants contend

7   that plaintiffs' claims fail the prudential ripeness standard because the claims are

8   premised on speculation about the Rule's operation in practice and further factual

9   development is required. Mtn. at 7–8. Plaintiffs assert that the prudential ripeness

10   standard is met because the Rule is final and they are suffering injuries. Opp. at 4.

11        "Determining whether administrative action is ripe for judicial review requires [a

12   court] to evaluate (1) the fitness of the issues for judicial decision and (2) the hardship to

13   the parties of withholding court consideration." Nat'l Park Hosp. Ass'n, 538 U.S. at 808

14   (citing Abbott Labs., 387 U.S. at 149). When considering whether issues are fit for

15   review, the question should be a "purely legal one" and the agency action in question

16   should constitute a "'final agency action' within the meaning of § 10 of the APA." Id. at

17   812 (quoting Abbott Labs., 387 U.S. at 149).

18        The second factor examines "the hardship to the parties of withholding court

19   consideration." Id. at 808. Generally, a showing of hardship requires demonstrating that

20   the regulation in question creates "adverse effects of a strictly legal kind." Id. at 809

21   (quoting Ohio Forestry Ass'n, Inc. v. Sierra Club, 523 U.S. 726, 733 (1998)). Such

22   adverse effects do not arise if the regulation in question "do[es] not command anyone to

23   do anything or to refrain from doing anything; [it] do[es] not grant, withhold, or modify any

24   formal legal license, power, or authority; [it] do[es] not subject anyone to any civil or

25   criminal liability; [and it] create[s] no legal rights or obligations." Id. (alterations in original)

26   (quoting Ohio Forestry Ass'n, 523 U.S. at 733).

27        Here, the challenge to the Rule in this case "is a purely legal one," i.e., whether the

28   INA was properly construed and implemented by DHS. See Abbott Labs., 387 U.S. at

149 (noting that "whether the statute was properly construed by the Commissioner" to be a purely legal challenge).  Next, the Rule constitutes a "rule" as defined by the APA.  See 5 U.S.C. § 551(4), (13) (defining "agency action" and "rule").  The text of the Rule confirms that its promulgation was an agency action.  See 84 Fed. Reg. at 41,294 ("This rule changes how the Department of Homeland Security (DHS) interprets and implements the public charge ground of inadmissibility.").  This factor indicates the Rule is ripe for review.

With respect to hardship, the Rule imposes potential adverse effects of a strictly legal kind.  If an alien falls within the Rule's definition of a public charge as determined by an immigration officer, then he or she is inadmissible.  In other words, the Rule defines a legal right—admissibility to the United States.  Concurrently, it also defines the legal powers and authorities of federal government officials in evaluating whether an alien is admissible.  The Rule does not define the legal rights of plaintiffs or create any legal obligations directly impacting them.  However, the potential adverse effects on individuals cause a direct harm to plaintiffs, as discussed above with regard to plaintiffs' standing.  For example, fewer individuals using plaintiffs' services results in a corresponding reduction in funding to plaintiffs.

Defendants argue that plaintiffs' claims are all premised on speculation about the potential future effects of the Rule and disagreement with DHS's predictions based on available evidence.  Mtn. at 7–8.  The Rule went into effect on February 24, 2020 after the Supreme Court stayed the final remaining preliminary injunction enjoining the Rule.  Plaintiffs' FAC was filed May 20, 2020.  Thus, they have had a period of approximately three months to assess the impact of the Rule.  The FAC alleges current harms stemming from the Rule.  For example, plaintiff Farmworker Justice ("FJ") alleges that "[b]eginning in March 2020, FJ has been addressing concerns that farmworkers have about the implications of the public charge Regulation when seeking to take action to prevent or treat COVID-19."  FAC ¶ 31.  Plaintiff Maternal and Child Health Access ("MCHA") alleges the "Regulation is frustrating MCHA's mission by reducing access to

United States District Court
Northern District of California

nutrition, medical care, and adequate housing.  Immigrant families who MCHA serves are already disenrolling from public benefit programs, such as SNAP and Medicaid, based on fears that using those programs will affect their future immigration relief options."  Id. ¶ 27 (emphasis added).

Plaintiffs' challenge is not speculative and further factual development of the Rule's impact is not needed for purposes of ripeness.  Accordingly, the court DENIES defendants' motion with respect to ripeness.

### 3.    Zone of Interests

In order to succeed on the merits, plaintiffs must be within the zone of interests of the statute that forms the basis of their challenge.  The zone of interests analysis asks "whether Congress created a private cause of action in legislation," Organized Vill. of Kake v. U.S. Dep't of Agric., 795 F.3d 956, 964 (9th Cir. 2015) (en banc), such that "this particular class of persons has a right to sue under this substantive statute," Lexmark Int'l, Inc. v. Static Control Components, Inc., 572 U.S. 118, 127 (2014).  It is "not a question of Article III standing" and "this inquiry . . . 'does not implicate subject-matter jurisdiction . . . .'"  Organized Vill. of Kake, 795 F.3d at 964 (quoting Lexmark, 572 U.S. at 128 & n.4).  "[I]n the APA context, . . . the [zone of interests] test is not 'especially demanding.'"  Lexmark, 572 U.S. at 130 (quoting Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak, 567 U.S. 209, 225–26 (2012)).

"Whether a plaintiff's interest is 'arguably . . . protected . . . by the statute' within the meaning of the zone-of-interests test is to be determined not by reference to the overall purpose of the Act in question[,] . . . but by reference to the particular provision of law upon which the plaintiff relies."  Bennett v. Spear, 520 U.S. 154, 175–76 (1997) (first and second alterations in original) (quoting Ass'n of Data Processing Serv. Orgs., Inc. v. Camp, 397 U.S. 150, 153 (1970)).  Put differently, "the plaintiff must establish that the injury he complains of . . . falls within the 'zone of interests' sought to be protected by the statutory provision whose violation forms the legal basis for his complaint."  Id. at 176 (alteration in original) (quoting Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 883 (1990); and

citing Air Courier Conf. v. Postal Workers, 498 U.S. 517, 523–24 (1991); see also E. Bay Sanctuary I, 932 F.3d at 768 n.9 ("'[W]e are not limited to considering the [specific] statute under which [plaintiffs] sued, but may consider any provision that helps us to understand Congress'[s] overall purposes in the [INA].'" (alterations in original) (quoting Clarke v. Sec. Indus. Ass'n, 479 U.S. 388, 401 (1987))). "[F]or APA challenges, a plaintiff can satisfy the test in either one of two ways: (1) 'if it is among those [who] Congress expressly or directly indicated were the intended beneficiaries of a statute,' or (2) 'if it is a suitable challenger to enforce the statute—that is, if its interests are sufficiently congruent with those of the intended beneficiaries that the litigants are not more likely to frustrate than to further . . . statutory objectives.'" California, 963 F.3d at 941–42 (second and third alterations in original) (quoting Scheduled Airlines Traffic Offices, Inc. v. Dep't of Def., 87 F.3d 1356, 1359 (D.C. Cir. 1996)).

### i.   APA Zone of Interests

In the preliminary injunction order, this court determined that the organizational plaintiffs did not fall within the zone of interests for three reasons. First, the court reasoned that simply being negatively affected by the Rule does not establish that the organizational plaintiffs fell within the INA's zone of interest. Dkt. 131 at 71. Second, the organizational plaintiffs' briefing failed to identify or explain what statutory provisions supported their argument. When plaintiffs later identified a statutory section at the hearing, 8 U.S.C. § 1611, they did not demonstrate how that section had any integral relationship with 8 U.S.C. § 1182(a)(4) or explain how § 1611 was related to the organizational plaintiffs' role. Id. at 71–72. Third, the court explained that the organizational plaintiffs "simply fail[ed] to explain how their interests related to § 1182(a)(4)'s purpose of excluding immigrants likely to become public charges. Id. at 72.

