# Exhibit A

<pre>
 1            IN THE UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF MARYLAND
 2                    SOUTHERN DIVISION

 3
   CASA DE MARYLAND, INC., et al.,)
 4                                )
            Plaintiffs,           )
 5                                ) Case Number: 8:20-cv-2118-PX
            vs.                   )
 6                                )
   CHAD F. WOLF, et al.,          )
 7                                )
            Defendants.           )
 8

 9        TRANSCRIPT OF PROCEEDINGS - MOTIONS HEARING
            BEFORE THE HONORABLE PAULA XINIS
10              UNITED STATES DISTRICT JUDGE
            FRIDAY, AUGUST 14, 2020; 11:00 A.M.
11                  GREENBELT, MARYLAND

12                 A P P E A R A N C E S

13  FOR THE PLAINTIFFS:

14      INTERNATIONAL REFUGEE ASSISTANCE PROJECT
            BY:  KATHRYN SHU-YENG AUSTIN, ESQUIRE
15               MARIKO HIROSE, ESQUIRE
            ONE BATTERY PARK PLAZA, 4TH FLOOR
16          NEW YORK, NY 10004
            (516) 296-0688
17          (516) 701-4620

18      ASYLUM SEEKER ADVOCACY PROJECT
            BY:  ZACHARY MANFREDI, ESQUIRE
19          228 PARK AVENUE S. #84810
            NEW YORK, NY 10003
20          (305) 484-9260
            (248) 840-0744

21
        ***Proceedings Recorded by Mechanical Stenography***
22          Produced By Computer-Aided Transcription

23  _____
            MARLENE MARTIN-KERR, RPR, RMR, CRR, FCRR
24          FEDERAL OFFICIAL COURT REPORTER
             6500 CHERRYWOOD LANE, STE 200
25            GREENBELT, MARYLAND 20770
                   (301)344-3499
</pre>

1                    A P P E A R A N C E S
                          continued
2
FOR THE DEFENDANTS:
3
        UNITED STATES ATTORNEY'S OFFICE
4       DISTRICT OF MARYLAND
              BY:  JANE ELIZABETH ANDERSEN, ESQUIRE
5             6500 CHERRYWOOD LANE, SUITE 200
              GREENBELT, MARYLAND 20770
6             (301) 344-4422

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S
 2          (Call to Order of the Court.)
 3               THE COURT:  All right.  Good morning, everyone.
 4          Ms. Smith, if you would call the case.
 5               THE COURTROOM DEPUTY:  May I have your attention,
 6  please.
 7          The United States District Court for the District of
 8  Maryland is now in session, the Honorable Paula Xinis
 9  presiding.
10          The matter now pending before this Court is Civil
11  No. PX-20-2118, Casa de Maryland, Inc., et al., versus Chad F.
12  Wolf, et al.  We're here today for the purpose of a motions
13  hearing.
14          Counsel, please identify yourselves for the record.
15               MR. MANFREDI:  Zachary Manfredi from the Asylum
16  Seeker Advocacy Project for Plaintiffs, Your Honor.
17               MS. AUSTIN:  Kathryn Austin from the International
18  Refugee Assistance Project, also for the plaintiffs.
19               MS. HIROSE:  Mariko Hirose from the International
20  Refugee Assistance Project, also for the plaintiffs.
21          Good morning, Your Honor.
22               THE COURT:  Anyone else for the plaintiffs before I
23  turn to the government?
24               MS. HIROSE:  The three of us will be speaking for the
25  plaintiffs today.  Thank you, Your Honor.
```

1        THE COURT:  Okay.  All right, great.

2      And then I see you, Ms. Andersen, for the defendants.  Is

3   that right?

4        MS. ANDERSEN:  Yes.  Good morning, Your Honor.  Jane

5   Andersen on behalf of the government.

6        THE COURT:  All right, great.  Thank you.

7      Okay.  Thank you all for joining me today.  We have a lot

8   to cover, so I expect that we'll be moving this along.

9      A couple of things.  I know that we are joined by many

10   members of the public and that I just want to let -- take a few

11   minutes just to go over the rules of the road in that respect.

12      As -- even though this is a virtual hearing, as my

13   background suggests, we are in court.  So we will be handling

14   this matter just as if we were in court and that means for

15   those of you who are joining us virtually, you may absolutely

16   stay for the entire time, you're more than welcome, but there

17   are no interruptions of any kind; and just as if there were

18   interruptions in my court, then we would be asking the

19   courtroom deputies to escort you out.  So we'll be

20   electronically ejecting anybody who interrupts this proceeding.

21      Secondly, just as if we were in court, there are -- there

22   is no independent recording of this proceeding.  So you cannot

23   record this proceeding by audio or video of any kind.  Doing so

24   would be a violation of my court order.  You could be held in

25   contempt.

1    There is, however, an official court record of today and

2    that is the one taken by Ms. Martin-Kerr, our court reporter.

3    Hi, Ms. Kerr.  If you cannot hear us or if at any point

4    we're talking over one another, making your job harder, just

5    let me know and we will stop.  Okay?

6    THE COURT REPORTER:  Thank you, Judge.  Okay.

7    THE COURT:  All right, great.

8    And with that, I'm going to start us off with -- oh, the

9    only other thing, we seem to all be doing it, is you keep your

10   phones on mute when you are not speaking so that we cut down on

11   just the background noise of, you know, the barking dogs, the

12   crying babies, the dump trucks rolling by.  Although, I do look

13   forward at some point to seeing your pets, because I've seen so

14   many of them, and I feel like I've gotten to know them so well.

15   So if there's a cat that, you know, randomly walks by, it's not

16   a big deal.  We'll just keep our phones on mute so that we

17   minimize the background noise.

18   Okay.  So with that, we have a number of things.  I want

19   to start with -- in the order in which I've received them --

20   the Supplemental Authority, because while I've gotten the

21   notices, I don't quite know for what purposes you've offered

22   them.  So I just want to understand why you've given them to

23   me.  I have my own thoughts but that's not what I'm really

24   interested in.  I want to know what you want.

25   Ms. Andersen, let me start with you.  I'm going to start

1  in order of the Supplemental Authority I have received.  From

2  you I've received, I think very shortly after the opinion came

3  out, the Fourth Circuit opinion in *CASA de Maryland v. Donald*

4  *J. Trump, et al.*  For what purpose are you offering that

5  Supplemental Authority?

6          MS. ANDERSEN:  Yes, Your Honor.  Thank you.

7      I wanted to make sure the Court was aware of it because it

8  seems to be relevant on a number of different points,

9  potentially, and part of it is just to maybe guide this Court

10  when it may make various decisions, you know, relating to the

11  PI motion.

12     So number one, of course, the court found that CASA de

13  Maryland didn't have organizational standing, but, of course,

14  it found that two individuals did have standing, so ended up

15  ruling on the merits.

16     Here, you know, obviously, I did not raise standing in our

17  proceedings, but, of course, the Court needs to satisfy itself

18  that it has standing for jurisdictional purposes.

19          THE COURT:  Let me stop you there.  Are you arguing

20  that any of the plaintiffs do not have standing?

21          MS. ANDERSEN:  I do believe from that case that

22  organizational standing would be inappropriate; however, they

23  may be able to satisfy membership standing based on the members

24  on membership standing, which that's addressed in that case.

25          THE COURT:  Okay.  So put organizational standing to

1    the side.  Representational standing, are you asserting that

2    they have not adequately pled representational standing based

3    on what I see as somewhat robust averment regarding the members

4    of the organization being injured by the rule changes?

5           MS. ANDERSEN:  Not for the purposes of this PI

6    motion, Your Honor.  Obviously, we have the right to raise it

7    at a later date if it becomes appropriate.  And one of the

8    reasons why I think it is important for this Court's analysis,

9    if we assume that they have membership standing but not

10   organizational standing, goes to irreparable harm; and should

11   this Court enter an injunction, how it could narrowly tailor

12   such an injunction.

13      So I just want to make sure that those concepts are -- I

14   think they are relevant even if this Court finds that there is,

15   you know, membership standing or any other form of --

16          THE COURT:  Well, okay, so let me stay on that just a

17   little bit longer.  I'm not quite clear what the government

18   means by "not for purposes of this motion" because the concept,

19   as you know, behind standing is the jurisdictional one; and if

20   I don't have power, I don't have power.  So if the government

21   is taking the position, well, you have power for now but you

22   might not have power later, it may matter later in the

23   conversation about where this case is going; and so that's why

24   I'm pressing on this.

25      If, Ms. Anderson, if you're saying you're going to be

challenging representational standing, I may take that up in a

separate way; but, again, that's why I'm pressing on it is I

want to understand what the argument would be in light of the

way in which the allegations have been pled and the factual

averments that have been made.

MS. ANDERSEN: Yes, Your Honor. I think that they

would likely be able to establish membership standing at least

for some of their claims. I only just hesitate because, again,

you know, in briefing this in a week, I don't want to preclude

any other arguments after consulting with, you know, other

people within the Department of Justice if there's other people

that have different opinions than I did. So I just didn't want

to preclude that.

I think it's not a waiveable issue, so I'm aware of that;

but, obviously, I would have raised it if I had a strong reason

to do so and I did not.

THE COURT: Okay. So then before we leave this call

today, we might revisit this question.

So I understand that for purposes of standing, you've

given me this opinion. For what other purposes did you wish

for me to review it?

MS. ANDERSEN: Yes, Your Honor.

The Fourth Circuit also addressed the irreparable harm

prong of a preliminary injunction standard, and I think the

case stands for the proposition that however -- that it is

1  important when determining what the irreparable harm is.

2      So, for example, there are a number of allegations, both

3  from the declarations and the complaint, about the burden on

4  the organizations themselves, about the resources that they

5  need to divert because of the rules; and I think that case is

6  very clear that those sorts of concerns are not within the

7  Article III standing, which then goes to irreparable harm.

8      So when the Court is balancing the equities of what the

9  harm is, it should be looking at the members in particular in

10  those harms when it's balancing it.

11     I think that the court in that held that CASA's purported

12  injuries were not the product of the rule's dictates but of its

13  own priorities and choices, and that was within the discussion

14  of the irreparable harm prong as well.

15         THE COURT:  So it kind of goes hand in glove with

16  standing.

17         MS. ANDERSEN:  Yeah, yeah, and that's why, you know,

18  I didn't brief it.  It was a very -- standing would have taken

19  up a lot of pages.  I was trying to keep within that 35.  You

20  know, in hindsight, at least, maybe if I briefed it, just to

21  help frame that issue, that may have been helpful to the Court.

22  So I apologize if that, you know, would have been helpful.

23     But, of course, also this decision came down after that,

24  which I think clarified a lot of things, because the case in a

25  lot of ways is, sort of, you know, similar.  So it's helpful

1    from that perspective.

2         And the final factor, which the Fourth Circuit weighed in

3    on, is when you need to weigh the interests between the harms

4    of the plaintiffs and the harms to the government and the

5    public, and there is just -- again, I think it's important for

6    the Court to be aware of and what the court held on those

7    fronts.

8         So just, for example, the court held that the district

9    court's reasoning that an individual's interest must always

10   trump general interest was incorrect; that the government is

11   asserting in that case a significant interest in not burdening

12   the public; and that the government's interest in that sense

13   has to be considered and weighed with the individual harms.

14             THE COURT:  Are you talking about the aspect of the

15   ruling that dealt with the propriety of a nationwide

16   injunction, as opposed to more circumscribed relief?

17             MS. ANDERSEN:  Well, it was not -- that part of it

18   was just the weighing of whether the irreparable harm prong or

19   the last prong, I guess, of the *Winter's* where you're weighing

20   the plaintiff's harm versus the government's harm or the public

21   interest harm.

22             THE COURT:  Okay.

23             MS. ANDERSEN:  And the court also just noted that in

24   the field of immigration in particular, that the public

25   interest, you know, can be disturbed when there is a

1  legislative expression, you know, from the legislative branch

2  and from the executive branch, and a court disturbing that; and

3  the court did address that within the weighing of the harms,

4  that the harm of just disturbing the executive branch's

5  discretion, especially in this field where the agency is given

6  very broad discretion, is a harm in and of itself.

7      And so that is one harm that the Court would be required

8  to factor into when weighing all the --

9      THE COURT:  Although, it's fair to say -- and we'll

10  get into this more in a moment -- but it's fair to say that the

11  Fourth Circuit opinion didn't have any arguments relating to

12  the authority of the Secretary who will be promulgating these

13  rules.  Am I right?  There is no FVRA claim.

14      MS. ANDERSEN:  Correct.  Correct.  Yeah, yeah, this

15  really just goes to the APA challenge --

16      THE COURT:  Right.

17      MS. ANDERSEN:  -- on the merits, yeah.

18      And last, the court, obviously, did talk about, you know,

19  in that case they rejected the nationwide injunction.  The

20  court, obviously, discusses why injunction is equitable in

21  nature and that it has to be tailored to address the injury of

22  the particular plaintiff.

23      And, again, this is why I think standing does become

24  relevant in this case even if there is some standing for this

25  Court to, you know, deal with the merits, that it is important.

1  And in this case -- and I can address it now or when we're

2  doing it, but I think there are ways, should this Court find

3  that injunction is appropriate, that it could be narrowed in

4  very reasonable ways.

5      You know, and, again, I think the Fourth Circuit just

6  solidifies --

7          THE COURT:  Let me ask you, Ms. Andersen, if you were

8  to take a few more pages and address standing, would you agree

9  that there aren't any -- necessarily any additional facts that

10 you need, that you could address standing based on the

11 pleadings?

12         MS. ANDERSEN:  I believe that would be appropriate,

13 Your Honor, yes.

14         THE COURT:  Okay.  All right.

15     Okay, and I'm intimately aware of the holding regarding

16 national -- a nationwide injunction, and maybe when we get more

17 into the argument today, you can address Judge King's view,

18 which said, in reaching the remedy in that case, it's dicta.

19     But in any event, we'll put that to the side, but I think

20 I understand that you're looking at this case as altering the

21 playing field for standing, irreparable harm, and the scope of

22 relief.  Is that fair?

23         MS. ANDERSEN:  Yes, Your Honor.

24         THE COURT:  Okay, great.  Thanks.

25     Okay.  And then for the plaintiffs, in the last 24 hours

1  I've received two things; one is an opinion from the Northern

2  District of California regarding the Public Charge Rule.  It

3  was a case decided at the -- not on injunctive relief in this

4  opinion but on a 12(b)(1) and 12(b)(6) posture.  For what

5  purpose are you offering this case, Plaintiffs?

6          MR. MANFREDI:  Yes, Your Honor.  Zach Manfredi for

7  Plaintiffs.

8      First, Your Honor, I just wanted to clarify how Plaintiffs

9  have proposed to divide the argument amongst the three of us,

10  if that's helpful for the Court.  I'm prepared to discuss the

11  issue surrounding -- related to Mr. Wolf's appointment as

12  Acting DHS Secretary.  My colleague Kathryn Austin is prepared

13  to discuss the likelihood of success on the merits for any of

14  our other APA claims; and then my colleague Mariko Hirose is

15  prepared to address any other claims or any other issues in

16  relation to our claims.

17          THE COURT:  Okay, great.

18          MR. MANFREDI:  So I'm happy to address the *La Clinica*

19  case's relevance as to the appointment issue, and Ms. Hirose

20  can address it as to the standing issue.