Defendants argue that the court should now dismiss plaintiffs' claims because they do not fall within the zone of interests of the INA. Mtn. at 8. In particular, they argue that the INA's zone of interest extends to aliens improperly determined to be inadmissible, not

United States District Court
Northern District of California

organizations seeking to assist those aliens.  Id. at 8–9.  In response, plaintiffs advance three reasons why they fall within the zone of interest of the INA.  First, one set of interests implicated by the public charge provision is to accurately identify which immigrants are likely to become a public charge and deny them admission.  Opp. at 7.  Plaintiffs allege that several of the legal organization plaintiffs represent individuals who fit their description.  Id. (citing FAC ¶¶ 33–37, 39–40, 42–43).  Second, a second set of interests implicated by the public charge provision concerns the health and economic status of immigrants who are granted admission to the United States.  Id. at 9.  Plaintiffs allege that their missions, either in whole or in part, is to protect and improve the health and economic status of immigrant communities and they help immigrants avoid becoming public charges.  Id.  Third, the Rule itself presupposes impact on and the involvement of the organizational plaintiffs.  Id. at 9–10.

The court begins with the three appellate opinions discussing the Rule.[4]  The Ninth Circuit's opinion staying this court's preliminary injunction noted that the organizational plaintiffs were not parties to the appeal and did not express any opinion on zone of interests more generally.  See City & Cty. of San Francisco, 944 F.3d at 784 n.7 & 786 n.8.  In its order affirming a preliminary injunction staying the Rule, the Seventh Circuit succinctly framed the zone of interest issue concerning an immigrant aid organization plaintiff:

> we accept that [the aid organization] helps immigrants navigate the INA's various requirements, including the public-charge rule, and it has an interest in ensuring that immigrants are not improperly denied adjustment of status or removed from the country because of confusion over DHS's Rule.  But the link

---

[4] The Fourth Circuit recently issued an opinion reversing a preliminary injunction enjoining the Rule.  Casa de Md., Inc. v. Trump, No. 19-2222, (4th Cir. Aug. 5, 2020).  The court found that the organization plaintiff in that case did not have standing and, therefore, did not address the zone of interests test.  The Fourth Circuit's holding with regard to standing does not compel a different result here.  There, the court reasoned that the organization's voluntary "budgetary choice[]" like spending money on legal action is not a cognizable Article III injury.  Slip. op. at 23.  Here, plaintiffs have demonstrated loss in revenue due to disenrollment or non-utilization of services for which they are reimbursed.  In other words, because plaintiffs are harmed regardless of their voluntary budgetary choices, they have standing.

> between these injuries and the purpose of the public-charge part of the statute is more attenuated, and thus it is harder to say that the injury [the organization] has asserted meets the "zone-of-interests" test.

Cook Cty., Illinois v. Wolf, 962 F.3d 208, 221 (7th Cir. 2020).  The court declined to resolve the organization's status since only one plaintiff was required to demonstrate it fell within the zone of interests and a different plaintiff, Cook County, met that criteria.  Id. at 220.  Most recently, the Second Circuit, in an opinion affirming a preliminary injunction enjoining the Rule, held that aid organizations were within the zone of interests.  New York v. Dep't of Homeland Sec., — F.3d —, Nos. 19-3591, 19-3595, 2020 WL 4457951, at *12 (2d Cir. Aug. 4, 2020).  The court reasoned that the organizations'

> interests stem from their assorted missions to increase non-citizen well-being and status, which they express in their work to provide legal and social services to non-citizens.  An overbroad interpretation of the public charge ground, tipping the balance too far in the direction of exclusion at the expense of admission in the interest of family unity and economic vitality, imperils both these interests.

Id.

As an initial observation, the INA's public charge provision does not directly regulate the conduct of or benefit plaintiffs.  The observation is not dispositive because in East Bay Sanctuary I, the Ninth Circuit noted that aid organizations' purpose in aiding immigrants seeking asylum was consistent with the INA's purpose to establish the statutory procedure for granting asylum to refugees.  932 F.3d at 768.  In support of that statement, the court cited statutory sections in which "Congress took steps to ensure that pro bono legal services of the type that the [aid organizations] provide are available to asylum seekers."  Id. (citing 8 U.S.C. § 1158(d)(4)(A)–(B)).  The court also cited other statutory provisions in the INA which "give institutions like the [aid organizations] a role in helping immigrants navigate the immigration process."  Id. (citing, e.g., 8 U.S.C. § 1101(i)(1)).  While plaintiffs here do not cite a mandate similar to § 1158(d)(4), they cite the same sections as in East Bay Sanctuary I as evidence of Congress's intent that organizations have a role in helping immigrants navigate the immigration process.

Unlike the preliminary injunction briefing and hearing, plaintiffs have now identified

statutory provisions that bring them within the zone of interest.  Notably, the public charge provision excludes from its ambit any person who "is an applicant for, or is granted, nonimmigrant status under section 1101(a)(15)(U).  8 U.S.C. § 1182(a)(4)(E)(ii).  In turn, 8 U.S.C. § 1101(a)(15)(U) cross references § 1184(p) and § 1184(p)(3)(A) requires the Attorney General and other government officials, where appropriate, to refer potential U visa applicants to nongovernmental organizations.  Similarly, the public charge provision excludes persons who are "a qualified alien described in section 1641(c)."  8 U.S.C. § 1182(a)(4)(E)(iii).  In turn, 8 U.S.C. § 1641(c)(4) includes "an alien who has been granted nonimmigrant status under section 1101(a)(15)(T)" and § 1101(i)(1) requires "the Secretary of Homeland Security, the Attorney General, and other Government officials, where appropriate, [to] provide the alien with a referral to a nongovernmental organization" for nonimmigrant aliens described in 8 U.S.C. § 1101(a)(15)(T)(i).  Thus, "[t]hese statutes, which directly rely on institutions like [plaintiffs] to aid immigrants, are a sufficient 'indicator that the plaintiff[s] [are] peculiarly suitable challenger[s] of administrative neglect . . . support[ing] an inference that Congress would have intended eligibility' to bring suit."  E. Bay Sanctuary I, 932 F.3d at 769 (third through seventh alterations in original) (quoting Hazardous Waste Treatment Council v. EPA, 861 F.2d 277, 283 (D.C. Cir. 1988)).

Moreover, the injury that plaintiffs complain of is within the zone of interests. Plaintiffs allege they have been harmed and will be harmed by a decrease in utilization of their services by aliens who are or believe they are subject to the Rule.  As discussed, the public charge provision references other statutory sections that require, where appropriate, government officials to refer aliens to nongovernmental organizations.

Additionally, plaintiffs can show they are suitable challengers if their "interests are sufficiently congruent with those of the intended beneficiaries that the litigants are not more likely to frustrate than to further . . . statutory objectives."  California, 963 F.3d at 942.  "The test forecloses suit only when a plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be

1   assumed that Congress intended to permit the suit." Id. (internal quotation marks

2   omitted) (quoting Match-E-Be-Nash-She-Wish, 567 U.S. at 225).  In considering this

3   prong of the zone of interests test, the court finds persuasive the Second Circuit's opinion

4   that determined the organizations there were among "'those who in practice can be

5   expected to police the interests that the statute protects[,]' namely, the admission of non-

6   citizens who will be self-sufficient and the exclusion of those who will not." New York,

7   2020 WL 4457951, at *12 (alteration in original) (quoting Fed. Defs. of N.Y., Inc. v. Fed.