21          THE COURT:  Okay.  So that's helpful because with

22  regard to the question of Acting Secretary Wolf's authority in

23  this respect, *La Clinica* seemed to raise more questions than

24  provided answers, and the subsequent provision of the OAG or

25  the GAO, rather -- I'm dyslexic this morning.  I only had three

1     cups of coffee, so excuse me -- seemed to put to bed a

2     lingering factual question I had.

3          So when I read the *La Clinica* case, it seemed to accept as

4     true that President Trump actually nominated Acting Secretary

5     McAleenan and that it accepted that fact as true and based its

6     decision on that, but I hadn't found any authority for that.

7     And then when I -- and it's not pled that way in your

8     complaint.  And then the GAO -- government accountability -- I

9     did it right -- the GAO advisory opinion assesses it the same

10    way so that Secretary Nielsen's last memorandum on her way out

11    is the operative document.

12         So it did raise for me were you offering this opinion for

13    any insight as to what I do with the FVRA and the HSA

14    assessment?

15             MR. MANFREDI:  Yes, Your Honor.

16         So two points, Your Honor, the first of which is we --

17    first, I mean, we just wanted the Court to be aware since the

18    case did directly address this issue, but we believe the -- the

19    court's opinion there, as well as the GAO report, we do believe

20    strongly supports Plaintiffs' claim that the amendments, which

21    Secretary Nielsen purported to make, never did, in fact, result

22    in secretary -- in Acting Secretary McAleenan lawfully assuming

23    his office.  So insofar as that's the case, we believe that

24    it's correct.

25         It is Plaintiffs' view, in fact, that the -- Mr. McAleenan

1  was not actually designated under the FVRA, which we agree with

2  the GAO, that there is an actual -- so we would disagree with

3  that part of the report.

4       But insofar as the Court does potentially even agree with

5  the *La Clinica* court that Mr. McAleenan's appointment was

6  pursuant to the FVRA, rather than the HSA, we think that also

7  strongly supports Plaintiffs' claims because then it would be

8  indisputable that the Vacancies Act's time limit provisions

9  would apply to his appointment; and in this case, it is also

10 very clear that those have been exceeded when the relevant

11 actions were taken.

12      So in that sense, we think it's helpful to the Court in

13 either respect.

14           THE COURT:  Okay.  Thank you.

15      And so with that, the way I'd like to take up the argument

16 is I actually want to start with the government and talk about

17 the FVRA and the HSA and then I'll turn to Plaintiffs and then

18 we can move on to the APA claims; and the reason why I would

19 like to do it in that order is because if, in fact, I agree

20 that the FVRA provides for sole and exclusive remedy in the

21 event that Acting Secretary Wolf is without authority to

22 promulgate these rules and that sole and exclusive remedy is to

23 set aside -- well, declare the rules as having, quote, no force

24 and effect, that's what the FVRA says, then the rule itself is

25 a nullity whether it is valid or not.  And so I have a question

1    about whether I even need to reach the APA claims in that

2    instance.

3         And, Ms. Andersen, I have to say, in reading the GAO

4    opinion, it's certainly not binding on me but it was tracking

5    quite closely what I was thinking about this issue, as stunning

6    as it is, frankly, to imagine that we're at day 500 and we

7    still don't have a secretary installed that is nominated by the

8    President and confirmed by the Senate.

9         So I wanted to give you the floor first to explain to me

10   how it is that I can find otherwise in this case.

11        MS. ANDERSEN:  Thank you, Your Honor, and I do

12   appreciate that opportunity.

13        Obviously, this decision just came down this morning, so I

14   just will start off by saying that, you know, the Office of

15   Legal Counsel, Department of Justice needs to review that, and

16   we believe they will come to some sort of, you know, opinion on

17   it, you know, once they have a chance to review it.  So I'm

18   sort of in this limbo period right now.

19        But I would like to --

20        THE COURT:  Can I ask a question about that before

21   you move on to the merits?  Is there a possibility, in

22   reviewing that, that there may be some decision on the

23   government's part to delay enforcement of these rules?  In

24   other words, should we check back by the end of the week next

25   week?

1          MS. ANDERSEN:  Again, I am told that they will be

2    reviewing it.  So my assumption means that that means, you

3    know, they will come to some decision one way or another, if

4    it's something they agree with or disagree with, in which case

5    this case could become moot in theory; but right now that's not

6    the case.

7          So I, you know, would like the opportunity to explain the

8    Department's position --

9          THE COURT:  Oh, absolutely.

10         MS. ANDERSEN:  Yeah, yeah.  And it is a position that

11   they put forward before GAO -- you know, I think just as a

12   general matter, you know, GAO, obviously, served a very

13   important function on behalf of Congress but it is not binding

14   on the executive branch.  So there's just always, in any of

15   these cases, that there can be disagreement, and I just don't

16   know yet if there will be, ultimately, once OLC has a chance to

17   review it.

18         THE COURT:  Okay.

19         MS. ANDERSEN:  So just kind of putting that to the

20   side for now, and I, of course, will update the Court, you

21   know, as soon as I -- if there's any sort of official decision,

22   I will let the Court know because it, obviously, you know,

23   could potentially impact this case.

24         And just to, again, frame sort of what's in dispute and

25   what's not in dispute, this particular case, because it's

1  dealing with Secretary Wolf, if this Court agrees that

2  Secretary Nielsen's order did not change the order of

3  succession, then there's no more argument on behalf of the

4  government.  You know, even if the Court adopted the reasoning

5  by the court in Washington that McAleenan was appointed through

6  the FVRA instead, Wolf's appointment would not be proper.  So

7  that's just not an issue that the Court would need to resolve.

8       We would concede at that point that our argument would

9  rely on the Court making two findings and the first has to be

10  that Secretary Nielsen's order on April 9th changed the order

11  of succession for all purposes.  If you find against the

12  government on that point, the Court does not need to reach any

13  further decisions and that is because Secretary McAleenan

14  signed the order on day 214.  So if he was appointed pursuant

15  to the Federal Vacancies Reform Act, he would have exceeded the

16  200-day statutory limitation.

17       The Department's argument is that --

18          THE COURT:  Okay, let me make sure I understand it.

19  The government is not disputing that the order -- the changed

20  order of succession signed by Acting Secretary McAleenan was on

21  214 -- day 214 from when the vacancy first came open.

22          MS. ANDERSEN:  Yes.

23          THE COURT:  Likewise, you're not disputing that the

24  rules in question in this case were promulgated far in excess

25  of the 210-day period that's framed in the FVRA.  That's also

1  not in dispute?

2       MS. ANDERSEN:  That is correct.

3       The argument and the reason why we believe that Secretary

4  Wolf's appointment is legal is because Secretary McAleenan and

5  Secretary Wolf were appointed pursuant to Section 113 of the

6  Homeland Security Act, which does not contain the 210-day

7  limitation.  That would be our second argument that would --

8  that could also address the Court, but the Court doesn't even

9  have to go that far if -- you know, until the Court finds that

10 Secretary Nielsen's order was a lawful and proper order

11 pursuant to the Homeland Security Act.

12      Does that make sense?

13      THE COURT:  No.  Well, no, I get the two steps.  I

14 mean, frankly, I think you can also look at it from the other

15 end of the telescope, which is if I find that I can read the

16 FVRA in harmony with the HSA, meaning I can give every word of

17 both statutes full force and effect, then I could potentially

18 stop at the question of giving the FVRA its full force and

19 effect.  It puts a 210-day time limit on acting secretaries.

20      The HSA is designed to help me figure out who slots in

21 under that first 3345(a)(1), who is the first assistant

22 according to that statute.  The HSA 113, 6 U.S.C. 113, that

23 helps me figure out who's in there, right?  And it could either

24 be by the statutory order of succession, but then if we get to

25 the further order of succession, it tells me I can look to

1  Secretary Nielsen's order, right?

2      So even if I credit your argument that Secretary Nielsen's

3  order didn't -- it is lawful and she did mean to put Acting

4  Secretary McAleenan in, if I can read the statutes in harmony

5  and Acting Secretary Wolf is intending to promulgate these

6  rules at day 499 and day 500 of the vacancy, then don't you

7  lose?  And I can just base it on that, that ruling.  I don't

8  have to do anything else.

9          MS. ANDERSEN:  Yes, Your Honor.  Yes, there are two

10 independent legal arguments that the government's argument

11 rests on.  So, yes, they're independent.  If the Court finds

12 against us on one of them, we would lose.  So I guess it's up

13 to the Court which direction it -- you know, what it wants to

14 address first.

15     I think I was thinking about Secretary Nielsen's order

16 first because that came, you know --

17         THE COURT:  First in time.

18         MS. ANDERSEN:  -- first in time.  So kind of

19 everything flows from there.

20     But because of this case, unlike some other cases, like in

21 the Washington case where the court found an alternative route

22 was appropriate, you know, there were different legal issues

23 involved.  Those just aren't present here.  So I just wanted to

24 make sure that that was clear, that there is no sort of

25 alternative arguments on behalf of the government that, you

1  know, if you find this, you can uphold the rules on these other

2  grounds.  There's no alternative grounds.  So I just wanted to

3  simplify it the best way possible.

4       THE COURT:  So a couple of things in that respect.  I

5  do want you to address, give me your best argument, as to why

6  -- because under what you've just said, the only way the

7  government wins is if I find that the HSA totally replaces the

8  FVRA, it eclipses it.  I can read no other provisions of the

9  FVRA as having any relevancy in this case.  So I want the best

10 argument in that respect.

11      And then, secondly, you are agreeing that unlike the *La*

12 *Clinica* cases, there isn't -- this analysis only falls under

13 the one of three options under the FVRA for determining the

14 order of succession and that is the first, the default.  There

15 is no presidential selection of Acting Secretary McAleenan at

16 issue.  Am I right about that?

17      Why don't we start with the last one and then --

18      MS. ANDERSEN:  I don't know the answer to that

19 because if the President did select him, like the Washington

20 court held, it doesn't matter because then Wolf was not -- we

21 would concede that his order on day 214 -- that the 200-day

22 date would apply for sure.  The Court need not reach that.  It

23 sort of -- I think that's sort of being worked out as sort of,

24 you know, what should have been the line of succession and how

25 that works out.  So I don't want to take a position because I

1 know that's being determined.  It's not relevant here

2 because --

3        THE COURT:  Okay.  And it's not relevant because even

4 if it were true, you would actually deal with it.  You would

5 say that if that were true, then at least as it applied to this

6 case, it would mean --

7        MS. ANDERSEN:  As applied to Secretary Wolf.

8        THE COURT:  -- Chad Wolf -- got it.  Okay.  All

9 right, then, yeah, let's put that to the side.  It doesn't

10 really -- it may or may not matter, though, for purposes of my

11 analysis.  So my analysis right now, I see no evidence.  I

12 can't take judicial notice of anything right now, unless you

13 tell me otherwise, that the President installed Acting

14 Secretary McAleenan.

15     So the only provision I can look at this under is

16 3345(a)(1).  I can't look to the other two that says the

17 President and only the President.

18     So the reason why I care about that is because I do want

19 us, when we talk about the next part of this conversation,

20 which is how does the HSA fully eclipse the FVRA, I just want

21 to make sure we're in the right FVRA box.

22        MS. ANDERSEN:  Yes.

23        THE COURT:  Okay.

24        MS. ANDERSEN:  Absolutely, yes.  So it's the

25 government's position that Secretary McAleenan was delegated to

1  the acting role pursuant to 113 of the Homeland Security Act

2  and not pursuant to the Federal Vacancies Reform Act and that's

3  why the 210 days does not apply.  So I can walk the Court

4  through that analysis, you know, of why the Court should not

5  incorporate the time limitations that is found in the FVRA into

6  the Homeland Security Act.

7       Is that where you want me to start?

8            THE COURT:  I think so.

9            MS. ANDERSEN:  Okay.  So the FVRA is not the

10 exclusive scheme for acting service when there is an express

11 office-specific statutory provision for succession.  And that's

12 found -- that's contained in the express language of the FVRA,

13 Section 3347.

14      And here, Congress did pass an express office-specific

15 statute in the Defense Authorization Act of 2017, which granted

16 the Homeland Security, for the Secretary, the authority to

17 delegate her order of succession, and that's where we turn to

18 Section 113.

19            THE COURT:  Okay.  Now, before we go there, let's

20 talk about 3347 of the FVRA, because you're saying the

21 authority for me to read the HSA as the exclusive means is that

22 in 3347 there's a carve-out, right, a carve-out for statutes

23 which expressly authorize the President accord, or the head of

24 the executive department, to designate an officer or employee

25 to perform the functions and duties of a specified office.

1    That one?

2         MS. ANDERSEN:  Yes, Your Honor.

3         THE COURT:  Okay.  It goes on to say temporarily in

4    an acting capacity.  Right?

5         MS. ANDERSEN:  Correct.

6         THE COURT:  So what about 6 U.S.C. 113 incorporates

7    temporary or expressly addresses designation temporarily and in

8    an acting capacity?  I get the acting capacity part.  So maybe

9    I'm really focused on the temporarily part.

10        MS. ANDERSEN:  Absolutely, Your Honor.

11        The government acknowledges that any position for any

12   acting service would necessarily have to be temporary.  What

13   the disagreement over is what does "temporary" mean and whether

14   210 days is some magic number or not.  And Congress, of course,

15   when they passed Section 113 in the Homeland Security Act, they

16   could have included a number.  It could have been 200 days; it

17   could have been something different, but they intentionally did

18   not include a number.

19        And, again, these two statutes, I think the plaintiffs are

20   trying to frame it that there's no conflict, but I think the

21   proper analysis is that these are two statutes that

22   cross-reference each other.  They're both clearly aware of each

23   other and, therefore, in the Federal Vacancies Rule Act

24   statute, which specifically designates, you know, particular --

25   like, who exactly the 210-day limitation applies to.

1          So, again, if you look in Section 3346, it specifically

2     says the person serving as an acting officer, as described

3     under Section 3345 -- and, of course, Section 3345 has three

4     people, you know, three sort of groups for somebody to serve as

5     an acting, which is different.  You know, Congress could have

6     said --

7               THE COURT:  Well, it's different and then it isn't.

8     I mean, that's why I wanted us to first make sure we're talking

9     about the right provision.  Right?  Because in this case, we're

10    in 3345(a)(1), right?  And so when we go there --

11              MS. ANDERSEN:  I think I disagree.  We're not in -- I

12    do not agree that we're in 3345(a)(1).

13              THE COURT:  Okay, then are we in (a)(2) or (a)(3)?

14              MS. ANDERSEN:  Your Honor, I don't believe we're in

15    any of that.

16              THE COURT:  Here's why I ask that -- well, I guess

17    here's why I ask that, because -- let's do it this way.  If you

18    pull up 113 and you look at 113, there is a very important part

19    in the beginning which locks very well with the FVRA.  So it

20    can't be that Congress intended for the HSA to eclipse the

21    FVRA.  This is how I read it, at least.

22         Look at the first provision, (a)(1).  It says, "Except as

23    provided under paragraph (2), there are the following officers,

24    appointed by the President, by and with the advice and consent

25    of the Senate."  And the first one is the Deputy Secretary of

1    Homeland Security, who shall be the first assistant for

2    purposes of subchapter III, chapter 33, of title 5.  That's the

3    FVRA, right?  And then you go down and they do the same thing

4    for the Under Secretary of Management.