8   Bureau of Prisons, 954 F.3d 118, 131 (2d Cir. 2020); and citing Bank of Am. Corp. v. City

9   of Miami, 137 S. Ct. 1296, 1304 (2017)).

10        Defendants quote an in chambers opinion issued by Justice O'Connor that

11  determined that aid organizations were outside the zone of interests of the Immigration

12  Reform and Control Act of 1986 ("IRCA").  I.N.S. v. Legalization Assistance Proj. of L.A.

13  Cty. Fed'n of Labor, 510 U.S. 1301, 1302, 1305 (1993) (O'Connor, J., in chambers).

14  Justice O'Connor wrote "IRCA was clearly meant to protect the interests of

15  undocumented aliens, not the interests of organizations such as respondents." Id. at

16  1305.  Other district courts have distinguished this statement on the grounds that Justice

17  O'Connor's opinion was non-precedential and predates the Court's opinions in Match-E-

18  Be-Nash-She-Wish Band and Lexmark.  Cook Cty., Illinois v. McAleenan, 417 F. Supp.

19  3d 1008, 1021 (N.D. Ill. 2019); see Capital Area Immigrants' Rights Coal. v. Trump, — F.

20  Supp. 3d —, No. CV 19-2117 (TJK), 2020 WL 3542481, at *11 (D.D.C. June 30, 2020)

21  (same).  While these reasons might be valid, more persuasive is the fact that Legalization

22  Assistance Project dealt with IRCA, 8 U.S.C. § 1255a, and not the public charge

23  provision.  As discussed above, the public charge provision incorporates other statutory

24  sections providing for referrals by government officials to nongovernmental organizations

25  thereby implicating their interests.  Legalization Assistance Project also reasoned "[t]he

26  fact that the INS regulation may affect the way an organization allocates its resources . . .

27  does not give standing to an entity which is not within the zone of interests the statute

28  meant to protect."  510 U.S. at 1305 (citation omitted).  Here, the injury is not just

1   diversion of resources but also a loss of resources tied to decreased utilization of

2   plaintiffs' services.  This factual difference is such that, even if Legalization Assistance

3   Project were precedential, it would not apply in this case.

4          In sum, plaintiffs have put forward a more convincing argument than the one

5   advanced at the preliminary injunction stage.  Critically, the Supreme Court "has

6   repeatedly emphasized that the zone of interests test is 'not especially demanding' in the

7   APA context."  California, 963 F.3d at 941 (quoting Lexmark, 572 U.S. at 130).

8   Accordingly, the court cannot say as a matter of law that plaintiffs fall outside the zone of

9   interests with regard to their APA claims.

10                 **ii.      Whether Zone of Interests Applies to Constitutional Claims**

11          Next, defendants contend that plaintiffs' Fifth Amendment claims fail the zone of

12   interests test because the Supreme Court has suggested that there is a heightened zone of

13   interests requirement for implied causes of action such as plaintiffs' constitutional

14   claim.  Mtn. at 8 n.2.  Yet, in the very case that defendants cite for this proposition, Clarke

15   v. Securities Industry Association, 479 U.S. at 396, 400 n.16, the Court cautioned that

16   "[w]hile inquiries into reviewability or prudential standing in other [non-APA] contexts may

17   bear some resemblance to a 'zone of interest' inquiry under the APA, it is not a test of

18   universal application."  The Court went on to distinguish earlier dicta suggesting a zone of

19   interest inquiry was applicable to constitutional claims, stating "[w]e doubt, however, that

20   it is possible to formulate a single inquiry that governs all statutory and constitutional

21   claims."  Id. (citing Ass'n of Data Processing Serv. Orgs., Inc. v. Camp, 397 U.S. 150,

22   153 (1970)).  As plaintiffs point out, the Ninth Circuit has also questioned whether a zone

23   of interests test can be applied in light of the Court's decision in Lexmark, which focused

24   on Congress's intent in creating statutory causes of action as opposed to causes of

25   action that arise under the Constitution.  See Sierra Club v. Trump, 929 F.3d 670, 701–02

26   (9th Cir. 2019) ("[W]e doubt that any zone of interests test applies to Plaintiffs' equitable

27   cause of action.").  Accordingly, the court declines to apply a zone of interest test to

28   plaintiffs' constitutional claims.

United States District Court
Northern District of California

1    In sum, the zone of interests test is not "especially demanding," <u>Lexmark</u>, 572 U.S.

2    at 130, and, "at the very least, the [states'] interests are 'marginally related to' and

3    'arguably within' the scope of the statute." <u>E. Bay Sanctuary Covenant v. Trump</u>, 950

4    F.3d 1242, 1270 (9th Cir. 2020) (quoting <u>Match-E-Be-Nash-She-Wish Band</u>, 520 U.S. at

5    175–76).  The court, therefore, DENIES defendants' motion with respect to zone of

6    interests.

7        **4.     First and Second Claims—Contrary to Law and Arbitrary and**

8              **Capricious**

9        Turning to defendants' motion with regard to the individual claims, the court

10   addresses plaintiffs' first and second claims together as they present a related issue.  In

11   its preliminary injunction order, the court determined that plaintiffs were likely to succeed

12   on the merits of their claim that the Rule was not in accordance with the INA.  Dkt. 131 at

13   48.  After a lengthy review of the prior legislative, regulatory, and judicial history of the

14   term "public charge," the court determined that DHS's interpretation of the term "public

15   charge" was not reasonable at <u>Chevron</u> step two.  In its order staying the injunction, the

16   Ninth Circuit determined that, at <u>Chevron</u> step one, the term "public charge" is not a term

17   of art and not self-defining—thus, it was ambiguous.  <u>City & Cty. of San Francisco</u>, 944

18   F.3d at 792.  At step two, the court also reviewed the lengthy legislative history and case

19   law surrounding the term "public charge" and concluded that there has not been "one

20   fixed understanding of 'public charge' that has endured since 1882."  <u>Id.</u> at 796.  Instead,

21   "[i]f anything has been consistent, it is the idea that a totality-of-the-circumstances test

22   governs public-charge determinations.  But different factors have been weighted more or

23   less heavily at different times, reflecting changes in the way in which we provide

24   assistance to the needy."  <u>Id.</u> In resolving the step two analysis, the Ninth Circuit

25   determined that the Rule was a reasonable interpretation of the INA.  <u>Id.</u> at 799.

26       Also in its prior order, this court determined that plaintiffs were likely to succeed on

27   the merits that the Rule is arbitrary and capricious because DHS failed to consider costs

28   and benefits, including costs to state governments and health effects on state

21

United States District Court
Northern District of California

1   populations. Dkt. 131 at 53. On appeal, the Ninth Circuit motions panel discussed both

2   the cost-benefit issue and the public health effect issue. With regard to the former, the

3   court observed that DHS "addressed at length the costs and benefits associated with the

4   Final Rule." City & Cty. of San Francisco, 944 F.3d at 801. With respect to public health

5   effects, the Ninth Circuit noted that "DHS not only addressed these concerns directly, it

6   changed its Final Rule in response to the comments." Id. The court determined that

7   DHS could change its policy as long as DHS acknowledged the change and explained

8   the reasons for it. Id. at 805. In sum, the court held that DHS demonstrated that it was

9   likely to succeed on the merits of the arbitrary and capricious claim.