5        So Congress knows how to write this statute so it fits --

6    right? -- with the FVRA.  The reason why that is important is

7    because it goes on then to give us, when you read it side by

8    side with 3345 -- right? -- it gives us who should then be

9    plugged in, under 3345(a)(1), as the first assistant.  Right?

10   I mean, that's the whole purpose.

11       Go back to 113(a)(1)(A).  "A Deputy Secretary of Homeland

12   Security, who shall be the Secretary's first assistant for

13   purposes of subchapter III, chapter 33 of title 5."  So for

14   purposes of the FVRA, which uses the term "first assistant,"

15   the HSA gives us who this person is.  So with that, just don't

16   go any further from there, how can I read the HSA as eclipsing

17   the FVRA, replacing the FVRA?

18            MS. ANDERSEN:  Yes, Your Honor.

19       Again, I'm not trying to say it eclipses it.  I think they

20   are read together, in conjunction, and there are certain

21   provisions that refer to each other and that directs everybody

22   to know when they do overlap; and then the sections that do not

23   refer to each other are exclusive and do not conflict.

24       So in Section 113(a)(1)(A), for example, that is talking

25   -- that's talking about the language.  So I think where in the

1   Vacancies Act, they refer to the position as first assistant --

2   　　　　THE COURT:  Right.

3   　　　　MS. ANDERSEN:  -- and in the Homeland Security, that

4   person is the Deputy Secretary.

5   　　But Secretary McAleenan wasn't serving as Deputy Secretary

6   of Homeland Security or the Under Secretary.  That's not the

7   order of succession.

8   　　　　THE COURT:  Right.

9   　　　　MS. ANDERSEN:  Those positions were vacant.

10  　　　　THE COURT:  Right.

11  　　　　MS. ANDERSEN:  So that's when we turn to 3347, which,

12  you know, specifically says that Sections 3345, which is what

13  the Court was referring to, are the exclusive means unless --

14  so I think that "unless" is what's important -- unless a

15  statutory provision expressly, you know, authorizes --

16  　　　　THE COURT:  Right.  And then acting in a temporary

17  basis.

18  　　　　MS. ANDERSEN:  Right, right.

19  　　　　THE COURT:  That's the part, though -- where is the

20  express replacement for this FVRA?  So, in other words --

21  because there's these officer statutes for every agency, right?

22  They say something slightly different but every agency has:

23  Here's the officer that has all of the -- is at the top.

24  Here's the top banana officer.  For us that's 112.  Then we

25  have the second banana, third banana, fourth banana, and

1  that's, for us, 113.  And every agency kind-of, sort-of has

2  this.

3       So if I read it as broadly as you're suggesting, I do run

4  the risk that the FVRA is kind of, you know, written out of its

5  utility; but not even going that far, where do I see expressly

6  in 6 U.S.C. 113 that Congress meant for this provision to be

7  the exclusive means and not the FVRA?

8            MS. ANDERSEN:  Again, if you turn to Section 113(g),

9  which specifically deals with vacancies --

10           THE COURT:  Okay.  I'm there.

11           MS. ANDERSEN:  So it's (g)(2).  It states,

12  "Notwithstanding chapter 33 of title 5," which is the Federal

13  Vacancies Reform Act, "the Secretary may designate" --

14           THE COURT:  Wait-wait-wait-wait, wait-wait-wait-wait.

15  Stop there.  I want to stop you on that one because now the

16  part at the top is really, really important.  Right?  Because

17  the part at the top, when Congress meant to identify the

18  Federal Vacancies Reform Act, they said subchapter III of

19  chapter 33 of title 5.  That's the FVRA.

20       Chapter 33 of title 5 -- and this is my word.  You all can

21  tell me what it's really supposed to be called, but it's the

22  larger civil service statute.  Right?  It's got all of these

23  different provisions about qualifications and how you can get

24  installed and how you can get removed.  And I won't -- I don't

25  want to go through the whole thing with you, but the point

1  being is that I can't agree with your reading on it saying

2  "notwithstanding chapter 33 of title 5" means the FVRA.

3      How do you respond to that difference between how they

4  refer to subchapter III in the first section and they don't

5  refer to it in (g)(2)?

6          MS. ANDERSEN:  I mean, I believe that it's contained

7  within that chapter.  Correct?  So it's a broader statement but

8  it incorporates the Federal Vacancies Reform Act.

9          THE COURT:  But how can I find that that's an express

10 replacement of the Federal Vacancies Reform Act?  Because, this

11 is -- you know, again, if I'm trying to read everything so that

12 I give every word in the statute, under that cannon of

13 statutory construction, that Congress knows what they have

14 already passed when they pass something new, how do I know that

15 what they meant to do here, again, is eclipse the FVRA when

16 they cite the entire sort of civil service statute?

17     And they know how to cite the FVRA in other places because

18 if you go to the next section, actually, very specifically when

19 they don't mean the entire section, they mean 3345 and 3349(b),

20 Congress knew how to cite those directly.

21     So that's why I'm having a very hard time finding that

22 6:113 replaces the FVRA and I'm not to look to any other

23 provisions in it.

24         MS. ANDERSEN:  Again, I don't necessarily want to say

25 it replaces it, but this definitely gives authority to the

1   Secretary to designate such other officers.

2          THE COURT:  Okay.

3          MS. ANDERSEN:  It's a limited category than the FVRA.

4   So it's saying the Secretary has this authority.  It's a more

5   limited group of people that that person can choose from.

6          And, again, because I think these statutes should be read

7   together because they do cross-reference each other.  Because

8   the FVRA is very specific about who the 210 days applies to,

9   and the Homeland Security Act was passed after the FVRA.

10  Congress would absolutely know how to put in paragraph (g)(2)

11  because, to Your Honor's point, it references it clearly within

12  the Homeland Security Act when it wants to.  And it could have

13  said subject to the limitations in Section 3347 and it did not

14  do that, where the Vacancies Reform Act, you know -- again, it

15  doesn't say all vacancies.  It's like a limited subset of

16  vacancies that it applies to.

17         And this group of individuals, which is the Secretary from

18  other offices within the department, is a different subset of

19  individuals that the Secretary can choose from than what is

20  found in the Federal Vacancies Reform Act.

21         THE COURT:  So if I credit that argument that the HSA

22  does provide a -- your word -- a "subset," my word maybe

23  "further line," right, so if you don't have an Acting

24  Secretary, you don't have an Under Secretary of Management, the

25  Secretary can designate who else can act in that capacity, if I

1   credit all of that, doesn't that, once again, though -- if I am

2   to do as you agree I should, read the two statutes in harmony,

3   how do I not incorporate the time limit that is set in the FVRA

4   in this case?

5       Because the Vacancies Act, the purpose of that Act is to

6   make sure that when Congress gives to the President a little

7   bit of wiggle room in terms of nominating for an office for

8   Senate confirmation, that the wiggle room has some limits on

9   it.  Because it is, at its core, a constitutional question.

10      If I have to read them together, 113 doesn't have any

11  timing provision on it, no guardrail whatsoever.  FVRA does and

12  the whole purpose of the FVRA is to put some guardrails on

13  this.

14      What's my authority for not reading -- well, let me ask it

15  this way.  If I credit your argument wholesale, the effect of

16  it is that I'm not reading the remaining provisions of the FVRA

17  as having any import here, right?

18          MS. ANDERSEN:  I mean, with respect to this case, the

19  only thing that's relevant is the 210 days.

20      And to answer Your Honor's argument about, you know, why

21  it shouldn't be incorporated is just a matter of, you know, we

22  should assume that Congress meant that or that, you know, the

23  200 days -- the 210 days by itself, obviously, is not a magic

24  number.  There's not some magic constitutional number.

25      The history of it, it had changed.  It used to be shorter.

1   They've extended it.

2           THE COURT:  Right.

3           MS. ANDERSEN:  And there's certainly reasonable

4   reasons why Congress would, for different agencies, especially

5   like a very important agency like Homeland Security, might not

6   want a position to be vacant, you know, past the 210 days.

7           And just, again, just as a -- more just of a -- some

8   perspective is that even under the Federal Vacancies Rules Act,

9   you know, Congress did envision longer periods of time where it

10  would be vacant.  Of course, those facts aren't present here

11  but just as conceptually that, again, 210 days is not a magic

12  number.

13          THE COURT:  Except those other examples matter

14  because it's when there's a nomination on the floor, right?

15  And so Congress has some -- the Senate has some skin in the

16  game, if you will, as to how long that might take, right?

17  Where what we have here is -- what I'm struggling with is if I

18  credit your argument, what's the limiting principle?  Like,

19  what, what allows the President to -- or what would prevent the

20  President from placing someone in office who must be nominated

21  and confirmed by the Senate to have the authority that he or

22  she has without going through that process?  What in the HSA

23  limits the President's authority and doesn't allow ad infinitum

24  acting secretaries for the entire time of that person's tenure?

25          MS. ANDERSEN:  Thank you, Your Honor.

1     You know, obviously, this has not been litigated.  I can

2  point the Court to two different decisions that kind of shed a

3  little bit of light on this issue, but, again, just to go to

4  the general principle is it is permissible for Congress to

5  choose.  You know, this is their responsibility to devise a

6  consent.  So if they have chosen not to set a defined time

7  limit because they've decided, in their judgment, that they

8  want the executive branch, in particular the Homeland Security,

9  to have more flexibility and it becomes sort of more of a

10  political question, then binding an agency to a particular

11  timeline, that is within Congress' discretion.  So that just

12  kind of answers kind of a more broader question.

13     And, again, the fact that the Homeland Security Act was

14  passed after the Vacancies Act, you know, not every agency is

15  given this authority.  Not every agency head is able to pick

16  their order of succession.  The Homeland Security is one of

17  them.

18     I think when we look at cabinet-level agencies, there are

19  certainly different concerns for why, you know, despite,

20  perhaps, some political issues for getting, you know, a

21  nomination confirmed or for whatever --

22          THE COURT:  Right.

23          MS. ANDERSEN:  -- any other reason that may be, there

24  could be good policy reasons that Congress decided not to

25  incorporate a defined number and leave it to within that realm

1  of, you know, it's a political question.

2      And, again, there's not a whole lot of litigation on this,

3  but just in case it is helpful for the Court.

4          THE COURT:  But isn't it -- is it a political

5  question or a constitutional question?  Because at this point,

6  again, even if I credit that the HSA is ambiguous in this

7  respect, and I still have to read it -- you know, again, moving

8  to another cannon of statutory construction, then I've got to

9  -- if I say, wow, it's ambiguous, I'm not really sure, the

10  government raises a good point here, I then have to read it in

11  a manner that gives the appointments clause -- that would

12  render this decision a constitutional one or render, I'm sorry,

13  the reading of the HSA to be constitutional.  And the only way

14  I can do that is to say there's got to be some way that the

15  appointments clause has meaning here.

16      And that gets me back to, so where do I read in the HSA

17  any limiting principle, even crediting that Homeland Security

18  should have maybe more authority than some other agencies

19  because of the important function it serves?

20          MS. ANDERSEN:  Yes, Your Honor.

21      And I give those examples as just why Congress, you know,

22  they didn't expressly incorporate it in there.

23      And to answer Your Honor's question, the one case that I

24  think --

25          THE COURT:  They did not expressly?  They didn't

1  expressly?

2      MS. ANDERSEN:  They did not put a number in, correct.

3  Correct.

4      THE COURT:  Okay.

5      MS. ANDERSEN:  There's a case from 2018 from the

6  District of Minnesota.  It's *Bhatti v. FHFA.*  And that case

7  involved -- it's at 332 F.Supp 3d 1206, and that case involved

8  an acting director of the Federal Housing Finance Agency who

9  served under President Obama in an acting capacity for four

10  years.

11      THE COURT:  Okay.

12      MS. ANDERSEN:  And there were people that challenged

13  that and saying four years is much longer than the facts that

14  we have here before the Court today, and it was asserted that

15  four years in an acting capacity for a Senate-confirmed

16  position was constitutionally too long.

17      That court, they held that that was a political question,

18  that whether an officer has served for too long is something

19  that the court should not weigh into, and they cited some

20  Supreme Court cases about, you know, non-judicial discretion

21  and those sorts of things.  That's just a premise.

22      I'd like to step back from that because that's, obviously,

23  a tough -- you know, once it gets to that point, that's a tough

24  -- you know, a tough issue to think through.

25      Here, I --

1          THE COURT:  But you haven't argued political

2     question, have you?  I mean, you didn't -- I don't recall you

3     raising that this is a question the Court shouldn't weigh in on

4     when there's a statute at issue.

5          MS. ANDERSEN:  Yeah, I think the issue here is that

6     the -- Secretary Wolf who, you know, number one, was Senate

7     confirmed for a germane position -- so just going back through

8     a little history is when Senate McAleenan had announced he was

9     going to resign, he agreed to stay on, you know, to help

10    transition.  It was at that time that now Acting Secretary

11    Wolf, his nomination for a different position was before the

12    Senate.

13         Senator -- I'm sorry.  Acting Secretary McAleenan had

14    reissued the new order of succession.  Everybody knew.

15    Congress knew.  You know, there were press reports about that,

16    that, you know, it was envisioned that it was Secretary Wolf

17    once he was Senate confirmed.  And I mention that because the

18    fact that he was Senate confirmed for a different position

19    within the agency, if you're thinking about it as a

20    constitutional issue, is important.  So that's one factor.

21         So, again, I guess just the time limit alone is not the

22    only factor if the Court was to, you know, weigh into sort of

23    the constitutional issue.

24         So he was Senate confirmed.  The Senate was aware that he

25    would be next in line as acting and that the other positions

1  were vacant.

2      And then, again, just going to the -- if you look at the

3  actual numbers, I understand there's differences within the

4  FVRA with the 210 days, that, you know, there's some back and

5  forth with Congress; but it does, again, envision -- if you're

6  worried about somebody in an acting position serving beyond the

7  210 days, it does envision a situation, for example, where

8  somebody is serving as an acting official for 210 days, the

9  President nominates somebody, the President then withdraws

10  somebody, you get a whole-nother 210 days.  And that can happen

11  twice.  So you're talking, you know, over 500 days.

12      We're not even at 500 days today.

13      THE COURT:  But that's when the President and only

14  the President decides to nominate, right?  I mean, we're not in

15  that category.  And, again, Congress knew how to give wiggle

16  room when we're in that category but we're not there.

17      I mean, I understand.  I think your argument is that we're

18  a little kind of the functional equivalent of it.  So if,

19  Judge, if you're worried about the spirit of the statute and

20  reading it the way the government suggests, you're not going to

21  run into any constitutional infirmity because Acting Secretary

22  Wolf kind of fell in that category.  Right?

23      MS. ANDERSEN:  Yeah, yeah.  I think -- I think courts

24  are advised not to sort of dive into these constitutional

25  issues unless they have to.  There's a number of steps before

1  we get there and one of them being is that, you know, Secretary

2  Wolf, you know, if you compare it to some history and some

3  other acting positions in various roles, is less than 500 days.