10          As discussed more thoroughly in this court's order in State of California, et al., v.

11   U.S. Department of Homeland Security, et al., No. 19-cv-04975-PJH, Dkt. 180, the

12   procedural posture of this case presents several issues. For example, applying the

13   motions panel's opinion would require the court to determine the extent to which the

14   opinion is binding (or persuasive) as to each of plaintiffs' claims that defendants now

15   seek to dismiss. Further, because the court has deferred ruling on defendants' motion to

16   dismiss in the related case, it is therefore appropriate to follow a similar course of action

17   here as plaintiffs' substantive claims largely overlap with the related case.

18          Accordingly, the court DEFERS RULING ON defendants' motion to dismiss

19   plaintiffs' first and second causes of action until the Ninth Circuit issues an opinion on the

20   preliminary injunction or otherwise disposes of the case.

21          **5.    Third, Fifth & Eighth Claims—McAleenan's Appointment**

22          Plaintiffs' third claim alleges that the Rule is arbitrary and capricious because then

23   Acting Secretary of Homeland Security McAleenan was serving in that role in violation of

24   DHS's organic statute and the APA. FAC ¶ 203. Similarly, plaintiffs' fifth claim alleges

25   that McAleenan was not lawfully appointed under the FVRA and DHS's organic statute.

26   Id. ¶¶ 211–13. Plaintiffs' eighth claim alleges that McAleenan's appointment violates the

27   Appointments Clause, the FVRA, and DHS's organic statute and, therefore, seek relief

28   under the Declaratory Judgment Act. Id. ¶ 230.

United States District Court
Northern District of California

1    Defendants argue that McAleenan was lawfully appointed as Acting Secretary

2    because, after enactment of the FVRA, Congress permitted DHS to set its order of

3    succession.  Mtn. at 17.  On April 9, 2019, then Secretary Kirstjen Nielsen established a

4    new succession order that placed the Customs and Border Patrol ("CBP") Commissioner

5    third in the line of succession.  Id. at 18.  McAleenan was CBP Commissioner at the time,

6    the positions above him were vacant, and, therefore, he was lawfully appointed.  Id.

7    Plaintiffs respond that then Secretary Nielsen's amended order of succession only

8    applied when the Secretary is "unavailable to act during a disaster or catastrophic

9    emergency."  Opp. at 18.  Instead, plaintiffs contend that relevant DHS order required

10   that, following the resignation of the Secretary, Executive Order 13753 governed the

11   order of succession and provided an order of succession different than Nielsen's order.

12   Id.  Under Executive Order 13753, McAleenan was seventh, not third, in line and there

13   were two Senate-confirmed appointees in front of him.  Id.  Defendants reply that

14   Secretary Nielsen's order expressly "designate[d] the order of succession for the

15   Secretary of Homeland Security[.]"  Reply at 14.  This order clearly defined the order of

16   succession and controls over any previous version of the order of succession.  Id.

17   Resolving this issue requires examination of the FVRA, DHS's organic statute, and

18   the orders issued pursuant to the organic statute.  "Congress broadly designated the

19   [FVRA] to be the 'exclusive means for temporarily authorizing an acting official to perform

20   the functions and duties of any' Executive office that would otherwise require Senate

21   confirmation."  Guedes v. Bureau of Alcohol, Tobacco, Firearms & Explosives, 920 F.3d

22   1, 11 (D.C. Cir. 2019) (per curiam) (quoting 5 U.S.C. § 3347(a)).  "But there is an

23   'unless'—Congress crafted exceptions to that exclusivity."  Id.  DHS's organic statute has

24   two such exceptions that apply notwithstanding the FVRA.  First, 6 U.S.C. § 113(g)(1)

25   requires the Under Secretary for Management to serve as Acting Secretary if the

26   Secretary or Deputy Secretary is unavailable to perform the duties of Secretary.  Second,

27   § 113(g)(2) permits the Secretary to "designate such other officers of the Department in

28   further order of succession to serve as Acting Secretary."

United States District Court
Northern District of California

1    In December 2016, then Secretary of Homeland Security Jeh Johnson issued an

2    order of succession, entitled DHS Delegation No. 00106, that stated in relevant part:

3        **II. Succession Order/Delegation**

4            A. In case of the Secretary's death, resignation, or
     inability to perform the functions of the Office, the orderly
5    succession of officials is governed by Executive Order 13753,
     amended on December 9, 2016.

6
             B. I hereby delegate to the officials occupying the
7    identified positions in the order listed (Annex A), my authority
     to exercise the powers and perform the functions and duties of
8    my office, to the extent not otherwise prohibited by law, in the
     event I am unavailable to act during a disaster or catastrophic
9    emergency.

10   Dkt. 167-1, at 2.[5]  On April 9, 2019, Secretary Nielsen signed an order that approved an

11   amendment to Delegation No. 00106.  That amendment invoked 6 U.S.C. § 113(g)(2)

12   and stated: "I hereby designate the order of succession for the Secretary of Homeland

13   Security as follows: Annex A of DHS Orders of Succession and Delegations of Authorities

14   for Named Positions, Delegation No. 00106, is hereby amended by striking the text of

15   such Annex in its entirety and inserting the following in lieu thereof: . . . ."  Dkt. 166-3, at

16   3.  The amendment then listed the order of succession with the CBP Commissioner third

17   in line.  Id.

18       Thus far, the parties are in general agreement about the relevant authorities and

19   documents.  Where they depart is the effect of the April 9th order.  Defendants argue that

20   the amendment designated the order of succession in all cases, regardless of whether it

21   involved section II, subparagraph A of Delegation No. 00106 (i.e., in case of the

22   Secretary's death, resignation, or inability to perform the functions of the Office), or

23   subparagraph B (i.e., when the Secretary is unavailable to act during a disaster or

24

25   [5] Plaintiffs attach a copy of Delegation No. 00106, dated as of April 10, 2019, to their
     opposition.  Additionally, defendants attach a copy of Secretary Nielsen's order amending
26   Delegation No. 00106 to their motion.  Dkt. 166-3.  While neither document was attached
     to the pleading, the court can consider documents "whose contents are alleged in a
27   complaint and whose authenticity no party questions . . . ."  Knievel, 393 F.3d at 1076.
     The FAC references both documents and neither party challenges the authenticity of the
28   documents in question.  FAC ¶¶ 149–50.

                                                24

catastrophic emergency).  In support of their argument, defendants quote the text of the April 9th order: "I hereby designate the order of succession for the Secretary of Homeland Security as follows . . . ."  Mtn. at 18; Reply at 14 ("Secretary Nielsen's order, in no uncertain terms, expressly 'designate[d] the order of succession for the Secretary of Homeland Security[.]'").  This is an instance where the omitted material, signified by the ellipses in defendants' motion and the bracket in their reply, is critical to understanding what exactly Secretary Nielsen ordered.  The order states, "I hereby designate the order of succession for the Secretary of Homeland Security <u>as follows:</u>"  Dkt. 166-3 at 3 (emphasis added).  Here is what followed: "Annex A of DHS Orders of Succession and Delegations of Authorities for Named Positions, Delegation No. 00106, is hereby amended by striking the text of such Annex in its entirety and inserting the following in lieu thereof: Annex A.  Order for Delegation of Authority by the Secretary of the Department of Homeland Security."  <u>Id.</u>  The order of succession is then laid out in the amended Annex A.  In other words, the April 9th order only replaced Annex A and made no other changes to Delegation No. 00106.  Thus, when Secretary Nielsen resigned "the orderly succession of officials [was] governed by Executive Order 13753, amended on December 9, 2016," but not the amended Annex A, which only applied when the Secretary was unavailable due to disaster or catastrophic emergency.  Dkt. 167-1.