4  From a historical perspective, that is not, I think, so

5  unreasonable that it would kind of fall into that category of

6  any kind of -- reaching a constitutional issue.

7      Now, whether or not -- you know, so I think it more goes

8  to the statutory, you know, argument.

9      And the other case -- just in -- again, it's an old case

10 and it's not from this district, but just because there's not a

11 whole lot on there, I was trying to find more cases -- from the

12 Eastern District of Michigan, *United States v. Lucido*, 373

13 F.Supp 1142, and that's a different statute but it was a DOJ

14 office-specific vacancy.  And there just the court held that an

15 Acting Attorney General could serve beyond what the Vacancies

16 Act at that time, you know, had required.

17          THE COURT:  But that was -- okay, so that was

18 pre-FVRA, right?

19          MS. ANDERSEN:  It was a vacancy.  It was an old one.

20 It was a 30-day time limit.  So it was two different statutes.

21 So I don't know, you know, how great weight it is, but just

22 conceptually, we said there's -- again, there's not one magic

23 number.

24          THE COURT:  And I think some would say, including the

25 amici, that the FVRA was designed to plug up some of those

1    loopholes that were at issue when the FVRA was passed; that

2    there had been -- you know, 20 percent of the relevant offices

3    were empty because the prior Vacancies Act allowed for sort of

4    ad infinitum, if you will -- that's my word -- appointments.

5         And so I'm not really sure.  I mean, I'll take a look at

6    it to see if it, you know, has any relevance here, but would

7    you say -- is the same thing -- it sounds like *Bhatti*, though

8    -- I didn't get the whole cite -- 332 F.Supp 3d, that one is

9    post FVRA.

10        MS. ANDERSEN:  Yes, although it did -- yes.  That is

11   (2018) 332 F.Supp 3d 1206.

12        THE COURT:  1206.  Okay.  Thanks.  All right, great.

13        MS. ANDERSEN:  And, obviously, you know, I read

14   through, obviously, the amici briefs.  You know, I think some

15   of those older cases were housekeeping statutes, which is

16   different than what we're dealing with here, too.  So I just do

17   want to distinguish that.  I think that's different in kind,

18   that this is intentionally Congress expressly saying the

19   Secretary can create an order of succession, which is different

20   than delegation of duties, for whatever that's worth.

21        THE COURT:  Okay.  All right.

22        MS. ANDERSEN:  I would like to address the first

23   point, if Your Honor will allow me to --

24        THE COURT:  Sure.

25        MS. ANDERSEN:  -- Secretary Nielsen's memo, unless

1  you have any other questions about that provision.

2      THE COURT:  No, I'm good.  Thank you.  I appreciate

3  your indulging me.

4      MS. ANDERSEN:  Thank you for indulging me.

5      So, again, before we even get to Secretary Wolf's service

6  as Acting, we have to look necessarily at Acting Secretary

7  McAleenan who, according to the Department of Homeland

8  Security, was appointed through Section 113 and not the Federal

9  Vacancies Reform Act.

10     So if I can ask the Court to look at -- I don't know if

11  you have it in front of you or not -- Exhibit 1 to the

12  declaration of Neal Swartz, which is at ECF 41-2, beginning at

13  page five of that filing.

14     THE COURT:  All right.  So let me go to -- okay.

15  Give me the 24 --

16     MS. ANDERSEN:  41-2.

17     THE COURT:  ECF 41-2.  Okay.  What am I looking for?

18  Because I may have it somewhere else.

19     MS. ANDERSEN:  Sure.  It's the memorandum that

20  Secretary Nielsen signed dated April 9, 2019.  I think we did

21  include it in two different places.

22     THE COURT:  Yeah, because I know I have your

23  exhibits.  At least I want to say it is -- let me find it.

24  But, yeah, I have read it.  I've read part -- in my head, A and

25  B, Section A and B.  So if you want to, while I look for it,

1    I'll -- you can go ahead.

2              MS. ANDERSEN:  Okay.  So before I sort of get into

3    the memo, just two, again, concepts to keep in mind is that,

4    you know, once Congress passed the National Defense

5    Authorization Act for fiscal year 2017, it was at that time

6    that Congress added the Section 113, which gave the Secretary

7    her authority to designate an order of succession, and that was

8    not the case beforehand.

9         But even prior to that, under -- it's 6 U.S.C. Section

10   1-2, that goes to the Secretary of Homeland's ability to

11   delegate specific duties, and, again, that's just a general

12   concept that is applicable in a lot of agencies where you can

13   delegate specific duties for various reasons; and the order of

14   succession is, you know, a distinct concept even though they're

15   oftentimes the same list of people.

16             THE COURT:  Right.

17             MS. ANDERSEN:  And that's just to kind of keep that

18   -- I think it's important, at least it was for me, to kind of

19   keep those two principles in mind when looking at the

20   memorandum that Secretary Nielsen signed.

21        So, again, you know, the government's position is that the

22   Court has to just look at this April 9th memorandum, that this

23   is the operative document.  And, you know, depending on what

24   the Court finds, if it's clear and unambiguous or not, this is

25   what the Court needs to look at.

1          THE COURT:  Well, and so I think I have it up now.

2     It's 41-2, Exhibit 2, correct?

3          MS. ANDERSEN:  Correct.

4          THE COURT:  And the two provisions are under Title

5     II, Succession Order/Delegation.  "A" says, In the event of

6     death, resignation, or inability to perform, I look to the

7     Executive Order 13753, and that was the one in place -- put in

8     place by President Obama.

9        Section B says, In the event of disaster or catastrophic

10    emergency, "I hereby delegate to the officials occupying the

11    identified positions in the order listed (Annex A), my

12    authority."  Right?  I'm looking at the right place?

13         MS. ANDERSEN:  Yes.

14         THE COURT:  Okay.  So what is the argument that this

15    falls in anything other than A, which is resignation -- that's

16    what happened; she resigned -- the orderly succession of

17    officials is governed by the Executive Order.

18         MS. ANDERSEN:  Yes, Your Honor.  So what I actually

19    would like -- so Exhibit 2 is an internal administrative

20    document.  This was actually updated on April 10th, the day

21    after Secretary Nielsen signed the memo, which is found at

22    Exhibit 1.  So it should be a few pages before that.

23         THE COURT:  Okay.

24         MS. ANDERSEN:  And I think this is where the

25    confusion is.  So, obviously, there was confusion and there was

1  an error made but my -- the error was made in amending this DHS

2  order, which was done -- you know, it's an administrative

3  function, but the legal authority for the Secretary was done

4  the day before when she signed the April 9th, 2019 memo.

5  THE COURT:  This is the order of delegation, right?

6  I mean, this says order of -- what document am I supposed to

7  look at for the official order of delegation?  The GAO looked

8  to this document, right?

9  MS. ANDERSEN:  Well, the GAO also looked at

10  Exhibit 1.

11  THE COURT:  Okay.  So let's look at Exhibit 1.

12  MS. ANDERSEN:  Yeah.  As soon as the Secretary makes

13  a decision and decides, this is what the order of delegation

14  is.

15  THE COURT:  Okay.

16  MS. ANDERSEN:  That becomes legal and binding.  So

17  the second she signed this memo, the April 9th, 2019 memo --

18  THE COURT:  At Exhibit 1.

19  MS. ANDERSEN:  -- if something happened a minute

20  later and that was never incorporated into what's Exhibit 2,

21  the DHS orders, I don't think anybody would argue which

22  document controlled and that's because the DHS orders is an

23  internal document, and the basis for that is also set forth in

24  the declaration.

25  But this is an administrative document.  It, in and of

1  itself, does not have legal effect.  It is the April 9th memo

2  that has the legal -- that is the legal effect.  So, again, in

3  a hypothetical, if on April 9th, 2019, the Secretary signed

4  this and the minute she signed it, she resigned, it would be

5  this document that controlled.

6      The confusion, of course, becomes this memorandum refers

7  to the prior DHS orders.  So that's why we're here today and

8  that's why there's a dispute.  And what I would like to do is

9  explain sort of what this memo actually did, what should have

10  happened and then what actually happened.

11          THE COURT:  All right.

12          MS. ANDERSEN:  Because, you know, again, the

13  government concedes that it was not updated appropriately,

14  which was, you know, why there's confusion today.  It was later

15  fixed but that's kind of moot for this case.

16          THE COURT:  I mean, listen, let me stop here because

17  I have to read the black and white on the page, and if I look

18  at Exhibit A, it still refers to what?  I mean, where in

19  Exhibit A or where in Exhibit 1 do I find the authority to say

20  that Secretary McAleenan was the next in line?

21          MS. ANDERSEN:  So if you will bear with me, if you

22  would start from the top of that document of April 9th, so this

23  is a memorandum that is prepared by the general counsel of the

24  department, and, obviously, the subject, it refers to order of

25  succession for Secretary.  It doesn't talk about delegation of

1  duties.  It talks about the order of succession with no

2  limitations.

3          THE COURT:  Okay.

4          MS. ANDERSEN:  In the summary, it does two things.

5  It also, once again, talks about the order of succession.

6  There's no limitations in there.  It also refers to Section 113

7  and, again, 113 talks about order of succession.  It is Section

8  112 that refers to delegation of duties, which is, again, a

9  distinct principle.

10      And then, again, in the action, you know, it states, by

11  approving the attached document, you will designate, again,

12  your desired order of succession with, you know, no

13  qualifications in it.

14          THE COURT:  Okay.

15          MS. ANDERSEN:  So, so far I think it seems -- if you

16  just read this, you were, like, this is what the Secretary is

17  doing.  She's changing the order of succession.  There's no

18  limitations.

19      If you flip to the attachment, so there's the heading --

20          THE COURT:  That's the next page.

21          MS. ANDERSEN:  The next page was an attachment to the

22  memo that the Secretary signed.  So the heading, again, is

23  amending the order of succession.  Again, the first paragraph,

24  it references Section 113 and --

25          THE COURT:  Yep.

1          MS. ANDERSEN:  -- tells us that her intention is to

2    change the order of succession.

3          THE COURT:  Okay.

4          MS. ANDERSEN:  And then it refers to Annex A, which

5    then cross-references the prior DHS order, which is the

6    administrative document, and it says you should amend Annex A

7    and you should insert this new list.  And this new list is

8    where --

9          THE COURT:  Okay, for Annex A.  Okay.

10         MS. ANDERSEN:  So the problem is, is when the next

11   day -- so then this gets signed by the Secretary.  She signs it

12   on the 9th.  She resigns the next day.  Senator McAleenan takes

13   over, assuming that this is -- you know, with the understanding

14   that this was done properly.  Then it goes back to I think it's

15   the general counsel's office at Homeland Security.  They

16   endeavor to update this internal document.

17       And, again, if you read what this document, what the memo

18   clearly did, which was the Secretary invoking her authority

19   pursuant to Section 113 to change the order of succession, what

20   should have happened was not only Exhibit A -- or Annex A

21   should have been included but the first page of the DHS orders,

22   paragraphs IIAB should have been merged together because,

23   again, clearly, number one had governed the order of succession

24   and that should have been updated to actively reflect what the

25   memo does.

1          THE COURT:  But, I mean, it doesn't just -- it's not

2     just a scribner's error.  It's not just a we didn't update the

3     right thing.  I mean, A and B then break that out very

4     specifically.  Which Annex A -- I mean, first, Exhibit 1 deals

5     with invoking 113, changing the order in Annex A.  Right?  I

6     mean, that's fair, clear.  And then the order of Annex A on

7     page two of Exhibit 1 now puts in a new order.

8          Okay.  Now I look to what was updated 4-10, DH Orders of

9     Succession.  This is a legal document, right?  I mean --

10          MS. ANDERSEN:  No.  No, Your Honor.  It is an

11     administrative document.  And, again, the example would be what

12     if the people in the office, you know, took the Secretary's

13     memo and changed it and altered it?  I don't think -- you know,

14     a court would not say, well, that's binding because the

15     Secretary is the only person that has the authority to do it.

16          So if it was incorporated incorrectly by staff, the Court

17     cannot give that legal effect.  The Court has to look only at

18     the April 9th memo, which is what Secretary Nielsen signed.

19          THE COURT:  But I look at the April 9th memo and all

20     it does -- because I'm looking at the next section of it.  It

21     says, I designate the order as follows:  Annex A, Orders of

22     Succession, Delegations of Authorities for Named Positions,

23     Delegation 00106, is hereby amended by striking Annex A and

24     substituting what she substituted.

25          MS. ANDERSEN:  Yes, Your Honor, but if you want to --

1   if you were to give effect to the preceding paragraph, which

2   is, By the authority vested in me, as Homeland Security,

3   pursuant to Section 113, I hereby designate the order of

4   succession, the only reasonable interpretation would be that

5   the folks the next day that were updating the DHS orders

6   necessarily had to merge Section IIA and B in order to give

7   effect to the memo.

8           THE COURT:  But they didn't necessarily -- but they

9   didn't have to because A, A refers to an Executive Order 13753.

10  If her April 9th, what you call the official authority, if that

11  is telling staff what to do, it doesn't even reference, does

12  it, the Executive Order at issue.  It just references Annex A.

13          MS. ANDERSEN:  No, but it --

14          THE COURT:  If she were changing the order of -- the

15  order of succession with respect to the Executive Order as it

16  was written in the original issue date to 12-15-2016 in

17  Exhibit 2, if she was going to change that, she would have

18  referenced it, right?  I mean, how do I just read that she

19  really meant to change both?

20          MS. ANDERSEN:  Your Honor, because of the -- not only

21  in the prior paragraph but in the entire, you know, memorandum

22  of the first page it says that she is designating the order of

23  succession.  So she's not saying I want to change the

24  delegation of my duties in the event of disaster or

25  catastrophic emergency, which is a very, you know, limited kind

1   subset.  Throughout the memo it is expressly clear that her

2   purpose of signing this memo is to change the order of

3   succession and not the delegation of the duties, and there is

4   no qualification anywhere in this memo.

5        So, again, this becomes a problem of --

6             THE COURT:  Well, the qualification --

7             MS. ANDERSEN:  -- execution --

8             THE COURT:  The qualification is "I hereby designate

9   the order of succession for the Secretary of Homeland Security

10  as follows:"  And then the reference is to Annex A.  So the

11  qualification is what I'm changing is Annex A.  I mean, she has

12  the authority and she's using it, no doubt.

13            MS. ANDERSEN:  She has the authority.  She has the

14  authority to issue her order of succession.  Clearly this was

15  the day before she left.  I don't think she was worrying about

16  what would happen in the case of a disaster or catastrophic

17  emergency.

18       So, again, I don't think you can read only what Annex A

19  used to refer to when the preceding paragraph and everything

20  else in the memo talks unambiguously, without any

21  qualification, about order of succession.  And, again, if you

22  replace this with Annex A but then merge the first two

23  paragraphs, that would have accurately reflected what the

24  Secretary was doing on April 9th --

25            THE COURT:  Here's my -- here's my problem with it.

 1    I am not here to get in the head of Secretary Nielsen at the

 2    time and neither are any of the lawyers.  If I read this, and I

 3    don't see a lot of room for an alternative explanation, the

 4    first page of Exhibit 1 is, Pursuant to your authority under

 5    6:113(g)(2), you're amending the order of succession.