Had Secretary Nielsen intended to modify the order of succession applicable in case of the Secretary's death, resignation, or inability to perform the functions of the Office, then her order could have so stated.  In fact, plaintiffs cite a later amendment of Delegation No. 00106 by Acting Secretary McAleenan, which stated "Section II.A of DHS Delegation No. 00106, DHS Orders of Succession and Delegations of Authorities for Named Positions, is amended hereby to state as follows: 'In case of the Secretary's death, resignation, or inability to perform the functions of the Office, the order of succession of officials is <u>governed by Annex A</u>.'"  Dkt. 167-2 at 2 (emphasis added).  The fact that McAleenan amended Delegation No. 00106 to modify section II.A to cross-reference Annex A but Nielsen did not, reinforces the conclusion that at the time of

1    Nielsen's resignation, Executive Order 13753 governed the order of succession.

2          In turn, Executive Order 13753, amended December 9, 2016, provided:

3                Subject to the provisions of subsection (b) of this section, the
                 officers named in subsection (a) of this section, in the order
4                listed, shall act as, and perform the functions and duties of the
                 office of, the Secretary of Homeland Security (Secretary), if
5                they are eligible to act as Secretary under the provisions of the
                 Federal Vacancies Reform Act of 1998, 5 U.S.C. 3345 et seq.
6                (Vacancies Act), during any period in which the Secretary has
                 died, resigned, or otherwise become unable to perform the
7                functions and duties of the office of Secretary.

8    81 Fed. Reg. 90,667, 90,667.  The Executive Order then lists the order of succession and

9    the CBP Commissioner is seventh in line.  Id.  Plaintiffs allege that, at the time of

10   McAleenan's elevation to Acting Secretary, the roles of both the Under Secretary for

11   National Protection and Programs and the Under Secretary for Intelligence and Analysis

12   were filled by Senate-confirmed appointees such that McAleenan's appointment was

13   invalid and any action by him was ultra vires.  FAC ¶¶ 152–53.

14         This is not the end of the inquiry, however.  As quoted above, subsection (a) is

15   "[s]ubject to the provisions of subsection (b)."  81 Fed. Reg. at 90,667.  Subsection (b)

16   provides: "Notwithstanding the provisions of this section, the President retains discretion,

17   to the extent permitted by the Vacancies Act, to depart from this order in designating an

18   acting Secretary."  Id. at 90,668.  Thus, as long as McAleenan's appointment was

19   permitted by the FVRA, the President had the discretion to appoint him as Acting

20   Secretary.  Plaintiffs do not allege that McAleenan failed to meet one of the three options

21   provided by the FVRA for the temporary appointment of officers.  See Guedes, 920 F.3d

22   at 11 (discussing the three options).  Accordingly, the President had discretion to appoint

23   McAleenan as Acting Secretary regardless of the order of succession outlined in

24   subsection (a) of Executive Order 13753.

25         For the foregoing reasons, defendants' motion to dismiss plaintiffs' third, fifth, and

26   eighth (pertaining to McAleenan) causes of action is GRANTED.

27         **6.**      **Fourth, Sixth & Eighth Claims—Cuccinelli's Appointment**

28         Plaintiffs' fourth claim alleges that the Rule is arbitrary and capricious because

1  then Acting Director of USCIS Cuccinelli was serving in that role in violation of the FVRA

2  and the APA.  FAC ¶ 206.  Their sixth claim alleges that Cuccinelli was not eligible to be

3  appointed as Acting Director of USCIS under the FVRA and, therefore, his actions have

4  no force or effect.  Id. ¶¶ 216–18.  Plaintiffs' eighth claim alleges that Cuccinelli's

5  appointment violates the Appointments Clause, the FVRA, and DHS's organic statute

6  and, therefore, seek relief under the Declaratory Judgment Act.

7       Defendants argue that both claims against Cuccinelli should be dismissed

8  because the Rule was promulgated under the authority and signature of Acting Secretary

9  McAleenan and not Cuccinelli.  Mtn. at 18.  Plaintiffs respond that they allege that

10  Cuccinelli's pre-promulgation involvement likely entailed taking FVRA-defined action.

11  Opp. at 19.  They also argue that because Cuccinelli's appointment violated FVRA, his

12  substantial involvement in the promulgation of the Rule renders it not in accordance with

13  law.  Id. at 20.

14       Plaintiffs advance two separate theories regarding Cuccinelli's appointment.  Both

15  theories advance from the same predicate, Cuccinelli's appointment violated section

16  3345 of the FVRA.  The first theory is that because of the predicate FVRA violation, the

17  Rule was arbitrary and capricious under the APA.  The second theory is that because of

18  the predicate violation, the Rule is rendered void by a separate FVRA provision.

19       Under the APA, "an agency action" that is "not in accordance with law" must be

20  held "unlawful and set aside."  5 U.S.C. § 706(2).  "The FVRA renders any action taken in

21  violation of the statute void ab initio: section 3348(d) declares that '[a]n action taken by

22  any person who is not acting [in compliance with the FVRA] shall have no force or effect'

23  and 'may not be ratified.'"  SW Gen., Inc. v. N.L.R.B., 796 F.3d 67, 78 (D.C. Cir. 2015)

24  (alterations in original) (quoting 5 U.S.C. § 3348(d)(1)–(2)).  Assuming for the sake of

25  argument that plaintiffs are correct regarding their predicate FVRA violation,—i.e.,

26  Cuccinelli's appointment violated FVRA—it does not follow that he took an action that can

27  be remedied under either the APA or the FVRA.

28       Title 8 U.S.C. § 1103(a) prescribes the powers and duties of the Secretary of

1    Homeland Security including charging him or her "with the administration and

2    enforcement" of immigration laws and establishing regulation as he or she deems

3    necessary for carrying out his or her authority under the provisions of the INA.  8 U.S.C.

4    § 1103(a)(1), (3).  Pursuant to that authority, DHS issued both the NPRM and the Rule.

5    83 Fed. Reg. at 51,116; 84 Fed. Reg. at 41,295 ("DHS's authority for making public

6    charge inadmissibility determinations and related decisions is found in several statutory

7    provisions.").  The Rule was issued pursuant to then Acting Secretary McAleenan's

8    authority, 84 Fed. Reg. at 41,295–96, and under his signature, id. at 41,508.  The NPRM

9    was issued pursuant to then Secretary Nielsen's authority, 83 Fed. Reg. at 51,124, and

10   signature, id. at 51,296.  Plaintiffs challenge the promulgation of that Rule, which was not

11   issued pursuant to Cuccinelli's authority (or even under USCIS's authority).  For that

12   reason, this case is unlike the only district court that determined Cuccinelli to be

13   unlawfully appointed and, as a remedy, set aside asylum directives there were issued by

14   Cuccinelli.  L.M.-M. v. Cuccinelli, 442 F. Supp. 3d 1, 11, 37 (D.D.C. 2020).  Even if

15   plaintiffs were able to demonstrate that Cuccinelli was unlawfully appointed, they cannot

16   state a claim for violation under the FVRA or the APA with regard to promulgation of the

17   Rule.

18        For the foregoing reasons, defendants' motion to dismiss plaintiffs' fourth, sixth,

19   and eighth (pertaining to Cuccinelli) causes of action is GRANTED.  Because the Rule

20   was promulgated under the acting DHS Secretary's authority, no additional factual

21   allegations could state a claim and further amendment of these claims would be futile.