 6         And then the second page says, By the authority vested in

 7    me, yes, I'm amending the order of succession as follows.  And

 8    then it only references Annex A.

 9         She does this in light of the memo at Exhibit 2.  That is

10    what was in place for her tenure.

11              MS. ANDERSEN:  That was in place.  And just, you

12    know, again, for some context, I agree with you, you know, the

13    Court needs to find that the April 9th memo, you know, directed

14    as we say it did; but just for context, again, you know, the --

15    for all the other positions -- so, again, when this initial

16    memo, the DHS orders, 106, was first done, this was before the

17    Secretary had the authority to delegate her order of

18    succession, which is why in paragraph A it refers to the

19    Executive Order, because the Secretary didn't have the

20    authority at the time.  That's why that exists.

21         The other provision, Annexes B through AC, which are also

22    included in the exhibit, those are for lower level positions.

23              THE COURT:  Right.

24              MS. ANDERSEN:  All of those positions, you know, for

25    order of succession and delegation of duties is the same list.

1    So, again, the fact that it's referring to Annex A, you know,

2    for both purposes is not -- it's consistent with the rest of

3    the DHS orders.

4         And, again, what would trouble me is how -- if Annex A was

5    not intended to apply to both paragraphs IIA and B, how do you

6    read in, like, that first paragraph of -- you know, that says

7    by the authority vested in me pursuant to Section 113, I hereby

8    designate the order of succession?  You know, if you read that

9    out, then is that appropriate --

10             THE COURT:  No.  No, you read it as the reason why

11   she can change Annex A.  And, again, I mean, it's just -- it's

12   because she has the authority.  She has the authority to change

13   both.  She chooses Annex A, disaster or catastrophic emergency.

14   Again, I am not looking behind why the agency would do what

15   they did at any particular time.  I'm just trying to read it

16   and give the plain language its meaning.

17        So I'm not reading it out.  She has the authority to

18   designate a further order of succession.  That's (g)(2).  And

19   her further order of succession is with respect to those

20   positions in the event of disaster or catastrophic emergency

21   because she's only talking about Annex A.

22        I mean, I want to think -- I want to think more about your

23   argument that it has to mean both A and B because she didn't

24   have that authority back in 2016.  It had to come from the

25   President.  Now she does have that authority and so --

1          MS. ANDERSEN:  Yeah, in Section 1-2, which has -- you

2     know, it just says previously -- does talk about delegation of

3     authorities generally, you know, of when the Secretary can

4     delegate authority.  So, again, delegation -- because, again, I

5     think if you think about, you know, if I am unable to act

6     during disaster or catastrophic emergency, that implies there

7     is a limited period of time I can act.  You know, somebody else

8     can act on my behalf but I'm still the Secretary and I'm going

9     to come back.  That's different than my order of succession

10    meaning I'm going to resign and who is going to replace me.

11         THE COURT:  I see what you're saying.  So you're

12    saying that, basically, order of succession in the first

13    paragraph and second paragraph of Exhibit 1 on page 2 doesn't

14    make any sense if you're only looking at B?

15         MS. ANDERSEN:  Correct.  And I think the fact that

16    there are no --

17         THE COURT:  Because it's not --

18         MS. ANDERSEN:  Yeah.

19         THE COURT:  Because B is not about an order of

20    succession; it's about who's going to step in, in a disaster or

21    catastrophic emergency.  Okay.  I think I get it.  Okay.

22         MS. ANDERSEN:  And that is all I have on that issue

23    unless I can answer anymore questions.

24         THE COURT:  Thank you.

25       All right.  Let's turn then to Mr. Manfredi.  Am I saying

1  your name right?

2         MR. MANFREDI:  (Man-Freddy), yes.

3         THE COURT:  (Man-Freddy).  Okay.

4      All right.  If you would, can you pick up on

5  Ms. Andersen's last point first and then we'll get to the

6  timing provision.  The last point seems to be urging me to read

7  the memorandum as not just referring to Annex A but to the

8  entire order of succession.

9         MR. MANFREDI:  Yes, Your Honor.

10     I mean, we disagree.  We think that the plain text of the

11 memorandum, especially in the portion you cited, is clear that

12 it says "as follows."  That's the only amendment the plain text

13 supports concluding that the Former Secretary Nielsen intended

14 to make at all, and it's clear that in the "as follows," all

15 that is referenced is the order within Annex A.

16     And I would just refer Your Honor to the GAO's finding

17 specifically on this issue.  They determined that these were --

18 they declined to sort of count any of these arguments as post

19 hoc justification, basically, suggesting that they did

20 contradict the plain text and would require basically an extra

21 textural reading about what was required.  We think it's

22 perfectly consistent to read it as being limited to this

23 amendment.

24     And I would just add secondarily that we also would

25 maintain that it's implausible to suggest that the delegation

1  is merely an administrative document and that Secretary

2  Nielsen's directive could have had any independent authority

3  aside from amending the delegation, because by its own plain

4  text, that's all it purports to do is amend the delegation.

5       And, additionally, the delegation is not contrary to what

6  the Swartz declaration suggests; merely the administrative

7  document is signed by Secretary Jeh Johnson and does invoke his

8  statutory authority under both the HSA and FVRA for its

9  changes.  So we think it's quite clear that that is an

10 authoritative legal document.

11      And if there were any doubt, Your Honor, as to the

12 intended effect of Secretary Nielsen's changes, we think

13 Mr. McAleenan's changes that he attempted to make on day 214

14 are quite clear.  He, in fact, does amend the delegation to

15 remove Section A and make Annex A the appropriate document only

16 in the case -- in the case of resignation, excuse me, as well.

17      And it would seem quite clear -- this is what the *La

18 Clinica* court found, as well as the GAO report -- that those

19 amendments would have been superfluous if the government's

20 interpretation that this was a succession order that exceeded

21 delegation --

22           THE COURT:  I see your point.  Yep.  Secretary

23 McAleenan wouldn't have had to do it.

24           MR. MANFREDI:  Absolutely.  Yes.

25           THE COURT:  Got it.  Okay.

1     And then with respect to the argument that under the FVRA,

2    under 3347, I can read the HSA as basically being the exclusive

3    statute, so, you know -- and read in some sort of -- I guess

4    the only way that I can think about this is, best argument for

5    the government is I can read into HSA some reasonableness in

6    terms of a timing provision, that it must have meant to give

7    Homeland Security its own timing -- "reasonableness" is the

8    only word I can think of.  Like, we'll keep it open for a

9    reasonable period so it's not unconstitutional.

10     What's your response to that?

11     MR. MANFREDI:  I have three responses, Your Honor.

12    The first is I would just like to note that what I believe

13    Ms. Andersen stated now is, in fact, different than what the

14    government officially stated in the Federal Register in their

15    response to this argument in the Final Rule.  If you look at 85

16    Federal Register 38557, the government claims that because the

17    HSA supersedes the FVRA, that that authorizes acting

18    secretaries to serve, quote, without time limitation.

19     So the government's view in the APA context -- and we

20    would assume they would be, perhaps, obligated to maintain that

21    view, at least as to these rules -- is that the Secretary --

22    that the HSA, in fact, doesn't impose any time limit at all;

23    that it is, in fact, a statute which authorizes indefinite

24    service for an acting official absent Senate confirmation in

25    their role.

1          THE COURT:  Even though -- and I'm sorry to interrupt

2     you but I just found it quite appropriate.

3          Even though the same agency saw fit to report the vacancy

4     under 3349?

5          MR. MANFREDI:  We think that that supports our

6     position that it must be the case that the FVRA does, in fact,

7     cover the vacancy; and even if you look at the Exhibit 5

8     submitted in the Swartz declaration, that's a signed letter by

9     the general counsel reporting the vacancy, which, quote, says

10    the position is covered by the FVRA.

11         And so insofar as the government is now maintaining that

12    the FVRA is entirely superseded, we think that that's quite

13    odd.  I mean, our foremost arguments are those about what is

14    the most sensible reading of the statute, which I'm happy to go

15    into additional detail, but it does seem clear that the

16    government both reported it, according to the FVRA's reporting

17    requirement --

18         THE COURT:  Right.

19         MR. MANFREDI:  -- and all those instances.

20         So it seems like at least those aspects of the FVRA the

21    government would, perhaps, concede aren't displaced, and that

22    would suggest to us as well that the time limits might also

23    should apply.

24         THE COURT:  Okay.  Right, because I'm not sure how I

25    say, well, 3349, that still applies.

1          MR. MANFREDI:  Absolutely.  Yes, absolutely.

2          THE COURT:  3345, you know, or the timing provision

3    doesn't but the reporting requirements do.  I think I -- I

4    don't know how I do that.

5       Okay.  Go ahead.

6          MR. MANFREDI:  And I would just add, Your Honor, too,

7    that the government makes the point that Section 113(g)(2),

8    which they rely on here, was past -- which postdates the

9    Vacancies Act; but I want to note that in the same Defense

10   Appropriations Authorization that established 113(g), Congress

11   also added 113(a)(1)(F) to the statute which, again,

12   incorporates the FVRA, making the Under Secretary the first

13   assistant to the Deputy.

14         THE COURT:  Right.

15         MR. MANFREDI:  So it seems quite clear that Congress,

16   at least in that instance, intended to maintain FVRA

17   incorporation within the succession orders of DHS on the face

18   of the statute even at the time they gave the Secretary this

19   additional authority.  Just to flag --

20         THE COURT:  Because you're saying at the time (F)

21   was -- what we had read earlier together --

22         MR. MANFREDI:  There are two other explicit

23   incorporations of the FVRA in Section 113.

24         THE COURT:  Okay.  Where is that?

25         MR. MANFREDI:  The first is Section 113(a)(1)(A),

which makes the Deputy Secretary the first assistant to the

Secretary for purposes of the Vacancies Act, which we think,

again, makes it unequivocal that when the Deputy Secretary

becomes the first assistant, they serve pursuant to the time

limits of the Vacancies Act.  That seems to be, to us, the

basis of the statute.

THE COURT:  Right.

MR. MANFREDI:  But additionally, section -- so that

was when the Homeland Security Act was first enacted.  That was

in place at the time.

But then, again, Section 113(a)(1)(F), which makes the

Under Secretary the first assistant to the Deputy for purposes

of the FVRA, that was passed in the same appropriations bill

that established 113(g)(2).  And so it --

THE COURT:  I see your point.  Got it.

MR. MANFREDI:  The incorporation, yes, happened

simultaneously.

So we think it can't be the case that Congress intended to

supersede the Vacancies Act and its timelines entirely when

they precisely also mandated that it require -- apply to that

succession.

THE COURT:  And when was that change to the HSA?

When did that happen?

MR. MANFREDI:  So those changes were -- the exact

dates are a little -- I could check on them, but it's the

1  2016/2017 Defense Appropriations Authorization Act that added

2  those changes.

3          THE COURT:  But you're saying they were part of the

4  same amendments?

5          MR. MANFREDI:  They were part of the same amendments.

6  Exactly.

7          THE COURT:  Okay.  That's helpful.  Okay.

8          MR. MANFREDI:  And I just -- if I may, I know the

9  one -- I would add that of the one case the government cited,

10 the *Lucido* case, as Your Honor I think correctly noted, that

11 case was prior to the FVRA and, in fact, we think was one of

12 the reasons the Vacancies Act was passed was precisely to

13 prevent that from happening.

14    But the *Bhatti* case, which the government also mentioned,

15 I would just add we don't -- I think it's only dicta, the

16 political question doctrine in that case.  The case was

17 otherwise decided on standing, we believe, and the court didn't

18 really reach any conclusion at all as to whether the time

19 limits would trigger an appointments clause problem.

20    And also that even insofar as that's the case here, we are

21 talking potentially, we believe, that this is the longest

22 running cabinet-level vacancy in modern history, and so for a

23 position at that level, it does seem that we're much -- insofar

24 as there is a constitutional concern, we're much closer; but

25 that, as a statutory question, interpreting the statute, what

1  you have to look at is not the precise appointments issue

2  arisen by Mr. Wolf's case but by what the government's

3  interpretation of 113(g)(2) would authorize, and here their

4  statement is that it authorizes unlimited service, so without

5  time limitation.

6       And so insofar as the Court is trying to avoid a serious

7  constitutional question in the reading of the statute, we think

8  that's what the Court needs to be apprised of.

9       THE COURT:  Right, right.  I mean, and I would take

10  it that the response to the, you know, executive knows how to

11  be reasonable and so we can import a reasonableness element to

12  113, the way that I -- when I think about that, I think about

13  it very practically, that that would mean that all challenges

14  end up before a court.  Right?  I mean, the whole reason why

15  Congress puts a time limit on it is so it's clear, upfront,

16  predictable, everybody can fall within it.

17       MR. MANFREDI:  Absolutely.

18       THE COURT:  And otherwise, the only guardrail on the

19  interpretation would be it has to be challenged before a judge

20  when whatever, you know, entity believes that the executive has

21  overstepped.  And I'm not sure that's what Congress intended

22  when they said we'll give the President a bit of wiggle room on

23  appointments.  So --

24       MR. MANFREDI:  We agree, Your Honor.

25       And I think that the FVRA enforcement mechanism is also

1  quite clear in the sense of what Congress wanted the

2  consequences to be in instances where there was a violation

3  under Section 3348.

4        THE COURT:  Okay.

5     And what else would you like me to know that we haven't

6  already talked about with respect to the interpretation of --

7  really anything that has to do with the FVRA and HSA?

8        MR. MANFREDI:  Just that we think it's quite clear,

9  Your Honor, in this case that the FVRA's time limits do apply

10  to the position, that Your Honor can give effect to both

11  statutes, that that's the most natural reading, and that the

12  remedy in that case is clear and that even if Your Honor were

13  to find that the appointment -- if Your Honor, excuse me,

14  alternatively found that the appointment was invalid under the

15  HSA, that that itself could trigger an FVRA violation because

16  then they would not serve lawfully under the express statute,

17  which is an exception to the FVRA, which would get us back to

18  the FVRA as the only possible avenue.

19        THE COURT:  Right.

20        MR. MANFREDI:  And so then the FVRA's specific

21  remedial provisions would apply in that context as well.

22        THE COURT:  So let me ask you both, and I'll actually

23  start with Ms. Andersen on this question, and this is the last

24  section in my mind on the FVRA.  Any reason why I should not

25  convert this to a motion for summary judgment?  Any additional

1  facts that are relevant to the (AUDIO GAP) -- way to avoid the

2  whole question of preliminary injunctive relief is not making

3  it preliminary.  Like, if I'm going to decide it, I'll decide

4  it and then you all do what you're going to do based on my

5  decision.

6      So what's your view on that, Ms. Andersen?  What would be

7  the reason to not convert this to summary judgment?