22        **7.    Seventh Claim—Equal Protection**

23        Defendants move to dismiss plaintiffs' seventh claim for violation of the Equal

24   Protection component of the Fifth Amendment.  The Equal Protection Clause of the

25   Fourteenth Amendment commands that no state shall "deny to any person within its

26   jurisdiction the equal protection of the laws," U.S. Const. amend. XIV, § 1, which amounts

27   to a direction that all persons who are similarly situated should be treated alike.  City of

28   Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985).  The equal protection

United States District Court
Northern District of California

1    component of the Fifth Amendment's Due Process Clause imposes a similar obligation

2    on the federal government.  See Bolling v. Sharpe, 347 U.S. 497, 499–500 (1954); see

3    also I.N.S. v. Pangilinan, 486 U.S. 875, 886 (1988) (considering "the possibility of a

4    violation of the equal protection component of the Fifth Amendment's Due Process

5    Clause").

6        Defendants argue that plaintiffs' Equal Protection claims should be dismissed

7    because the Rule is facially neutral, and plaintiffs cannot establish discriminatory intent.

8    Mtn. at 19.  Defendants contend that the court should apply a narrow standard of review,

9    as required by Trump v. Hawaii, 138 S. Ct. 2418 (2018), because this case implicates the

10   Executive Branch's authority over the admission and exclusion of foreign nationals.  Mtn.

11   at 20.  According to defendants, the FAC contains no allegations suggesting that the Rule

12   is not at least plausibly related to DHS's stated objectives.  Id.  Defendants also contend

13   that the public statements by government officials upon which plaintiffs rely were not

14   made by DHS officials and have no express connection to the Rule.  Id. at 21.

15       Plaintiffs respond that they have alleged sufficient facts to plausibly demonstrate

16   defendants acted with a discriminatory purpose.  Opp. at 21.  These allegations include:

17   the Rule will bear more heavily on non-white immigrants, which DHS acknowledged in

18   the Rule, (id.); statements by administration officials indicate that the Administration was

19   motivated in part by racial animus (id. at 22–23); and the sequence of events leading to

20   the promulgation of the Rule indicate a substantive departure from the normal decision-

21   making process, (id. at 23).  Plaintiffs next argue that Trump v. Hawaii is not applicable

22   where, as here, DHS's regulated activity applies to people already residing in the United

23   States and national security concerns are not present.  Id. at 23–24.

24       In its order on defendants' motion to dismiss in California, et al. v. Department of

25   Homeland Security, et al., No. 19-cv-4975-PJH, Dkt. 180, the court discussed at length

26   the Supreme Court's jurisprudence regarding initial entry cases and whether plaintiffs in

27   that case could state a claim for an Equal Protection violation.  Rather than recapitulate

28   that discussion in its entirety, the court summarizes a few main points.  To begin, the

United States District Court
Northern District of California

Court has long recognized that Congress's power concerning the initial entry of aliens into the country is plenary.  See Fiallo v. Bell, 430 U.S. 787, 792 (1977) ("This Court has repeatedly emphasized that 'over no conceivable subject is the legislative power of Congress more complete than it is over' the admission of aliens." (quoting Oceanic Navigation Co. v. Stranahan, 214 U.S. 320, 339 (1909)).  However, once an alien arrives in the United States and begins establishing ties to the country, the Court has recognized certain constitutional protections extend to those persons, even if their presence is "unlawful, involuntary, or transitory."  Mathews v. Diaz, 426 U.S. 67, 77 (1976) ("There are literally millions of aliens within the jurisdiction of the United States.  The Fifth Amendment, as well as the Fourteenth Amendment, protects every one of these persons from deprivation of life, liberty, or property without due process of law." (citations omitted)).  It is therefore necessary to distinguish whether a government action involves an initial entry into the United States or whether an alien has begun to establish ties with the United States such that his or her constitutional status changes accordingly.  See Landon v. Plasencia, 459 U.S. 21, 32 (1982).

Trump v. Hawaii is best viewed as an initial entry case where Congress's power is at its height.  In that case, the Supreme Court examined an Equal Protection challenge to an executive order issued by the President that restricted entry into the United States by foreign nationals of select countries, nearly all majority-Muslim countries.  Hawaii, 138 S. Ct. at 2403–04.  The Court considered but ultimately did not apply the highly deferential standard of review articulated in Kleindienst v. Mandel, 408 U.S. 753, 756–57 (1972), noting that stating "Mandel's narrow standard of review 'has particular force' in admission and immigration cases that overlap with 'the area of national security.'"  Hawaii, 138 S. Ct. at 2419 (quoting Kerry v. Din, 576 U.S. 86, 104 (2015) (Kennedy, J., concurring)).  Instead, the Court applied rational basis review and upheld the proclamation on those grounds.  Id. at 2420–21.

Similar to Hawaii, the Rule applies to immigrants and nonimmigrants seeking initial admission to the United States.  84 Fed. Reg. at 41,295.  Unlike Hawaii, it also applies to

1   aliens who are already physically present in the United States and seeking adjustment of

2   status.  Id.  Because the Rules applies in part to aliens who are already in the United

3   States, defendants cannot entirely rely on cases based on Congress's plenary power

4   over initial entry cases to uphold the Rule.  Moreover, aliens who are physically present

5   in the United States can state a claim for violation of the Equal Protection component of

6   the Fifth Amendment.  See Kwai Fun Wong v. United States, 373 F.3d 952, 970–73 (9th

7   Cir. 2004); see also Plyler v. Doe, 457 U.S. 202, 210 (1982) ("Indeed, we have clearly

8   held that the Fifth Amendment protects aliens whose presence in this country is unlawful

9   from invidious discrimination by the Federal Government." (citing Mathews, 426 U.S. at

10   77)).

11        In Department of Homeland Security v. Regents of the University of California,

12   writing for a plurality with regard to an Equal Protection challenge to the Administration's

13   revocation of the Deferred Action for Childhood Arrivals ("DACA") program, Chief Justice

14   Roberts stated that "[t]o plead animus, a plaintiff must raise a plausible inference that an

15   'invidious discriminatory purpose was a motivating factor' in the relevant decision.

16   Possible evidence includes disparate impact on a particular group, '[d]epartures from the

17   normal procedural sequence,' and 'contemporary statements by members of the

18   decisionmaking body.'"  140 S. Ct. at 1915 (second alteration in original) (quoting

19   Arlington Heights, 429 U.S. at 266–68).  At no point did the plurality cite or apply Hawaii's

20   deferential standard of review.  This indicates that application of the Arlington Heights

21   framework is appropriate to evaluate whether plaintiffs plead discriminatory animus.

22   Because this court has likewise determined that Trump v. Hawaii (and the plenary power

23   doctrine more generally) does not apply to the Rule in its entirety, similar to Regents, it is

24   appropriate to apply Arlington Heights to plaintiffs' claim.

25        Defendants cite a Board of Immigration Appeals ("BIA") opinion for the proposition

26   that "[i]t is a well established fact that an applicant for adjustment of status under Section

27   245 of the Act is in the same posture as though he were an applicant before an American

28   consular officer abroad seeking issuance of an immigrant visa for the purpose of gaining

admission to the United States as a lawfully permanent resident."  Reply at 17 (quoting Matter of Harutunian, 14 I.&N. Dec. 583, 589 (B.I.A. Feb. 28, 1974)).  The BIA's opinion could be construed as stating that Congress's plenary power applies even if an individual is inside the United States because an adjustment of status is formally the same as an overseas application for admission.