8          MS. ANDERSEN:  Thank you, Your Honor.

9      I cannot conceive of any new facts that would have to be

10  before the Court to decide it.  I guess the only sort of

11  hesitation I would have is to consult with my clients and the

12  Department of Justice to see if there was any additional, you

13  know, briefing or any sort of, you know, legal arguments just

14  to make sure that, you know, we've been heard on everything.

15  Because, obviously, especially with the GAO decision coming

16  down today, like, this has been moving.  So that would be the

17  only thing I think I would ask.

18      But as far as a factual matter, you know, we do believe

19  that with respect to Secretary Nielsen's memo, that the Court

20  really needs -- can only look at that memo.  And the other

21  issues are just pure legal arguments.

22          THE COURT:  Okay.

23      All right.  Would you agree with that, Mr. Manfredi, that

24  really -- I mean, absent maybe some additional time to make

25  sure you all have it, you covered the waterfront on the

1    arguments you want me to consider, this is -- I think you've

2    asked for it, that this is one of those areas where I can

3    convert it pretty quickly to a merits determination.

4         MR. MANFREDI:  Yes, Your Honor.  We do think that's

5    the case, especially as to the time limit provisions of the

6    FVRA.  There's certainly no additional factual development that

7    would be required in that instance.

8         But we would just add that, you know, in our case, we are

9    seeking relief before the effective date of the rules on the

10   21st.  So insofar as Your Honor will be able to move within

11   that time frame, that is the Plaintiffs' request.

12        THE COURT:  And here's the rub.  Right?  It's exactly

13   what the Fourth Circuit opinion talks about.  This is no fault

14   of the plaintiffs.  I know that the notice of the Final Rule

15   just came out in June.  You moved as quickly as you could.  You

16   all have moved as quickly as I've made you to, and you've done,

17   both sides, an admirable job in briefing this.

18        But, you know, this may or may not be able to get decided

19   before they go into effect, although we're going to do it as

20   quickly as we possibly can and make it right, I guess is my

21   thought on that, which leads me to another -- again, before I

22   move on to the APA, because I am acutely aware that the APA --

23   I don't want to decide something that I don't necessarily have

24   to decide in the alternative, and we're going to talk about the

25   APA in a minute.

1    But I am concerned that there is a lingering -- (AUDIO
2  GAP) -- expedited consideration.  I don't -- especially if
3  we're talking about moving one very important aspect of this
4  case to summary judgment.
5    So I am inclined to say in, again, a relatively truncated
6  time, because these are largely, if not exclusively, questions
7  of law, let's get two things briefed and that will be the
8  question of representational or associational standing, in
9  addition to organizational standing.  I mean, you can tell me
10 why you think that the Fourth Circuit opinion doesn't really
11 knock you out of the box on organizational standing, because
12 there's five organizations.  There are different
13 considerations, but there is also what wasn't really addressed
14 in the Fourth Circuit opinion.  So standing, let's button it
15 up.
16    And then two, let's move to considering the question, the
17 FVRA/HSA question on a summary judgment posture, because I'm
18 hearing that there's no additional facts that the Court needs
19 to consider.
20    So we can do this one of two ways.  We can talk a little
21 bit more now about the APA and then brief those other two
22 issues, but you can educate me on some of my outstanding
23 concerns with the APA questions and then we can set a briefing
24 schedule for this; or we can set a briefing schedule for these
25 other two things and then just reconvene a week or so from now

1   and deal with the APA at the same time, because I don't see the

2   APA as one that can be resolved on the record.

3       I think that if I find for injunctive relief, that there's

4   likelihood of success on the merits, I still, looking at this,

5   would see how the government would want your opportunity to

6   develop the factual record if for nothing else so I can look at

7   the underlying comments, the administrative record.  So I just

8   don't see this one getting converted, converted on the merits.

9       And so from a procedural perspective, I'm not -- I almost

10  wonder whether we should take up the question of the HSA and

11  the FVRA first, because I can move to merits a lot more easily

12  than I can on the APA.

13      Government, what's your thought on that?  And then I'll

14  turn to the plaintiffs.

15          MS. ANDERSEN:  That sounds reasonable to do it that

16  way.

17          THE COURT:  Plaintiffs, for -- I can't remember.  Was

18  it Ms. Austin who will be handling the APA question?

19      You know, what's your thought on this wonky idea that I'm

20  having, which is that we move to a merits determination on the

21  FVRA?  We can do it relatively quickly, and we still can reach

22  the APA but it may be on an injunction, as opposed to merits.

23  Or do you think we should just move right to merits on that as

24  well?  Give me the administrative record and -- other than the

25  administrative record, I'm not sure what other facts there

1  would be of relevance.

2          MS. AUSTIN:  If Your Honor doesn't mind, I might put

3  that to my colleague Mariko Hirose.

4          THE COURT:  Okay.

5          MS. HIROSE:  Thank you.

6      So if it's possible, Your Honor, our preference is to

7  begin to address the APA issues today.  To the extent it's

8  possible, we would love for Your Honor to address all of the

9  issues that are ready for decision, just because the stakes are

10 so high for our clients; and should this case go up on appeal,

11 we think it might be more beneficial for the Court of Appeals

12 to have more of your analysis on the various issues rather than

13 less.  But, of course, I understand that we are talking about a

14 short time period and that may not be feasible.

15         In terms of what we're requesting, what's really important

16 to us is trying to get some relief for our clients before

17 August 21st; and with respect to that, I would also like to

18 talk about other potential alternatives, including, of course,

19 a TRO or postponement of the effective dates of the rules under

20 5 U.S.C. 705, which is a specific remedy that's available in

21 this context under the APA and is different from a preliminary

22 injunction.

23         So a lot of the concerns that the government has raised

24 and that were discussed in the Fourth Circuit decision last

25 week really don't apply to that relief.

1      THE COURT:  Can you speak to that?  How is it -- how

2  is it different if I'm -- if I'm getting your argument right,

3  it's that under 705, I'm staying the enforcement of these

4  rules.

5      MS. HIROSE:  You're staying the effective dates which

6  is -- it seems like a minor difference, but I think the Supreme

7  Court has actually said that there is a difference between

8  stays on proceedings in a judiciary context versus an

9  injunction on a person that could lead to contempt.

10      And the other difference is that Congress specifically

11  contemplated this remedy in the case of an APA.  So some of the

12  concerns that have been raised against preliminary injunction,

13  and the Court has brought up exercise of equitable authority,

14  doesn't apply here.  And it would make sense that in the

15  context of an APA, Congress thought that this would be an

16  appropriate remedy because it's -- in most circumstances, as is

17  the case here, it just wouldn't make any sense to postpone

18  effective dates just in some limited manner that would just

19  result in a regulatory scheme that the agencies didn't intend

20  and that would be a burden to the agencies.

21      So it is consistent also with the vacatur remedy at

22  summary judgment that the APA provides for and that, of course,

23  the Supreme Court said in the DACA decision is entirely

24  appropriate at summary judgment.

25      THE COURT:  But, I mean, it may be of a different

1 name but doesn't it have the same effect as a nationwide

2 injunction, which is -- again, if I look at the Fourth

3 Circuit's, at least in this case, clear pronouncement that I've

4 got to be very weary about only using such remedy in

5 extraordinary circumstances, one reading of that opinion is

6 that there's -- (AUDIO GAP) -- extraordinary circumstance.

7         But putting that to the side, you know, how do I reconcile

8 the clear -- you know, that whether I do it under 706 or 705

9 and whether I stay deadlines or I enjoin, what I'm -- the

10 effect of it is that I'm telling DHS to not enforce these

11 regulations when it intended to enforce them.  And isn't that

12 the functional equivalent of a nationwide injunction?

13         MS. HIROSE:  It may be practically similar, but

14 courts have recognized the distinction between saying that the

15 rules do not have effect and that defendants, including

16 individuals, are enjoined from enforcing the rules.

17         So I think that there's similarly some difference between

18 declaratory judgment and preliminary injunction where courts

19 have recognized that there's a difference, although, in effect,

20 they may look very similar.

21         And the same in the case *Nken*, which is about a stay of

22 judicial proceedings, stay in the context of appeal.  The

23 Supreme Court has recognized that there is a difference and

24 that a stay is a lesser exercise of judicial authority than an

25 injunction.

1    So the Fourth Circuit decision didn't address these

2  differences, and it also didn't address the fact that 5 U.S.C.

3  705 explicitly provides for this remedy.

4    In addition, we've cited several cases in which

5  postponement of the effective dates, date of the rules, have

6  been affirmed by courts, including the Supreme Court and in the

7  Fifth Circuit; and like in those cases, defendants haven't

8  articulated a way in which it would be feasible to have more of

9  a narrower remedy given what Plaintiffs have put forward.  It's

10 just a narrower remedy wouldn't face irreparable injury that

11 we've put forward, which is a burden on the organization.  It

12 would just increase the burden, and it would be also, of

13 course, incredibly unfair and, just, I would imagine, a huge

14 burden on the agency as well because this is clearly not how

15 they wanted the regulatory scheme to move forward.

16    So in the context of an APA in particular, postponement of

17 the effective dates of the rules is the most appropriate remedy

18 at this stage.

19    THE COURT:  Remind me, Government, did you address

20 705 in your responsive pleading?

21    MS. ANDERSEN:  Yes, Your Honor.  The courts have used

22 the same balancing test on the same factors under either prong,

23 and I am trying to pull it up now and I have it, but I'm like

24 99 percent sure that in the recent Fourth Circuit decision, in

25 a footnote, it did address this argument and rejected it, that

1  705 gives the court broader authority than an injunction would,

2  that it really goes to the ultimate, like on the merits, you

3  know, if you can vacate an order or not but doesn't talk about

4  preliminary relief.

5      If I can pull it up, I will.  In my memory, it's in a

6  footnote.

7          THE COURT:  Well, they asked for it; you're right.  I

8  mean, the plaintiffs in that case moved for an order pursuant

9  to 705 postponing the effective date.  So I wouldn't be -- I

10 mean, the problem that I'm having, again, is trying to move as

11 quickly as the parties are requesting, and seeing no practical

12 difference, I'd be hesitant to say, you know, that one remedy

13 is foreclosed pursuant to the Fourth Circuit opinion but the

14 other, which is the functional equivalent, isn't without a lot

15 more consideration and thought.

16     So I'm going to put that on the short list of, perhaps,

17 additional things you want to tell me about in another round of

18 truncated pleadings, because I'm not necessarily seeing 705

19 working differently.

20     So with regard to the APA, though, I'll tell you, I have a

21 hard stop of about 1:15, so I'm going to go right to where I

22 see the weaknesses of the likelihood of success on the merits.

23     I am more persuaded by the argument that the 30-day

24 Timeline Rule is arbitrary and capricious if for nothing else

25 than I find it implausible to say that the rule needs to be

1    amended to address the *Rosario* problem of 78 percent of the

2    applications can be processed within 60 days and the lion's

3    share within 90 days.  It seems irrational and implausible to

4    say that the fix for that is to take away the timeline

5    completely.

6         And when you think about the whole purpose of *Rosario* was

7    about accountability and that's the only reason it was before

8    the court the way it was, and when I look at the administrative

9    record that there isn't a whole lot of support for this notion

10   that at once the government can say we can't predict the

11   future, that's why we can't have a Timeline Rule, but we can

12   predict, don't worry, asylees, because most of them we will get

13   to in 60 days, that just seems to be illogical.  So that's

14   where I am on the 30-day Timeline Rule.

15        On the question of the interaction of the two rules, on

16   this record, I have to say I'm not yet persuaded that enacting

17   the Broader EAD Rules is arbitrary and capricious based on the

18   rationale that the plaintiffs -- the rationales that the

19   plaintiffs have given me.  And where I am on that -- and I'm

20   going to turn to you first, Ms. Austin -- is that I'm not

21   terribly persuaded that this really falls into, first, you

22   know, content restriction like what they were talking about in

23   *United Farm Workers* and that, more specifically, some of the

24   characterizations of the comment and responses that the

25   plaintiffs give me don't really line up with the record.

1    So there were some -- the arguments about the agency

2    failing to consider the harmful effect on bona fide asylum

3    seekers point me to a back and forth about the intent of the

4    rule but not really the effect, and that the effect, while the

5    agency's, you know, response wasn't -- it left me wanting more,

6    it's not irrational or so implausible that I can find, given

7    the deference that I have to accord this matter on this record

8    with, you know, time ticking, can find it arbitrary and

9    capricious.

10    However, I am looking at the fact that there have been

11    some larger rationales for why do we need these rules at all,

12    and those rationales, I'm wrestling with them because they

13    still don't seem to hold water; like, these rules need to be

14    put in place to reduce fraudulent application.  Based on the

15    historical data, I'm not quite seeing the statistics the way

16    that the government is.

17    So that's a lot.  I know I threw a lot at you but that's

18    what I'm wrestling with right now.  What would you like me to

19    know about your argument that I haven't understood?

20    MS. AUSTIN:  Just to begin, to harms, the government

21    in some ways makes it easy for you by saying affirmatively and

22    absolutely that the Broader EAD Rule will not harm bona fide

23    asylum seekers, and it says that in many ways throughout the

24    preamble and that's the explanation that their policy making

25    has to be judged by.  You know, that was the DACA case, but

1  this recent explanation requirement is not a mere formality;

2  it's what enables judicial review.  It's what enables the

3  public to understand why an agency makes the decisions it

4  makes.

5      And so on the face of the government's explanation, it

6  says no bona fide asylum seekers will be harmed -- will be

7  deterred -- I'm sorry.  I think I may have misspoken.  They

8  said that no bona fide asylum seekers will be deterred from

9  pursuing their asylum claims.  And that was a conclusory

10 assertion.  There is no support for that and, in fact, there

11 were commenters that pointed them to evidence that that wasn't

12 actually true.

13     Commenters pointed out that absent work authorization, an

14 asylum seeker might not be able to pay for transportation to

15 get to their hearing.  Commenters pointed out that they might

16 not be able to afford counsel.  And the agency itself even

17 acknowledged that absent work authorization, asylum seekers

18 might be homeless, but that's tough luck.  If that's a concern,

19 they should look up the homelessness resources of their state.

20     So I think, based on the information that the agency had

21 before it, you know, *State Farm* tells us that in order to

22 be reasoned, agency -- in order -- excuse me.  In order for

23 their decisions to be reasoned, agencies have to connect the

24 facts found with the choice that they made.  And here, the

25 decision that the agency made was contradicted by the

1  information before it.

2      It might have been a more difficult case if the agency

3  hadn't said so absolutely bona fide asylum seekers will not be

4  deterred from pursuing their claims, but it said that.  And so

5  we have to --

6          THE COURT:  But it doesn't say that, does it?  I

7  mean, I'm looking at least at one part of the record where it

8  says DHS acknowledged that these reforms will also apply to

9  aliens with meritorious asylum claims and that these applicants

10  may experience some degree of economic hardship as a result of

11  heightened requirements; however, the ultimate goal is to

12  maintain integrity of the asylum process, and DHS has

13  determined that sustaining an underregulated administrative

14  regime is no longer feasible.