A few points are worth considering with regard to Matter of Harutunian.  First, the BIA did not cite a case for its proposition, which makes evaluating its statement of the law difficult.  Second, the statement appears to conflict with the proposition that "[a]liens, even aliens whose presence in this country is unlawful, have long been recognized as 'persons' guaranteed due process of law by the Fifth and Fourteenth Amendments." Plyler, 457 U.S. at 210 (citations omitted).  Even assuming the BIA's statement is true, the court is persuaded by the Court's plurality opinion in Regents which did not apply Hawaii to the DACA program, a program applicable to persons who were physically present in the United States but otherwise had no lawful status under the immigration laws.  See Regents, 140 S. Ct. at 1901.

"Under Arlington Heights, a plaintiff must 'simply produce direct or circumstantial evidence demonstrating that a discriminatory reason more likely that [sic] not motivated the defendant and that the defendant's actions adversely affected the plaintiff in some way.'" Ave. 6E Invs., LLC v. City of Yuma, Ariz., 818 F.3d 493, 504 (9th Cir. 2016) (internal quotation marks omitted) (quoting Pac. Shores Props., LLC v. City of Newport Beach, 730 F.3d 1142, 1158 (9th Cir. 2013)); see also Regents, 140 S. Ct. at 1915.  "A plaintiff does not have to prove that the discriminatory purpose was the sole purpose of the challenged action, but only that it was a 'motivating factor.'" Ave. 6E Invs., (quoting Arce v. Douglas, 793 F.3d 968, 977 (9th Cir. 2015)).  While Arlington Heights describes an evidentiary framework rather than a pleading standard, the Ninth Circuit has used its factors in evaluating a district court's dismissal of a complaint pursuant to Rule 12(b)(6).[6]

---

[6] While not directly applicable to Equal Protection claims, the Supreme Court and the Ninth Circuit have held that, for employment discrimination cases, the McDonnell

1   See id.

2        In Arlington Heights, the Court described a series of non-exhaustive factors that

3   guides the inquiry into whether a defendant's actions were motivated by a discriminatory

4   purpose "by examining (1) statistics demonstrating a 'clear pattern unexplainable on

5   grounds other than' discriminatory ones, (2) '[t]he historical background of the decision,'

6   (3) '[t]he specific sequence of events leading up to the challenged decision,' (4) the

7   defendant's departures from its normal procedures or substantive conclusions, and (5)

8   relevant 'legislative or administrative history.'"  Pac. Shores Props., 730 F.3d at 1158–59

9   (alterations in original) (quoting Arlington Heights, 429 U.S. at 266–68; and citing Comm.

10  Concerning Cmty. Improvement v. City of Modesto, 583 F.3d 690, 703 (9th Cir. 2009));

11  see also Avenue 6E Invs., 818 F.3d at 504 (applying Arlington Heights factors to an

12  Equal Protection claim dismissed pursuant to Rule 12(b)(6)).

13                    **i.      Disparate Impact**

14        Here, plaintiffs allege that the Rule's "negatively weighted factors

15  disproportionately and detrimentally affect communities of color."  FAC ¶ 120.  The

16  complaint also cites the Rule, where DHS stated that it "recognizes that it is possible that

17  the inclusion of benefits such as SNAP and Medicaid may impact in greater numbers

18  communities of color, including Latinos and [Asian-American, Pacific Islanders], as well

19  as those with particular medical conditions that require public benefits for treatment, and

20  therefore may impact the overall composition of immigration with respect to these

21  groups."  84 Fed. Reg. at 41,369.  Plaintiffs have plausibly alleged that the Rule will

22  impact certain racial groups more heavily than others.

23

24  ─────────────────

Douglas evidentiary framework is a useful touchstone to evaluate whether a claim

25  survives a motion to dismiss; however, a plaintiff "is not required to plead a prima facie
case of discrimination in order to survive a motion to dismiss."  Sheppard v. David Evans

26  & Assoc., 694 F.3d 1045, 1050 (9th Cir. 2012) (citing Swierkiewicz v. Sorema N.A., 534
U.S. 506, 508–11 (2002)).  Similar to McDonnell Douglas, the Arlington Heights

27  framework is an evidentiary burden-shifting regime.  A Rule 12(b)(6) motion only requires
plaintiffs to meet the requirements of Rule 8 and Twombly/Iqbal.  See Kwai Fun Wong,

28  373 F.3d at 968 (applying Swierkiewicz to Equal Protection claim that immigration
officials discriminated against the plaintiff on the basis of her race).

United States District Court
Northern District of California

1    However, the court notes that the plurality opinion in Regents found that the

2 disparate impact of the DACA rescission on Latinos was not sufficient to state a claim.

3 Writing for himself and three other justices, Chief Justice Roberts stated "because

4 Latinos make up a large share of the unauthorized alien population, one would expect

5 them to make up an outsized share of recipients of any cross-cutting immigration relief

6 program. . . . Were this fact sufficient to state a claim, virtually any generally applicable

7 immigration policy could be challenged on equal protection grounds." Regents, 140 S.

8 Ct. at 1915.  This reasoning is persuasive and the Rule's disparate impact, while notable,

9 is not dispositive.

10             **ii.       Statements by Decisionmakers**

11    Next, plaintiffs cite evidence of potential bias exemplified by actions and

12 statements of the President and his advisors.  With regard to the administration generally,

13 plaintiffs cite numerous immigration-related executive actions that they characterize as

14 either exclusively or disproportionately harming immigrants from non-white majority

15 nations.  These actions include separating young children from their parents at the

16 southern U.S. border, ending DACA and temporary protected status for El Salvador,

17 Honduras, Haiti, Nepal, Sudan, and Nicaragua, and excluding nationals from majority-

18 Muslim countries.  FAC ¶ 124.  With respect to the President, plaintiffs allege that, as a

19 candidate, the President ran a campaign replete with racist aspersions about people of

20 Mexican descent and Muslim faith.  Id. ¶ 125.  After his inauguration, the President stated

21 that Haitians "all have AIDS," that America should not be a haven for "people from

22 shithole countries," and that he preferred immigrants coming from places like Norway.  Id.

23 They also allege that on July 14, 2019, the President claimed that four congresswomen

24 of color "originally came from countries whose government are a complete and total

25 catastrophe, the worst, most corrupt and inept anywhere in the world . . ." and asked

26 "Why don't they go back and help fix the totally broken and crime infested places from

27 which they came . . . ."  Id. ¶ 129 (second alteration in original).

28    With respect to administration officials, plaintiffs allege that other senior

administration officials made statements indicative of racial bias.  They cite statements at a press conference by then Acting Director of USCIS Cuccinelli who said that "President Trump has once again delivered on his promise" regarding immigration.  Id. ¶ 133.  When asked about how the Rule would target Latinos, Cuccinelli stated "if we had been having this conversation 100 years ago, it would've applied to more Italians."  Id.  Cuccinelli also "rewrote" the words to Emma Lazarus's sonnet on the Statue of Liberty "Give me your tired and your poor" by adding "who can stand on their own two feet and who will not become a public charge."  Id. ¶ 134.  Cuccinelli explained that the poem was referring back to people coming from Europe where they had class-based societies.  Id.  Plaintiffs also cite a statement by the prior acting director of Immigration and Customs Enforcement Mark Morgan who said of unaccompanied children in detention centers, "I've looked at them and I've looked at their eyes . . . and I've said that is a soon-to-be MS-13 gang member.  It's unequivocal."  Id. ¶ 137 (alteration in original).