15      So the way that I read it in a number of places in this

16  record is they are making a judgment that based on the

17  evidence, they need to make these changes to deter frivolous

18  and fraudulent claims and that they acknowledge that it may

19  burden -- in my view, regrettably burden -- bona fide asylum

20  seekers; but they have made -- that it's an opportunity cost

21  that the agency has to acknowledge but that they believe the

22  deterrence factor in the fraudulent applications is paramount

23  right now given the strains on the agency.

24          MS. AUSTIN:  Your Honor, and I think I may have

25  misspoken when I first got up to the podium, so to speak.  The

harm that we are pointing to that the agency does not

acknowledge is that bona fide asylum seekers will be deterred

or prevented from pursuing their asylum claims. And we don't

have to go through it now, but I will just give you a few cites

where I think the evasiveness of the government is quite

glaring where they just say the opposite or respond by saying

this doesn't change the asylum standard, therefore, this could

not, you know, deter or prevent someone from pursuing their

claims.

So I think pages 38555 of Exhibit 3, and that's page 25 of

the exhibit if it's easier for you to go by that.

THE COURT: Okay.

MS. AUSTIN: And then another place -- I do find that

it's very instructive to follow, to trace their response to the

comments that are put forward.

And then the other one is 3858 -- excuse me, 38590 to

38592. In 38590, for example, somebody raised the problem that

the rule will force many bona fide asylum seekers, who do not

have the means to go without employment, to abandon their

meritorious claims.

And then, you know, tracing the government's response --

and, you know, I welcome Ms. Andersen's input because I don't

want to, you know, misrepresent; but as I read it, their only

response is asylum applicants will not be impacted in their

pursuit of their asylum claims because this rule does not

1    change any eligibility criteria for asylum.

2         And there's a similar exchange in 38591 to 38592.

3         THE COURT:  And so run by me again what the argument

4    is.

5         MS. AUSTIN:  That given that the purpose of the

6    asylum system is to respond to the needs of asylum seekers --

7         THE COURT:  Right.

8         MS. AUSTIN:  -- given that asylum seekers have the

9    right to apply for asylum, any change to the work authorization

10   rules that would impinge on this right to apply for asylum and

11   make it more -- and deter people from seeking protection from

12   persecution or force them to abandon their claims would be a

13   significant issue for the agency; and that, at the very least,

14   the agency should have grappled with that problem before making

15   policy.

16        But what the agency did was ignore the problem by either

17   asserting, in a conclusory fashion, that it did not exist,

18   which I will also say is irrational on the basis of the rule

19   because the agency said that it would be deterring people, just

20   somehow it would prune away all -- you know, that somehow the

21   effectiveness would be to prune away all non-meritorious claims

22   but somehow the meritorious claims would survive this blunt

23   instrument.  You know, it's irrational on its face.

24        But the agency, you know, didn't grapple with the issue,

25   notwithstanding the fact that commenters brought the issue to

1  their attention again and again.

2      THE COURT:  But let me ask you this, the part that I

3  just read to you, I mean, did it not say, listen, we know this.

4  We know it's going to have an affect not only on work

5  applications -- it said bona fide asylum seekers -- but we're

6  making the choice that we have to change the rules to deal with

7  what they call the underregulated administrative regime that's

8  no longer feasible.

9      So it's, in sum and substance, saying we know this is

10 going to adversely affect aliens with meritorious asylum

11 claims.  They may experience some degree of economic hardship;

12 however, the ultimate goal, which is to reduce false and

13 fraudulent applications and lessen the burden on the agency is

14 what we have to consider.

15     And so to me that's the -- that's like the flash point is

16 does that make any sense?  And the statistics that I'm seeing

17 don't necessarily bear that out.

18     MS. AUSTIN:  I agree with you, Your Honor, on that

19 point, but -- and to your question about whether their

20 acknowledgment of monetary impacts -- because they very -- you

21 know, if you look at -- if you trace their responses, they are

22 very careful.  They say that we acknowledge there could be some

23 monetary impacts, some qualitative impacts; but what they

24 refuse to acknowledge is that this will actually impinge on a

25 person's right to apply for asylum, and we think that that's

1  irrational.

2      And to the extent that the agency based its decision on an

3  assumption that no asylum seekers would be prevented from

4  actually pursuing protection, that explanation can't support

5  this policy that we would --

6          THE COURT:  Okay.  Okay.

7      Let me then turn, since our time is short.  Ms. Andersen,

8  Ms. Austin invited you to comment.  I'm inviting you to

9  comment.  Tell me why this -- the agency did consider the

10  adverse impact on bona fide asylum seekers if they did; and if

11  not, do they have to.

12          MS. ANDERSEN:  Thank you, Your Honor.

13      And I want to address this and if I can also address the

14  Timeframe Rule, because it seems like that's Your Honor's most

15  concern and I want to make sure --

16          THE COURT:  Sure.

17          MS. ANDERSEN:  But just very quickly, I think there's

18  a few sort of assumptions in Plaintiffs' argument that I just

19  want to address.  So I think the most important being that it

20  was Congress that has authorized -- that has expressly stated

21  that there is no entitlement to work authorization while an

22  asylum application is pending, and that's extremely important

23  because Congress can do that.  So if we're talking about harm

24  such as, well, I need to hire a lawyer, I need housing, I need

25  food, these are all things Congress could provide and maybe

1   they should but they don't, and, you know, those are harms that

2   currently exist.

3        So I think, you know, when we're looking at the rules, the

4   question is did this particular rule -- what are the harms that

5   this rule does for the change.  So in the current system,

6   people already cannot obtain work authorization by mandate, by

7   statutory mandate for 180 days.  So what this is doing is, you

8   know, it's extending it.  And I think that's just important

9   when you're trying to look at what harms did the agency

10  consider, what harms are they required to consider.

11       So, yes, they absolutely acknowledge, and I cite through

12  the brief all the areas where they acknowledge that, you know,

13  this may delay some people from getting work authorization for

14  a longer period of time; but when you go down the rabbit hole

15  into, well, then they can't get counsel and, therefore, they're

16  not going to actually get their asylum application approved

17  when they really do deserve it, I think you've gone too far as

18  to sort of the, you know, the harm.

19       I think what the rule is trying to say is that these rules

20  don't govern asylum eligibility.  They govern work

21  authorization while your asylum application is pending.  Those

22  are two distinct things and those are two concepts that

23  Congress intentionally delineated, and they did this in 1996,

24  and they did this expressly because they wanted to separate

25  work authorization as a separate process from the asylum

1   application process because there was evidence at that time

2   that there were people that were using the system fraudulently

3   to be able to work.  Because there was backlog, they knew that

4   if you submitted an application, you could delay the process

5   long enough and you could maintain, you know, your work

6   authorization.

7        So when this started back in I think the '80s, anyone who

8   filed an asylum application, they were authorized to work

9   within 60 days if their application had not been acted upon;

10  and that is when it proved unworkable first by regulation in

11  1994 but then by congressional mandate in 1996 where Congress

12  determined that the work authorization should be separated.

13       So, again, I think when there's -- when the plaintiffs

14  point to certain comments about this is not going to affect an

15  asylum, a person's eligibility, it's because it's not affecting

16  their eligibility under the law.  What hurdles there might be

17  as far as, you know, financial burdens, those have always

18  existed.

19       You know, it's similar to our civil litigation system.

20  There is no right to counsel, you know, but, you know, those

21  analogies --

22            THE COURT:  But you will agree -- I mean, I hear you

23  that, you know, this is against the statutory backdrop that

24  Congress said you have no right to work, but there has been a

25  20-year history of certain regulations that now the rationale

1    -- because this is the rationale that the agency is using --

2    saying, well, we have to deter fraudulent and frivolous

3    applications, they're not talking about work applications,

4    right?  They're talking about asylum applications, right?

5         MS. ANDERSEN:  There are people using the asylum

6    process to obtain --

7         THE COURT:  Right.

8         MS. ANDERSEN:  -- the work authorization, yep.  So

9    that was one of the roles was to reduce incentives, to remove

10   incentives.

11      So currently, under this system, somebody can submit an

12   application, you know, obtain the work authorization in

13   180 days and then can delay the process through appeals even if

14   they don't have a meritorious claim, but they can remain to

15   work.  So it's sort of two-prong; one, trying to deter that,

16   because you're going to have to wait a little bit longer; and

17   number two, trying to streamline the entire process so

18   everybody gets through the system faster.  So it's a dual

19   purpose.

20        THE COURT:  And I guess the point, the larger point

21   is that, you know, you say, on the one hand, they're really

22   separate but, on the other hand, they are the very reason --

23   it's the very -- the interconnectedness of the two is the very

24   reason why the agency is saying these changes must be put in

25   place.

1     And that's the plaintiffs' point, right, is, well, then,

2  if you're going to say that, agency, you've got to address the

3  harms it will cost to the bona fide applications because you're

4  saying that the work -- changing the work authorization is

5  going to reduce fraudulent ones.  Well, what are they going to

6  do to the folks who are legitimately seeking asylum?

7     So what's -- what in the record says you've considered

8  that; not just saying, well, they're two separate things?

9          MS. ANDERSEN:  And I should be clear.  They

10  absolutely did address that and they acknowledge the harms.  I

11  just want to make sure we're separating what harms, you know,

12  we're talking about.

13     And, you know, number one, it established the problem that

14  it addressed, but I'll go to the -- so, for example, on 38584,

15  it talked about -- well, this is addressing a problem about the

16  longstanding critical and growing crisis.  Let me get to harm.

17     Okay.  On page 38598, I think it's in 38598 where it talks

18  about -- it explains why the 365-day was picked, based upon the

19  average adjudication time, and it was not feasible to determine

20  a more precise time.  And then it goes on to addressing some of

21  the harms, and the agency, you know, noted that if people are

22  fleeing from prosecution [sic], they would be willing to wait a

23  longer period of time, if necessary, or that same motivation

24  would not be present for people that, you know, were not bona

25  fide asylum seekers.

1          THE COURT:  Okay, 38598 for me has -- I see it.

2    Okay, got it.

3          MS. ANDERSEN:  I think in our brief we cited some

4    more examples but --

5          THE COURT:  Okay, but 38598 is a -- it just is a

6    table, right?  I mean, 38598 -- I'm looking at 85 FR 38598 and

7    mine is a table.  It doesn't -- it's not a response to any

8    particular comment.

9          MS. ANDERSEN:  Sure.  Okay, so let me go back.  I

10   think I was in the wrong section.  So initially on page --

11   let's see -- you know, the primary purpose generally is to

12   mitigate the ongoing harms, and that's sort of the -- if you

13   look at the broader picture, because if we can deter, you know,

14   more people and we have more meritorious applications, it will

15   be able to be processed faster.  So that's just one way it

16   addresses that.  It will balance sort of any harms that are

17   associated with any delay in employment and that's because the

18   ultimate goal of all of this is let's actually decide the

19   underlying employment applications faster than we currently

20   are.  The agency wants to do that better and that will help

21   everyone, including bona fide asylum seekers.

22        You know, currently, it can take up to two years.  Some

23   people can get it much faster.  So, again, if you look at broad

24   strokes, if that number can get down, as soon as you are

25   granted asylum, you can work right away.  So, again, that's the

1  ultimate goal, right, is let's get everyone's asylum

2  adjudication fast.  That was always the goal.  Once somebody is

3  granted asylum, they can work, and we're not even worrying

4  about the, you know, 365 days or anything.  So that's just

5  broad strokes of what the overall goal or one of the overall

6  goals is to do.

7      And starting at 38565, DHS expressly noted and considered

8  the impact on asylum applicants, and they provided the detailed

9  reason in that section.  So it begins, DHS recognizes that this

10 rule may have a substantial impact on asylum applicants but

11 does not agree that the 365-day waiting period for employment

12 authorization is overly burdensome, cruel, or precludes aliens

13 from being self-sufficient.  And it continues.

14     But I think I just want to address that because I do think

15 that's important, and part of it is just understanding what the

16 change actually does.  So if you indulge me a little bit, and

17 I'll go quickly, the current rule is what's known as the

18 180-day Clock, but that day includes delays, applicant-based

19 delays.  The 365-day Rule is currently a calendar day clock.

20     So it's not appropriate in all cases, at least, to just

21 say it's going to delay by six months for every individual.  So

22 I think it's actually made clear in the plaintiffs' own

23 declaration.  It is not uncommon for asylum applicants to

24 submit an asylum application and then request a postponement of

25 their hearing because they want to either get an attorney, they

1    want additional time.  That happens routinely and I think

2    plaintiffs will agree on that, and that's their right to do to

3    get more time.

4         When they do that, when an asylum applicant asks for

5    postponement of a hearing, the clock, that 180-day clock stops

6    under the current rule and then it doesn't begin again until

7    you actually appear for that hearing that you postponed.  So,

8    for example, if a hearing is scheduled on day 45, you ask for

9    postponement, you know, it's rescheduled and --

10             THE COURT:  Right.  No, I get it, but aren't there --

11   but aren't there other changes?  I mean, this is such a broad

12   -- you know, there's many different changes in that many of the

13   other changes have to do with when and how an application is

14   actually complete.  Right?  So when the clock, the 365-day

15   clock would even start ticking.  Am I right?  So isn't it just

16   sort of a shift of these administrative -- or am I getting that

17   wrong?

18             MS. ANDERSEN:  Yeah, actually, the rule -- you know,

19   the other thing that kind of goes broadly to show that the

20   agency acted appropriately within APA is that in the Broader

21   Rule, they made a lot of significant modifications based on the

22   comments, and that's shown throughout, and one of it was for

23   the 365-day waiting period.  Initially it was based upon if

24   there were delays at the adjudication, but now, as long as at

25   the end of the year there are no applicant-caused delays, the

1 application can go forward; and that was like a modification

2 that they made, you know, to the comments.

3 So again --

4 THE COURT: And what's considered an applicant-caused

5 delay has changed, right? I mean, let me say this, for the

6 interest of time, I'm not sure that at this stage, for

7 preliminary relief, unless I find on its face, given the

8 Federal Register, that it's arbitrary and capricious, which is

9 a high standard -- you know, I can't second guess this stuff at

10 this stage, which is why, I'll tell you, I'm not wholly yet

11 knowing which way I'm going on the APA Rules.

12 But maybe in the minutes that we have left, Ms. Andersen,

13 can you address for me how it's at all rational to say -- to

14 address the problem of a too-tight timeline on the Timeline

15 Repeal Rule, which is going to take it away completely, how is

16 that rational?

17 MS. ANDERSEN: Your Honor, thank you.

18 Well, number one, I want to address Your Honor's concern

19 about the *Rosario* court. Keep in mind that that was only a

20 decision that told the agency it had to abide by its own

21 self-imposed regulation. So the only reason why it was, you

22 know, held to that standard was because in 1994, the agency

23 itself imposed that deadline. So that deadline is not by

24 statute; it's not a mandate by Congress. There is no mandate

25 and that's important because the agency has every right to

1  change its own regulations, and the standard is no different,

2  you know, than if it never had one in the first instance.

3  　　　　　THE COURT:  I don't know if I agree with that, number

4  one; and number two, it still doesn't make the decision

5  rational.  You know, what's clearly rational is the agency

6  doesn't like *Rosario.*  Okay.  And they don't like *Rosario*

7  because they can't get it done and that they actually have

8  statistics that show what a push it was to get it done within

9  30 days.