In Regents, 140 S. Ct. at 1916, Chief Justice Roberts' plurality opinion found the President's statements to be "unilluminating" and instead noted that "relevant actors were most directly [the] Acting Secretary [of Homeland Security] and the Attorney General." The opinion stated that "respondents did not 'identif[y] statements by [either] that would give rise to an inference of discriminatory motive.'"  Id. (alterations in original) (citation omitted).  Next, Chief Justice Roberts found the President's statements were "remote in time and made in unrelated contexts" and did not "qualify as 'contemporary statements' probative of the decision at issue."  Id. (quoting Arlington Heights, 429 U.S. at 268). While a plurality opinion, this reasoning suggests that the President's statements, which have no direct connection to the Rule are not relevant to the Equal Protection analysis.

Applying here, plaintiffs allege both pre- and post-inauguration statements by the President.  The pre-inauguration statements, FAC ¶ 125, are similar to those in Regents that are more remote in time and not applicable to the agency action at issue.  The post-inaugurations statements pertain to the same time period as the beginning of the rulemaking process but are not connected to the Rule.  With regard to statements by

United States District Court
Northern District of California

United States District Court
Northern District of California

1   other administration officials, plaintiffs cite statements by Cuccinelli that were made at a

2   press conference discussing the Rule.  As discussed above, Cuccinelli was appointed

3   two months before DHS promulgated the Rule and plaintiffs have not alleged Cuccinelli

4   was involved in the rulemaking process.  Even assuming his statements plausibly

5   demonstrate discriminatory intent, plaintiffs have not alleged he was a relevant actor in

6   the rulemaking process.  This reasoning also applies to the statement by acting director

7   Morgan, who has no apparent connection to the Rule.  Finally, plaintiffs' citation of

8   various executive actions is similar to their disparate impact argument.  It may be true

9   that this administration's action falls more heavily on immigrants and non-immigrants

10  from non-White, non-European countries, but disparate impact by itself is insufficient to

11  state a claim for an Equal Protection violation.

12          In sum, plaintiffs have identified a few statements made in unrelated contexts by

13  the President and comments from a DHS official who is not alleged to have any

14  connection to the rulemaking process, other than defending it after it was promulgated.

15  They have not alleged sufficient factual matter concerning statements by decisionmakers.

16                      **iii.    Departure from Normal Procedures**

17          Plaintiffs also contend that the Rule departed from normal procedures as

18  evidenced by the efforts of White House advisor Stephen Miller's comments to fast-track

19  the Rule to completion.  Id. ¶ 131 ("[T]he timing on public charge is unacceptable . . . I

20  don't care what you need to do to finish it on time."); see also id. ¶ 132.  Plaintiffs'

21  allegations barely raise an inference of an improper departure from the norm.  Cf.

22  Regents, 908 F.3d at 519 ("DACA received reaffirmation by the agency as recently as

23  three months before the rescission, only to be hurriedly cast aside on what seems to

24  have been a contrived excuse (its purported illegality).  This strange about-face, done at

25  lightning speed, suggests that the normal care and consideration within the agency was

26  bypassed.").  Plaintiffs' allegations that the Rule was fast tracked do not raise an

27  inference of discriminatory intent.  This rulemaking process was not a 3-month about-

28  face; the NPRM began a year before the final Rule was published, received hundreds of

1    thousands of comments, which prompted some changes to the Rule.  At most, they

2    plausibly allege that defendants wanted to implement the Rule sooner rather than later.

3          In light of the foregoing, plaintiffs have not alleged sufficient factual matter to state

4    a claim for an Equal Protection violation.  The court GRANTS defendants' motion to

5    dismiss plaintiffs' fifth cause of action.  Because plaintiffs could allege additional factual

6    matter, the dismissal is with leave to amend.[7]

7         **8.**       **Whether the President is a Proper Defendant**

8          Defendants also argue that the court should dismiss the President as a defendant

9    because plaintiffs lack an express or implied equitable cause of action to sue the

10    President.  Mtn. at 22.  Plaintiffs respond that courts routinely issue relief enjoining the

11    official actions of a sitting President.  Opp. at 24.

12          Generally, courts lack "jurisdiction of a bill to enjoin the President in the

13    performance of his official duties."  Franklin v. Massachusetts, 505 U.S. 788, 802–03

14    (1992) (plurality opinion) (quoting Mississippi v. Johnson, 71 U.S. (4 Wall. ) 475, 501

15    (1866)).  In narrow circumstances, the Supreme Court has held that the President might

16    be subject to a judicial injunction.  For example, United States v. Nixon, 418 U.S. 683

17    (1974), held that the President may be subject to a subpoena to provide information

18    relevant to an ongoing criminal prosecution.  Plaintiffs have not cited a specific case that

19    would authorize the court to depart from the general rule against enjoining the President.

20          It does not follow, however, that the court should therefore dismiss the President

21    as a defendant.  Franklin noted that "the President's actions may still be reviewed for

22    constitutionality," though not under the APA because the President is not an "agency" for

23    purposes of the APA.  505 U.S. at 800–01 (citing Youngstown Sheet & Tube Co. v.

24    Sawyer, 343 U.S. 579 (1952); and Panama Refining Co. v. Ryan, 293 U.S. 388 (1935)).

25

26

27

28

---

[7] Other district courts have found that plaintiffs in those cases have alleged sufficient factual allegations to state a claim for violation of the Equal Protection component of the Fifth Amendment.  See New York, 2020 WL 4347264, at *6; Cook Cty., Ill., 2020 WL 2542155, at *3–5.  These other cases suggest that plaintiffs could allege additional facts such that amendment of their complaint is not futile.

United States District Court
Northern District of California

At this stage, the court declines to decide whether the President should be dismissed. Defendants have not presented authority for the proposition that the President should dismissed from this action, as opposed to enjoined from taking a specific action.  At the same time, plaintiffs have not cited any authority authorizing the court to enjoin the President, assuming they are able to state a claim outside of the APA.  See also id. at 828 (Scalia, J., concurring in part and concurring in the judgment) ("Review of the legality of Presidential action can ordinarily be obtained in a suit seeking to enjoin the officers who attempt to enforce the President's directive . . . ." (citations omitted)).  Because this order dismisses all non-APA claims against defendants, the court need not opine further on this issue.

## CONCLUSION

For the foregoing reasons, the court DENIES defendants' motion to dismiss with respect to their standing, ripeness, and zone of interest challenges.  Defendants' motion to dismiss plaintiffs' third through sixth and eighth causes of action for violation of the APA, FVRA, and Declaratory Judgment Act is GRANTED, and the claims are DISMISSED WITHOUT LEAVE TO AMEND; and defendants' motion to dismiss plaintiffs' seventh cause of action for violation of the Fifth Amendment is GRANTED, and the claim is DISMISSED WITH LEAVE TO AMEND.  Further, the court DEFERS RULING ON defendants' motion to dismiss plaintiffs' first and second causes of action.[8]  Plaintiffs will be permitted to file an amended complaint after resolution of the deferred claims.

**IT IS SO ORDERED.**

Dated: August 7, 2020

/s/ Phyllis J. Hamilton
PHYLLIS J. HAMILTON
United States District Judge

---

[8] On April 1, 2020, the court granted in part and denied in part plaintiffs' motion to compel discovery.  Dkt. 157.  The court also stayed discovery "until resolution of defendants' forthcoming motion to dismiss." Id. at 31.  Because this order defers ruling on two of plaintiffs' claims, the court's prior stay order remains in effect.

United States District Court
Northern District of California