10  　　　But those same statistics show they can get the lion's

11  share done within 60 and, even better, 90 but reject any

12  timeline, and the reason is because they can't predict.  They

13  can't predict what the ebbs and flows would be but they've

14  already predicted it.  So I'm just -- that's where I'm kind of

15  chasing my tail on how is this rational.

16  　　　　　MS. ANDERSEN:  Again, it goes to that there are other

17  provisions within immigration law where there are no similar

18  deadlines, just as, you know, the courts don't have deadlines

19  on when they have to issue decisions by, you know, by mandate.

20  So just conceptually, there's nothing problematic.  There's no

21  requirement to have a deadline of when any adjudicator

22  adjudicates things.

23  　　　The 30-day time limit was set 20 years ago.  Things were

24  extremely different, and that's set out in the rules.  There

25  were adjudicating local INS officers.  There were not the same

1   sort of national security and background checks that are

2   required today, which necessarily takes longer.  I think

3   there's data in there, at least from 2013, about just the

4   influx of applications, a whole host of that which I think Your

5   Honor is aware of.

6       So the question was -- and they did expressly address

7   whether a 45-day or a 90-day deadline would be a reasonable

8   alternative, and, again, I think it's just a very, you know,

9   rational sort of result of saying, listen, 20 years ago, the

10  agency thought 30 days was totally sufficient, and it was for

11  some period of time, and that changed and it was changes we

12  couldn't foresee.

13      So if we're going to go through the notice and rule

14  comment period, issue a new rule that may also be on the books

15  for another 20 years, and we have no idea what 10 years from

16  now is going to look like, what challenges this country may be

17  facing or not or what's happening around the world, you know,

18  why box us in when there's zero, you know, mandate by Congress?

19      And there are other things in place to hold -- you know,

20  USCIS is very transparent with all of their deadlines.  You can

21  go on their website, put in any application, and you can see

22  what the average waiting time is.  So they do try to hold

23  themselves to an accountability, things they're trying to get

24  better at --

25          THE COURT:  Which is different than saying -- which

are different than what they say in the Federal Register, by

the way.  I mean, it's kind of a -- it's a moving target

because USCIS says, well, this can take anywhere from a month

to a year.  That's not really helpful to an applicant, and it's

certainly not helpful to the court to figure out what -- how

this is a rational fix to this problem, especially in light of

-- and, again, you all have much bigger brains than I do so --

and you've been doing this for a lot -- you know, this is your

thing, and you're helping me bring me along.

Tell me why it's rational in light of the 365-day change.

Right?  So before it was only six months you had to wait, and

there was a 30-day adjudication process.  Now it's a year you

have to wait and there is no timeline for the agency, and the

agency has already come out and said, well, we've got to double

the time that you have to wait to reduce the administrative

cost on the agency.

I'm finding those two rules together to work serious harm

on the ayslee's ability to work at all.

MS. ANDERSEN:  And, Your Honor, I would start again

from the premise that explicit in the statute itself it says

that no asylee applicant has a right to work, and that's by

Congress' mandate and they say that and then they actually put

limitations.  They, themselves, say 160 days.

THE COURT:  This is not a right to work.  It's an

opportunity to work that the agency gives them and with that

1  document that's so critical.  So that's the part that -- no

2  right to work doesn't move me.  You give the opportunity.

3          MS. ANDERSEN:  It's not the right to work.  I

4  probably misphrased that.  But what Congress did say is that --

5  and I don't have the exact language, but they said that there

6  is no -- it's a discretionary benefit and that is mandated by

7  Congress.

8      And, again, that's just why -- so, you know, Congress has

9  delegated two classes of people, people that have been --

10  received asylum and people who are pending asylum, and it was

11  Congress' prerogative to address that, and they chose that they

12  wanted to separate the process out.  They did not want to

13  provide work authorization immediately, and they didn't want to

14  provide it, at a minimum, for six months.  And then they gave

15  the complete discretion for the executive agency to figure out

16  the best way to execute that.

17      So while I agree with you the agency has to articulate a

18  reasonable basis for changing its rule before --

19          THE COURT:  Right.

20          MS. ANDERSEN:  But I think it's not just irrational

21  as a minor policy.  So I would just say that that is a rational

22  policy choice.  Did they explain it well, I think, is the

23  question under the APA of why they needed it, and I just -- I

24  have a hard time, like, if -- in history we have seen how

25  things have changed.  I don't think in 1994, you know, we knew

1 some of the security things that we, you know, dealt with after

2 September 11.  We don't know what's going to happen 10 years

3 from now.

4      And, again, there's other areas in immigration law that

5 don't have these same timelines.

6      So you're asking why are we treating, you know, this one

7 benefit, which is a discretionary benefit differently than

8 others.  And the *Rosario* is really -- I think that's just to

9 highlight that the agency was required to divert resources.  So

10 that is a harm to the agency that if the agency -- it's their

11 prerogative to sort of figure out, you know, where should we

12 sort of divert our sources.  And, you know, they comply with

13 the court order, absolutely, but it has, you know, to divert

14 resources.

15      So even an injunction would be extremely harmful for the

16 agency today where they're really facing, you know, a huge

17 crisis ahead of them with funding.

18           THE COURT:  Well, and, you know, I can credit

19 everything you say but then it still just doesn't align with no

20 timeline whatsoever.  I mean, because taking that to its

21 logical extension, then let's throw out the Federal Rules of

22 Procedure.  Why do we need timelines at all?  Like, let's just

23 everybody is on the honor system.  We don't work that way and

24 government accountability, especially in this context with a

25 20-year history of some accountability, does matter.  That's

1 number one.

2 And number two, you're right, you don't -- the agency has

3 to give me a rational basis. I don't have to agree with it but

4 it does have to have some rational basis.

5 And the thing that I struggle with is the agency saw fit

6 repeatedly to tell the public, Don't worry, asylees, you know,

7 we will stay within that 60-day timeline more often than not.

8 It's simply irrational to think that that's relevant to tell

9 asylees and the public when it, at once, shouldn't matter and

10 doesn't matter.

11 And so that's -- you know, that's the part that I'm still

12 really wrestling with when an agency didn't need to do that and

13 they did do it.

14 So in any event, okay, I'm sorry to have to cut this

15 short. This has been extremely helpful. This is what I would

16 like to talk about as next steps. I don't really see how

17 practically we're going to get this done by next Friday, as

18 much as I have tried, but we're still going to move as quickly

19 as I can.

20 So what I propose is this, between now and next Friday,

21 that I give you all an opportunity for simultaneous letter

22 pleadings not to exceed 10 pages each, exclusive of exhibits,

23 if you need exhibits, on the following questions: Standing,

24 the propriety of converting the FVRA/HSA questions, which I

25 think are Counts Four and -- well, you know what counts they

1   are.  HSA and FVRA challenges to motions for summary judgment.

2   If so, tell me anything else you wish for me to know with

3   regard to the law; alternatively, if not, tell me what other

4   facts you need that would preclude summary judgment.  And then,

5   thirdly, the question of a 705 remedy on the APA.  How is it

6   different than 706 or -- not 706 necessarily but the nationwide

7   injunction question that was raised in the *CASA* case that just

8   came down last week.  Those are the three areas that I need

9   additional help from you all on.

10      Talk amongst yourselves.  Ms. Andersen, if it turns out

11   that after, you know, talking to your people and looking at

12   this more closely you are not going to make a standing

13   challenge to associational standing or representational

14   standing and you all have narrowed the basis of standing, use

15   your 10 pages on something else, because there's lots of issues

16   here.

17      And if, in fact, you need a little wider berth on either

18   side, just pen me a quick line that says, Judge, we need to

19   exceed the pages because this other issue really does need to

20   be briefed.  I'm not going to be unreasonable about it.  I'm

21   just trying to cabin that this doesn't get so long and unwieldy

22   that I can't decide it in a timely manner and putting the onus

23   on you all to be as efficient as possible.  So that will be

24   simultaneous by next Friday.

25      And then I suggest that we find another time shortly

1  thereafter to get together again so that if there's anything

2  that we didn't address on the APA question, you think I'm

3  getting it all wrong and there are other arguments to be made

4  on the follow-up issues, you have the opportunity to do that.

5  And I would suggest we do that the following week, so that will

6  mean Friday, August 28th.

7      Can you all do a one o'clock follow-up Zoom on Friday,

8  August 28th?  Does anyone -- let me do it this way, can anyone

9  not do a follow-up on Friday, August 28th, at one o'clock?

10     (No response.)

11         THE COURT:  Okay.  Now, I do appreciate that this may

12  result in some push and pull in terms of the effect of these

13  rules, the rules taking effect next week.  I just simply see

14  these issues as too important and too in need of further

15  thought and reflection from you all to just pull the trigger

16  before then; but, Plaintiffs, if you have an alternative

17  proposal, let me hear it now and then I've got to run.

18         MS. HIROSE:  Sure, Your Honor.  Thank you.

19     I just wanted to clarify when I was talking about the 705

20  relief and TRO possibilities earlier, I had meant it could be

21  up until the time that this Court is ready to rule on summary

22  judgment on the issues that are ready for summary judgment.  So

23  that could be a very short stay or postponement, which would be

24  different in kind and scope from -- certainly from what the

25  Fourth Circuit was talking about.

1    And, of course, the government, itself, could agree to

2  that kind of remedy.  I know that it has happened in other

3  cases, so I'll just throw that out there.

4         THE COURT:  I see what you're saying.  So you're

5  saying that the stay can be until some resolution on the

6  merits.

7    Now, this may be important for you all then to talk about

8  if you would like to explore do you want this FVRA ruling or

9  don't you, I guess.  You know, do you want me to reach the

10  merits on that very critical question that the agency is still

11  dealing with?  And if you all resolve that you would prefer to

12  simply press pause on the rules until we work out some of these

13  other issues, you're saying 705 gives you that flexibility, it

14  gives me that flexibility.

15         MS. HIROSE:  Yes, absolutely.

16         THE COURT:  Got it.  All right.  Well, then you all

17  talk about it from your perspectives.

18    I still think that a week to resolve all of these issues

19  is what I'm going to need.  It doesn't preclude me from

20  exercising 705 authority at any point, right, once I get your

21  briefing on it, simply say we're going to stay the rules

22  effective until I reach the merits?

23         MS. HIROSE:  That is our position, that you would

24  still have the authority to do that.  I would love to hear from

25  the government if they are in agreement with that, just to make

1 sure.

2     And I guess the other issue is if it would be helpful to

3 have some preliminary briefing before Friday on some of these

4 issues in case Your Honor thinks --

5         THE COURT:  Yeah, I think the only -- I think the

6 only one may be the 705 issue, if the government takes a

7 different position that, you know, after the rules take effect,

8 then has the ship sailed.  If the government's position is that

9 the rule -- if the rule takes effect, then this whole stay

10 thing is mooted, then maybe we do need that sooner rather than

11 later.

12     Ms. Andersen, do you have a position on that?

13         MS. ANDERSEN:  My understanding was that I thought it

14 was the same as the injunction standard.  So I'll have to look

15 into that.  I'm not aware of the -- of what you're referring

16 to, where that authority is.

17         THE COURT:  I think the plaintiffs' position is that

18 they just want to make sure if I give you all until next week,

19 that the government's position isn't going to be, well, Judge,

20 at least, you know, the rules have taken effect, therefore, 705

21 is mooted; it doesn't have any legs anymore because you can't

22 stay it; it's already taken effect.

23         MS. ANDERSEN:  Oh, I see.  I will get back to the

24 plaintiffs or the Court on that --

25         THE COURT:  Okay.

1          MS. ANDERSEN:  -- on the answer to that.  I don't

2     know the answer to that.

3          THE COURT:  All right.

4        So then let's do this.  I can make it easier for you all

5     so that -- I've got to look at all of these issues anyway.  Why

6     don't you all brief simultaneous three pages, if you need it,

7     the question of 705 by Monday.  The remaining questions, as

8     we've laid them out, by Friday.  Use your good judgment as to

9     how you want to use your ten-ish pages.  You've earned a bit of

10    judicial leniency on that because you really did stick with

11    what I asked you to stick with, and I really do appreciate it.

12       So let's do the first issue, you know, no more than three

13    pages and the rest of it ten-ish pages, and that way, if there

14    is any question, I've got to look at 705 before Friday, then we

15    have your relative positions.

16       Does that work for you all?

17         MS. HIROSE:  Thank you, Your Honor.

18         MS. ANDERSEN:  Yes.

19         MS. HIROSE:  And just to clarify, double-spaced

20    pages?

21         THE COURT:  Nope.  No, I was actually giving you

22    single-spaced.

23         MS. HIROSE:  Oh, single-spaced.  Okay.

24         THE COURT:  I think it's just a psychological thing

25    for me that when I get a letter and it's only two pages, even

1  though it's single-spaced, it was really four pages.  It just

2  makes me feel better.

3      So it's single-spaced.

4          MS. HIROSE:  Okay.  Thank you.  I'm glad you

5  clarified.

6          THE COURT:  At least 12-point font, though.  Despite

7  my youthful appearance, I cannot read 10-point font.

8      Okay.  We'll get a quick letter order out setting the

9  further briefing.  Any questions about it before we break for

10  the day?

11      (No response.)

12          THE COURT:  Okay, great.

13      Thank you all for your time today.  Really helpful.

14  Appreciate it.  We'll talk the day I said.  I don't have it in

15  front of me, but you all know it.  I think it's the 28th at one

16  o'clock.

17      Okay.  Take care.

18          MS. ANDERSEN:  Thank you.

19          MS. HIROSE:  Thank you, Your Honor.

20          MS. AUSTIN:  Thank you.

21          THE COURTROOM DEPUTY:  This Honorable Court now

22  stands in recess.

23      (Recess taken, 1:30 P.M.)

24

25

1      I, Marlene Martin-Kerr, FCRR, RPR, CRR, RMR, certify that

2    the foregoing is a correct transcript of the stenographic

3    record of proceedings in the above-entitled matter.

4

5                   Dated this 17th day of August, 2020.

6

7                              /s/
                        Marlene Martin-Kerr
8                   Federal Official Court Reporter

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>INDEX</u>

AUGUST 14, 2020

CASA DE MARYLAND, et al., vs. CHAD WOLF, et al.

PAGE

COMMENCEMENT OF PROCEEDINGS................................. 3

PRELIMINARY REMARKS BY THE COURT........................... 4

<u>SUPPLEMENTAL AUTHORITY:</u>

    By Ms. Andersen....................................... 6
    By Mr. Manfredi...................................... 13

<u>FEDERAL VACANCIES REFORM ACT - HOMELAND SECURITY ACT:</u>

    Argument By Ms. Andersen............................. 16
    Argument By Mr. Manfredi............................. 52

<u>ADMINISTRATIVE PROCEDURE ACT:</u>

    Argument By Ms. Mariko............................... 66
    Argument By Ms. Austin............................... 72
    Argument By Ms. Andersen............................78

PROCEEDINGS ADJOURNED..................................... 99

CERTIFICATE PAGE......................................... 99